Jeffrey C. Matura, State Bar No. 019893
Asha Sebastian, State Bar No. 028250
**Graif Barrett & Matura, P.C.**
1850 North Central Avenue, Suite 500
Phoenix, Arizona 85004
Telephone: (602) 792-5700
Facsimile: (602) 792-5710
jmatura@gbmlawpc.com
asebastian@gbmlawpc.com

Attorneys for Defendant Town of Colorado City, Arizona

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Town of Colorado City, Arizona; City of Hildale, Utah; Twin City Power; and Twin City Water Authority, Inc.,<br><br>Defendants. | Case No. CV-12-8123-PCT-HRH<br><br>**STATEMENT OF FACTS TO SUPPORT:**<br><br>**DEFENDANT TOWN OF COLORADO CITY'S MOTION FOR SUMMARY JUDGMENT ON COUNT I**<br><br>– AND –<br><br>**MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT II REGARDING DAMAGES** |

Pursuant to Local Rule 56.1(a), defendant Town of Colorado City, Arizona submits the following statements of facts to support its Motion for Summary Judgment on Count I and Motion for Partial Summary Judgment on Count II Regarding Damages.

**I.   NO EVIDENCE EXISTS REGARDING RELIGIOUS DISCRIMINATION ON COUNT I.**

1.   Suzette Steed testified that a representative from the FLDS Church told her to leave the area and that this representative did not work for the Marshal's Department. See Suzette (Bateman) Steed's Deposition Transcript, at p. 50, line 5 to p. 52, line 15, attached as **Exhibit 1**.

1  2. Suzette Steed also testified that she is friends with Officer Sam Johnson, considers him a good officer, and does not believe he or the other officers perform functions on behalf of the FLDS Church. Id. at p. 59, line 12 to p. 63, line 12.

3. Ruby Jessop testified that she did not flee her husband's home, but rather loved her husband and made her own decision to leave. See Ruby Jessop Deposition Transcript, at p. 30, line 14 to p. 37, line 25, attached as **Exhibit 2**.

4. Ruby Jessop also testified that Officer Sam Johnson received a trespass call, stopped a car in which she was a passenger, and told the driver not to trespass upon the property of Ruby Jessop's husband, but did not issue any citation. Id. at p. 183, line 12 to p. 190, line 7.

5. Ruby Jessop also testified that a Mohave County Sheriff's Officer responded and told her that she could not take any action without a Court order. Id.

6. Steven Bateman testified that his father released his dog into the wild when he was about 13 years old because the dog killed their farm animals. See Steven Bateman Deposition Transcript, at p. 14, line 6 to p. 17, line 7, attached as **Exhibit 3**.

7. Steven Bateman also testified that he was not aware of any edict from Warren Jeffs to kill dogs. Id. at p. 18, line 19 to p. 19, line 5.

8. Steven Bateman also testified that he believes Officer Shem Jessop spoke to his father about his dog, but he was not part of the conversation, did not hear what was discussed, and has no proof that the Marshal's Department was even involved. Id. at p. 26, line 17 to p. 27, line 23; and p. 28, line 22 to p. 29, line 4.

9. Steven Bateman also testified that he has no personal knowledge that any officer from the Marshal's Department carried out any edict from the FLDS Church to get rid of dogs. Id. at p. 32, lines 7 – 12.

10. Jonathan Roundy testified that he did not make any statement that he would honor someone's property claim based upon their religious status. See Jonathan Roundy's Deposition Transcript, at p. 146, lines 8 – 20, attached as **Exhibit 4**.

11. Jonathan Roundy also testified that he worked as an officer for the Marshal's Department for almost 20 years and never made a decision based upon what a religious leader said or treated anyone differently because of their religion; rather, he went out of his way to take special care of those who he believed were not FLDS because of the scrutiny he knew the Department was under. Id. at p. 213, line 5 to p. 214, line 19.

12. Jerold Williams testified that when his family prevented him from entering a house, he broke through a window to gain entry. See Jerold Williams' Deposition Transcript, at p. 37, line 14 to p. 38, line 3; p. 39, lines 2 – 13; p. 41, lines 6 – 18, attached as **Exhibit 5**.

13. Jerold Williams also testified that, after his family called the Marshal's Department for help, he refused multiple orders from the officer to leave the residence. Id. at p. 41, line 21 to p. 43, line 25; p. 45, line 3 to p. 46, line 20; p. 47, line 20 to p. 49, line 6.

14. Jerold Williams also testified that the officer told him that the city prosecutor recommended that the officer arrest him if he refused to leave, and after Jerold Williams still refused to leave, the officer arrested him for trespassing. Id. at p. 49, line 14 to p. 53, line 5.

15. Randy Servis, an Officer with the Arizona Department of Agriculture, investigated the stud horse issue and testified that he did not believe religion had anything to do with how the Marshal's Department handled the stud horse. See Randy Servis' Deposition Transcript, at p. 74, line 25 to p. 75, line 24, attached as **Exhibit 6**.

**II.    THE UNITED STATES FAILED TO DISCLOSE ANY COMPUTATION OF DAMAGES FOR THE "AGGRIEVED PERSONS."**

16. The United States disclosed 16 "aggrieved persons." See the United States' Eleventh Supplemental Initial Disclosures, at p. 2 – 5, attached as **Exhibit 7**.

17. The only disclosure of damages is two general statements. The first says that the United States "may seek damages on their behalf pursuant to 42 U.S.C. § 3614(a)." Id., at p. 2 (emphasis added).

18. The second states that "[t]he United States <u>will</u> be seeking monetary relief for aggrieved persons, including compensatory damages they suffered as a result of Defendants' discriminatory actions, including their out-of-pocket and economic costs, lost housing opportunities, and emotional distress, embarrassment and humiliation." <u>Id.</u> at p. 31 (emphasis added).

19. The United States also says that "[t]he precise amount needed to compensate aggrieved persons for the emotional distress they suffered will be determined by the jury." <u>Id.</u>

20. The United States also represented that it would "continue to evaluate the evidence in this case to determine the identity of aggrieved persons as well as the monetary damages amounts sought on their behalf, and <u>will</u> supplement these responses accordingly." <u>Id.</u> (emphasis added).

### III. NO EVIDENCE SHOWS THAT THE "AGGRIEVED PERSONS" SUFFERED DAMAGES DUE TO COLORADO CITY'S CONDUCT.

21. John Cook testified that he had never spoken to anyone from the United States until the day before his deposition. <u>See</u> John Cook's Deposition Transcript, at p. 16, line 2 to p. 17, line 7, attached as **Exhibit 8**.

22. John Cook also testified that he had no knowledge about any discriminatory treatment by Colorado City or the other defendants against non-FLDS members. <u>Id.</u> at p. 49, line 24 to p. 50, line 2.

23. When the defendants tried to cure the United States' disclosure failures and asked John Cook what type of damages he sought as an "aggrieved person," he responded: "I do not have any knowledge of that." <u>Id.</u> at p. 60, lines 7 – 10.

24. Ross Chatwin also did not know that the United States identified him as an "aggrieved person" until just before his deposition in May 2013. <u>See</u> Ross Chatwin's Deposition Transcript, at p. 18, line 13 to p. 19, line 8, attached as **Exhibit 9**.

25. Ross Chatwin testified about a single incident that occurred in 2004, in which he claims that the Marshal's Department falsely arrested him. Id. at p. 136, lines 12 – 25.

26. Ross Chatwin was sharing a residence with his brother and believed that a Court had granted him a life estate. He therefore changed the locks to his brother's area of the residence, but did so before the Court issued an order granting him a life estate. Id. at p. 95, lines 5 – 17.

27. To change the locks, Ross Chatwin climbed through a window to where his brother lived. Id. at p. 98, line 16 to p. 99, line 13.

28. When Ross Chatwin's brother's family returned, they called the Marshal's Department for help. Id. at p. 100, line 18 to p. 101, line 16.

29. Officer Fred Barlow requested that Ross Chatwin provide the keys to the new locks to his brother, but he refused. Id. at p. 102, lines 7 – 14.

30. Ross Chatwin was then arrested for trespass. Id. at p. 106, line 14 to p. 116, line 8.

31. The next day, the Court issued the order granting Ross Chatwin a life estate in the residence and he was released, but not until the Court warned him that "what [he] had done was a very serious crime." Id. at p. 116, line 18 to p. 118, line 17.

32. When asked about damages he sought as an "aggrieved person," Ross Chatwin testified: "I don't know about that. Without being advised, I don't know." Id. at p. 136, lines 12 – 25.

33. When follow-up questions were asked to obtain as much information about damages as possible, the United States' attorney objected and instructed Ross Chatwin not to answer the questions. Id. at p. 137, line 1 to p. 140, line 9.

34. Jesseca Jessop testified about a single incident that occurred in April 2013. It involved a property dispute between her and Penny Barlow regarding who had the right to occupy a residence. See Jesseca Jessop's Deposition Transcript, at p. 34, line 7 to p. 38, line 3, attached as **Exhibit 10**.

1        35.    Officer Hyrum Roundy from the Marshal's Department responded to a call at the scene, spoke to Jesseca Jessop and Penny Barlow, and told Jesseca Jessop to obtain an eviction order from the Court to remove Penny Barlow. Id. at p. 38, line 5 to p. 39, line 25.

        36.    Jesseca Jessop admitted that she did not obtain an eviction order. Id. at p. 40, line 5 – 11.

        37.    When asked about whether she was seeking any damages as an "aggrieved person," she provided the following testimony:

> Q: Do you understand, ma'am, we've heard the term said a few times today by Mr. Keveney, do you understand that you are identified as an aggrieved party in this case?
>
> A: Sort of.
>
> Q: Have you heard that term before, other than today?
>
> A: No.
>
> Q: No. Okay. Are you seeking anything?
>
> A: No.
>
> Q: Do you want anything out of this case personally?
>
> A: No.
>
> Q: And let me just maybe clarify a little bit. You're not looking for money, are you?
>
> A: No.

Id. at p. 83, lines 5 – 18.

        38.    The United States disclosed that Willie Jessop would testify about "the FLDS Church's control over the Twin Cities, the Cities' assistance to the FLDS Church in its surveillance of non-FLDS members, the coordination of Church security personnel and the CCMO, the CCMO's failure to provide police services with respect to housing, and

6

1 related matters." See the United States' Eleventh Supplemental Initial Disclosures, at p. 4, attached as **Exhibit 7**.

39. Willie Jessop did not testify about any discrimination related to housing, did not recall signing a document agreeing to be a witness for the United States, did not testify about any damages he seeks, and did not even know that he was listed as an "aggrieved person." See Willie Jessop's Deposition Transcript, at p. 14, line 12 to p. 15, line 6, attached as **Exhibit 11**.

40. Ron Rohbock testified about a single incident that occurred in August 2013, in which he obtained an occupancy agreement for a residence that someone else already occupied. See Ron Rohbock's Deposition Testimony, at p. 43, line 20 to p. 46, line 14, attached as **Exhibit 12**.

41. Ron Rohbock also testified that he did not want to spend the time or money to obtain an eviction order. Id. at p. 57, lines 8 – 17.

42. Accordingly, Sergeant Sam Johnson, who responded to a call at the scene on behalf of the Marshal's Department, could not remove the current residents. Id. at p. 54, lines 9 – 17.

43. Ron Rohbock eventually filed an unlawful detainer action and obtained the right to occupy the residence. Id. at p. 60, line 24 to p. 61, line 25.

44. Ron Rohbock now lives in that residence and has utilities. Id. at p. 62, line 22 to p. 63, line 5.

45. Regarding damages, Ron Rohbock testified that he had not thought about compensation, but that he would gladly take something for his "50 years of what I would call back breaking slave labor for a religion that I got nothing from." Id. at p. 75, lines 7 – 16.

46. Jerold Williams testified about a single incident that occurred in July 2012 when he broke into a window to enter a residence where his family was staying. See Jerold Williams' Deposition Transcript, at p. 37, line 14 to p. 41, line 12, attached as **Exhibit 5**.

47. After Jerold Williams' family called the Marshal's Department, Officer Curtis Cooke responded, asked Jerold Williams to leave on multiple occasions, spoke to the Town Prosecutor about how to handle the situation, and then arrested Jerold Williams for trespassing when he still refused to leave. Id. at p. 42, line 2 to p. 50, line 3.

48. Jerold Williams also testified that a Mohave County Sheriff's Officer confirmed what Officer Cooke told him regarding the insufficiency of his occupancy agreement and that he needed to get a Court order to enforce his rights, but that he never obtained any Court order. Id. at p. 91, lines 7 – 16.

49. When asked about damages related to his status as an "aggrieved person," Jerold Williams testified that he was not seeking any money. Id. at p. 96, line 3 to p. 97, line 19.

50. The United States did not disclose that Isaac Wyler suffered any discrimination or damages related to the sale or rental of a residence under the Fair Housing Act. See the United States' Eleventh Supplemental Initial Disclosures, at p. 5, attached as **Exhibit 7**.

51. The Marshal's Department arrested Isaac Wyler for criminal trespass in 2009 while he was inspecting houses for the United Effort Plan Trust. The Judge later found Isaac Wyler guilty of criminal trespass, sentenced him to 2 years of probation, and required him to pay a monetary fine. See Isaac Wyler's Deposition Transcript, at p. 7, line 13 to p. 8, line 16, attached as **Exhibit 13**.

Dated this 22nd day of December 2014.

GRAIF BARRETT & MATURA, P.C.

By: /s/ Jeffrey C. Matura
Jeffrey C. Matura
Asha Sebastian
1850 North Central Avenue, Suite 500
Phoenix, Arizona 85004
Attorneys for Defendant Town of Colorado City, Arizona

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of December 2014, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF system for filing and transmittal of Notice of Electronic filing to the following CM/ECF registrants:

R. Tamar Hagler
Eric W. Treene
Sean R. Keveney
Jessica C. Crockett
Matthew J. Donnelly
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Attorneys for Plaintiff United State of America

R. Blake Hamilton
Durham Jones & Pinegar
111 East Broadway, Suite 900
Salt Lake City, Utah 84111
Attorneys for Defendants City of Hildale, Utah,
Twin City Water Authority, and Twin City Power


/s/ Carolyn Harrington
4849-4183-7857