# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

United States of America,   )
                           )
             Plaintiff,   )
                           )
         vs.          )  No. CV-12-8123-PCT-HRH
                           )
Town of Colorado City,   )
Arizona; City of Hildale,  )
Utah; Twin City Power; and )
Twin City Water Authority, )
Inc.,                      )
                           )
          Defendants.  )
                           )

**THE DEPOSITION OF SUZETTE BATEMAN**
(Videotaped)

Salt Lake City, Utah
May 13, 2014
3:06 p.m.

(ORIGINAL)
**PREPARED FOR:**

DISTRICT COURT

**REPORTED BY:**
Az Litigation Support, LLC
Marty Herder, CCR
Certified Court Reporter
CCR No. 50162

1    A.   No.

2    Q.   So you don't have any firsthand knowledge as to

3  whether what was reported to you is true or not.

4    A.   No.

5    Q.   Any other interactions that you had with the

6  Marshal's Department that lead you to believe they're

7  working with the church?

8    A.   The last one that I would say that I had was they

9  had set it up a thing called the United Order, and had put

10  my son from another wife as caretaker over our family.

11         And he was to be our guide.  They had sent my

12  husband away to repent.

13         And some things that they were doing in the United

14  Order, I did not feel good about.

15         I wasn't part of the United Order.  I didn't

16  qualify.

17         I did not feel good about it.  So I went to this

18  caretaker, and I said to him, these girls and me do not want

19  to live like this anymore.  We do not feel like this is

20  right.  We want to leave.

21         And I just laid all our cards out on the table to

22  him and told him.

23         He jumped up.  And he said, you have one damn hour

24  to take a pillowcase and put in that pillowcase everything

25  you'll need, because I'm throwing you and these girls out on

1  the street and I am going to give you firsthand experience

2  of what it's like to leave on your own with these kids, and

3  then I'm going to go and contact the bishop's office and let

4  him know what went down.

5      Q.   Okay.

6           So, a few things.  This is when you left in

7  January of 2012?

8      A.   No, this was before that.

9      Q.   Okay.  When did this occur?

10     A.   This occurred more around the first of January.

11     Q.   Of 2012?

12     A.   Yes.

13     Q.   You said that the son -- your son from another, by

14  another woman was placed as a caretaker over your family.

15     A.   He was also security for the bishop's office.  He

16  wasn't a cop, but he was security.

17     Q.   All right.  What was his name?

18     A.   Nathaniel Steed.

19     Q.   He did not work for the Marshal's Department;

20  right?

21     A.   No.  He worked for the bishop's office.

22     Q.   So I'm correct he didn't work for the Marshal's

23  Department.

24     A.   No.  Yes, he did not.

25     Q.   And when you said that he was placed as a

1   caretaker, he was placed as a caretaker by the church;

2   right?

3        A.   Yes, by the bishop.

4        Q.   And you said that your husband was sent away.

5        A.   Yes.

6        Q.   He was sent away by the church.

7        A.   Yes.

8        Q.   And you told Nathaniel that you wanted to leave,

9   and he said, you have an hour to gather your stuff, he was

10  contact going to contact the bishop's office.

11       A.   And let him know he had kicked me and the children

12  out on the street.

13       Q.   To your knowledge he never had any communication

14  with the Marshal's Department about that issue; right?

15       A.   I don't know that he did.

16       Q.   Okay.

17            You don't have any knowledge that Nathaniel

18  contacted the Marshal's Department about you wanting to

19  leave; is that accurate?

20       A.   I only did when a friend told me I could come to

21  their house if I wanted to leave and bring my stuff.

22            And I was unpacking it at this friend's place.

23  And he pulled up in his Suburban and shined his lights, it

24  was night, shined his lights, and there was two police

25  officers behind him in police cars.

```
 1              MR. MATURA:  I don't have any problem with you
 2   getting a copy of the summary.
 3              MR. HOOLE:  Thank you.
 4   BY MR. MATURA:
 5       Q.   Do you remember, ma'am, approximately how long you
 6   spoke to Ms. Lowther that day?
 7       A.   I spoke about an hour or two, that I remember.
 8       Q.   In person?
 9       A.   Yes.
10       Q.   At your house?
11       A.   Yes.
12       Q.   You know Officer Sam Johnson.
13       A.   Yes, I do.
14       Q.   In fact you grew up together, didn't you?
15       A.   Yes, we did.
16       Q.   Neighbors?
17       A.   Yes.
18       Q.   Would you consider yourself friends?
19       A.   Yes.
20       Q.   You've known him pretty much your entire life.
21       A.   Yes, I have.
22       Q.   You knew him before he was a police officer.
23       A.   Yes, I did.
24       Q.   And you've had several interactions with him since
25   he's been a police officer; true?
```

60

1    A.    Yes, I have.

2    Q.    In fact, ma'am, isn't it true that when dealing

3    with your son or sons, I'm not sure which one it is, and

4    being out late and partying and drinking, that you would

5    specifically call Sam Johnson to help you?

6          MR. HOOLE:   Form of the question.

7          THE WITNESS:   If I don't have to answer that, I

8    would like to not.

9    BY MR. MATURA:

10   Q.    Unfortunately, ma'am, you do have to answer that

11   question.

12   A.    According as my husband asked me to call Sam, I

13   called Sam.

14   Q.    Okay.

15         And so did -- is the only reason -- is your

16   testimony that the only reason you would call Sam Johnson is

17   because your husband asked you to call him?

18         MR. HOOLE:   Form.

19         THE WITNESS:   I would call my husband and tell him

20   what had gone on, and he would tell me to call Sam and what

21   to say.

22   BY MR. MATURA:

23   Q.    Did you call Sam because of your friendship and

24   relationship with him?

25   A.    No.

61

1           MR. HOOLE:  Form of the question.

2    BY MR. MATURA:

3       Q.   You believe Sam Johnson's always done a good job

4    in helping you out?

5       A.   Yes, he has.

6           MR. HOOLE:  Speculation.

7    BY MR. MATURA:

8       Q.   You said yes, he has?

9       A.   Yes, he has.

10       Q.   You trust Sam Johnson.

11       A.   I do.

12       Q.   Do you believe he's a good police officer?

13       A.   Yes, I do.

14       Q.   Have you ever had any negative interaction with

15    Sam Johnson in terms of his service as a police officer?

16       A.   No.

17       Q.   So you don't believe that Sam Johnson is

18    performing functions on behalf of the church, do you?

19           MS. GZIFA:  Objection.

20           THE WITNESS:  I didn't say that.

21    BY MR. MATURA:

22       Q.   Okay.

23           You think he is.

24       A.   Definitely.  They all are.

25

62

1    Q.   You haven't listed out any interaction here today

2  of the eight that you talked about that involve Sam Johnson,

3  have you?

4    A.   No.

5    Q.   So you haven't had any interactions with Sam

6  Johnson in terms of performing services as a police officer

7  that would lead you to believe that he's acting on behalf of

8  the church, have you?

9    A.   No.

10    Q.   Same thing with Curtis Cooke.  You've had no

11  interactions with Officer Cooke that would lead you to

12  believe that he's operating on behalf of the church, have

13  you?

14    A.   No.

15        MS. GZIFA:  Objection; form.

16  BY MR. MATURA:

17    Q.   Same thing with Shem Jessop.  You've never had any

18  interactions with Officer Jessop that would lead you to

19  believe that he's acting on behalf of the church, have you?

20    A.   Well, I'm just finding out he's an officer.  No.

21        MS. GZIFA:  Objection; form.

22        THE WITNESS:  I didn't know he was one.  But now I

23  do.

24  BY MR. MATURA:

25    Q.   So the answer then, just so the record is clear,

63

1   is you never had any interaction --

2        A.    No -- no interactions.

3        Q.    Let me just finish the question.

4              You never had any interaction with Shem Jessop

5   that would lead you to believe that he's acting on behalf of

6   the church.

7        A.    No.

8        Q.    You've never had any interaction with

9   Officer Hyrum Roundy that would lead you to believe he's

10  acting on behalf the church.

11             MR. HOOLE:  Form of the question.

12             THE WITNESS:  No.

13  BY MR. MATURA:

14       Q.    I'm correct?

15       A.    Yes, you are correct.

16       Q.    And you don't know the religion of each of the

17  officers, do you?

18       A.    Do we -- do I what?

19       Q.    Do you know -- you don't know the religion of each

20  of the officers, do you?

21             MS. GZIFA:  Objection; form.

22             THE WITNESS:  I know they all belief in the same

23  religion I did.

24  BY MR. MATURA:

25       Q.    You know that for a fact.

# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

United States of America,      )
                               )
                Plaintiff,     )
                               )
          vs.                  )   No. CV-12-8123-PCT-HRH
                               )
Town of Colorado City,         )
Arizona; City of Hildale,      )
Utah; Twin City Power; and     )
Twin City Water Authority,     )
Inc.,                          )
                               )
                Defendants.    )
_____)


**THE DEPOSITION OF RUBY JESSOP BARLOW**
(Videotaped)


**CONFIDENTIAL**


Phoenix, Arizona
December 12, 2013
9:22 a.m.


(ORIGINAL)
**PREPARED FOR:**                  **REPORTED BY:**
                                   Az Litigation Support, LLC
                                   Marty Herder, CCR
DISTRICT COURT                     Certified Court Reporter
                                   CCR No. 50162

1          (Brief pause.)

2    BY MR. MATURA:

3        Q.   Ms. Jessop, I've handed you Exhibit 1.  Is that

4    your handwriting?

5              MS. HAMILTON:  Don't answer that question.

6              We're invoking the spousal privilege on this.

7              MR. MATURA:  On a letter that's out in the public?

8              MS. HAMILTON:  You sent it out to the public.  You

9    distributed it to the State Legislature.  She did not.

10             MR. MATURA:  And -- well, we'll have that battle,

11   I guess.  We're probably going to have to come back and

12   redepose her at a later date.

13   BY MR. MATURA:

14       Q.   Are you going to refuse to answer that question

15   whether this is your handwriting?

16       A.   Yes, I am.

17             MR. HOOLE:  We'll stipulate that it's her letter

18   to her husband.

19             But not answer questions as to its content and

20   object to its use.

21   BY MR. MATURA:

22       Q.   So I'm still going to have to ask you some

23   questions, and your attorney's going to instruct you not to

24   answer, but the judge has asked us to make sure that we go

25   through this step-by-step process so he's clear what we're

1    talking about.

2              So I still have to ask you some questions.

3              The letter says:  Dear Haven, I don't want you to

4    feel it was your fault that I made the decision I made.  I

5    just need to really find who I really am and what I want in

6    my life.

7              Our children are very special to me.  You have a

8    special place in my life.  But I want to really find myself

9    and make a couple changes in my life.  You're a good man and

10   father.  I just wanted to say thank you for the good times

11   we have shared together.

12             I am taking my phone and will change it over to

13   another plan.

14             Please understand that it is my own choice, thank

15   you for your love.  Always, Ruby.

16             And then it says P.S., please don't be a stranger,

17   I still need to see my kids.  I am sorry for the trouble I

18   have put you through.  I am sorry that I haven't been more

19   patient.  Remember you will always have a special place in

20   my -- then there's a picture of a heart.

21             Is the information contained in this letter true?

22             MR. HOOLE:  Objection.  Spousal privilege.  Move

23   to strike.

24   BY MR. MATURA:

25        Q.   Are you going to refuse to answer that question?

32

1      A.   Yes, I am.

2      Q.   The letter is dated December 17, 2012.  Is that

3  the date the letter was written?

4           MS. HAMILTON:  Spousal privilege.  Don't answer.

5  BY MR. MATURA:

6      Q.   Are you going to refuse to answer that question?

7      A.   Yes, I am.

8      Q.   On the second page there is the name Ruby.  Is

9  that your signature?

10          MS. HAMILTON:  Spousal privilege.  Don't answer.

11  BY MR. MATURA:

12     Q.   Are you going to refuse to answer that question?

13     A.   Yes, I am.

14     Q.   I have a lot of questions about this letter, as

15  you can probably image.

16          But if I were to ask you any questions about

17  this -- the details of this letter, would you refuse to

18  answer on the advice of your attorney?

19          MS. HAMILTON:  Yes.

20          THE WITNESS:  Yes, I would.

21          MS. GZIFA:  Hold on one second.

22          MR. MATURA:  Go ahead.

23          (Brief pause.)

24          MS. GZIFA:  Can we take another break?

25          MR. MATURA:  Absolutely.

1          THE VIDEOGRAPHER:  We are off the record at

2     10:00 a.m.

3          (Brief recess taken.)

4          THE VIDEOGRAPHER:  We are on the record at 10:17.

5          MR. MATURA:  Do you want to say something?

6          MR. HOOLE:  This is Roger Hoole.  Thank you for

7     letting us take a minute to think about this Exhibit No. 1.

8          We -- we're not completely familiar with its

9     circumstances and how it might have been released or

10    obtained.  Because of that, and the possibility that there

11    has been a limited waiver of spousal privilege with respect

12    to this letter only, we're not going to object to questions

13    regarding this letter, subject to renewing that objection

14    once we find out how this was obtained.

15         But I want to make it very clear that this is not

16    intended nor should be deemed as any kind of a broader

17    waiver of the spousal privilege.

18         But we will, if you insist, answer questions today

19    with respect to this exhibit only, as long as you agree that

20    it's not going to be treated as a broader waiver.

21         MR. MATURA:  Fair enough.

22         MR. HOOLE:  Okay.

23    BY MR. MATURA:

24    Q.   Okay.  Ms. Jessop, with that instruction from your

25    attorney, let's talk about Exhibit 1.

1           Did you write this letter?

2      A.   Yes, I did.

3      Q.   It's dated December 17, 2012.  Is that the date

4  you wrote it?

5      A.   Yes, I did.

6      Q.   And you wrote it for your husband; right?

7      A.   Yes.

8      Q.   And did you leave this letter in the house the day

9  that you left?

10     A.   Yes.

11     Q.   And are the contents of this letter true?

12     A.   Yes.

13     Q.   And so at the beginning when you say, dear Haven,

14  I don't want you to feel it was your fault that I made the

15  decision I made, is the decision you're talking about in

16  that first sentence the decision to leave?

17     A.   Yes.

18     Q.   And so you're telling Haven it's not his fault

19  that you're leaving Colorado City; right?

20     A.   Yes.

21     Q.   You then say that you -- you just need to really

22  find who you are and what you want in your life.

23          What did you mean by that?

24     A.   I want to make my own choices.

25     Q.   So, you wanted to go out in the world and find

```
 1    yourself and figure out who you are and make your own
 2    decisions; is that what you're --
 3         A.   Yes.
 4              MS. GZIFA:  Objection; form.
 5    BY MR. MATURA:
 6         Q.   Is that right?
 7         A.   Yes.
 8         Q.   You say your children are very special to you.
 9    Then you tell Haven that he has a special place in your life
10    and you want to really find yourself and make a couple
11    changes in your life.
12              When you say that Haven has a special place in
13    your life, did you love your husband?
14         A.   Yes, I did.
15         Q.   Is that what you mean when you say has a special
16    place or did you mean something else?
17         A.   When you have six kids with somebody, you're going
18    to have feelings for this person.
19         Q.   And you had been married how long at that point in
20    time?
21              MR. HOOLE:  Legally or spiritually?
22    BY MR. MATURA:
23         Q.   Do you understand the question, how long you've
24    been legally married -- I'll say legally.
25              MR. HOOLE:  Object to the form.
```

36

```
 1            MS. HAMILTON:  Do you remember when you got the
 2   license?
 3            THE WITNESS:  Ten years I think.
 4   BY MR. MATURA:
 5       Q.   You tell Haven that he's a good man and father.
 6            Is that right?
 7       A.   Yes.
 8       Q.   How was he a good man?  Describe that for me.
 9       A.   Kind.  Very patient.
10       Q.   Would you describe it in any other way?
11       A.   No.
12       Q.   Kind to you?
13       A.   Kind to kids.
14       Q.   And the kids?
15       A.   (Witness nods head.)
16       Q.   Yes?
17       A.   Yes.
18       Q.   Patient with you.
19       A.   Yes.
20       Q.   And patient with the kids.
21       A.   Yes.
22       Q.   You say he's a good father.
23            Describe how is he a good father to your kids.
24       A.   He loves them.
25       Q.   Treats them well?
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
© Az Litigation Support, LLC  (480)481-0649

37

```
 1        A.    Yes, he does.  Provides for them.

 2        Q.    Earns money so they can have what they need to

 3   live?

 4        A.    Uh-hmm.  Yes.

 5        Q.    He had a job and earned money so you had what you

 6   needed to live.

 7        A.    Yes.

 8        Q.    You tell Haven you want to thank him for the good

 9   times you shared together.

10              What do you mean by that?

11        A.    Well, when you spend ten years together, there's

12   good and there's bad memories.

13        Q.    What are some of the good memories you have?

14        A.    Having six kids.

15        Q.    The birth of each of your children.

16        A.    Yes.

17        Q.    Raising the children together.

18        A.    Yes.

19        Q.    Was Haven involved in raising the kids?

20        A.    Somewhat, yes.

21        Q.    Changed diapers?

22        A.    No.

23        Q.    Okay.

24              He helped with the parenting responsibilities?

25        A.    Yes.
```

183

1      Q.   At that point in time no judge had ordered the

2   custody to be in your control.

3      A.   No.

4           But it doesn't stop me from going and seeing my

5   kids.

6      Q.   Okay.

7           At that point in time, though, you had no court

8   order directing Haven Barlow to turn the kids over to you.

9           MS. GZIFA:  Objection.  Asked and answered.

10          THE WITNESS:  No.

11   BY MR. MATURA:

12     Q.   And so you're driving away from the house and

13   around town, and you get stopped by Officer Sam Johnson.

14     A.   Yes.

15     Q.   Was he in a police vehicle?

16     A.   Yes, he was.

17     Q.   Was he in uniform?

18     A.   Yes, he was.

19     Q.   And he walked up to the car.

20     A.   Yes.

21     Q.   Did you get out of the car?

22     A.   No, I didn't.

23     Q.   Did Joe get out of the car?

24     A.   No.

25     Q.   Joe Rohbock was driving.

184

1       A.   Yes.

2       Q.   So Sam Johnson came up to Joe Rohbock's window and

3   talked to him.

4       A.   Yes.

5       Q.   And Sam Johnson said that you, Ruby, are

6   welcome -- what -- tell me what Sam Johnson said.

7       A.   I don't know the exact words.

8       Q.   So tell me to the best of your recollection what

9   Sam Johnson said when he was talking into the car.

10      A.   Can I ask what you're doing here?

11           I said, I'm here to see my kids.

12           Well, you're welcome, but he's not.

13      Q.   Okay.

14           Do you remember any other details of that

15   conversation?

16      A.   He was kind of unprofessional about it.

17      Q.   Why do you say that?

18      A.   Very snobby.

19      Q.   Why do you say that?

20      A.   Because we're ex-FLDS now.

21      Q.   Did he mention that to you?

22      A.   No.

23      Q.   Did he ever mention your religious status at all

24   during that conversation?

25      A.   No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
© Az Litigation Support, LLC  (480)481-0649

1        MR. MATURA:  Why is that funny?

2        MR. HOOLE:  Oh, I'm not answering questions today.

3        MR. MATURA:  No, but you're laughing during the

4    questions.

5        MR. HOOLE:  Well, I think we all know why that's

6    funny.

7        MR. HAMILTON:  I'll also put it on record that we

8    had a long discussion before this deposition about not

9    intimidating witnesses and during the deposition Roger Hoole

10   has pulled out his camera phone and snapped photos of David

11   Darger.

12       And so I just want to make sure the record is

13   clear of who's actually doing the intimidation threatening

14   here.

15       MS. HAMILTON:  And just for the record there was

16   no long discussion with you, Mr. Hamilton.

17       There was only a very brief discussion with

18   Mr. Matura about the fact that he didn't respond to my

19   e-mail yesterday.

20       So you all had a long conversation.  Yes, you did.

21   But you didn't have it with us.

22       MR. HOOLE:  And I took a picture because I

23   understand that Mr. Matura does -- does not know whether

24   Mr. Darger is FLDS, and I think it's important to have a

25   picture of Mr. Darger in this case.

```
 1              MR. MATURA:  You guys --
 2              MR. HOOLE:  So we can address that issue at some
 3    point.
 4              MR. MATURA:  You guys done over there?
 5              MR. HOOLE:  Yep.
 6              MR. MATURA:  Anything else you want to say?  Say
 7    your piece.
 8              MS. HAMILTON:  Ask your co-counsel.
 9              MR. MATURA:  This what is lawyers do when they get
10    tired.
11              THE WITNESS:  Sweet.  I'm tired too.
12              MR. MATURA:  Okay.  We still have to plug through
13    though.
14              Will you read back my last real question before
15    all the garbage?
16              THE REPORTER:  "Question:  Did he ever mention
17    your religious status at all during that conversation?"
18    BY MR. MATURA:
19         Q.   So did Joe Rohbock respond to Officer Johnson
20    during this conversation to your recollection?
21         A.   He had to.  He was pulled over.  He was driving.
22    Obviously, yes, I do have my driver's license.  Yes, I do
23    have an insurance card on my car.
24         Q.   So did Officer Johnson ask to see his license and
25    registration?
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
© Az Litigation Support, LLC  (480)481-0649

1      A.   Yes, he did.

2      Q.   And Joe gave it to him.

3      A.   Yes, he did.

4      Q.   And then Sam Johnson gave back the license and

5   registration; right?

6      A.   As far as I know.

7      Q.   And Sam Johnson didn't ticket Joe Rohbock for

8   anything.

9      A.   Not that I'm aware of.

10     Q.   Didn't cite him for any type of moving violation.

11     A.   I don't think so.

12          He did tell him that if he went out back on the

13   property he would.

14     Q.   So Officer Johnson told Joe Rohbock if he goes

15   back on the property he would be cited for what, do you

16   remember?

17     A.   Trespassing.

18     Q.   And what was Joe Rohbock's response to that, if

19   any?

20     A.   Well, then I guess I won't go on the property,

21   I'll just stand right across the street from it.

22     Q.   Okay.

23          Anything else you remember about that meeting

24   between Sam Johnson and Joe Rohbock while you're sitting in

25   the car?

1       A.      Nope.

2               We just sat across the street.

3       Q.      So you went back, sat across the street from the

4  house.

5       A.      Yes.

6       Q.      For how long?

7       A.      Waiting for the sheriff's deputy to get there,

8  probably about an hour.  I don't know.

9       Q.      Does the sheriff deputy eventually show up?

10      A.      Yes.

11      Q.      And what happened next?

12      A.      I talked to the sheriff's deputy, told him what

13  went on.

14              And he said, well, I can't —— I can't do this

15  without a court order.

16              And I said, that's fine, I want to do a welfare

17  check on my kids then.

18              So, the sheriff's deputy went over to the

19  Marshal's Office, told the Marshal's Office what he was

20  doing.

21              And I was watching Sam the whole damn time.

22              He got his beeper phone, climbed in his ride, and

23  the sheriff's deputy walked up to the door, knocked on the

24  door.

25              Nobody would answer.

1          So, the sheriff's deputy come back, and he said

2   there's no answer -- or, I was going to say -- okay, go

3   back.

4          I asked the officer, the sheriff's deputy, to --

5   that I wanted to see my kids.

6          Haven said no --

7   Q.   Okay.

8   A.   -- obviously.

9          Um, so the sheriff's deputy was going to go talk

10  to Haven.

11         Knocked on the door.  No one would answer.

12         Come back out, come back and talk to me, and he

13  said, I'm sorry, no answer, there's nothing I can do, I

14  can't break down the door, I can't do nothing for you.

15         And I said, well, can I ask for a welfare check on

16  my kids then?

17         And he says, of course you can.

18         So he went back over to Sam Johnson, and he said,

19  this is what I'm doing.

20         And Sam Johnson got back in his ride -- I saw him

21  pull his phone out.

22         Got back in his ride, closed the door.

23         And the sheriff's deputy walked up to the door,

24  knocked on the door.

25         The door opens right up.

1          The officer goes in, checks on the kids, comes

2    back out.

3          They're fine.

4          And we left.

5      Q.   You don't know who Officer Sam Johnson spoke to on

6    the phone, do you?

7      A.   I don't.

8          (Deposition Exhibit No. 4 was marked for

9    identification by the reporter.)

10   BY MR. MATURA:

11     Q.   Ms. Jessop, I've handed you Exhibit 4 from the

12   Mohave County Sheriff's Office incident information report

13   for Incident No. 12-044861, regarding the incident that

14   you're describing.

15         Have you ever seen this document before?

16     A.   No.

17     Q.   It says that this entire incident occurred on

18   December 23rd, 2012.

19         Does that sound right to you?

20     A.   Sorry, what?

21     Q.   It says that this incident that you've been

22   describing occurred on December 23rd, 2012.

23         Does that sound right to you?

24     A.   I'm not sure about the actual date.

25     Q.   Okay.

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

United States of America,       )
                                )
            Plaintiff           )
                                )
      vs.                       )
                                )
                                )  No. CV-128123-PCT-HRH
Town of Colorado City,          )
Arizona; City of Hildale,       )
Utah; Twin City Power; and      )
Twin City Water Authority,      )
Inc.,                           )
                                )
            Defendants. )
————————————————————)

**THE DEPOSITION OF STEVEN BATEMAN**

Salt Lake City, Arizona
May 14, 2014
9:02 a.m.

(ORIGINAL)
**PREPARED FOR:**                    **REPORTED BY:**
                                     Az Litigation Support, LLC
                                     Marty Herder, CCR
DISTRICT COURT                       Certified Court Reporter
                                     CCR No. 50162

1          I don't think I was working out of town at the
2     time.  My best guess is 13.  But like I say, I don't recall.
3     If we could find record of that child, when that happened,
4     then that would be the date.  That would be immediately
5     after that when that happened.
6          Q.   So you think, to your best recollection, you were
7     13 when this happened?
8          A.   I'm guessing I was 13.  It's been many years.
9          Q.   And how old are you now?
10         A.   I'm 28.
11         Q.   So if it was 2001, that would have made you around
12     14 or 15?
13         A.   Yeah.
14              Like I say, it's off my best guess.  I don't
15     recall the specific age.
16         Q.   Do you recall telling Ms. Lowther that you were
17     ten or 12 years old?
18         A.   I don't specifically recall.  You know, like I
19     say, I'm trying to base this off of -- I don't really know.
20         Q.   And you don't have any kind of documentation that
21     would help you with respect to when this event transpired?
22         A.   Not unless we can find that report.
23              I haven't taken the time to dig it up.
24         Q.   Is it fair to say that you're basing this off of
25     your memory, and you don't have a very clear memory of this

 1   incident?

 2               MS. GZIFA:  Objection.

 3               THE WITNESS:  I have a very clear memory of what

 4   happened.

 5               I don't have a very clear memory of specific

 6   conversations or specific dates, but it stuck with me,

 7   because previously to that I owned a dog that I was very

 8   attached to that we had gotten rid of a couple weeks before

 9   that.  And so I was glad that we didn't have to go through

10   that with the animal that I had.

11   BY MR. HAMILTON:

12       Q.   So you said that you had a dog that you had gotten

13   rid of a couple of weeks before this incident?

14       A.   Correct.

15       Q.   Do you recall telling Ms. Lowther that after this

16   announcement was made that your dad took your dog 20 miles

17   out of town to a neighbors and turned him loose?

18       A.   That's the way we got rid of the dogs.  That's the

19   way dad got rid of ours.

20               It was before that.  Because I remember when the

21   officer -- when the guy showed up to talk to my dad, my dad

22   told him we did not have one.

23       Q.   So you don't recall telling Ms. Lowther that your

24   dad actually took a Lab, a one or two years old Lab, after

25   that announcement was made?

```
 1              MS. GZIFA:  Objection as to form.

 2              THE WITNESS:  No, it wouldn't have been after.  It

 3    was before.  It was previously before.  I specifically

 4    remember that.

 5              Like I say, I'm going off my best memory, but that

 6    was very specific, because of the fact that I was glad they

 7    didn't have to take it.

 8    BY MR. HAMILTON:

 9         Q.   So I just want to make sure we're clear here.

10              When you say before, are you talking before anyone

11    showed up at your home or before the announcement was made

12    in the general public meeting?

13              MS. GZIFA:  Objection as to form.

14              THE WITNESS:  Before anyone showed up.

15              I don't recall where -- when my dad got rid of it,

16    how close that was to the time that the incident happened

17    with the other dog.

18    BY MR. HAMILTON:

19         Q.   Okay.

20              So you didn't recall if your dad actually took

21    your dog out, got rid of your dog, gave it to a neighbor,

22    before Fred M. Jessop made his announcement or not?

23         A.   It was before the announcement.

24              I just don't know if it was before the incident.

25         Q.   Okay.
```

1          Do you know what caused your father to get rid of

2    your dog that you had this close relationship with?

3          A.   Yes.  It was killing animals.

4               It had been killing all of our farm animals.

5          Q.   So it had nothing to do with the incident, as far

6    as you know?

7          A.   No.

8          Q.   And you said that you weren't close to this

9    family.  Did you understand this to be the Copeland family?

10         A.   Yes.

11         Q.   Do you recall telling Ms. Lowther that you came to

12   an understanding that the Copelands were on the run from the

13   law?

14         A.   Yes.

15         Q.   How did you gain that understanding?

16         A.   I worked with his boys over the years off and on.

17         Q.   Who did you work with?

18         A.   His sons.  It's been so many years.

19              His two sons.  We worked with -- one was about my

20   age and one was a few years younger.

21         Q.   Do you remember their names?

22         A.   It will come to me.

23              It's been probably 12, 14 years since I talked to

24   them.

25              Brandon Copeland was one.  Um, I'm trying to

18

1   remember the other one.

2          It will come to me.

3      Q.   And what do you recall them telling you about why

4   their family was on the run from the law?

5      A.   They had all these stories about their life back

6   in Missouri where they were from.  One of the boys had had

7   an incident with a gun at a school, where he fired it at

8   school or something like that, and he had to hide the gun.

9   It was just the stories of why they were there, because they

10  showed up in Colorado City kind of out of the blue.  Nobody

11  really knew who they were.

12         They had a story about their dad driving a

13  four-wheeler across a lot of country.  And then eventually

14  going back and getting them.

15         They just had a lot of stories about their life

16  back there, and that's why they were out here.  And they

17  always wanted to go back.  They just wanted to let things

18  cool down.

19     Q.   Now, in the Complaint it states that less than one

20  month later, after this edict from Warren Jeffs -- again,

21  you were not aware of any edict from Warren Jeffs about

22  dogs; correct?

23         MS. GZIFA:  Objection.  Mischaracterizes his

24  testimony.

25         THE WITNESS:  It was made -- announced by the

 1   Bishop, but nothing happened without his approval.

 2   BY MR. HAMILTON:

 3       Q.   But, again, you have no knowledge of Warren Jeffs

 4   making an edict that dogs would be destroyed?

 5       A.   Specific, no I did not here him say it.

 6       Q.   Okay.

 7            And so the Complaint says that less than one month

 8   later, in compliance with Jeffs' edict, Marshal's deputies

 9   went to each household in the cities and asked residents to

10   turn over any dogs that they had in the home to the

11   officers.

12            Do you have any knowledge about that?

13       A.   I know that the -- that I believe it was Shem

14   Jessop showed up at my dad's house asking about the dog, and

15   I know that our neighbor, Dan Johnson, who was the one

16   taking care of the church's herd of sheep, was allowed to

17   keep one dog for that reason.

18            I had heard talk after that of other people that

19   had -- that had given their dogs to the officers.  I don't

20   recall them saying whether they showed up, I just know they

21   were at my dad's house.  I saw that.

22       Q.   Okay.

23            Let's talk about that specific incident.  What do

24   you recall about the officers showing up, specifically Shem

25   Jessop showing up at your father's house?

1      Q.   So you didn't -- your recollection now is you

2  don't remember anyone else being there with Shem Jessop?

3      A.   I don't -- I do not recall anyone else being there

4  with Shem Jessop.

5          If I sit there and scratch my brain, things come

6  and go.  It was a long time ago.

7          I'm trying to remember the exact specifics, like I

8  say.

9          My dad talked to them a lot, about a lot of

10  different things.  I'm trying to narrow down that specific

11  incident.

12      Q.   Do you also recall telling Ms. Lowther that there

13  was another cop car SUV behind the trailer?

14      A.   I don't recall if that was at that same incident

15  or not.  Like I say, I'm trying to base it off of what I

16  absolutely know.

17      Q.   So let's talk about the conversation that you can

18  recall.

19          You remember someone knocked on the door.  Again,

20  you're thinking it was Shem Jessop.  And your father and

21  that individual talking on the porch.  And you and your

22  brother being present during that conversation; is that

23  correct?

24      A.   That's correct.

25          MS. GZIFA:  Objection; compound.

1  BY MR. HAMILTON:

2      Q.   With respect to that conversation, what do you

3  recall was said and who said it?

4      A.   I recall them asking for my dad, and then --

5      Q.   Let me stop you right there.

6           You said you remember them asking for your dad.

7  Was it one person or two?

8      A.   It was one person, sorry.  Him.  Him asking for my

9  dad.

10     Q.   Okay.

11     A.   And somebody went and got him.  And they were out

12  on the porch.  And I recall there being a conversation about

13  the dogs.  I don't have specifics on -- on, you know, exact

14  wording that was used.

15          I recall my dad telling him we didn't have ours

16  anymore.  That was very specific to me, because it was my

17  dog that we had previously gotten rid of that would have

18  went.

19          Um, and then I recall them walking down the

20  driveway a little bit, then my dad turning to myself and my

21  brother and telling us to go back in the house.

22          And we went back in the house and looked out the

23  window and watched them talk for a little while.

24     Q.   Okay.

25          Do you recall, again, the person you believe was

 1    Shem Jessop saying he was there to get rid of dogs?

 2        A.    Something to that effect, yes.

 3        Q.    You don't recall --

 4        A.    That's the point that my dad told us to go in the

 5    house, when they started having that conversation.

 6        Q.    Okay.

 7              And do you recall telling Ms. Lowther that they

 8    actually walked to the end of the driveway so you couldn't

 9    hear what was being said?

10        A.    Yes, when he told us to leave, they were walking

11    away.  We went in the house and they kept walking.

12        Q.    And when you spoke to Ms. Lowther, how come you

13    didn't tell her that you were told to go into the house?

14        A.    I, like I say, I just told her based off my

15    memory.  I -- there's a lot of details that I'm trying to

16    base this off of my best judgment.

17              I don't know.  I don't know what's really

18    relevant, what really affects anything, or what doesn't.

19    There's a lot of things that happened that I have to think

20    about and think whether they actually apply or not.  Because

21    it was just another day.

22        Q.    It's true that you have no recollection of this

23    individual, that you believe was Shem Jessop, saying that he

24    was there to carry out the edict of Fred Jessop?

25        A.    Not in those exact words, no.

1    Q.    It's true that you really have no personal

2   knowledge that the Marshal's Office in any way was involved

3   in carrying out any edict of the FLDS church?

4    A.    I have no proof of it.

5          I remember conversations that that's what was done

6   with it, and it was done by people that were involved in the

7   Marshal's Office.

8          Shem Jessop was very involved in the Marshal's

9   Office.

10          I don't know whether he was actually an officer at

11   the time.

12          There was not a lot of difference to us on whether

13   someone was a cop or not.  If they were involved, it was all

14   the same.

15          So I have to sit back and think on whether I saw

16   the person in a police car, you know, how they were

17   involved.  Because it didn't make a difference to us.

18          If they were involved with the Marshal's Office,

19   they were the same.

20    Q.    But your recollection today is that you think it

21   was Shem Jessop, but you're not 100 percent sure; correct?

22    A.    Correct.

23    Q.    That the reason why you're basing that belief that

24   it was Shem Jessop was because of a distinct truck and

25   trailer; true?

```
1    to make sure, and I'm going to get to the conversations that
2    you had in a minute here, because I want you to be able to
3    tell your whole story.
4            But I want to know what you personally witnessed
5    or heard with respect to what you personally witnessed and
6    heard.
7            You have you no personal knowledge that the
8    officers, the Marshal's Office, in any way carried out an
9    edict of the FLDS church to get rid of dogs; correct?
10           MS. GZIFA:  Objection; form.
11           THE WITNESS:  I did not personally witness them
12   doing that, no.
13   BY MR. HAMILTON:
14       Q.   And you didn't personally hear any officer tell
15   you that that's what they were doing; correct?
16       A.   Correct.
17       Q.   Now, let's talk about the conversations you had.
18           What -- who did you have conversations with about
19   this edict by Fred Jessop?
20       A.   Talked to my dad after the fact about it.
21       Q.   What did your father tell you?
22       A.   He told me that they took them out and got rid of
23   them.
24       Q.   Did he tell you who took them out and got rid of
25   them?
```

# EXHIBIT 4

1            IN THE UNITED STATES DISTRICT COURT

2                       DISTRICT OF ARIZONA

3       ------------------------------X

4    United States of America,        :

5         Plaintiff,
                                       : Civil No.
6    v.                                  3:12-CV-08123-HRH
                                       :
7    Town of Colorado City, Arizona,
     et al.,
8         Defendants.                  :

9

10      ------------------------------X

11         CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

12                      St. George, Utah

13                   Wednesday, July 16, 2014

14           Video Deposition of JONATHAN CARL ROUNDY, a

15    witness herein, called for examination by counsel

16    for Plaintiff in the above-entitled matter, pursuant

17    to subpoena, the witness having been previously duly

18    sworn, taken at the Durham Jones & Pinegar, 192 East

19    200 North, 3rd Floor, St. George, Utah at 9:00 a.m.,

20    on Wednesday, July 16, 2014, and the proceedings

21    being taken down by Stenotype by Russel D. Morgan,

22    CSR, and transcribed under his direction.

23

24

25

Jonathan Carl Roundy

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

July 16, 2014
St. George, UT

Page 146

1  it in court?
2      A   I remember trying to maintain the status
3  quo. That's what I remember.
4      Q   Okay. My question was whether or not you
5  had ever made the statement that I indicated to you
6  in substance.
7      A   Not that I recall.
8      Q   Okay. Do you ever remember making a
9  statement regarding that incident that Fred Jessop
10  claims it's his property and we are going to honor
11  that because he's a member of the church?
12      A   No.
13      Q   You are saying that didn't happen or you
14  don't remember?
15      A   I don't recall saying anything about that.
16      Q   Okay. And then did you ever make a
17  statement, in substance, that Fred Jessop was part
18  of the church, and he asked and believe that that is
19  where I am going to stand as chief marshal?
20      A   I don't recall any of that.
21      Q   Okay. Did you ever say in substance that
22  you were going to honor the original FLDS Church
23  Trust and that the church had told Fred to plant
24  that property?
25      A   I don't recall.

Page 147

1      Q   Were there any arrests that you were aware
2  of due to this incident?
3      A   No.
4      Q   Okay. So, do you know whether or not
5  Mohave County ever arrested Fred Jessop for anything
6  involving this property?
7      A   I don't believe so.
8      Q   Okay. Do you remember an incident in
9  approximately May 2010 where people were plowing
10  Shane Stubbs' field?
11      A   I remember a dispute, whoever's field it
12  was.
13      Q   Okay. Do you remember a dispute where
14  Shane Stubbs claimed that unauthorized people were
15  plowing Shane Stubbs' field?
16      A   Yes.
17      Q   Okay. Was that in approximately May 2010?
18      A   It could be that.
19      Q   Did you ever become -- did you respond to
20  that incident?
21      A   I did.
22      Q   Okay. Was Helaman Barlow also involved in
23  that incident?
24      A   I don't recall.
25      Q   Okay. You don't recall whether or not you

Page 148

1  sent Helaman Barlow out there to just keep the
2  peace?
3      A   Unless there was more than one incident, I
4  remember responding specifically myself. But there
5  might have been more than one.
6      Q   Okay. Was Mohave County -- were Mohave
7  County officers at that field when you responded to
8  that incident?
9      A   No.
10      Q   Okay. Did you ever respond to an incident
11  at that field where Mohave County was also there?
12      A   Not that I recall.
13      Q   Okay. Can you explain to me or summarize
14  for me the incident that you were at that field that
15  you remember responding to?
16      A   I got out there. And there was a, I think
17  he was disking. I told him to stop. I got ahold of
18  Ken Brendel. And I just told everybody to stop what
19  they were doing.
20      Q   Who did you say was out there? I'm sorry.
21      A   I think it was a Jessop. On the tractor?
22      Q   Yes.
23      A   Yeah, Jessop.
24      Q   Was it Fred Jessop?
25      A   No. It was one of Merlin Jessop's sons.

Page 149

1  I don't recall his name.
2      Q   Okay. And you remember one Jessop plowing
3  that field?
4      A   Yes.
5      Q   Okay. And is it your testimony that you
6  told that person to stop plowing the field?
7      A   Yes.
8      Q   Okay. And so, did they?
9      A   While I was there they did, yes.
10      Q   Okay. And did that resolve the dispute as
11  far as you knew?
12      A   If I recall, it was resolved. It might
13  have continued on later in the day when I didn't
14  respond back.
15      Q   Do you remember --
16      A   Which would have been a different officer?
17      Q   Do you remember whether or not there was
18  another incident after that where somebody was
19  plowing that field again?
20      A   I think there was more than -- there was
21  more than one incident.
22      Q   Okay. Do you remember an incident where
23  Helaman Barlow responded to someone plowing that
24  field?
25      A   I think so.

38  (Pages 146 to 149)

Jonathan Carl Roundy
CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
July 16, 2014
St. George, UT

Page 210

1    Q    And, in total, how much time do you think
2    you gave the Hainlines to move their vehicle before
3    Matthew was arrested?
4    A    I recall 20 minutes.
5    Q    Did you have any other involvement in the
6    arrest of Matthew Hainline or Genevieve Hainline
7    that day that we have not spoken about that you
8    recall?
9    A    No.
10   Q    And did you do a police report on the
11   arrest of Matthew Hainline and Genevieve Hainline?
12   A    Yes.
13   Q    And, to the best of your knowledge, those
14   police reports are accurate?
15   A    Yes.
16   Q    Have you ever seen the video showing the
17   arrest of Genevieve Hainline?
18   A    I don't think so.
19   Q    Have you ever seen the news reports that
20   came out after her arrest?
21   A    No.
22   Q    Are you aware, has anyone ever told you
23   that there were news reports that claimed that the
24   arrest of Genevieve Hainline was religiously
25   motivated?

Page 211

1    A    I am not aware, no.
2    Q    Do you agree with this, a statement that
3    that arrest was religiously motivated?
4    A    No.
5    Q    Do you remember a little bit ago about Mr.
6    Donnelly was asking you questions that he asked you
7    about Lydia Stubbs --
8    A    Yes.
9    Q    -- involving the horse, right?
10   A    Yes.
11   Q    And do you remember that Mr. Donnelly
12   asked you about call logs?
13   A    Yes.
14   Q    And then, to be more specific, do you
15   remember Mr. Donnelly asked you whether you had an
16   opinion as to whether the call logs should match up
17   with Lydia Stubbs' phone records?
18   A    I remember him saying phone records.
19   Q    Okay.
20   A    I'm not aware of what he was asking,
21   really.
22   Q    Do you have any knowledge about how
23   dispatch logs calls?
24   A    If they receive a call, then there is a
25   log.

Page 212

1    Q    And what do you mean when you say receive
2    a call?
3    A    If they talk to a person, then there is a
4    call generated.
5    Q    Do you have any knowledge regarding which
6    particular phone line generates a phone call log
7    versus ones that don't?
8    A    Yes.  The dispatch phone will go to the
9    dispatcher and will create a log.  If they just call
10   a police department, there will be no record of
11   that.
12   Q    So, if Lydia Stubbs, for example, called
13   the police department phone number, do you know
14   whether that would generate a log?
15   A    No, it would not.
16   Q    Do you have any knowledge about what
17   happens if they call dispatch that rolled over to
18   another line, if a log is then generated?
19   A    If they didn't answer the call, then there
20   would be no log; if the phone was busy --
21   Q    So do you have knowledge if, for example,
22   if Lydia Stubbs called dispatch, that line was busy,
23   and that call rolled over to a non-dispatch line,
24   and that would generate a log?
25   A    No, it would not.

Page 213

1    Q    And have you ever actually compared Lydia
2    Stubbs' phone record with the call logs for her
3    calls in any particular date?
4    A    No.
5    Q    Mr. Roundy, do you understand that the
6    Department of Justice' lawsuit involves in part the
7    allegation that the marshal's department is
8    controlled by the FLDS Church?
9    A    If that's what you say.  I haven't read
10   it.
11   Q    You worked there for almost 20 years; is
12   that right?
13   A    Yes.
14   Q    Did you ever make a single decision while
15   a member of the marshal's department at any point in
16   time during those almost 20 years that was based
17   upon what some religious leader told you to do?
18   A    I made all the decisions that were made
19   when I was there.
20   Q    Were those decisions based upon your
21   training as a police officer?
22   A    Yes.
23   Q    During your time as a police officer there
24   for almost 20 years, did you ever treat anyone
25   differently because of their religion?

54  (Pages 210 to 213)

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## Page 214

1      A   No.
2      Q   And maybe more directly I should ask this
3   way, did you ever discriminate against anyone
4   because they weren't members of the FLDS Church?
5      A   No.
6      Q   Did you go out of your way to assist those
7   that you knew were not members of the FLDS Church?
8      A   I did make that effort, yes.
9      Q   And explain that to me.
10     A   Because we were under such close review
11  anyway, and I wanted to be fair and impartial, that
12  I made a special effort.  If somebody was non -- if
13  I perceived they were a non-FLDS person, I made sure
14  that I made a special effort to do as much in each
15  case as I would in any other person's case.  I
16  remember solving many cases for many people.  And it
17  didn't matter to me who it was.  But I was conscious
18  of treating everybody the best that I could.  That
19  was my effort, my personal effort.
20     Q   When you were chief of police, did you
21  provide any direction to those who worked for you as
22  police officers about treating people fairly and
23  equally?
24     A   Yes.
25     Q   Did you ever witness a situation while you

## Page 215

1   were chief of police where any other officer who
2   worked under you treated someone differently because
3   of religion?
4      MR. DONNELLY:  Foundation.
5      A   Not that I recall.
6      BY MR. MATURA:
7      Q   If you had witnessed someone treating, an
8   officer treating someone differently because of
9   their religion during the time that you were chief,
10  would you have taken some action?
11     MR. DONNELLY:  Form.
12     A   Yes, I believe so.
13     BY MR. MATURA:
14     Q   Would that have been acceptable to you as
15  chief of police for someone, another officer in your
16  department, to treat someone differently because of
17  their religion?
18     A   No.
19     Q   I don't think I have any more questions,
20  sir.  But I would like to have the opportunity to
21  take a quick two minute break to check my notes.
22     A   Okay.
23     THE VIDEOGRAPHER:  Going off the record at
24  5 o'clock.
25     (Whereupon, a brief recess was taken.)

## Page 216

1      THE VIDEOGRAPHER:  We are on the record at
2   5:11.
3      BY MR. MATURA:
4      Q   Mr. Roundy, just a few more questions for
5   you.  Do you remember earlier Mr. Donnelly asked you
6   questions about an incident between Fred Jessop and
7   Shane Stubbs?
8      A   Yes.
9      Q   A property dispute?
10     A   Yes.
11     Q   And then, do you remember that Mr.
12  Donnelly also asked you about the alleged
13  conversation you had with Jethro Barlow about that
14  property dispute?
15     A   Yes.
16     Q   First of all, do you recall what you told
17  Jethro Barlow?
18     A   I don't recall exactly what I told him.
19     Q   Do you recall what, well, can you tell me
20  to the best of your recollection what you told him
21  and why you told him?
22     MR. DONNELLY:  Form.
23     A   As just consistent with what we always
24  did.  Fred was the one on that property at that
25  time.  Shane did not have a court order.  It was

## Page 217

1   consistent with the counsel firm, our prosecutor,
2   until he had a court order and some paperwork, then
3   to remain, keep the status quo.  I said, let's keep
4   it how it is until we can get some official
5   documents on it to keep the peace.
6      BY MR. MATURA:
7      Q   To the best of your recollection, is that
8   what you told Jethro Barlow about what happened
9   between Fred Jessop and Shane Stubbs?
10     A   That was the intent.
11     MR. DONNELLY:  Form.
12     MR. MATURA:  What was wrong with the form
13  there?
14     MR. DONNELLY:  Just time.
15     BY MR. MATURA:
16     Q   Okay.  And you were the chief of police
17  when this happened?  Let me ask that, actually, a
18  different question.  You were an officer for the
19  marshal's department when this happened?
20     A   Yes.
21     Q   Including when you spoke to Jethro Barlow?
22     A   Yes.
23     MR. MATURA:  I don't have any more
24  questions.
25

Alderson Reporting Company
1-800-FOR-DEPO

# EXHIBIT 5

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CV-12-8123-PCT-HRH |
| | ) | |
| Town of Colorado City, | ) | |
| Arizona; City of Hildale, | ) | |
| Utah; Twin City Power; and | ) | |
| Twin City Water Authority, | ) | |
| Inc., | ) | |
| | ) | |
| Defendants. | ) | |

**THE DEPOSITION OF JEROLD WILLIAMS**
(Videotaped)

St. George, Utah
April 23, 2014
9:05 a.m.

(ORIGINAL)
**PREPARED FOR:**

DISTRICT COURT

**REPORTED BY:**
Az Litigation Support, LLC
Marty Herder, CCR
Certified Court Reporter
CCR No. 50162

1          So when you decided to go to the residence on

2    July 19, 2012, there were -- your family was still living in

3    that property; true?

4         A.    Yes.

5         Q.    Your wives and children.

6         A.    Yes, they were there.

7         Q.    And they did not want you to come into the

8    property --

9         A.    They were ordered by the church leadership to not

10   let me in the house.

11        Q.    Just take a -- let me finish my question so we

12   don't talk over each other.  Okay?

13        A.    Okay.

14        Q.    You're aware, sir, on July 19th, 2012, your family

15   did not want you to enter that house; right?

16        A.    When I got there, somebody, somebody that's not

17   one of my children, was out on the front porch, and they ran

18   in the house, slammed the door, and locked it.

19          So, yeah, I kind of got the idea that they didn't

20   want me to come in.

21        Q.    And did you knock on the door?

22        A.    I went to the door.  And I don't remember for sure

23   if I knocked, but I noticed a window that was open, a little

24   bit, right next to the front entry.  I slid it open, pushed

25   the screen out.  It bent while I was trying to get it out.

1    And I went through the window and went around to the stairs

2    and opened the door for Liz.  And we walked up the stairs

3    and said we decided we're going to come home.

4        Q.   So even -- so you knew before you climbed through

5    a window that you were not welcome in that residence that

6    day; true?

7        A.   It's my house.

8        Q.   Well, sir --

9        A.   What do you mean I'm not welcome?  I built it.

10       Q.   You knew that the -- the members -- family members

11   who were in that residence that day didn't want you to come

12   inside; right?

13           MR. DONNELLY:  Object to form.

14   BY MR. MATURA:

15       Q.   You're going to hear some objections today, and

16   that's fine.

17           Unless someone tells you not to answer, you can

18   still go ahead and answer the question.  Okay?

19           Do you remember the question?

20       A.   I didn't know they didn't want me.  I -- I had

21   reason to believe that they would resist it at first, but I

22   thought that they would -- if I could talk to them and tell

23   them what the issues were, that they would agree with me.

24       Q.   Well, why --

25       A.   So I went with a determination to try to talk to

1    them.

2         Q.   Why climb through a window?

3         A.   Because they locked the door.

4         Q.   But don't you think by locking the door that was a

5    good indication they didn't want you to come in?

6         A.   Do you want to be locked out of your own house?

7         Q.   Well, do you think, sir, that there's a more civil

8    way to handle this dispute than climbing through a window to

9    enter a residence where you know the occupants don't want

10   you to come in?

11             MR. DONNELLY:  Object to form.

12             THE WITNESS:  There may have been another way.

13   That seemed like the thing to do at the time.

14   BY MR. MATURA:

15        Q.   Did you call anyone on the phone who was inside

16   the house?

17        A.   No.

18        Q.   You said you knocked on the door --

19        A.   I don't remember whether I knocked or whether I

20   didn't.

21             They knew I was there.

22        Q.   So they knew you were there.  You saw someone go

23   in to the front door, close it, and lock it behind them;

24   right?

25        A.   Well, I suppose they locked -- I mean, I tried the

```
 1    door and it was locked.
 2         Q.   So you don't remember knocking on the door, but
 3    you remember trying to open the front door.
 4         A.   Yes.
 5         Q.   And it was locked.
 6         A.   I don't usually knock on my own house.
 7         Q.   But you knew there was an issue that day; right?
 8         A.   Yeah, I knew there was an issue.
 9         Q.   And -- and that's -- that's part of the reason why
10    you came back on July 19, because there was an issue with
11    respect to your family and you wanted to come out and
12    investigate it; right?
13              MR. DONNELLY:  Object to form.
14              THE WITNESS:  I came out not to investigate.  I
15    came out to tell them what I had found out had been going on
16    and felt like they needed to know and felt like I had an
17    obligation to them to not let it happen to my children.
18    BY MR. MATURA:
19         Q.   And, and --
20         A.   And that was the reason I went back.
21         Q.   Okay.
22              And you knew that day that despite your intentions
23    of wanting to speak to your family, that your family didn't
24    want to talk to you; is that fair?
25              MR. DONNELLY:  Object to form.
```

41

```
 1              THE WITNESS:  I didn't know that.

 2              I thought that they loved me and that we could

 3   talk.

 4              It surprised me that they acted the way they did.

 5   BY MR. MATURA:

 6      Q.    And your response to their reaction was to climb

 7   through essentially a basement window or a lower window to

 8   get into the house.

 9      A.    Well, the door was locked, and they wouldn't open

10   it, so I went in what was available, yes.

11              It's in my house.  If I wanted to break them all

12   out, I could you break them all out.

13      Q.    You don't have title to that house, do you?

14      A.    Well, when I say mine, I built it, I occupied it.

15      Q.    But it's owned by the UEP Trust.

16      A.    Right.  Which technically would be Bruce Wisan or

17   at that point, and I had an occupancy agreement from him

18   when I went to the house.

19      Q.    And we'll look at the occupancy agreement in just

20   a few minutes.

21              Now, you know, sir, that someone inside the house

22   called the local Marshals Department; right?

23      A.    I suppose they did.  He showed up.

24      Q.    Right.  Because Officer Curtis Cooke showed up.

25              Do you remember that?
```

```
 1         A.    Yes, I remember it.
 2         Q.    And do you remember officer -- Officer Curtis
 3    Cooke coming into the front door and seeing you standing in
 4    the house?
 5         A.    Yes, I remember.
 6         Q.    And do you remember talking to Curtis Cooke?
 7         A.    Yes.  I remember him asking me to leave.  And I
 8    said, it's my house, I built it.
 9               And besides I have an occupancy agreement.  And I
10    handed it to him.
11         Q.    And Officer Cooke asked to see a copy of the
12    occupancy agreement?
13         A.    I don't know that he asked, but I handed it to
14    him.
15         Q.    And he looked at it.
16         A.    Yes.
17         Q.    And he then -- do you have a -- you spoke to
18    Officer Cooke about the occupancy agreement?
19         A.    Yes.
20         Q.    Do you remember then, sir, he spoke to other
21    occupants of the property?
22         A.    He went in and out several times during the first
23    few minutes talking to whoever he talked to.  I didn't hear
24    whatever his conversations were outside of the room.
25         Q.    Did you -- were you present for any conversations
```

43

1    that Officer Cooke had with the other occupants of the
2    property?
3         A.   Um, no, not that I can recall.
4         Q.   And it's a large house.  You told me it's about
5    15,000 square feet.
6         A.   Yes.
7         Q.   And so there's a lot of space, a lot of rooms
8    Officer Cooke was walking through, talking to people.
9         A.   I don't think he went clear through the house, but
10   he went back in another part for a few minutes.
11              He went outside a time or two.
12              And I -- I think he was calling somebody in the
13   church.
14              He said he was calling the city attorney to see
15   what the city attorney recommended for him to do.
16              That's what he came back in and said the city
17   attorney says that if you don't leave, then I should arrest
18   you.
19        Q.   Okay.  We'll get to that in just a few minutes.
20              Officer Cooke didn't tell you that he called
21   someone from the church, did he?
22        A.   No.
23        Q.   You don't know if that's true or not.
24        A.   I don't have personal -- I was not a personal
25   witness to him talking to someone from the church.

44

1    Q.    Okay.

2          Now, what's your relationship to Angelina Rohbock?

3    A.    She's Liz's daughter, youngest daughter.

4    Q.    Is she a natural child of yours?

5    A.    No.

6    Q.    Are you aware that she told Officer Cooke that she

7    was scared for her life with you being in the residence?

8    A.    I -- I read it on the statement, but I didn't know

9    it at the time she thought that and I don't really think she

10   was afraid for her life.

11   Q.    Well, did you talk to Angelina Rohbock that day

12   about whether she was scared?

13   A.    I didn't talk to her that day.  They went back

14   in another part of the house.  I didn't talk to her that

15   day.

16   Q.    So you don't have any firsthand knowledge of what

17   she told Officer Cooke.

18   A.    No.

19          I've spoken with her a number of times since then,

20   and I don't think she's afraid for her life though.

21   Q.    You have no idea what she told Officer Cooke on

22   July 19, 2012.

23   A.    I wasn't there to hear that conversation.

24   Q.    So, the answer is, no, you don't know.

25          Is that right?

1    A.   I was not a personal witness to what they talked

2    about.

3    Q.   And then Officer Cooke, did he not then come back

4    to you and say -- and ask you to please leave the residence?

5    A.   He asked me to leave a couple times.  And I says,

6    why should I leave?  I built the house.  It's my house.

7    Q.   So let's --

8    A.   It's my home, why should I leave?

9    Q.   Sorry.  I apologize.

10        Let me just be clear.

11        After Officer Cooke spoke with you and got a copy

12   of your occupancy agreement, and after he spoke to the other

13   occupants of the residence, which at least according to his

14   report told him that they were scared for their life, he

15   then came back to you and asked you to vacate the residence;

16   true?

17        MR. DONNELLY:  Object to form.

18        THE WITNESS:  This allegation that they're afraid

19   of their lives in my view is a blatant lie, because they are

20   not afraid for their lives of me.

21        I have never even as much as raised my voice to

22   any of them.

23   BY MR. MATURA:

24   Q.   And in order to know whether that's a lie, we

25   would have to ask Officer Cooke or Angelina Rohbock whether

1    that was said because you weren't there; right?

2         A.   No, I wasn't there, that's true.

3         Q.   So you can't say under oath that it was a lie.

4         A.   I can say that I don't have any idea on what they

5    would base being fearful of their lives by -- from me.

6         Q.   Okay.

7         A.   I don't know -- there is no basis for them to be

8    afraid for their lives, because there's never been any

9    violence not even so much as raising of my voice for being

10   angry with any of them.

11              So, to me it's a -- it's a total fabrication.

12        Q.   Do you think perhaps you climbing you through

13   a window to enter a residence where they had locked the

14   doors to keep you out might be a basis for someone to be

15   afraid?

16              MR. DONNELLY:  Object to form.

17              THE WITNESS:  They might.

18   BY MR. MATURA:

19        Q.   I'm sorry?

20        A.   I suppose they could be.

21        Q.   Okay.

22              So it's certainly not out of the realm of

23   possibility that Angelina Rohbock knew you climbed through

24   the window and told Officer Cooke that I'm scared for my

25   life.

47

1          Right?

2      A.   Are you asking me if I believed she was really

3    afraid for her life?

4      Q.   No, I'm asking you whether you would understand

5    that perhaps she told Officer Cooke that she was afraid for

6    her life in part because you had climbed through a window

7    when they tried to keep you out.

8          Does that make sense?

9          MR. DONNELLY:  Object.

10          THE WITNESS:  Not very much.  Not if you know the

11    people involved, it doesn't make very much sense.

12    BY MR. MATURA:

13      Q.   And we'll have to talk to Angelina Rohbock, right,

14    to figure out exactly what she told Officer Cooke, because

15    you don't know?

16          MR. DONNELLY:  Object to form.

17    BY MR. MATURA:

18      Q.   Is that true?

19      A.   I guess that she would have to say.

20      Q.   Now, let's go back then.  You recall then that

21    Officer Cooke came back to you and asked you to leave the

22    property.  Yes?

23      A.   Yes, he asked me to leave.

24      Q.   And you refused; right?

25      A.   If I remember right, I said, this is my house, I

48

```
 1   built it.
 2        Q.   Okay.
 3             So you refused to leave.
 4        A.   And -- and I don't see why I should leave my own
 5   house.
 6             Besides the fact I have an occupancy agreement
 7   here, so legally how can you say that I have no right to be
 8   here.
 9        Q.   So my question, sir, is you refused to leave the
10   house; right?
11        A.   Right at first I told him I don't see any reason
12   to leave.
13        Q.   So it's a simple yes or no.  You refused to leave
14   the house.
15        A.   I think I did refuse to leave the house.
16        Q.   And Officer Cooke asked you on multiple occasions
17   to leave the residence; true?
18        A.   Maybe a couple, two or three times.
19        Q.   Okay.
20             So it wasn't just a one time request.  It was two
21   or three times he asked you to leave and two or three times
22   you refused.
23        A.   I suppose I could have asked him where his search
24   warrant was and why he had any business being in the home
25   himself because legally I had the right to be there.
```

1      Q.   So the question, sir, is Officer Cooke asked you

2  two or three times to leave, and each time he asked you to

3  leave you refused.

4        Is that true?

5      A.   I didn't leave.  If that's a refusal, then I guess

6  that's a refusal.

7      Q.   Then you were aware that Officer Cooke called the

8  city prosecutor; right?

9      A.   He said he did.  I wasn't the witness to his

10  conversation with the city prosecutor.  He went outside --

11      Q.   Okay.

12      A.   -- to do the phone call.  I didn't hear his phone

13  call.

14      Q.   And Officer Cooke told you that the prosecutor

15  told him that if you don't leave he should arrest you;

16  right?

17      A.   I didn't hear him say the prosecutor.  I heard

18  city attorney.  That's what he said, if I remember

19  correctly.

20      Q.   And so you remember him telling you that he spoke

21  to the city attorney, and the city attorney told him that if

22  you don't leave, he should arrest you; right?

23      A.   That's what he said.

24      Q.   And he then asked you again to leave the

25  residence, so he didn't have to arrest you; true?

1      A.    I don't remember if he asked again.

2            I remember telling him that I wanted to make a

3      phone call, and he said, I'll give you two minutes.

4            And it was probably about 30 seconds and he was

5      grabbing for my arms trying to cuff me, because he realized

6      I called the Mohave County officer, the Mohave County

7      Sheriffs Office.

8      Q.    And who did you call at Mohave County?

9      A.    I don't remember the name of who answered, and I

10     don't right off have the name, but I called the dispatch,

11     whatever it is, the number.

12     Q.    How did you have the number?

13     A.    I didn't have it at first.

14           I called Jethro Barlow, who I had been talking to

15     previous to this who has been doing stuff for Bruce Wisan.

16     And I figured he'd have it, so I called him to see if he had

17     it.

18     Q.    So you called -- so Officer Cooke asked you again

19     to leave.

20           You said you wanted --

21     A.    I said --

22     Q.    Hold on.  I'm sorry.  Just let me ask the

23     question.

24           Officer Cooke asked you to leave, and then you

25     asked him if you could make a phone call; right?

```
 1        A.    Yes.
 2        Q.    And you called Jethro Barlow to get the phone
 3   number for Mohave County.
 4        A.    That's correct.
 5        Q.    And, by the way, did Jethro Barlow tell you to go
 6   to this house on July 19th?
 7        A.    No, he didn't tell me to do anything.
 8        Q.    And Jethro Barlow gave you the phone number for
 9   Mohave County; right?
10        A.    Over the phone, yes.
11        Q.    So then you hung up with Jethro Barlow; true?
12        A.    Yes.
13        Q.    And now you're making a second phone call.
14        A.    Yes.
15        Q.    To Mohave County.
16              And Officer Cooke says, leave this house
17   immediately.
18              True?
19        A.    I think he -- I don't know what he was thinking,
20   but I think he was watching me write down the number.  And
21   he probably recognized it for all I know.
22              And he didn't -- he -- he got very agitated,
23   started sweating and shaking, like he was quite agitated.
24   And, and I think he did command me to leave immediately.
25              And I says, can't we wait a couple minutes until
```

52

1     the Mohave County sheriff gets here?

2         Q.   Well --

3         A.   And he seemed very determined that we were not

4     going to wait for the Mohave County sheriff to get there.

5         Q.   Now, you asked Officer Cooke for the opportunity

6     to make a phone call; true?

7         A.   Yes.

8         Q.   And he gave you that opportunity because you

9     called Jethro Barlow; right?

10        A.   I didn't tell him who I was calling.

11        Q.   That wasn't the question.

12             The question was, you asked for the opportunity to

13    make a phone call, and he let you make a phone call; right?

14        A.   He said, I'll give you two minutes, is what I

15    remember him saying.

16        Q.   Now you made one phone call.

17             Now you're making a second phone call, at which

18    point in time Officer Cooke says, leave this house

19    immediately.

20             Right?

21        A.   It wasn't two minutes yet.

22        Q.   That wasn't the question though.

23             He again asked you to leave the residence.  This

24    is now the fourth or fifth time; right?

25        A.   I don't know how many times.

1     Q.   But it was multiple times.

2     A.   There were several.

3     Q.   And you again didn't leave; true?

4     A.   No, I wasn't intending to leave.  It was my house.

5 Why should I?

6     Q.   And at that point in time Officer Cooke placed you

7 under arrest; right?

8     A.   No.  Not that -- I don't remember him ever saying,

9 you're under arrest.

10        I remember I was trying to write, and he started

11 grabbing for my hands to try to cuff me from behind.

12        And I at first didn't know what he was doing.  He

13 was quite -- like if I was some kind of criminal, he just

14 going to rough -- manhandle me or whatever, but he grabbed

15 the pen out my hand and threw it on the floor hard enough to

16 break it.

17        And he got a cuff on one hand, and at that point I

18 said I'll go outside and wait.

19     Q.   So now --

20     A.   So I started walking down the stairs.  I told him,

21 okay, I'll leave, I'll go outside and wait.

22        And while I was trying to go down the stairs, he

23 several times reached for my other arm to try to put it in

24 the cuff, and I kept walking until we got outside.

25        And then I put my arm back there, and he put the

1           MR. DONNELLY:  Object to form.

2   BY MR. MATURA:

3       Q.   And that's the same thing that Curtis Cooke told

4   you on July 19; true?

5       A.   Curtis never said anything about a court order.

6       Q.   Okay.

7           And is it not true, sir, that Detective Kenyon

8   from Mohave County told you that this was a civil dispute,

9   between you and your family, and that you need to go down

10  and get a court order to exercise your rights to occupy that

11  property?

12          MR. DONNELLY:  Object to form.

13          THE WITNESS:  I don't remember that specific

14  language.

15          I do remember him saying something about getting a

16  court record.  And I never did it.  I decided not to.

17          MR. MATURA:  Let me mark an exhibit.

18          (Deposition Exhibit No. 4 was marked for

19  identification by the reporter.)

20  BY MR. MATURA:

21      Q.   Mr. Williams, I've handed you Exhibit 4, which is

22  a document from Mohave County about this August 4th, 2012,

23  encounter.  And it's from Detective Kenyon.

24          And my question for you, sir, is:  Did you call

25  Detective Kenyon to come out with you that day?

1    submitted his name?

2         A.    No, I don't have knowledge of it.

3         Q.    You're identified in this case by the Department

4    of Justice as an aggrieved party or an aggrieved person.

5              Do you understand that?

6         A.    Yes.

7         Q.    And can you tell me -- and I'm going to put a

8    caveat on this so don't answer until I'm done.  Can you tell

9    me what your understanding is of what it means to be an

10   aggrieved individual in this lawsuit, if your answer

11   includes something that you've learned not just speaking

12   with a lawyer of the Department of Justice?  Does that make

13   sense?

14        A.    I would imagine it means you're like a -- a

15   plaintiff.

16             Is that the right word?

17             Someone whose rights have been violated by a

18   government official, in this case the police department.

19        Q.    Are you seeking any relief from this lawsuit?

20        A.    I haven't actively sought after or asked or

21   demanded anything.

22        Q.    You're not seeking money?

23        A.    I'm letting things come however they do.

24             I have not asked or petitioned for money, no.

25             I'm not saying I would refuse some if it's a

```
 1    result of it, but I'm saying that I have not petitioned and

 2    said that I am owed anything, any kind of damages or

 3    anything like that.

 4            I haven't -- I don't even know how to begin to say

 5    what that would be --

 6        Q.   Okay.

 7        A.   -- from what has happened to me.

 8            (Whereupon, Mr. Hamilton enters the room.)

 9    BY MR. MATURA:

10        Q.   As we sit here today on April 23rd, 2014, you're

11    not seeking any monetary damages by being an aggrieved

12    individual.

13        A.   I haven't personally petitioned for any.  But if

14    it's part of this case and it's a result of it, we'll get --

15    cross that bridge when we get to it.  I don't -- I don't

16    know what result will happen.

17            The main thing that I want is to see the people

18    there educated about what's really going on, so that these

19    injustices don't keep happening.

20        Q.   When --

21        A.   That's my main feeling.

22            Is this is an ongoing problem, and I'd like to see

23    an even handed administration of the city government, the

24    police department, and not be treated like a criminal

25    because the church decreed and cast you out with a bunch of
```

# EXHIBIT 6

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

United States of America,      )
                               )
                Plaintiff,     )
                               )
            vs.                )   No. CV-12-8123-PCT-HRH
                               )
Town of Colorado City,         )
Arizona; City of Hildale,      )
Utah; Twin City Power; and     )
Twin City Water Authority,     )
Inc.,                          )
                               )
                Defendants.    )
_____)


**THE DEPOSITION OF RANDY SERVIS**
(Videotaped)


*** CONFIDENTIAL DRAFT ***


Flagstaff, Arizona
September 12, 2013
3:26 p.m.


(DRAFT COPY)
**PREPARED FOR:**                **REPORTED BY:**
                                 Az Litigation Support, LLC
                                 Marty Herder, CCR
DISTRICT COURT                   Certified Court Reporter
                                 CCR No. 50162

```
1    BY MR. MATURA:
2        Q.   So then the next question, is it true, sir, that
3    the additional information you may receive could clear
4    Marshal Roundy of any criminal violation?
5        A.   Or implicate him in more.  I don't know.
6             So, but it could, yes.
7        Q.   All right.
8             So if this report were shown to a jury one day
9    down the road, or a judge, would you agree with me that it
10   would be inaccurate to describe this report as being
11   complete?
12       A.   This report that you have in front of me,
13   Exhibit No. 3, it's complete.
14       Q.   Okay.
15       A.   The case is not closed.  The -- so -- but this
16   report is complete.
17       Q.   All right.
18            So it would be inaccurate to describe to a jury
19   that the investigation is complete.
20       A.   Correct.
21       Q.   And you won't make any comments today about what
22   the ultimate result of the investigation may be until you
23   receive additional information; is that fair?
24       A.   Correct.
25       Q.   Now, are you going to testify here today or
```

```
 1   perhaps at a trial in the future that you believe
 2   Marshal Roundy's interactions with Lydia Cooke with regard
 3   to this horse were impacted by Ms. Cooke's religion?
 4        A.   I don't have any -- I don't think religion has
 5   anything to do with this particular case or my aspect of
 6   this case, so. . .
 7        Q.   Do you know Marshal Roundy's religion?
 8        A.   No, I don't.
 9        Q.   Do you know Lydia Cooke's religion?
10        A.   No, I don't.
11        Q.   Do you know Shane Stubbs' religion?
12        A.   No, I don't.
13        Q.   Do you know Tusk Jessop's religion?
14        A.   Define know.
15        Q.   Well, if I asked you what is Tusk Jessop's
16   religion, what would you tell me?
17        A.   I don't know.
18        Q.   Okay.
19        A.   Okay.  But I have been told what his religion is,
20   but I don't know that for sure.
21        Q.   Have you ever asked Tusk Jessop what his religion
22   is?
23        A.   No.  That would be an improper question to ask
24   anybody involved in this case.
25        Q.   Could be a First Amendment violation.
```

# EXHIBIT 7

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1  Jocelyn Samuels
   Acting Assistant Attorney General
2  Steven H. Rosenbaum (NY Bar #1901958)
   Jonathan M. Smith (DC Bar #396578)
3  R. Tamar Hagler (CA Bar #189441)
   Christy E. Lopez (DC Bar #473612)
4  Eric W. Treene (NY Bar #2568343)
   Sean R. Keveney (TX Bar #24033862)
5  Jessica C. Crockett (NY Bar #4694972)
   Anika Gzifa (DC Bar #495394)
6  Matthew J. Donnelly (IL Bar #6281308)
   Attorneys
7  United States Department of Justice
   Civil Rights Division
8  950 Pennsylvania Avenue, NW
   Washington, DC  20530
9  Phone:(202) 305      -3216
   Facsimile:   (202) 514-0212
10 E-mail:  anika.gzifa@usdoj.gov

11 Attorneys for the United States

12

13       IN THE UNITED STATES DISTRICT COURT FOR THE
                 DISTRICT OF ARIZONA

14

15 | United States of America,

16 |            Plaintiff;           No. 3:12cv8123-HRH

17 |       v.

18 |

19 | Town of Colorado City, Arizona, *et al.*,

20 |            Defendants.

21

22 **UNITED STATES' ELEVENTH SUPPLEMENTAL INITIAL DISCLOSURES**

23       Pursuant to Federal Rule of Civil Procedure 26(e) and the Court's Scheduling and

24 Planning Order (ECF No. 48), Plaintiff the United States hereby supplements its initial

25 disclosures to provide additional and corrective information to Defendants Town of Colorado

26 City, Arizona, City of Hildale, Utah, Twin City Power, and Twin City Water Authority, Inc.

27

28

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**New information appears in bold text.**

The United States submits the names and addresses below subject to the parties' agreed Confidentiality Stipulation and Protective Order ("Confidentiality Stipulation"). The names and addresses below are "Confidential Material" as it is defined in the Confidentiality Stipulation, and as such, this information may not be used or disseminated in any way except as permitted under the terms of the Confidentiality Stipulation.

(i) The name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment:

The United States has identified the following individuals as those who are "aggrieved persons," as defined in the Fair Housing Act ("FHA"), 42 U.S.C. § 3602(i). The United States may seek damages on their behalf pursuant to 42 U.S.C. § 3614(a). These individuals may also be used to support the United States' claim under the Violent Crime Control and Law Enforcement Act of 1994 ("Section 14141").

1.  Patrick Barlow

    .           .           .

    Subject: Mr. Barlow's knowledge includes: the FLDS Church's control over the Twin Cities, the Cities' assistance to the FLDS Church in its surveillance of non-FLDS members, the coordination of Church security personnel and the CCMO, the Cities' efforts to prevent him from obtaining utility services at his home based on his religion, and related matters.

2.  Andrew Chatwin

    .

    ¿           .

2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Subject:** Mr. Chatwin's knowledge includes: the City's actions to prevent him from living in the Twin Cities, the CCMO's actions to arrest him for criminal trespass, the CCMO's refusal to enforce against FLDS members laws prohibiting vandalism and trespassing, and related matters.

3.    John Cook

**Subject:** Mr. Cook's knowledge includes: his efforts to procure water services in Colorado City, the Defendants' actions to prevent him from living in the Twin Cities, the CCMO's discriminatory treatment of non-FLDS members, and related matters.

4.    Ron and Jinjer Cooke, and their children

          The Cookes can be reached through their attorney William G. Walker
          177 North Church Avenue
          Tucson, Arizona 85701
          (520) 907-1291

**Subject:** Mr. and Ms. Cooke's knowledge includes: their efforts to find appropriate and affordable housing, their attempts to procure utility and water services in Colorado City, the City's actions to prevent them from living in the Twin Cities, the harassment and intimidation they have experienced resulting from the Defendants' discriminatory practices, and related matters.

5.    Charles (Ross) and Lori Chatwin

**Subject:** Mr. and Ms. Chatwin's knowledge includes: the Defendants' termination of water services in Colorado City, the Defendants' actions to prevent them from living in the Twin Cities, the CCMO's discriminatory treatment of non-FLDS members, and related matters.

6.    Richard Holm

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Subject:  Mr. Holm's knowledge includes:  his efforts to procure water services in Colorado City, the Defendants' actions to prevent him from living in the Twin Cities, the CCMO's discriminatory treatment of non-FLDS members,incl uding their harassment of his son, and the FLDS' control over the government functions of Colorado City and Hildale, and related matters.

7.    Christopher and Jesseca Jessop

Subject:  The Jessop's knowledge includes: the CCMO's failure to take action to enforce a valid occupancy agreement issued from the UEP, and related matters.

8.    Willie R. Jessop

Subject:  Mr. Jessop's knowledge includes:  the FLDS Church's control over the Twin Cities, the Cities' assistance to the FLDS Church in its surveillance of non-FLDS members, the coordination of Church security personnel and the CCMO, the CCMO's failure to provide police services with respect to housing, and related matters.

9.    Ron Rohbock

Mr. Rohbock can be reached through his attorney:
4276 South Highland Drive
Salt Lake City, Utah 84124
(801) 272-7556

Subject: Mr. Rohbock's knowledge includes: the CCMO's failure to take action to enforce a valid occupancy agreement issued from the UEP, and related matters.

10.    Jerold Williams and Elizabeth Wayman

4

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1

2

3    Subject:  Mr. Williams and Ms. Wayman's knowledge includes:  the CCMO's discriminatory treatment of non-FLDS members, the CCMO's implementation of FLDS edicts,
4    Mr. Williams' arrest at his home by the CCMO in 2012, and related matters.

5    12.    Dan Wayman

6

7

8    Subject:  Mr. Wayman's knowledge includes, but is not limited to:  his difficulty with
9    water service charges in the Twin Cities, and related matters.

10   13.    Isaac Wyler

11

12

13   Subject:  Mr. Wyler's knowledge includes: information concerning the enforcement of
14   court orders pertaining to management of the UEP, his conversations with representatives of
     the Cities, his knowledge about the availability of water in the Cities, his knowledge regarding
15   property disputes on UEP property, the CCMO's discriminatory treatment of non-FLDS
     members, the Cities' assistance to the FLDS Church in its surveillance of non-FLDS members,
16   the coordination of Church security personnel and the CCMO, the CCMO's actions to charge
17   him with criminal trespass, the CCMO's refusal to enforce against FLDS members laws
     prohibiting vandalism and trespassing, and related matters.
18

19   The United States may also rely on the following individuals to support its claims:
20

21   1.    Al Acosta, and his colleagues at Utah Peace Officer Standards and Training
           ("UTPOST")
22

23

24   Subject:  Lieutenant Acosta is the Bureau Chief of Investigations with UTPOST.
25   His knowledge includes: UTPOST decertifications of former CCMO officers, the FLDS's
     influence over the CCMO, the certification and reporting processes for police agencies in Utah,
26   and related matters.

27

28

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1    each computation is based, including materials bearing on the nature and extent of injuries suffered:

2
3    In accordance with 42 U.S.C. § 3614(d)(1), the United States is authorized to seek

4    monetary damages for aggrieved persons who have been harmed by the Defendants'

5    discriminatory practices in violation of the Fair Housing Act. The United States will be

6    seeking monetary relief for aggrieved persons, including compensatory damages they suffered

7
8    as a result of Defendants' discriminatory actions, including their out-of-pocket and economic

9    costs, lost housing opportunities, and emotional distress, embarrassment and humiliation. The

10   precise amount needed to compensate aggrieved persons for the emotional distress they

11   suffered will be determined by the jury. The United States continues to evaluate the evidence

12
13   in this case to determine the identity of aggrieved persons as well as the monetary damage

14   amounts sought on their behalf, and will supplement these responses accordingly. The United

15   States will also seek a civil penalty against each Defendant in an amount up to the maximum

16   permitted by 42 U.S.C. § 3614(d) and 28 C.F.R. § 85.3(b)(3).

17        (iv) For inspection and copying as under Rule 34, any insurance agreement under which
18        an insurance business may be liable to satisfy all or part of a possible judgment in the
          action or to indemnify or reimburse for payments made to satisfy the judgment:
19
              Not applicable.
20

21

22

23

24

25

26

27

28

31

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Dated: July 3, 2014.

1

2                                    JOCELYN SAMUELS
                                     Acting Assistant Attorney General
3                                    Civil Rights Division

4                                    STEVEN H. ROSENBAUM
                                     Chief
5                                    Housing and Civil Enforcement Section

6                                    JONATHAN M. SMITH
                                     Chief
7                                    Special Litigation Section

8                                    R. TAMAR HAGLER
                                     CHRISTY E. LOPEZ
9                                    Deputy Chiefs

10                                   ERIC W. TREENE
                                     Special Counsel

11                                   */s/ Anika Gzifa*
                                     SEAN R. KEVENEY
12                                   JESSICA C. CROCKETT
                                     ANIKA GZIFA
13                                   MATTHEW J. DONNELLY
                                     United States Department of Justice
14                                   Civil Rights Division
                                     950 Pennsylvania Avenue, NW
15                                   Washington, DC 20530
                                     Phone: (202) 514-4838
16                                   Facsimile: (202) 514-0212
                                     E-mail: sean.r.keveney@usdoj.gov
17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 8

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

United States of America,       )
                                )
                    Plaintiff,  )
                                )
            vs.                 )   No. CV-12-8123-PCT-HRH
                                )
Town of Colorado City,          )
Arizona; City of Hildale,       )
Utah; Twin City Power; and      )
Twin City Water Authority,      )
Inc.,                           )
                                )
                    Defendants. )
_____)

**THE DEPOSITION OF JOHN COOK**
(Videotaped)

**\*\*\* CONFIDENTIAL DRAFT \*\*\***

St. George, Utah
August 15, 2013
8:09 a.m.

(COPY)
**PREPARED FOR:**                   **REPORTED BY:**
                                    Az Litigation Support, LLC
                                    Marty Herder, CCR
DISTRICT COURT                      Certified Court Reporter
                                    CCR No. 50162

```
 1        A.    Okay.
 2        Q.    So, have you -- again, you've been disclosed as a
 3   potential witness in this case.  And I had you read your
 4   disclosure statement.
 5              And at the beginning of the deposition we went
 6   around and introduced ourselves.  And Mr. Keveney and
 7   Mrs. Gzifa identified themselves as working for the
 8   Department of Justice.
 9              When -- have you ever been contacted by the
10   Department of Justice?
11        A.    Sandra Kane's office, yes.
12              And I faxed her some information.
13        Q.    Okay.
14              I'm not talking about Ms. Kane.  I'm talking about
15   the Department of Justice.  She does not work for the
16   Department of Justice.
17        A.    Well, okay.
18        Q.    Have you ever spoken to Mr. Keveney prior to
19   today?
20        A.    No, I don't think so.
21        Q.    Have you ever spoken with Ms. Gzifa prior to
22   today?
23        A.    No.
24        Q.    Have you ever spoken with anyone from their office
25   as far as you know?
```

17

1       A.   As far as I know, I haven't.

2       Q.   Okay.  So you've never met with the Department of

3    Justice.

4       A.   As far as I know, no.

5       Q.   Did you know that you had been disclosed as a

6    witness in this case?

7       A.   Not until I received a summons.

8       Q.   Okay.

9            So prior to receiving the subpoena and deposition

10   notice, you had no idea that you were listed as a potential

11   witness in this case.

12      A.   No.

13      Q.   And is it your testimony at no point as far as you

14   can recall that you had any contact with anyone from the

15   Department of Justice?

16      A.   I have not.

17      Q.   Okay.

18           So it's safe to say that at no point did you ever

19   agree to be a witness in this case; is that correct?

20      A.   That's not correct, but I just am glad to help

21   wherever I can.

22      Q.   Okay.  But at no point --

23      A.   So when I received the summons, I was willing to

24   come here.

25      Q.   And I appreciate that, sir.

1      Q.    Okay.

2            Now, you just talked about your son-in-law filling

3      out a petition for benefits with the UEP trust; is that

4      correct?

5      A.    He was wanting to get a lot, yes.  But he did not

6      get an occupancy agreement, that I know of for sure, because

7      he did not pursue it because of what he was told by Jethro

8      Barlow and Bruce Wisan --

9      Q.    Okay.

10     A.    -- that he needed to wait.

11     Q.    And you -- you testified about that in your

12     previous deposition, so I'm not going to cover that again.

13     Okay?

14     A.    Okay.

15     Q.    Any other things besides those two incidents that

16     you know of or CCMO's discriminatory treatment of non-FLDS

17     members?

18     A.    Well, I do know that they have plenty of water to

19     put into their buildings that they want to build.

20     Q.    All right.  Sir -- sir, I don't mean to stop you,

21     but I'm asking you about Colorado -- Hildale and Colorado

22     City Marshal Office.

23     A.    Okay.

24     Q.    Do you have any knowledge about -- any other

25     knowledge about Hildale and Colorado City Marshal's Office's

1    discriminatory treatment of non-FLDS members?

2        A.    No.

3        Q.    You also have been disclosed in discovery

4    responses about having knowledge regarding Twin City Water

5    Authority's denying the request of non-FLDS individuals for

6    water services at new properties while at the same time FLDS

7    residents have received such services.

8            MR. KEVENEY:  Objection.

9            THE WITNESS:  That's correct.

10   BY MR. HAMILTON:

11       Q.    All right.

12            First of all, do you even know who Twin City Water

13   Authority is?

14       A.    Yes.

15       Q.    Who are they?

16       A.    Colorado City, Hildale City.

17       Q.    All right.

18            Is that their -- do you understand that to be

19   their water utility?

20       A.    They all operate out of the same building.

21       Q.    Okay.

22       A.    As far as I know, that when you submit a plan to

23   Hildale City, it's all part of the same utility services.

24       Q.    Okay.

25            Do you know of any non-FLDS individuals that

```
 1    community and almost every -- everything, every business in
 2    it for that number of years.
 3         Q.   Okay.
 4              What kind of damages are you seeking?
 5              MR. KEVENEY:  Object to the form.
 6    BY MR. HAMILTON:
 7         Q.   What type of -- you've been listed as an aggrieved
 8    individual.  What type of damages are you seeking in this
 9    case?
10         A.   I do not have any knowledge of that.
11              MR. KEVENEY:  Object to the form.  The
12    United States is seeking damages, not Mr. Cook.  He's not a
13    plaintiff.
14    BY MR. HAMILTON:
15         Q.   You have no knowledge about that.
16         A.   I have no knowledge.
17         Q.   You also have been disclosed as an individual
18    having knowledge about the defendants' conduct being
19    intentional, willful, and taken in disregard for the rights
20    guaranteed under the Fair Housing Act.
21              Do you have any knowledge about that?
22         A.   Yes, I've already stated what I know.
23         Q.   Do you have any other knowledge besides the
24    knowledge you've stated?
25         A.   No.
```

# EXHIBIT 9

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


United States of America,       )
                                )
                Plaintiff,      )
                                )
        vs.                     )   No. CV-12-8123-PCT-HRH
                                )
Town of Colorado City,          )
Arizona; City of Hildale,       )
Utah; Twin City Power; and      )
Twin City Water Authority,      )
Inc.,                           )
                                )
                Defendants.     )
_____)


**THE DEPOSITION OF ROSS CHATWIN**
(Videotaped)




Colorado City, Arizona
May 24, 2013
8:04 a.m.




(ORIGINAL)
**PREPARED FOR:**                    **REPORTED BY:**
                                     Az Litigation Support, LLC
                                     Marty Herder, CCR
DISTRICT COURT                       Certified Court Reporter
                                     CCR No. 50162

```
 1    intimidated, but just tell the truth.

 2              Whatever you do, absolutely tell the truth.

 3              That was the biggest thing I got out of the

 4    conversation.

 5         Q.   That's good advice.  I second that.

 6              Did you talk about any of the testimony you're

 7    supposed to give on behalf of the Department of Justice?

 8         A.   The testimony, like what happened?  You mean like

 9    what I'm supposed to say?

10         Q.   Yeah.  I mean --

11         A.   She didn't say anything about what I'm supposed to

12    say, no.

13         Q.   You understand you've been identified as a witness

14    for -- by the Department of Justice.

15         A.   Yes, I've understood that now.

16         Q.   Did you learn that for the first time when you

17    spoke last week?

18         A.   Yes.  When I talked to Lori Wagner is the first

19    time I've been -- well, I -- I guess I should say that I got

20    served a subpoena to be here.  And that was the first time

21    that I supposed I was being depositioned for something, but

22    I thought that at that time it was for the -- for the

23    Department of Justice, as who was subpoenaed me here.

24              But I understood from Libby here, no, no,

25    it's not -- I don't think it was the Department of Justice.
```

1  I think it was the attorneys for the towns of Colorado City

2  and Hildale that were actually subpoenaing you to come and

3  testify, or to be a witness and come and make a statement.

4      Q.   Okay.  All right.

5          So you received a subpoena actually from

6  Mr. Hamilton's office, he represents Hildale City, to have

7  you come here today.

8      A.   I believe so.

9      Q.   All right.

10          So, let's talk about your testimony, because what

11  happens during lawsuits is the attorneys exchange

12  information.  And we're required to give certain information

13  to them and they're required to give certain information to

14  us.

15      A.   Okay.

16      Q.   And part of the information that they gave us

17  was anticipated testimony that you may give on their behalf.

18          Okay?

19      A.   Okay.

20      Q.   It doesn't mean that you absolutely will give this

21  testimony.  It's their best educated estimate of the type of

22  testimony you're going to give.

23          Okay?

24      A.   Okay.

25      Q.   So they've identified several areas with your name

1   where the judge did and said what he said, and I don't

2   remember exactly what it was right now.

3       Q.   Let me ask it this way then.  I'm just trying to

4   make sure I understand the sequence.

5            On this September date, I'm going to

6   say September 7th or whenever it was --

7       A.   Oh, you're saying this is the court date.

8       Q.   Just one at a time here.

9            No.

10           On the date that you changed the locks again now,

11  that you just told me about --

12      A.   Uh-hmm.

13      Q.   -- am I connect, sir, that on that date you didn't

14  yet have the written signed order from the judge granting

15  you a life estate interest?

16           MS. WAGNER:  Objection; form.

17           THE WITNESS:  Right.  I did not.

18  BY MR. MATURA:

19      Q.   Okay.

20           Because I think you testified -- I just want to

21  make sure I understand the sequencing -- that the UEP's

22  attorney was going to do some work and submit a proposed

23  order that the judge still had to sign at that point in

24  time.

25      A.   That may have been later than that even.

```
 1   little bit.  I just unlocked it.

 2        Q.   You unlocked it.

 3        A.   Unlocked the window.

 4        Q.   You then left.

 5        A.   Yes, I then left.

 6        Q.   Okay.

 7             At some point in time when that part of the house

 8   was vacate -- vacant, if you will, no one was there, you --

 9   did you go back and enter through the window?

10        A.   I could be wrong on that.

11             Now that I think about it, I -- there may have

12   been someone there at the house at that time.

13        Q.   Okay.  So, but -- all right.

14             So maybe there was someone there, maybe not --

15        A.   Right.

16        Q.   But you came back at a later point in time during

17   that same day --

18        A.   The next day.

19        Q.   Okay.  Thank you.

20             The next day, and you entered into that part of

21   the residence through the window.

22        A.   When they were not there.

23        Q.   So you went through the window because you knew it

24   was unlocked because you had unlocked it the day before.

25        A.   Yes.
```

1       Q.    So you went in through the window.  You were now

2  in the residence, and you were able to then get access

3  and unlock the doors from the inside and have the locks

4  changed.

5       A.    Yes, I changed the locks, both of them.

6       Q.    Did you do it yourself?

7       A.    Yes, I did.

8       Q.    Something you knew how to do.

9       A.    Yes.

10      Q.    And did you again change two locks?

11      A.    I did.

12      Q.    Same two as before?

13      A.    Yes.

14      Q.    All right.

15            So later -- I'm sorry, the next day -- and do you

16  remember what -- what day of the week that was?

17      A.    Let me back up a second here.

18            The two locks I changed were actually the very

19  two same locks I changed before, in fact, using the very

20  same locks.  Because when they changed them back and put

21  theirs back on, they gave them back to me.  Said, hey, these

22  are yours.

23      Q.    Okay.

24      A.    I used those very same two locks.

25      Q.    All right.

1            So, you go back the next day, you climb through

2    the window, and you used the exact same two locks that you

3    used last time to changes the locks on the two doors.

4        A.    Yes.

5        Q.    And what do you do then?  Do you leave or what do

6    you do?

7        A.    I sit and wait, outside.

8        Q.    And who showed up first?

9        A.    Steven's wife, Elizabeth, with her children.  And

10   they needed the bathroom really -- one of them needed the

11   bathroom really bad.

12           She went to the door, running into the house

13   there, and the door was locked.

14           Well, she knew -- she knew it was.  She got her

15   key out here, and the key wouldn't fit it.

16       Q.    And you're in the house.

17       A.    No, I'm outside.

18       Q.    Oh, I'm sorry, excuse me, you're outside.  And --

19       A.    I'm outside watching her from outside.

20       Q.    What happened?

21       A.    I just watched.

22           And then she, she got -- appeared to be very, very

23   angry.

24           Instantly very, very angry here.

25           And grabbed her two kids by the hand here, and

```
 1   yanked them back down there into their minivan they were

 2   driving, or their car, their vehicle, the vehicle they were

 3   driving.

 4          She ran them down there really fast and

 5   aggressively put them into the car.  And then she sped out

 6   of the driveway, spinning rocks and gravel all over.  And

 7   then ran down -- I watched her go down to where -- I was

 8   watching her.  She went down to where my brother Steven was

 9   living.  That was in a trailer, modular home, that was --

10   that was about two blocks away.

11          And then I'm supposing that she went down there

12   and took care of her bathroom needs for her little boy that

13   needed it really bad.

14          And then about five, ten minutes later, then she

15   comes back along with the -- with the local police

16   department.

17      Q.   Do you know --

18      A.   Which I was expecting they would come.

19      Q.   Okay.  Who from the local police department came

20   back?

21      A.   And at this time Fred Barlow was the one that took

22   charge.

23      Q.   Officer Barlow.

24      A.   Officer Barlow was the one that actually took

25   charge.  And he was the one that -- that was there.
```

1          There were other ones there also.

2          And I believe that Helaman was there.

3          My -- my cousin Verl Young was there.  Steven

4    immediately showed up.  Other guys and people showed up

5    there in a big, big hurry, come running in there, rushing

6    in.

7     Q.    And did you speak to Officer Fred Barlow?

8     A.    I'm sure I did.

9     Q.    Do you remember what you talked about?

10    A.    He said -- you know, after asking, you know, why

11   I'm doing this, then, then what -- then if you will just

12   give me the key -- will you just -- he just asked for the

13   key, will you give me the key.

14          And I declined this time.

15    Q.    I'm going to try and make this easier on us

16   actually as we walk through it.

17    A.    Okay.

18    Q.    I have in my hand, sir, a copy of the incident

19   report from this event that you're about to describe to me.

20    A.    Okay.

21    Q.    I only have one copy here.  I just -- just have

22   that copy.

23          I'm not going to mark it as an exhibit at this

24   point in time, but --

25          MS. WAGNER:  May I see that, please?

```
 1    represent in time for -- so I can -- I'm just trying to see
 2    if it's accurate or not.  I'm trying to see -- what time
 3    would that be?
 4         Q.   I assume it's military hours which would be --
 5         A.   Well, I'm talking about -- I'm talking about what
 6    time would that be in -- in like -- is that, like, like
 7    10:00 o'clock in the morning, or?
 8         Q.   I'll tell you.
 9         A.   Okay.
10         Q.   If it's military hours, then that would be 6:07.
11         A.   Oh, okay.  Okay.
12         Q.   All right?
13         A.   Okay.
14         Q.   Then it says upon arriving at the address, I
15    talked to Officer Fred Barlow who arrived prior to me.
16    Officer Micah Barlow was also present.
17              Officer Fred told me that Charles Ross Chatwin had
18    admitted to climbing through the window of the upstairs
19    apartment at the residence and changed the locks on the
20    doors.
21              Are you with me so far?
22         A.   I am, but I don't -- I'm not calling it an
23    apartment of a house.  And I don't know if that makes a
24    difference or not, but --
25         Q.   Okay.
```

```
1         A.    -- I call it the upstairs of the house.

2         Q.    So, so far, right, you -- you admitted climbing

3    through the window of the upstairs of the house; right?

4         A.    Yes.

5         Q.    Okay.

6               It then continues --

7         A.    Of my home.

8               Okay.  Go ahead.

9         Q.    It then continues:  He, meaning you, locked the

10   occupant of the residence, Steven Chatwin, his brother, out

11   of the apartment.  Again, they say apartment.  I understand

12   it's a house.

13        A.    Okay.  All right.

14        Q.    He said:  Ross had taped a paper to the front door

15   that said, quote, no trespassing, end quote.

16              Did that -- did that happen?

17        A.    Yes.

18        Q.    You taped some paper on the front door.

19        A.    Uh-hmm.

20        Q.    Yes?

21        A.    Yes.

22        Q.    Just something you wrote with your own hand, a

23   sign?

24        A.    I don't know.  I don't remember if it's been one

25   that was a computer-generated one that had been made up,
```

108

1   like, just a copy of the one I did so many other times

2   before, or if it's one that was -- one that was -- that I

3   just handwrit.  I don't remember.

4       Q.   It says:  Myself and Officer Fred went to the

5   front of the residence and talked to Ross Chatwin and Steven

6   Chatwin.

7            It says:  Steven was upset and started yelling at

8   Ross.

9            Did that happen?

10      A.   Yes, that is correct.

11           And I'll even say one more thing too while we're

12  on this right here because it's something -- it's part of

13  that.

14           Is that the officer -- and Verl Young was there

15  too.  He was trying to calm Steven down because Steven was

16  getting very, very upset.  I mean, I've never seen Steven so

17  upset before.

18           So, and I was calm and collected here, because I

19  was doing a job.  You know, I was doing a purpose.

20           And, Steven was told by -- by -- I believe it was

21  Fred, but one of the officers said to Steven:  Steven, if

22  you don't be quiet and quit getting mad here, we're going to

23  have to arrest you.

24           And that was made -- that was -- that statement

25  was made.

```
 1        Q.    So the officers were trying to calm Steven down;
 2   right?
 3        A.    Yes.
 4        Q.    It then says:  That I, meaning the officer, told
 5   Steven to go back over to the police vehicles with
 6   Officer Micah Barlow.
 7        A.    Let's see.
 8              Okay.  Yeah, that was accurate.
 9        Q.    So they removed Steven from the situation --
10        A.    Right.  Because he was getting very upset, and he
11   was, you know, getting almost like -- could be getting
12   violent.
13        Q.    Okay.
14              And so you remember the officer removing Steven.
15        A.    That he -- yeah, that he went and went somewhere
16   else out of my presence, because he was. . .
17        Q.    Because he was so upset.
18        A.    Yes, right, correct.
19        Q.    It says:  I then talked to Ross Chatwin.  He said
20   he climbed through window to the upstairs and had changed
21   the locks and deadbolts on the doors of the house.
22              So far so good?
23        A.    Yes.
24        Q.    It says:  I asked him why he did this.
25              He said that a judge had given him a, quote,
```

```
 1    lifetime estate, end quote, of the property.

 2             So far so good?

 3    A.    Uh-hmm.

 4    Q.    Accurate?

 5    A.    To the best of my knowledge, yes.

 6    Q.    Okay.

 7             It then says:  I asked him to show me the court

 8    order signed by a judge.  He said he did not have anything

 9    like that, but his attorney did.

10             So far accurate?

11    A.    Yes.

12    Q.    It says:  I then told Ross that the upstairs

13    apartment -- I understand you don't like the word apartment;

14    right?

15    A.    Uh-hmm.

16    Q.    Okay.

17             Yes?

18    A.    Right.  Apartment implies here that there was --

19    that it was a duplex or it was an apartment building or

20    apartment house or something with multiple residences, and

21    it was never designed or meant to be that way.

22    Q.    Okay.

23             So it says:  I then told Ross that the upstairs

24    apartment was Steven's residence and the basement was his

25    residence.  I told Ross it was against the law to enter
```

1    another person's residence without that person's permission.

2           Is that accurate, that he told you that?

3    A.    Probably, yes.

4    Q.    It says:  I asked where the keys to the new locks

5    were.  Ross said he had them.  I asked him to unlock the

6    door and let Steven back into the apartment.  He said Steven

7    would have to break into the apartment.

8           Is that accurate so far?

9    A.    Uh, I don't remember if that was the word that I

10   used, to break in here.

11          I don't know much I used that.  I mean, it may or

12   may not have been.

13   Q.    Okay.

14          It says:  I then asked Officer Fred to watch

15   Mr. Chatwin and went over and talked to Steven.

16          During this time Ross Chatwin's wife was

17   videorecording everything and his children were also

18   present.

19   A.    That is correct, yes.

20   Q.    Okay.

21          Steven said his wife had left the residence for

22   approximately 30 minutes, when upon returning found the

23   locks changed and a sign taped on the door.

24          I assume you were not present during the officer's

25   conversation with Steven.

1   A. You mean when he pulled Steven aside and went

2 somewhere else?

3   Q. Right.

4   A. No, I don't think so.

5   Q. Okay.

6    So you don't know exact -- you don't know whether

7 Steven said this or how it was reported; is that true?

8   A. That's true.  That's correct.

9   Q. Let's just look at it anyways.

10    The report says that:  He, meaning Steven, said he

11 called 911 and notified the police.  He said that he and

12 Ross were already in civil court over the property.  I then

13 called Chief Sam Roundy and told him of the incident.  He

14 said if Ross Chatwin entered the residence without

15 permission he was in violation of criminal trespassing.  He

16 that this was an ongoing dispute.

17    Do you see that?

18   A. Yes.

19   Q. All right.  The next paragraph.

20    It says:  I then -- I returned to talk to Ross

21 Chatwin.  I asked him again what had happened.  And he again

22 said he had climbed through a window near the air

23 conditioning and had changed the locks on the doors.

24    Do you remember explaining that again to the

25 officer?

113

```
 1        A.   I don't remember the specifics about that, but
 2   yes.
 3        Q.   It seems accurate though.
 4        A.   Uh-hmm.
 5        Q.   Yes?
 6             Is that right?  Yes?
 7        A.   Uh-hmm, yes.
 8        Q.   You just have to answer out loud.
 9        A.   Okay.  I'm sorry.  Yes.
10        Q.   It then continues:  I asked him to produce the
11   keys to the locks.  He said they were in the basement where
12   he lived and refused to get the keys.
13             Do you remember saying that?
14        A.   Not specifically, but it could have been.
15        Q.   Okay.
16             It continues and says:  He also told me not to
17   refer to the residence as Steven's as he had a court order
18   giving him a life estate to the whole house.  I then
19   informed him that without proper documentation he had
20   no claim to the property and he was in violation of the law.
21             Do you remember them telling you that?
22        A.   Uh, not the specifics about it, but, yes, uh-huh,
23   yes.
24        Q.   Okay.
25             It then says:  I arrested Charles Ross Chatwin for
```

1    criminal trespass, a class six felony.

2              Did they arrest you?

3         A.   Yes, they did.

4         Q.   The second page of Exhibit 1 is a supplement,

5    which you're welcome to read the entire supplement if you

6    would like to.  It repeats almost exactly what we've already

7    talked about.

8              And I want to ask you about a part of this

9    supplement.  Okay?

10        A.   Okay.

11        Q.   About three quarters of the way down, the sentence

12   that says:  Ross stated that the judge had given him a life

13   estate to the whole house and the property.

14             Do you see that?

15        A.   Uh-hmm, yes.

16        Q.   The next sentence says:  Officer Helaman Barlow

17   asked if he had any documentation or court orders that would

18   prove his claim.

19             Do you see that language?

20        A.   Yes.

21        Q.   Do you remember Helaman Barlow specifically asking

22   you that, that it was Helaman Barlow that asked you that

23   question?

24        A.   I don't remember specifically if it was him that

25   asked that question here, but probably, most likely it was

 1  him.

 2       Q.   It continues and says:  Ross stated that he did

 3  not, but that his attorney could get them for him.  Officer

 4  Helaman then told Ross that he had no right to enter

 5  Steven's residence and that to do so is criminal trespass.

 6            Then if you skip down to the last paragraph.

 7            At 1845 hours, which would be 6:45 p.m. --

 8       A.   Okay.

 9       Q.   -- Officer Helaman placed Ross under arrest.

10            Do you remember that it was Officer Helaman

11  Barlow?

12       A.   No, I very intently remember that it was not

13  Officer Helaman.  It was Officer Fred that did that.  I know

14  very well that it was not Helaman.

15       Q.   And then, in fact, the next sentence says:  I,

16  which means Office Barlow -- excuse me, Fred Barlow, I

17  handcuffed Ross.

18       A.   This is -- this is talking about Fred here; right?

19       Q.   Yes.

20       A.   Okay.

21       Q.   And do you remember it was Fred Barlow that --

22       A.   I specifically remember it was Fred definitely.

23  Definitely was Fred.

24       Q.   Says:  I handcuffed Ross and took him over to the

25  office to fill out a booking packet.  Myself and

```
 1    Officer Micah Barlow transported Mr. Chatwin to the

 2    Washington County Jail for booking without incident.

 3              Is that what happened?

 4        A.   Yes.  That is what happened.

 5        Q.   Okay.

 6              Does this narrative, Exhibit 1, does this fairly

 7    represent what happened that day?

 8        A.   Uh, fairly.

 9        Q.   Okay.

10        A.   Fairly.

11              Now, now, why -- I know I was -- I was booked down

12    there without bail.  Bail was not an option.

13              Uh, a couple of things is that -- is that this was

14    a civil dispute.  Why did the local police department arrest

15    me on a civil dispute?

16              They were there to keep the peace, not to -- not

17    to, to interfere with a civil dispute.

18              And the other question is, is that, um -- is that

19    when I was down there in the jail, about 20 -- almost

20    24 hours later, then the prosecutor for the state of -- or

21    for Mohave County had looked at my case.

22              And he asked the questions, because he came and

23    told me this.  He says, I don't understand why you're here,

24    but according to my looking at the court record and seeing

25    that you have life estate of the whole house, that you
```

117

```
 1    should not be here, and I am releasing you immediately.
 2         Q.   And were you released?
 3         A.   And I was released immediately.
 4         Q.   How long did you spend --
 5         A.   I spent almost 24 hours in the Purgatory -- in the
 6    Hurricane Purgatory or the Washington County Jail.
 7         Q.   Okay.
 8              And did anything else happen with respect to this
 9    incident?
10         A.   Yeah.  I was hauled from the, from the jail -- the
11    next morning, I was hauled from there to -- to the, to the,
12    the Mohave County Court that was -- the northern court was
13    in Moccasin, Moccasin Court.
14              And there Judge Brown was -- was filling in or
15    something for the previous judge that was the judge there.
16              And she just told me that -- that what I had done
17    was a very serious crime and it was -- I could get, I
18    believe it was up, to five years in prison and $10,000 fine
19    for criminal trespass.
20              This is what the charges were.
21              And that we're going to -- you know, this is the
22    preliminary -- a preliminary seeing of the judge.
23              And that we'll set a date and we'll, you know,
24    commence to do whatever trial is necessary, you know, to get
25    it in the system.
```

```
1       Q.   And --

2       A.   And then I went back from there.  They hauled me

3    down, you know, all handcuffed up.  They hauled me back down

4    to the Purgatory, and I was put back there.

5            And then it wasn't very long later here, well,

6    hours later, then the -- that's when the Mohave County

7    prosecutor, he came and identified himself as the Mohave

8    County prosecutor.  And says that -- he actually came and

9    seen me right there in the jail with the -- with the other

10   inmates and the other people there.  And he says -- you

11   know, sitting across from a table there, he says, I don't

12   know why you're in here, I have looked up the case, and the

13   judge has given you life estate of the whole house, and that

14   they have no right to, to haul you down here in the first

15   place and to arrest you.

16           So I'm immediately going -- I'm going to arrest --

17   I mean, I'm going to release you immediately.

18      Q.   Do you know, sir, what the prosecutor looked at to

19   make that conclusion?

20      A.   He said that he had -- well, I don't know what it

21   was.  I don't know what -- he did not show me what he looked

22   at.

23           He just told me that he had looked at the file

24   here, and whether it was on the Internet or a phone call to

25   the, to the court or what, I don't know what it was.  That's
```

1      Q.   And no other attorney, to your knowledge, ever did

2    anything on your behalf to file a lawsuit against the

3    Marshal's Office.

4      A.   No.

5      Q.   Okay.

6      A.   I wanted to, but did not have the funds and the

7    means to go do it with, so I didn't.

8      Q.   Do you understand that the Department of Justice

9    has listed you as what they describe as an aggrieved person

10   entitled to damages?

11     A.   I did not know that, no.

12     Q.   Do you believe that you're entitled to monetary

13   damages?

14     A.   Yes, I do.

15     Q.   And how much do you believe you're entitled to?

16     A.   I don't know that.  Without being advised, I don't

17   know.

18     Q.   And those damages would be for what?

19     A.   For being illegally arrested, unlawfully arrested.

20     Q.   And you do not know what number you would place on

21   that.

22     A.   I don't at this point, no.

23     Q.   And do you know how you would calculate those

24   damages?

25     A.   I don't right now without advice.

1    Q.   And have you ever been asked to go through that

2  calculation in your mind by anyone from the Department of

3  Justice?

4            MS. WAGNER:  Objection.

5            THE WITNESS:  No, I have not.

6            MS. WAGNER:  Excuse me.

7            I want to make a continuing objection, that he not

8  discuss what he discussed with us in answer to your

9  questions -- in answer to that question.

10           MR. MATURA:  On what basis?

11           MS. WAGNER:  On the basis of a common interest in

12  litigation privilege on behalf of an aggrieved person.

13           MR. MATURA:  But once he's identified as an

14  aggrieved person and you've disclosed him to us, those

15  conversations are fair game.

16           MS. WAGNER:  No.  I believe that he should not be

17  discussing in answer to that specific question, I've been

18  listening carefully to your questions, conversations that

19  he's had with us.

20           MR. MATURA:  Okay.  Well, we'll see if the

21  objection comes up again.

22  BY MR. MATURA:

23     Q.   And these would be damages -- if you were to seek

24  damages, what I want to understand is, these would be

25  damages related to the false arrest in your mind that

```
 1   occurred in 2004; is that right?
 2           MS. WAGNER:  Objection.
 3           THE WITNESS:  There may be more things involved
 4   too besides that.
 5   BY MR. MATURA:
 6       Q.   Like what?
 7       A.   I don't feel like it's something that I should --
 8   that I should tell you without consulting an attorney first.
 9       Q.   By an attorney do you mean the Department of
10   Justice?
11       A.   No, by my attorney.
12       Q.   Okay.
13       A.   By my attorney.
14       Q.   So here's what I want to understand.  As you sit
15   here today, the only damages that you would seek would be
16   related to something that happened in 2004.
17           MS. WAGNER:  Objection.
18   BY MR. MATURA:
19       Q.   Is that fair?
20       A.   No.
21           MS. WAGNER:  Objection.
22           I'm asking you to wait.
23           Objection.  The United States is seeking damages
24   on his behalf, and I am objecting to your asking him
25   questions about what the United States is seeking.
```

139

1          He's already answered that he doesn't -- hasn't

2    done that calculation.  And I am objecting to your asking

3    him that question again.

4          (Whereupon, Mr. Vincen Barlow enters the

5    deposition room.)

6    BY MR. MATURA:

7       Q.   I'm going to ask it one more time, because I need

8    to know the time frame.  It's very important that I know a

9    time frame.

10          My question for you is whether you'd be seeking

11   damages or whether you would want the Department of Justice

12   to seek damages on your behalf for something that happened

13   in 2004.

14          MS. WAGNER:  Objection.

15          THE WITNESS:  I would need to consult with my

16   attorney --

17   BY MR. MATURA:

18       Q.   Is there --

19       A.   -- before I could answer that question.

20       Q.   Is there anything that happened in 2005, '6, '7,

21   '8, '9, '10, '11, '12, that you would lay claim to as a

22   basis for damages?

23          MS. WAGNER:  Objection.

24          Same objection.

25          THE WITNESS:  Without my attorney's advice, I

1    don't know for sure what I could do.

2    BY MR. MATURA:

3         Q.   So as you sit here today at least, you don't know.

4              MS. WAGNER:  Objection.

5              THE WITNESS:  Well, I don't know what I should

6    say.

7    BY MR. MATURA:

8         Q.   Do you have a private attorney on hand these days?

9         A.   I don't currently right now, no.

10             I could certainly get one.

11             MR. MATURA:  Let's take a two-minute break.

12             THE WITNESS:  Okay.

13             THE VIDEOGRAPHER:  We are off the record at 10:44.

14             (Brief recess taken.)

15             THE VIDEOGRAPHER:  We are on the record at

16   11:00 a.m.

17             MR. MATURA:  Okay, Mr. Chatwin, I don't have any

18   more questions for you at this time.  I may, in fact, have

19   more questions when Ms. Wagner is done, but for now I am

20   going to pass the baton to Lori.

21             THE WITNESS:  Okay.

22

23                     E X A M I N A T I O N

24   BY MS. WAGNER:

25        Q.   I just wanted to go back and ask you if you could

# EXHIBIT 10

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CV-12-8123-PCT-HRH |
| | ) | |
| Town of Colorado City, | ) | |
| Arizona; City of Hildale, | ) | |
| Utah; Twin City Power; and | ) | |
| Twin City Water Authority, | ) | |
| Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**THE DEPOSITION OF JESSECA JESSOP**
(Videotaped)

St. George, Utah
April 22, 2014
4:09 p.m.

(ORIGINAL)
**PREPARED FOR:**                                        **REPORTED BY:**
                                                        Az Litigation Support, LLC
                                                        Marty Herder, CCR
DISTRICT COURT                                          Certified Court Reporter
                                                        CCR No. 50162

34

```
 1    BY MR. MATURA:

 2         Q.   Now, April 6, 2013, obviously before you moved to

 3    Hildale; right?

 4         A.   Yes.

 5         Q.   And so let's look -- turn the page, please, to

 6    Page No. 2.

 7              This is an incident that occurred April 6, 2013,

 8    in which Officer Hyrum Roundy responded to a call at that

 9    location on West Field Avenue.

10              Do you recall this incident?

11         A.   Yes.

12         Q.   All right.  And so you were at this property on

13    that day; true?

14         A.   Yes.

15         Q.   And you were there with Sam Brower; right?

16         A.   Yes.

17         Q.   And Andrew Chatwin.

18         A.   Yes.

19         Q.   And Ross Chatwin.

20         A.   Yes.

21         Q.   And Andrew Chatwin had his video camera set up;

22    right?

23         A.   Yes.

24         Q.   And he was videotaping what happened that day;

25    right?
```

35

```
 1        A.    Yes.

 2        Q.    Did you ask him to set up his video camera to

 3   videotape?

 4        A.    No.

 5        Q.    Did you ask Sam Brower to come with you to the

 6   property that day?

 7        A.    No.

 8        Q.    Did you ask Andrew Chatwin to come with you that

 9   day?

10        A.    No.

11        Q.    Did you ask Ross Chatwin to come with you that

12   day?

13        A.    No.

14        Q.    Who did?

15        A.    My husband.

16        Q.    Okay.

17              And also Isaac Wyler was there; right?

18        A.    Yes.

19        Q.    And what happened was, ma'am, is that you and your

20   husband knocked on the door and wanted the person living

21   there to get out; true?

22              MR. KEVENEY:  Object to the form.

23              THE WITNESS:  Yes.

24   BY MR. MATURA:

25        Q.    And do you know -- do you know a woman by the name
```

36

1    of that Penny Barlow?

2        A.   Yes.

3        Q.   She was living in that property on April 6, 2013;

4    true?

5        A.   I don't know that.

6        Q.   You don't know that Penny Barlow was living there.

7        A.   No.

8        Q.   You know that she was at that residence on

9    April 6, 2013; right?

10       A.   Yes.

11       Q.   Okay.

12            So you know at least she was occupying the

13   property on that day; right?

14            MR. KEVENEY:  Object to the form.

15            THE WITNESS:  So she claims.

16   BY MR. MATURA:

17       Q.   Right.  Because she was there that day; right?

18            MR. KEVENEY:  Object to form.  You asked if she

19   was occupying the property.

20            MR. MATURA:  I've now asked a different question,

21   Mr. Keveney.

22   BY MR. MATURA:

23       Q.   She was there day; right?

24       A.   She was there.

25       Q.   And she was the one that you and your husband

```
 1   wanted to leave the property.
 2        A.   Yes.
 3        Q.   Okay.
 4             And even though you don't like media, as you
 5   testified to earlier, you had Andrew Chatwin filming this
 6   whole event to capture on camera; right?
 7             MR. KEVENEY:  Object to the form.  Argumentative.
 8   BY MR. MATURA:
 9        Q.   Is that true, ma'am?
10        A.   Yes.
11        Q.   Okay.
12             So -- and when -- now did you actually knock on
13   the door?
14        A.   I did not.
15        Q.   Your husband did.
16        A.   I don't remember.
17        Q.   Okay.
18             Do you remember that someone knocked on the door
19   and Penny Barlow answered the door?
20        A.   I don't recall.
21        Q.   Okay.
22             Do you recall that there was a dispute that arose
23   on April 6, 2013?
24             On one side of that dispute was your and your
25   husband's desire to move into this property.  On the other
```

1    side of that dispute was Penny Barlow saying I live here.

2            Do you remember that?

3        A.   Yes.

4        Q.   Okay.

5            And so you recall that at some point in time

6    Officer Hyrum Roundy showed up; true?

7        A.   Yes.

8        Q.   Okay.

9            And he talked to you.

10       A.   Not at first.

11       Q.   Okay.

12           He talked to you at some point in time.

13       A.   Yes.

14       Q.   And he talked to your husband.

15       A.   Yes.

16       Q.   And he talked to Penny Barlow.

17       A.   Yes.

18       Q.   Okay.

19           And, in fact, he talked to the others that were

20   present that day, Sam Brower, Andrew Chatwin, et cetera.

21       A.   I believe so.

22       Q.   All right.

23           And he explained to you that Penny Barlow was

24   saying, no, she has the right to be in that house.

25           Do you remember him telling you that?

1    A.    No.

2    Q.    You don't remember Deputy Hyrum Roundy explaining

3  to you that Penny Barlow was claiming that she had the right

4  to be there?

5    A.    I don't remember the whole conversations.

6    Q.    Okay.

7          But you do have a recollection that you knew there

8  was a dispute regarding who had -- who had the right to

9  occupy that property; true?

10   A.    True.

11   Q.    And you got that knowledge through what

12 Deputy Roundy explained to you and your husband; right?

13         MR. KEVENEY:  Object to the form.

14         THE WITNESS:  Yes.

15 BY MR. MATURA:

16   Q.    So although you don't remember the details of what

17 he told you, you do remember that he told you enough that

18 you have a recollection in your mind that you knew on that

19 day there was a property dispute.

20   A.    Yes.

21   Q.    Okay.

22         Now, and you remember that Deputy Roundy told you

23 and your husband to go down to court and get an eviction

24 order against Miss Penny Barlow?

25   A.    I believe so.

1      Q.    Yeah.  And he told you that if you went and got an

2   eviction order from a judge, that he would enforce it

3   against Penny Barlow.

4      A.    I don't recall.

5      Q.    Do you recall that Deputy Roundy told you he

6   couldn't evict Penny Barlow from that property until you got

7   an eviction order?

8      A.    Yes.

9      Q.    And on April 6, 2013, you did not have an eviction

10  order; correct?

11     A.    Correct.

12     Q.    And so now -- and do you remember that when

13  Deputy Roundy advised you and your husband to get an

14  eviction order, that your husband said, no, I don't want to,

15  or something to that effect?

16     A.    I don't recall the conversation.

17     Q.    Okay.

18           But you do recall enough information that you have

19  a recollection in your mind that Deputy Roundy advised you

20  and your husband to get an eviction order; true?

21     A.    True.

22     Q.    Now, you remember also your husband using

23  profanity in front of that Penny Barlow's children?

24     A.    No.

25     Q.    You don't remember that at all.

1      Q.    And he -- he -- you believe that he responded to

2  you appropriately.

3      A.    In this incident, yes.

4      Q.    Okay.

5            Do you understand, ma'am, we've heard the term

6  said a few times today by Mr. Keveney, do you understand

7  that you are identified as an aggrieved party in this case?

8      A.    Sort of.

9      Q.    Have you heard that term before, other than today?

10     A.    No.

11     Q.    No.   Okay.

12           Are you seeking anything?

13     A.    No.

14     Q.    Do you want anything out of this case personally?

15     A.    No.

16     Q.    And let me just maybe clarify a little bit.

17           You're not looking for money, are you?

18     A.    No.

19     Q.    If you're not looking for money and you're not

20  looking for -- are you looking for anything else besides

21  money personally?

22     A.    No.

23     Q.    Do you have any knowledge why you're identified as

24  an aggrieved party?

25     A.    Kind of.

# EXHIBIT 11

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CV-12-8123-PCT-HRH |
| | ) | |
| Town of Colorado City, | ) | |
| Arizona; City of Hildale, | ) | |
| Utah; Twin City Power; and | ) | |
| Twin City Water Authority, | ) | |
| Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**THE DEPOSITION OF WILLIAM JESSOP**
(Videotaped)

Colorado City, Arizona
May 21, 2013
12:01 p.m.

(ORIGINAL)
**PREPARED FOR:**                          **REPORTED BY:**
                                            Az Litigation Support, LLC
                                            Marty Herder, CCR
DISTRICT COURT                              Certified Court Reporter
                                            CCR No. 50162

1        A.    Blake, it's not honest for you to twist what I

2    said.

3              I said I have not been involved with their case.

4    I didn't say I hadn't spoken with them.

5              I have asked my attorneys to let me do some of my

6    own lawsuits to try to bring some resolution to some

7    problems.

8              And I didn't use the Department of Justice.  And

9    there's a big difference between saying I'm not talking to

10   them and using their -- using them for a lawsuit.

11       Q.    Okay.

12             Do you recall telling Helaman Barlow or Vincen

13   Barlow that you did not know that you were a witness or had

14   been listed as a witness --

15       A.    That's correct.

16             I asked him -- they told me that I was listed on

17   one.  I asked them for some professional help.  They told me

18   that they -- that it was inappropriate for them to have much

19   of a conversation because I was listed.  Therefore there's

20   been a spelling of cooperation on their part in providing me

21   help on other issues.

22             When I went to them and I wanted to get

23   information from the city records, lately they've been good.

24   Prior to that, I've had problems.

25             I had issues where I wanted to talk to Helaman.

15

1       He says, well, I can't, because you're listed as a

2   DOJ witness.

3       I said, I don't know what you're talking about.

4       And I still don't.

5       So if you wanted to bring more light on it, I'd be

6   glad to hear it.

7   Q.   Okay.

8       I'm not going to mark this as an exhibit, but I'm

9   going to show you what the Department of Justice has

10  produced as their supplemental disclosure, which lists you

11  as a person with potential information and gives a

12  description.

13      Would you read that out loud for the record, sir?

14  A.   Subject.  Mr. Jessop acknowledge includes the FLDS

15  control over the Twin Cities, the assistance of the FLDS

16  church, and its surveillance of non-members and the

17  coordination of church security personnel, CCMO and related

18  matters.

19  Q.   Okay.

20      Have you spoken to the Department of Justice about

21  those topics?

22  A.   I have spoken with law enforcement about them, and

23  I recall that DOJ was there in some of those discussions.

24  Q.   Okay.

25      How many times have you actually spoken with the

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

United States of America,      )
                               )
     Plaintiff,                )
                               ) Civil No.
v.                             ) 3:12-CV-08123-HRH
                               )
Town of Colorado City, Arizona; )
City of Hildale, Utah; Twin City)
Power; and Twin City Water     )
Authority, Inc.,               )
                               )
     Defendants.               )
                               )
_____)

DEPOSITION OF RON ROHBOCK

Taken at:

DURHAM JONES & PINEGAR
192 East 200 North, Suite 300
St. George, Utah

Tuesday, July 15, 2014
At 4:31 p.m.

Reported by Russel D. Morgan, CSR

1    the house.

2        A    That's correct.

3             MR. DONNELLY:  Protective order.

4    BY MR. HAMILTON:

5        Q    And so, you testified about an incident in which

6    Sergeant Johnston responded to the 930 North Memorial Street

7    residence.  You said, at that point in time, you had an

8    order.  Did you actually have an order from a court?

9        A    I had -- I had several --

10            Where were we on that at that time?

11            MR. HOOLE:  I can't answer questions.

12       A    I'm not sure where I was on that.

13            MR. HOOLE:  You do the best based on your memory.

14   BY MR. HAMILTON:

15       Q    Do you recall specifically telling Sergeant

16   Johnson that you, or you asked him the question whether he

17   was going to enforce UEP occupancy agreements?

18       A    Yes, I did.  Well, no, Helaman.  I asked Helaman

19   if he would.

20       Q    Do you recall when Sergeant Johnson came to that

21   930 North Memorial address that you were standing there with

22   Ross Chatwin?

23       A    I was standing there with Ross Chatwin, Andrew and

24   Isaac and Sam Brower.

25       Q    Okay.  So you were standing there with those four

1    gentlemen.  Do you recall asking him specifically if the

2    marshal's office was going to enforce UEP occupancy

3    agreements?

4         A    Yes.

5         Q    So, at that point in time, is it fair to say that

6    you didn't have a court order, that you only had an

7    occupancy agreement?

8         A    No, that is not fair to say.

9         Q    Okay.

10        A    We did have it posted to perform an inspection,

11   which is legal.  And it was also given by Bruce Wisan and

12   his lawyers, Zachary Shield.  And so, yes, we had gone the

13   legal route to go into the property and do an inspection.

14        Q    Okay.

15        A    Which all people living in that community agreed

16   to being subject to.

17        Q    At that point in time, had a court ordered that

18   you could go in and have an inspection of the home?

19        A    Didn't need a court order.

20        Q    Okay.  So when I ask you the question of whether

21   you had a court order, it's true that you didn't have a

22   court order at that point in time, correct?

23        A    I cannot say that.  I was in the middle of

24   litigation.  Roger helped me.  I mean, we had been through

25   many different --

1          MR. HOOLE:  Let's not discuss our relationship.

2      A    I can't tell you whether or not I had a court

3    order or not.

4    BY MR. HAMILTON:

5      Q    Wait.  Can you just hold on one second.  I need to

6    understand that objection.

7          Are you instructing the witness not to answer

8    questions about his relationship with you?

9          MR. HOOLE:  I'm instructing the witness not to

10   answer questions about his relationship with me to the

11   extent it involves communications.  And I am thinking we are

12   getting very close to that line.

13         MR. HAMILTON:  Okay.

14         MR. HOOLE:  And I want to act preemptively before

15   you try to invade that privilege.  So that's what I am

16   doing.

17   BY MR. HAMILTON:

18     Q    I want you to know that I will not be invading

19   that privilege on purpose.

20         I don't want to know any communications that you

21   had with Roger Hoole.  So, please, don't tell me any

22   communications that you had with Mr. Hoole unless there were

23   other parties present and you can tell me that there were

24   other parties present, and then we can talk about whether

25   you can claim that there was a privileged communication or

Ron Rohbock 7.15.14

```
 1   not.  Okay?  Does that make sense?
 2       A    That makes sense.  Before -- before this
 3   inspection --
 4            MR. HOOLE:  Let's wait for a question.  Then go
 5   question and answer.  Okay?
 6            THE WITNESS:  Okay.
 7            MR. HOOLE:  I need to be able to hear the question
 8   so that I can place an objection appropriately.
 9   BY MR. HAMILTON:
10       Q    Okay.  So, I want to know what transpired.  And I
11   understand that this event took place on August 8th, 2013.
12   Do you recall if that was about the date that this incident
13   took place with Sam Johnson?
14       A    Yes.
15       Q    Okay.  And you recall that you went down there,
16   that you were there with four gentlemen.  And you have told
17   us who those individuals were, Ross Chatwin, Andrew Chatwin,
18   Isaac Wyler and Sam Brower, correct?
19       A    Correct.
20       Q    And you recall Sam Johnson coming up to the home,
21   and you recall at that point in time that you had posted a
22   notice on the house, correct?
23       A    Not at that time.  Previous to that time.
24       Q    Okay.  So previous to that time you posted a
25   notice on that house, and I believe your testimony was that
```

 1   that you were representing the UEP.  At any point, have you

 2   been a representative of the UEP?

 3           MR. HOOLE:  Form of the question.

 4       A    Restate.  I'm not sure what you are asking me.

 5   BY MR. HAMILTON:

 6       Q    Did you ever work for Bruce Wisan as a special

 7   fiduciary?

 8       A    I did not.

 9       Q    Do you recall telling or having Sergeant Johnson

10   ask you whether there was a confrontation at the home at the

11   present time?

12       A    Sergeant Johnson was only there for a very few

13   moments, long enough to do what we have already discussed.

14   He took a picture of the document and then he left, and with

15   the idea that Helaman would be back to fill in and take

16   over.  Helaman never showed up.  So we never got anything

17   resolved.

18       Q    Do you have any recollection of telling Sergeant

19   Johnson that there was a confrontation because the people in

20   the house were not responding to the posting that you had

21   posted on the house?

22       A    Absolutely.

23           MR. DONNELLY:  Form.

24   BY MR. HAMILTON:

25       Q    Do you recall Helaman or Chief Helaman Barlow

Ron Rohbock 7.15.14

```
 1   was the reason I requested Bruce Wisan do a walk-through.
 2   This was a new thing that Bruce hadn't even considered.
 3   And, yes, we figured that if we had the cooperation of the
 4   marshal and that they did have to have the home inspected
 5   that they would just leave.  That would have been typically
 6   the case.  However, the marshals did not enforce.  And they
 7   basically contested.
 8       Q    So, if I understand correctly, it was your desire,
 9   by posting the house and asking for, or demanding the
10   opportunity to do a walk through the home, it was your hope
11   that the occupants of the home would just leave?
12       A    That would be the typical scenario, yes.
13       Q    That way you wouldn't have to go through the
14   actual legal process of filing an eviction action?
15       A    I didn't know whether or not I would have to do an
16   eviction.  Again, we were of hopes that we would not have to
17   spend the money and the time and do the eviction.
18       Q    Okay.  Do you recall Chief Barlow informing you
19   that you could call the Hildale City prosecutor and forward
20   any legal documents to him?
21       A    Yes, I do.
22       Q    Do you recall telling him that you would not be
23   calling the prosecutor but you would accept a call if he
24   called you?
25       A    I do recall that.
```

Ron Rohbock 7.15.14

```
 1   give him a copy of the video?
 2        A    That Sam Brower would call the chief?
 3        Q    Yes.
 4        A    No.  Never stated that.
 5        Q    You don't recall telling the chief that?
 6        A    I said if he wanted one he would have to go
 7   through either my lawyer or Sam Brower.  I did not have a
 8   copy of it.
 9        Q    Do you still -- do you know if Sam Brower still
10   has a copy of that video?
11        A    No, I do not.
12        Q    Do you know if a copy of that video was ever given
13   to Chief Barlow?
14        A    Not that I am aware of.
15        Q    Do you know if a copy of that video was ever given
16   to Nathan Kaplan?
17        A    I don't know if they've requested it.
18        Q    Do you know if a copy of that video was ever given
19   to the Department of Justice?
20        A    I do not know those things.
21        Q    Do you know if a copy of that video was ever given
22   to your attorney, Roger Hoole?
23        A    I do not.
24        Q    Besides what you have testified about here today,
25   do you have any other knowledge about the CCMO's failure to
```

1    take action to enforce valid occupancy agreements?

2            MR. DONNELLY:  Object to form.

3        A    It is my understanding that Judge Lindberg ordered

4    them to, ordered them, ordered the police department to

5    enforce those occupancy permits.  They, verbally, and I

6    understand this from both --

7            MR. HOOLE:  Don't talk about what you might have

8    heard from me.

9        A    -- from other individuals that had already gone

10   through this process, that it was imperative that the police

11   department enforce those documents.  And so, I was of the

12   opinion that they would.  And so did Judge Shumate.

13   Therefore, Judge Shumate awarded me damages because I was

14   not able to move into my home.

15   BY MR. HAMILTON:

16       Q    So, it's true that you actually filed an unlawful

17   detainer action against the occupants of the house at 930

18   North Memorial Street?

19       A    I did.

20       Q    It's true that you actually got an order from

21   Judge Shumate?

22       A    I did.

23       Q    It's true that you were able to occupy that house,

24   correct?

25       A    Correct.

Ron Rohbock 7.15.14

```
 1       Q    And it's true that you are currently occupying
 2   that house, true?
 3       A    I am.  And I do have an occupancy permit for that
 4   home.
 5       Q    And it's true, is it not that the marshal's
 6   department ever did anything to stop you after you had an
 7   order to occupy that house, true?
 8            MR. HOOLE:  Objection.  Assumes facts not in
 9   evidence.  Form.
10       A    Stop me?
11   BY MR. HAMILTON:
12       Q    They did nothing to stop you from entering the
13   home and occupying the home after you got a order allowing
14   you to occupy it, correct?
15            MR. HOOLE:  Same objections.
16       A    I'm going to stump this way.  I had little or no
17   dealings with the marshals other than what we have already
18   discussed.  Most of the dealings, both previous to me moving
19   into the home and afterwards when I did get the home, was
20   done through the Washington County Sheriff Department.
21   BY MR. HAMILTON:
22       Q    Okay.  And so, with respect to the home, it's true
23   that you are currently living there?
24       A    It is.
25       Q    And that you have utilities?
```

Ron Rohbock 7.15.14

```
 1      A     I do.

 2      Q     And the utilities are in your name?

 3      A     They are.

 4      Q     And you had no problem getting those utilities?

 5      A     No.

 6      Q     And you had no problems with either Hildale or

 7   Colorado City affecting your enjoyment of that property,

 8   true?

 9            MR. HOOLE:  Form of the question.

10      A     For three months after I did obtain the property,

11   I did have to work with the city, and, yes, they did work

12   with me adjusting bills, because they had, I don't know

13   whether it was purposely or otherwise, billed me for what

14   was going on previous to the history previous to my

15   occupying that property.  We finally did get an adjustment

16   of, I believe close to a thousand dollars, on our bill with

17   Hildale City.

18   BY MR. HAMILTON:

19      Q     So not only did Hildale City switch the utilities

20   into your name, they also adjusted your bill and reduced it

21   by a thousand dollars?

22      A     After we, after my wife and I objected to what was

23   going on as far as the garbage and the water usage and the

24   sewer usage and et cetera, yes, which they stated was only

25   reviewed every quarter.  So we had to pay the amount of
```

1    talking about this case?

2    BY MR. HAMILTON:

3        Q    Yeah.  Did you understand that I was talking about

4    this case specifically?  In this case, are you seeking any

5    type of monetary compensation?

6        A    Which case are you talking about, sir?

7        Q    In the Department of Justice case, are you seeking

8    any type of compensation?

9        A    I have not even thought about it.  I have been

10   asked to tell what I know.  If there is some compensation I

11   would be glad for it because I am very indigent.  I have

12   nothing to show for my 50 years of I would call back

13   breaking slave labor for a religion that I got nothing from.

14   So, yeah, I would -- I would accept it, yes.  But have I

15   sought it?  Have I sat down and said this is what I want?

16   No.

17            MR. HAMILTON:  I have no further questions.

18            MR. DONNELLY:  I have a couple follow-up

19   questions.

20                        EXAMINATION

21   BY MR. DONNELLY:

22       Q    Mr. Hamilton, a little bit ago asked you some

23   questions about your marriages, and particularly at one

24   point, he asked you about a marriage to somebody who was 17

25   years old.  Do you remember those questions?

# EXHIBIT 13

1                   IN THE UNITED STATES DISTRICT COURT

2                         DISTRICT OF UTAH

3

4

5      RONALD COOKE AND JINJER COOKE,        )
       HUSBAND AND WIFE,                      )
6                                            )CASE NO.
                         PLAINTIFFS,          10-CV-08105
7                                            ) JAT
                                             )
8      Vs.                                    )
                                             )
9      THE STATE OF ARIZONA EX REL. TERRY     )
       GODDARD, THE ATTORNEY GENERAL; AND     )
10     THE CIVIL RIGHTS DIVISION OF THE       )
       ARIZONA DEPARTMENT OF LAW,             )
                                             )
11                     PLAINTIFF-INTERVENOR.  )
       V.                                     )
12                                            )
       TOWN OF COLORADO CITY, ARIZONA; CITY)
13     OF HILDALE, UTAH; HILDALE-COLORADO    )
       CITY UTILITIES (HILDALE-COLORADO      )
14     CITY POWER, WATER, SEWER AND GAS      )
       DEPARTMENT AND Twin City WATER        )
15     AUTHORITY); Twin City POWER; JOHN     )
       AND/OR DOES I-XX;XYZ ENTITIES/        )
16     CORPORATIONS I-XX,                    )
       _____    )

17                     Video Deposition of ISAAC WYLER

18                       Taken:  NOVEMBER 29, 2011

19

20

21

22            Reported by: Linda J. Smurthwaite, RDR

23

24                    INTERMOUNTAIN COURT REPORTERS
                          5885 Holstein Way
25                        Murray, UT 84107
                          (801) 263-1396

                                                              1

1    to repeat it.  Fair enough?

2         A.    Okay.

3         Q.    I understand you've never had your deposition

4    taken before.  Have you ever been a party to any lawsuit,

5    to your knowledge?

6         A.    Well, I've testified in court before.

7         Q.    Okay.  Testified at some hearing somewhere?

8         A.    Oh yeah.

9         Q.    In Utah?

10        A.    Yes.

11        Q.    Arizona?

12        A.    Yes.

13        Q.    Approximately how many times have you

14   testified in a court hearing?

15        A.    Two or three times.  Not that many.

16        Q.    Can you give me a brief summary of why you

17   were testifying, if you know?

18        A.    In one case I was testifying in my own case,

19   in Arizona.  And in another case in Utah, I was

20   testifying for the United Effort Plan Trust.

21        Q.    You said you were testifying for your own

22   case in Arizona.  Can you give me the context of that

23   case?

24        A.    Yes.  It was concerning a vacant trailer --

25   two vacant trailers in Colorado City.

                                                          7

1        Q.    Was this a criminal proceeding, do you know?

2        A.    I don't know exactly how they -- I mean, I

3    wasn't arrested or anything.

4        Q.    Okay.

5        A.    So I don't know exactly what they call that.

6        Q.    All right.  Fair enough.  Do you know what

7    the resolution of that matter was?

8        A.    Yes.

9        Q.    What was that?

10       A.    The judge found me guilty.

11       Q.    Were you sentenced to any type of -- well,

12   let me ask:  Do you know what the sentence was?

13       A.    Yes.

14       Q.    What was it?

15       A.    It was $400 in money, and two years

16   probation.

17       Q.    Okay.  When did that resolve itself?

18            MR. WALKER:  Object to form.

19            THE WITNESS:  What's that?

20            MR. MATURA:  You'll hear objections.  Those are

21   primarily for the record, unless your attorney, who's

22   sitting to your right, tells you not to answer.  In that

23   case, you can decide whether to follow your attorney's

24   advice or not.  But you'll hear objections periodically,

25   which is what us lawyers do for the record, for later on

                                                        8