Steven H. Rosenbaum (NY Bar #1901958)
Jonathan M. Smith (DC Bar #396578)
R. Tamar Hagler (CA Bar #189441)
Christy E. Lopez (DC Bar #473612)
Eric W. Treene (NY Bar #2568343)
Sean R. Keveney (TX Bar #24033862)
Jessica C. Crockett (NY Bar #4694972)
Matthew J. Donnelly (IL Bar #6281308)
Attorneys
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Phone: (202) 305-4838
Facsimile: (202) 514-1116
E-mail: sean.keveney@usdoj.gov

Attorneys for the United States

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States, <br><br> Plaintiff; <br> v. <br><br> Town of Colorado City, Arizona, *et al.*, <br><br> Defendants. | No. 3:12cv8123-HRH <br><br> **UNITED STATES' OPPOSITION TO COLORADO CITY'S MOTION FOR SUMMARY JUDGMENT** |

Defendants, and their Colorado City Marshal's Office ("CCMO"), exist to protect and further FLDS Church interests. Specifically, the evidence shows that Defendants are intertwined with the FLDS Church in violation of the First Amendment. The evidence shows also that Defendants have used the CCMO to further this unconstitutional entanglement and, in the course of doing so, have selectively enforced the law based on religion, in violation of the Fourteenth Amendment's Equal Protection Clause. The evidence still further shows that, consistent with taking action to further FLDS Church interests rather than neutrally enforce the law or protect public safety, the CCMO has violated the Fourth Amendment's prohibition of unreasonable stops, searches, and arrests.

As to damages for its Fair Housing Act ("FHA") claim, in full compliance with its

1

Rule 26 disclosure obligations, the United States disclosed that it seeks emotional distress damages that the law tasks the jury to compute, and disputed material facts remain regarding the extent of the United States' damages for aggrieved persons. This Court should accordingly deny Colorado City's Summary Judgment Motion.

## I. SUMMARY JUDGMENT STANDARD

Colorado City must show that "the evidence, viewed in the light most favorable to the [United States], shows 'that there is no genuine issue as to any material fact and that [Colorado City] is entitled to judgment as a matter of law.'" *EEOC v. Swissport Fueling, Inc.*, 916 F. Supp. 2d 1005, 1019-20 (D. Ariz. 2013) (quoting Fed. R. Civ. P. 56(c)). Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are" issues for factfinder at trial, "[t]he evidence of the [United States] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (internal citation omitted); *see also Harris v. Itzhaki,* 183 F.3d 1043, 1051 (9th Cir. 1999) ("[Q]uestions of intent[ ] should be left to the jury.").

## II. ARGUMENT

**A. AMPLE EVIDENCE SUPPORTS COUNT I'S ALLEGATIONS OF VIOLATIONS OF THE FIRST, FOURTH, AND FOURTEENTH AMENDMENTS.**

In using the CCMO to enforce FLDS directives, even where furthering FLDS interests requires the CCMO to act unlawfully or contrary to accepted police practice, Defendants violate several—not just one—constitutional rights. Count I alleges violations not only of the Fourteenth Amendment's Equal Protection Clause, but also of the First Amendment's Establishment Clause and Fourth Amendment's prohibition of unreasonable searches and seizures. Compl. ¶¶ 52, 53 & 55. Count I also incorporates paragraphs that include more detailed allegations referencing the Establishment Clause and searches and seizures. *See, e.g.,* Compl. ¶¶ 5 & 33, 20, 31, 32. As set out further below, the evidence shows that Defendants are discriminating based on religion in violation of the Equal Protection Clause, *and* independently violating the Establishment

2

Clause and the Fourth Amendment.[1]  Despite the Complaint's clear allegations, and the evidence discovery revealed in support of *each* of the allegations, Colorado City misstates the scope of the Count I as limited solely to the Equal Protection Clause, and then misstates or ignores the evidence of the CCMO's religious discrimination.  This Court should deny Colorado City's attempt to limit Count I to the Equal Protection Clause.

**1. Ample Evidence Supports a Finding that Defendants have Violated the First Amendment**

**a) Establishment Clause Standards**

Courts have articulated many different standards for the Establishment Clause. *See Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1012 (9th Cir. 2010) (applying several different standards).  The Clause mandates "'governmental neutrality'—'neutrality between religion and religion, and between religion and nonreligion.'" *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 971 (9th Cir. 2011) (citation omitted).  The government "may not place its prestige, coercive authority, or resources behind a single religious faith or behind religious belief in general, compelling nonadherents to support the practices or proselytizing of favored religious organizations." *Id.* (citation omitted).

Under the *Lemon* test the challenged action (1) "must have a secular purpose; (2) "its principal or primary effect must be one that neither advances nor inhibits religion"; *and* (3) it "must not foster an excessive government entanglement with religion." *Newdow*, 597 F.3d at 1017 (quoting *Lemon v. Kurtzman,* 403 U.S. 602, 612-13 (1971)). Governmental action has the primary effect of advancing or disapproving of religion if it is "sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious

---

[1] After the Complaint, many United States' motions also indicated that the United States was pursuing evidence to support Establishment Clause and Forth Amendment violations. *E.g.*, U.S. [Second] Mot. to Compel Religious Info. 3, ECF No. 294; U.S. Resp. to Colo. City Mot. for Definite Statement and to Dismiss 2 & 9, ECF No. 26.

3

choices." *Brown v. Woodland Joint Unified Sch. Dist.,* 27 F.3d 1373, 1378 (9th Cir.1994) (internal citation omitted). The effect is analyzed from the point of view of objective "reasonable observer who is informed . . . [and] familiar with the history of the government practice at issue." *Id.* Under the similar "Endorsement" test, this Court judges "whether the challenged governmental action has the purpose or effect of endorsing, favoring, or promoting religion, particularly if it has the effect of endorsing one religion over another." *Newdow,* 597 F.3d at 1037 (citation omitted); *see also Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290, 316 (2000). "Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community." *Newdow,* 597 F.3d at 1037 (internal citation omitted). Moreover, the "core rationale underlying the Establishment Clause is preventing a fusion of governmental and religious functions." *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 126-27 (1982).

### b) Exemplary Evidence of Defendants' Establishment Clause Violations

Applied to any of these standards, the evidence shows that Defendants violate the letter and core rationale of this First Amendment tenet. As the incidents below show, rather than remaining neutral, Defendants use the CCMO's coercive authority to support the Church, to the detriment of non-FLDS adherents. Further, CCMO's excessive entanglement with the Church, including its Security Force, has both the purpose and effect of endorsing and favoring the FLDS.

The record is replete with evidence of excessive entanglement between the FLDS Church and CCMO, and with evidence that this entanglement has the purpose and effect of endorsing and advancing the FLDS Church. FLDS leaders direct who becomes a CCMO officer and who becomes Marshal. SOF 7-9, 16. This FLDS control of government law enforcement constitutes unconstitutional fusion and entanglement. *See Larkin*, 459 U.S. at 127 ("[I]mportant, discretionary governmental powers [cannot] be delegated to or shared with religious institutions.").

The extent to which the CCMO is designed to protect and endorse the FLDS rather than function as a religiously-neutral law enforcement agency is underscored by the

4

extent to which CCMO officers have violated their oaths to uphold the law to protect the FLDS Church. The CCMO communicated with and provided support to FLDS Leader Warren Jeffs while Jeffs was a fugitive. (Then) Chief Fred Barlow wrote fugitive Jeffs a letter stating, *inter alia*, that he was following Jeffs's directives regarding his police duties; that all officers had stated their desire to follow FLDS directives; and that he would stand with Jeffs and continue to follow FLDS directives. SOF 9. Several CCMO officers gave messages and contributions to couriers to give to fugitive Jeffs. SOF 10-11. Officers similarly advanced the FLDS religion by actively resisting outside law enforcements efforts to apprehend fugitive Jeffs. Several officers have been decertified for failing to comply with law enforcement and grand jury investigations regarding fugitive Jeffs. SOF 12-14. The CCMO's longstanding practice of placing religion ahead of its law enforcement responsibilities is evidence that advancing the interests of the FLDS is central to the CCMO's true mission, and belies Defendants' assertions that the CCMO is a non-religious, neutral arbiter of the law.

  This ongoing practice of putting the FLDS religion above police duties continued after Jeffs' conviction; the CCMO were at FLDS meetings where they knowingly listened to recordings that Jeffs impermissibly made while imprisoned. SOF 15. At the time the United States filed the Complaint in 2012, Colorado City was still soliciting directives from imprisoned Jeffs on whom to appoint as officers. SOF 16.

  The CCMO's endorsement and protection of the FLDS, even in contravention of law or their police duties, goes well beyond supporting and protecting Warren Jeffs. CCMO ignores FLDS members' illegal conduct for the purpose of advancing the FLDS religion. For example, the CCMO was aware of FLDS marriages involving underage girls, and opened no investigations of this child victimization. SOF 17. The CCMO was aware of the FLDS Church using child labor for pecan harvests, and aware that the FLDS Bishop's Storehouse was illegally redistributing prescription drugs to FLDS members. SOF 18-19. The CCMO has secretly recorded conversations with outside law enforcement to give to FLDS leaders. SOF 20. The CCMO warns FLDS members that

outside law enforcement are looking for them. SOF 22, 24. CCMO officers even follow FLDS edicts that directly compromise their ability to perform their core police functions effectively. For example, the CCMO followed an edict to stop using the internet, which prevented them from searching the internet as part of police investigations. SOF 21.

Similarly, the CCMO's entanglement with the FLDS Church Security Force goes far beyond acceptable law enforcement coordination, providing further evidence of the CCMO's willingness to ignore law enforcement duties to protect and endorse the FLDS. CCMO officers have impermissibly shared confidential law enforcement information with Church Security. SOF 25. Church Security has had improper access to the Cities' government video cameras. SOF 26. The CCMO and Security Force sometimes communicate secretly over encrypted radios to further FLDS interests, SOF 23, and the CCMO has warned Church Security when outside law enforcement was coming into the Cities. SOF 24. The CCMO has pulled over cars after Church Security "lost" the car. SOF 27. CCMO officers have also attended Church Security meetings, SOF 28, and provided training to Church Security on surveillance, firearms, weaponry, and hand to hand combat. SOF 29. CCMO projects its FLDS endorsement by standing on stage in police uniforms next to FLDS leaders who are running Church meetings. SOF 30. Based on the above, this Court should find sufficient evidence for a factfinder to find Defendants have violated the Establishment Clause.

**2. Ample Evidence Supports a Finding that Defendants Have Violated the Fourteenth Amendment**

The purpose of Defendants' above unconstitutional entanglement is to advance the interests of the FLDS Church. Consistent with this intent, in violation of Equal Protection Clause, the CCMO routinely takes action, or refrains from taking action, to protect and advance FLDS adherents and harm or disadvantage non-FLDS. Despite Colorado City's mischaracterized examples, *see* Colo. City MSJ 4-7, R. SOF 1-15, this conduct is exactly the type of religious discrimination the Constitution prohibits.

### c) Equal Protection Clause Standard

The Equal Protection Clause prevents the police from selectively enforcing the law based on religion. *See, e.g., Elliot-Park v. Manglona*, 592 F.3d 1003, 1006-08 (9th Cir. 2010); *Ass'n of Christian Schs. Int'l v. Stearns,* 362 Fed. App'x 640, 646 (9th Cir. 2010) (religion is a protected class). The United States must prove that the CCMO acted (or failed to act) with the intent or purpose to discriminate based on religion. *See Barren v. Harrington*, 152 F.3d 1193, 1194-95 (9th Cir. 1998). Discriminatory purpose implies that the actor "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 279 (1979) (citation omitted).

Determining whether "invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into [ ] circumstantial and direct evidence of intent." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). The *Arlington Heights* Court gave a non-exhaustive list of factors to consider, such as: (1) "clear pattern unexplainable on grounds other than" discriminatory ones, (2) "[t]he historical background of the [action]," (3) "[t]he specific sequence of events leading up [to] the challenged [action]," (4) the defendant's departures from its normal procedures or substantive conclusions, and (5) "contemporary statements." 429 U.S. at 266–68. When applying "the *Arlington Heights* factors to "demonstrate discriminatory intent through direct or circumstantial evidence, the plaintiff need provide very little such evidence . . . to raise a genuine issue of fact . . .; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder." *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013) (citation omitted).

### d) Exemplary Evidence of Defendants' Intentional Religions Discrimination in Policing

The discriminatory intent behind the following exemplary incidents should be judged against the FLDS "historical background" of the Colorado City/Hildale community, namely that it was set up to promote FLDS objectives and is opposed to outside secular involvement. *See* SOF 6.

7

- *The Dockstader Arrest at Home the FLDS Church Built for Warren Jeffs*

The record is replete with instances of selective enforcement/law enforcement action that provide direct and circumstantial evidence of discriminatory motive. For example, Colorado City fails to mention the June 2014 religiously motivated arrest of non-FLDS Harvey Dockstader at a class reunion. SOF 31-37. The event occurred at a home the FLDS Church built for Warren Jeffs; Willie Jessop, who the Church considers a threat, acquired the home through a default judgment. SOF 31, 33. FLDS member CCMO Officers[2] forcibly arrested non-FLDS Dockstader, causing him to bleed, for failing to sign a citation for a purported noise complaint. SOF 37. Before the arrest, the CCMO was surveying the party with Church Security, would not say who complained about noise, broke an administrative rule forbidding non-emergency contact with Jessop, and then elected to arrest non-home owner Dockstader. SOF 34-37. This sequence of events, the abnormal use of force, the home's religious historical background, and participants' FLDS memberships, support the inference that that religious animus motivated the CCMO's law enforcement actions.

- *ECO Alliance/Johnson Avenue Incident Involving the FLDS Bishop's Aides*

Colorado City also failed to address the attempted arrest and failed charging of Willie Jessop during the February 2013 ECO Alliance/Johnson Avenue incident. SOF 38-54. The property dispute concerned, among other things, property allegedly important to the Church that had previously been stolen from (former Church Security Leader) Willie Jessop. SOF 42, 45. The CCMO ignored evidence that FLDS Bishop aides had been involved, and Officers Jerry Darger and Curtis Cooke attempted to arrest FLDS Church "threat" Willie Jessop, but Mohave County deputies prevented them. SOF 31, 43-44, 46, 48. Procedural irregularities plague the aftermath. The CCMO returned witness

---

[2] The CCMO officers mentioned in this Motion all are/were FLDS members. SOF 4-6. Claims of when and whether officers purportedly were no longer FLDS members is a credibility determination for the factfinder.

statements to two witnesses without making copies. SOF 49. The CCMO took months to complete their reports, and some fail to mention the Bishop's aides. SOF 50. Indeed, the CCMO eventually referred Jessop to the prosecutor for felony charges, and then subsequently failed to follow that prosecutor's instructions to interview the Bishop's aides. SOF 51-52. From the sequence of events, procedural irregularities, and nature of the property at dispute, a factfinder could infer that the discriminatory purpose behind the CCMO actions was to arrest and prosecute non-FLDS "threat" Jessop because he was attempting to recover his stolen property that the FLDS Church valued.[3]

- ***Trespassing Arrest of Former FLDS Bishop William E. Timpson Jessop.***

The CCMO also selectively enforces criminal trespassing for FLDS members, and against non-FLDS persons. Colorado City fails to address Officer Cooke's religiously motivated trespassing arrest of former FLDS Bishop "William E." Jessop in 2011. SOF 55-62. His wife, a property occupant, invited him into the home, while another occupant, Bishop Lyle Jeff's brother, objected. SOF 57-58. Officer Cooke arrested William E. for trespassing, and was attempting to book him in the jail. SOF 60. (Then Sergeant) Helaman Barlow stopped Cooke from jailing William E. and released him with a citation. SOF 61. Afterwards, Officer Cooke announced in a CCMO meeting that he had consulted with Bishop Lyle Jeffs about trusting Helaman Barlow. SOF 62.

This statement admitting consultation with the FLDS Bishop, coupled with the context of the dispute between the Bishop's brother and apostate William E., support the inference that religious discriminatory intent motivated Officer Cooke's actions.

---

[3] An outside police expert opined that "the investigation, incomplete and tardy reports, and other actions by the CCMO officers," including CCMO officers attempts to obtain prosecution of two non-FLDS members, and then dropping that effort when the prosecutors directed the CCMO to interview high-ranking FLDS Members who were allegedly part of the event, deviates from accepted police practice, providing evidence that the law enforcement actions were motivated by religious bias. SOF 53; *cf. Arlington Heights*, 429 U.S. at 266–68 (departures from normal procedures evidence discriminatory intent).

- ***Jerold N. Williams Arrest for Trespassing at His Own Home***

Religious animus also drove Officer Cooke's subsequent 2012 arrest of Jerold N. Williams for trespassing at Williams's own home. The sequence of events and historical context provide evidence of religiously motivated discrimination. Colorado City's mischaracterization states that Williams's family prevented him from entering "a" house, rather than his house, that he built, lived in for 30 years, had a UEP occupancy agreement for, and had occupied when the Church had excommunicated him 2 weeks earlier. R. SOF 12. Williams had returned in defiance of FLDS leaders, and his loyal FLDS family blocked him from his home. R. SOF 12. Rather than honor the UEP occupancy agreement, treat the confrontation as a civil dispute, or require an eviction order, Officer Cooke arrested Williams for trespassing. R. SOF 12. Moreover, Officer Cooke immediately arrested Williams upon learning that Williams wanted to call outside law enforcement for help with the dispute. R. SOF 14.

Beyond this history and sequence of events, Officer Cooke's statements show his discriminatory intent; Cooke has previously declared his opposition to the non-FLDS run UEP, SOF 6, and previously stated that he consulted with the Bishop after the non-FLDS William E. arrest above. Moreover, Officer Cooke's actions here conflict with the next incident where the CCMO refused to arrest a FLDS member for trespass at non-FLDS Jesseca Jessop's property. This departure, the sequence of events, and the CCMO statements support the inference that religious discriminatory intent motivated this arrest.

- ***Failure to Cite FLDS Member Penny Barlow for Trespass at Jesseca Jessop's Property***

Compared to the trespassing arrests above, the CCMO provided different treatment in 2013 to non-FLDS Jesseca Jessop. Jessop had a UEP occupancy agreement for a Hildale property. SOF 64. When Jessop tried to move in, FLDS member Penny Barlow was at the property claiming she lived there. SOF 64. Officer Roundy knew of Jessop's occupancy agreement, but still refused Jessop's requests that he arrest or cite Barlow for trespassing. SOF 65. Compared to the above trespassing arrests of non-FLDS members, Roundy instead suggested that they needed to get a court to evict FLDS

10

member Barlow. SOF 65. Like Officer Cooke, FLDS member Roundy has previously declared his opposition to the non-FLDS run UEP. SOF 6. About a month later, Jessop had obtained an eviction order that was served on Penny Barlow in the Officer Cooke's presence. SOF 66. Despite this, and Jessop's occupancy agreement, Officer Cooke actually *referred Jessop* for possible criminal trespass. SOF 66. The Officers' statements against the non-FLDS UEP, and the differential treatment in the above trespassing arrests of non-FLDS members, support the inference that religious animus motivated the CCMO's actions against Jessop.

- ***Chief Roundy's Direct, Contemporaneous Statement of Religious Discrimination While Siding with a FLDS Member During a UEP Property Dispute***

Colorado City incorrectly claims no evidence exists that during a 2008 property dispute, then Marshal Jonathan Roundy stated "[the FLDS member says this is his property, and we are going to honor him because he is a member of the Church, and he has asked [the non-FLDS] to leave, and that is where I am going to stand as Chief of the Police." Colo. City MSJ 6. UEP Trust worker Jethro Barlow testified that he witnessed Roundy make the statement in substance. R. SOF 10.

- ***Chief Roundy's Euthanization of non-FLDS Member Lydia Stubbs's Horse.***

After making that discriminatory statement, Chief Roundy ordered the euthanization of non-FLDS Lydia Stubbs's horse in 2010. SOF 67-68. A factfinder that was analyzing Chief Roundy's discriminatory intent[4] could infer purposeful discrimination from Roundy's previous discriminatory statement above, and the incidents historical context and procedural irregularities. For historical context, Roundy knew Stubbs was a non-FLDS horse owner whose horses got loose numerous times. SOF 67. For irregularities, the killing violated state law, the CCMO reports on the incident were not untimely, and the CCMO have never euthanized any other horse. SOF 68-69.

---

[4] Colorado City's claim that there is no evidence of discriminatory intent ignores the evidence outlined here and instead focuses solely on a statement of an Arizona Investigator who was not investigating the motives behind the killing. R. SOF 15.

11

Based on the above examples, this Court should find sufficient evidence exists for a factfinder to conclude that the CCMO intentionally engages in religious discrimination.

### 3. Ample Evidence Supports a Finding that Defendants have Violated the Fourth Amendment

As discussed above, CCMO officers have a longstanding practice of adhering to FLDS guidance, even when it requires them to violate their oaths as police officers or the law. The Fourth Amendment is one such law that the CCMO treat as optional, especially where violating it advances the interests of the FLDS Church. The Fourth Amendment prohibits "unreasonable searches and seizures" "and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu,* 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio,* 392 U.S. 1, 9 (1968)). Arrests require probable cause of a crime, *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir. 2002), while investigatory stops require reasonable suspicion that criminal activity is afoot. *Arvizu,* 534 U.S. at 273-74. In determining the reasonableness of the seizure under the Fourth Amendment, the officer's subjective motivation is irrelevant; the analysis focuses on whether the facts the officer knows objectively provide the requisite probable cause or reasonable suspicion. *Whren v. United States,* 517 U.S. 806, 812-14 (1996).[5]

---

[5] Colorado City suggests that that the CCMO's conduct cannot violate both the Equal Protection and the Fourth Amendment, and that Section 14141 allows only Equal Protection claims. Colo. City MSJ 8. For the Section 14141, Defendant cites *United States v. City of Columbus*, No. CIV.A.2:99CV1097, 2000 WL 1133166, (S.D. Ohio Aug. 3, 2000). *Columbus*, however, upheld a Section 14141 complaint alleging excessive force (without an amendment charging racial discrimination) and found that the statute allowed claims for arrests without probable cause, and unlawful searches – all non-discriminatory related Fourth Amendment claims. *Id.* at *1-2, 6. Defendant cites *Whren* and *United States v. Johnson*, No. 1:12CV1349, 2014 WL 2807568 (M.D.N.C. June 20, 2014), for the suggestion that discriminatory conduct cannot also independently violate the Fourth Amendment. A single law enforcement action may, of course, violate both the Fourth and the Fourteenth Amendments, where it is both objectively unreasonable and motivated by impermissible discrimination. *Whren* itself, while finding that subjective intentions play no role in a Fourth Amendment analysis, stated that a subjective discriminatory motive for the same law enforcement action may violate other Constitution provisions. 517 U.S. at 813. The *Johnson* court merely found that the government could not rely on subjective discriminatory intent for traditional Fourth Amendment claim, not that the government could not assert a standard Fourth Amendment claim. 2014 WL 2807568 at *10-13.

Reasonable suspicion requires "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Michael R.,* 90 F.3d 340, 346 (9th Cir.1996) (internal citation omitted). The suspicion requires a credible basis with a "sufficient indicia of reliability," *Florida v. J.L.*, 529 U.S. 266, 270 (2000), and may only be justified by reference to factors that were present up to the time the stop was made. *United States v. Montero–Camargo*, 208 F.3d 1122, 1130 n.11 (9th Cir. 2000). A seizure's reasonableness must be evaluated by looking at the totality of the circumstances. *United States. v. Alvarez,* 899 F.2d 833, 836 (9th Cir.1990).

     A factfinder could conclude that, putting the officers' subjective motivations aside, many of the incidents described above as Equal Protection violations also objectively violate the Fourth Amendment. Regardless of motivation, the horse euthanization in violation of state law constitutes an unreasonable property seizure. *E.g.*, *Fuller v. Vines*, 117 F.3d 1425 (9th Cir. 1997) (killing dog constitutes seizure). Similarly, a factfinder could find the CCMO used excessive force when their arrest of Dockstader for a noise violation left him bleeding. SOF 37; *Graham v. Connor,* 490 U.S. 386, 397 (1989) (excessive force is unreasonable seizure). Additionally for all the seizures, a factfinder could find no credible evidence for the officer's purported pretext for the seizure –making the seizure unsupported by the required reasonable suspicion. *Howell v. Polk*, 532 F.3d 1025, 1027 (9th Cir. 2008) (reasonableness of search, seizure, or force used is jury question). For example, a factfinder could determine no disorderly noise occurred during the Dockstader arrest, thereby eliminating any probable cause for his arrest. And that the CCMO lacked probable cause when Mohave County officers stopped the CCMO from arresting Willie Jessop during the ECO Alliance incident.

     Moreover, additional examples exist of the CCMO seizing people without the required suspicion. They have detained vehicles without a specific, articulable basis. For example, two CCMO officers stopped Steve Bateman, but in response to Bateman's questioning could not articulate why his car was "suspicious." SOF 70. This stop thus

lacks the "specific, articulable facts" basis necessary for a seizure. Similarly, Officer Johnson stopped Lorin Holm at a stop sign, after Church Security "lost" Holm's car, to determine who was in the car. SOF 27. After he determined only Holm was in the car, he left; and as he was walking away made a reference to not rolling a stop sign. SOF 27. At the time Johnson seized him, Holm was completely stopped at a stop sign. SOF 27. This stop thus lacks any credible articulated basis for seizure.

The CCMO have also conducted unreasonable vehicle stops and detentions for traffic or other misdemeanor infractions that they never witnessed. In 2013, Officer Hyrum Roundy pulled over Sam Brower for allegedly following a car too close, based on a dispatch call from a then unknown person. Roundy then wrote the citation for a place where he had not observed Brower driving. SOF 71. Similarly, former Chief Helaman Barlow testified that he stopped a motorcycle for driving through the FLDS Church parking lot at (then FLDS Security Leader) Willie Jessop's request, and that he pulled the motorcycle over afterwards without observing the it in the parking lot. SOF 72. The bases for these stops, where no officer viewed the infraction, lack the "sufficient indicia of reliability" required for reasonable suspicion. Moreover, Jessop confirmed that he could have the CCMO stop cars for Church purposes. SOF 73. Jessop's statement shows that the above incidents are not aberrant, but rather exemplary of CCMO's broader practice of taking law enforcement action without a sufficient Fourth Amendment basis where it advances Church directives. Based on the above, this Court should find sufficient evidence for a factfinder to find Defendants have violated the Fourth Amendment.

**B. COLORADO CITY'S PARTIAL SUMMARY JUDGMENT MOTION ON DAMAGES ARISING FROM THE UNITED STATES' FHA CLAIM SHOULD BE DENIED.**

This Court should deny Colorado City's request for partial summary judgment on damages related to Count II's FHA claim. Colorado City misapprehends the nature of the FHA claim, submitting that that several aggrieved persons do not seek any damages. Colo. City MSJ 14. The aggrieved persons, however, are not parties and do not have independent claims for damages. *See* U.S. Resp. to Hild. MSJ 10-11, ECF No. 559. The

United States is the only entity with an FHA claim and a related damages demand. *Id.* Thus the relevant question is what damages aggrieved persons suffered from Defendants' discrimination, not whether they "seek" damages in this case; they do not.

### 1. The United States Complied with Federal Rule of Civil Procedure 26.

Colorado City asks for summary judgment on damages, pursuant to Rule 37(c), claiming that the United States did not properly disclose a computation of its damages in its Rule 26(a)(1)(A)(iii) disclosures. This Court should deny this belated[6] argument because the United States complied fully with its Rule 26(a)(1)(A)(iii) obligation to disclose its damages demand. At trial, the United States will seek damages for the aggrieved persons for emotional distress, embarrassment, and humiliation.

Rule 26 does not require that damages for emotional distress be "computed." Emotional-distress damages are not susceptible to the type of calculation Rule 26(a)(1) contemplates. *See Williams v. Trader Pub. Co.*, 218 F.3d 481, 487 n.3 (5th Cir. 2000).[7]

---

[6] Colorado City has also waived this argument by waiting two years to raise it. In January 2013, the United States issued its Rule 26(a) damages disclosure. SOF Ex. 45. The disclosure makes clear that the United States will be seeking damages on behalf of aggrieved persons incurred as a result of the Defendants' discriminatory housing practices. The disclosures also state that these damages include compensation for emotional distress and that a jury will determine the precise amount of emotional-distress damages for aggrieved persons. *Id.*; R. SOF 17. Over the next 2 years, the United States supplemented its disclosures 11 times. Although those supplements identified additional aggrieved persons, the Rule 26(a)(1)(A)(iii) statement did not change. R. SOF 17. Despite this, Colorado City never indicated any issues with the damages disclosures. It should be barred from now raising that disclosure as a summary judgment basis. *See Harrison v. Burlage*, No. 08CV80989, 2009 WL 3048687, at *3 (S.D. Fla. Aug. 14, 2009) (holding a failure timely to object to an initial disclosure constituted waiver); *cf. Alaska Stock, LLC v. Pearson Educ., Inc.*, 975 F. Supp. 2d 1027, 1045 (D. Alaska 2013) (noting, in denying summary judgment based on an alleged Rule 26(a)(1)(A)(iii) failure, that defendant never "contacted the [plaintiff] to remind it of its obligation to produce the calculations."); *see also* LRCiv. 7.2(j). (requiring that parties meet and confer regarding alleged discovery deficiencies).

[7] *See also First v. Kia of El Cajon*, No. 10CV536, 2010 WL 3069215, at *1 (S.D. Cal. Aug. 4, 2010) (reiterating '[w]hile Rule 26 generally requires a party to provide a computation of such damages, emotional distress damages, because of their vague and unspecific nature, are oftentimes not readily amendable to computation.'") (collecting cases and quoting *Creswell v. HCAL, Corp.,* 2007 WL 628036 *2 (S.D. Cal., Feb.12,

15

The United States informed Colorado City what individuals qualified as aggrieved persons, and that it intended to seek damages for emotional distress suffered by those individuals. Furthermore, the United States accurately informed Colorado City that a jury will determine the precise amount needed to compensate those aggrieved persons for the emotional distress. *See Bracey v. Board of Education of City of Bridgeport*, 368 F.3d 108, 118 (2d Cir. 2004) (noting that "[p]roper compensation for noneconomic damages cannot be computed by a mathematical formula."). Rule 26(a)(1)(A)(iii) requires nothing more, and thus Colorado City's motion based on Rule 37(c) should be denied.

### 2. There are Disputed Issues of Material Fact on the Issue of Damages for Identified Aggrieved Persons.

Despite Colorado City's assertion, disputed factual issues exist regarding whether the aggrieved persons the United States identified suffered emotional distress compensable under the FHA. *See Krueger v. Cuomo*, 115 F.3d 487, 492 (7th Cir. 1997) (finding a person injured by an FHA violation may recover emotional distress damages); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 998, 907 (2d Cir. 1993) ("[C]ivil rights plaintiffs may recover compensatory damages for emotional distress.").

Colorado City contends that no evidence exists that aggrieved persons suffered cognizable injuries. Notably, it nowhere contends that the aggrieved persons did not experience discrimination. Rather, relying on *United States v. Balistrieri*, 981 F.2d 916 (7th Cir. 1992), and *Biggs v. Village of Dupo*, 892 F.2d 1298 (7th Cir. 1990), Colorado City simply points out that a housing discrimination victim cannot rely on the fact of discrimination alone to prove damages for emotional distress. *See* Colorado City's Motion at 12. *Balistrieri*, however, is explicit that an aggrieved person's testimony is

---

2007)); *Gray v. Florida Dep't of Juvenile Justice*, No. 6CV990, 2007 WL 295514, at *2 (M.D. Fla. Jan. 30, 2007): ("[T]his Court agrees with the reasoning in *Perry* which suggests compensatory damages for emotional distress may not be susceptible to computation and thus, it is within the jurors ability to determine a reasonable amount").

16

sufficient either by itself "or in conjunction with the circumstances of the particular case, to establish damages for emotional distress." 981 F.2d at 932; *see also E.E.O.C. v. Moser Foods, Inc.*, No. 94CV2516, 1197 WL 827398, at *1 (D. Ariz. Nov. 7, 1997) ("[A] victim's testimony, in the context of a particular case, can be sufficient to meet the plaintiff's burden to show mental distress."). Indeed, *Balistrieri* pointed out that, "[t]he more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action." *Balistrieri*, 981 F.2d at 932. Thus "in housing discrimination cases, [courts have] generally upheld awards for emotional distress despite the lack of detailed description of that distress." *Id.*

Here, disputed facts exist regarding whether, and to what extent, aggrieved persons suffered emotional distress damages for which a jury could provide compensation.[8] As detailed in the Statement of Facts, aggrieved persons suffered emotional distress and can articulate that nature of that distress. SOF 74-78. For example, because of the Defendants discriminatory conduct, the identified aggrieved persons experienced what they described as stress, loss of sleep, anger, and frustration. SOF 74-78. As one victim put it: "[My] experience with the Marshal's office made me furious and frightened. . . . Because of the discriminatory treatment I have experienced with the Marshal's office I feel like I cannot get real justice where I live." SOF 75. That the Defendants never asked the aggrieved persons in their depositions about the emotional or psychological impact of the discrimination they experienced does not mean it does not exist. This Court should accordingly deny summary judgment for Colorado City on damages.

---

[8] Colorado City incorrectly contends that 42 U.S.C. § 3613(a)'s two-year limitations period bars any damages demand for one aggrieved person, Ross Chatwin. Section 3613(a)'s limitation, however, by its terms applies only to claims brought by aggrieved persons. The applicable limitation period that applies here for claims for monetary damages brought by the United States pursuant to 42 U.S.C. § 3614(a) is three years from the date on which the cause of action accrues, in this case, when the Attorney General has knowledge of a violation of the Act. *See* 28 U.S.C. § 2415(b).

### III. CONCLUSION

For the reasons above, this Court should deny Colorado City's Motion for Summary Judgment.

Respectfully submitted,

STEVEN H. ROSENBAUM
Chief
Housing and Civil Enforcement Section

JONATHAN M. SMITH
Chief
Special Litigation Section

R. TAMAR HAGLER
CHRISTY E. LOPEZ
Deputy Chiefs

ERIC W. TREENE
Special Counsel

   */s/ Matthew J. Donnelly*
SEAN R. KEVENEY
JESSICA C. CROCKETT
MATTHEW J. DONNELLY
Attorneys
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC  20530
Phone:     (202) 305-3216
Facsimile:  (202) 514-1116
E-mail:  matthew.donnelly@usdoj.gov

January 26, 2015

**CERTIFICATE OF SERVICE**

I certify that on January 26, 2015, I caused a copy of the foregoing *United States' Opposition to Colorado City's Motions for Summary Judgment* to be sent via the Court's ECF system to the following:

Jeffrey C. Matura
Asha Sebastian
Graif Barrett & Matura, P.C.
1850 North Central Avenue, Suite 500
Phoenix, Arizona 85004
*Attorneys for Defendant Town of Colorado City*

R. Blake Hamilton
Durham Jones & Pinegar
111 East Broadway, Suite 900
Salt Lake City, Utah 84111*Attorneys for Defendants City of Hildale, Twin City Water Authority, and Twin City Power*

　　　　　　　　　　　　　　　　　　 */s/ Matthew J. Donnelly*
　　　　　　　　　　　　　　　　　　MATTHEW J. DONNELLY
　　　　　　　　　　　　　　　　　　Attorney for the United States