WO                    IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


UNITED STATES OF AMERICA,            )
                                     )
                    Plaintiff,       )
                                     )
          vs.                        )
                                     )
TOWN OF COLORADO CITY, ARIZONA,      )
et al.,                              )
                                     )      No. 3:12-cv-8123-HRH
                    Defendants.      )      (Prescott Division)
_____)


O R D E R

Motions for Partial Summary Judgment

Plaintiff moves for partial summary judgment.[1]   This motion is opposed.[2] Defendants move for partial summary judgment.[3]  These motions are opposed.[4]  Oral argument was requested and has been heard.

---

[1]Docket No. 541.

[2]Docket Nos. 560 & 562.

[3]Docket Nos. 544 & 548.  In addition to filing a separate motion for partial summary judgment, the Hildale defendants join in Colorado City's motion for partial summary judgment.  See Docket No. 548 at 1, n.1.

[4]Docket No. 559 & 564.

<u>Facts</u>

Plaintiff is the United States of America.  Defendants are the Town of Colorado City, Arizona; the City of Hildale, Utah; Twin City Power (TCP); and Twin City Water Authority, Inc. (TCWA).[5]

Plaintiff alleges that "[d]efendants have engaged in a pattern or practice of illegal discrimination against individuals who are not members of the Fundamentalist Church of Jesus Christ of Latter-day Saints ('FLDS')."[6]  Plaintiff alleges that defendants "have acted in concert with FLDS leadership to deny non-FLDS individuals housing, police protection, and access to public space and services."[7]  Plaintiff further alleges that the Cities' joint police department, the Colorado City Marshal's Office (CCMO), "has inappropriately used its state-granted law enforcement authority to enforce the edits of the FLDS, to the detriment of non-FLDS members."[8]

In Count I of its complaint, plaintiff asserts a claim under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, against the Cities.  Plaintiff alleges that the Cities

---

[5]Colorado City and the City of Hildale are referred to collectively as "the Cities." Hildale, TCP, and TCWA are referred to collectively as "the Hildale defendants."

[6]Complaint at 2, ¶ 4, Docket No. 1.

[7]<u>Id.</u> (footnote omitted).

[8]<u>Id.</u> at 3, ¶ 4.

engaged in and continue to engage in a pattern and practice of conduct that deprives persons of rights, privileges, or immunities secured or protected by the First, Fourth, and Fourteenth Amendments to the United States Constitution and the laws of the United States.[9]

In Count II of its complaint, plaintiff asserts a single claim brought pursuant to § 3614(a) of Fair Housing Act (FHA), which "prohibits various forms of discrimination in the sale or rental of housing[.]"[10] United States v. Balistrieri, 981 F.2d 916, 927 (7th Cir. 1992). Plaintiff alleges that all four defendants have engaged in a pattern and practice of violating Sections 3604(a), 3604(b), and 3617 of the FHA[11] and that their conduct constituted "[a] denial to a group of persons rights granted by the Fair Housing Act, which raises an issue of general public importance, in violation of the Fair Housing Act, 42 U.S.C. § 3614(a)."[12] More specifically, plaintiff alleges that defendants "have, since approximately 2008, denied or unreasonably delayed water and electric service to non-FLDS individuals, refused to issue them building permits, and otherwise prevented non-FLDS individuals and the

---

[9]Id. at 15, ¶ 55.

[10]"Section 3614(a) provides that the Attorney General may bring a civil action to enforce the Fair Housing Act whenever he 'has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full and equal enjoyment of the rights secured by [the Act] or that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance....'" Balistrieri, 981 F.2d at 927 (quoting 42 U.S.C. § 3614(a)).

[11]Complaint at 16, ¶ 58, Docket No. 1.

[12]Id. at ¶ 59.

-3-

Trust[13] from constructing new housing or occupying existing housing[.]"[14]   Plaintiff alleges that the Cities and TCWA denied non-FLDS individuals' requests for new water service and that the Cities denied building permits to non-FLDS members due to a water shortage, even though "there is no water shortage in the Cities that would justify these denials."[15]   Plaintiff alleges that "[t]here are persons who have been injured by [d]efendants' discriminatory actions and practices who are aggrieved persons as defined in 42 U.S.C. § 3602(i).  These persons have suffered damages as a result of [d]efendants' discriminatory actions and practices....."[16] For Count II, plaintiff seeks injunctive relief, civil penalties, and damages on behalf of the sixteen aggrieved persons it has disclosed.

Plaintiff commenced this action on June 21, 2012.  Prior to the commencement of this case, a case entitled Cooke v. Town of Colorado City, Case No. 3:10-cv-8105-PCT-JAT, was filed.  In Cooke, the State of Arizona and Ron and Jinjer Cooke alleged that defendants violated the FHA and engaged in a pattern and pattern of discrimination on the basis of

---

[13]The Trust is the United Effort Plan Trust, which until 2005 was controlled by the FLDS church, but was reformed by a Utah court in 2006 and is now administered by a special fiduciary, "who is not affiliated with the FLDS Church[.]"  Id. at 4-5, ¶ 13.  Much of the land and many of the Cities' residences belong to the Trust and "[r]esidents who live in Trust-owned homes typically have signed occupancy agreements with the Trust."  Id. at 4, ¶ 12.

[14]Id. at 12, ¶ 36.

[15]Id. at ¶ 37.

[16]Id. at 16, ¶ 60.

religion in violation of the Arizona Fair Housing Act (AFHA).  The <u>Cooke</u> complaint was based in large part on allegations that the Cookes were denied a water connection because defendants claimed that "due to a water shortage, no new water connections would be provided for property that had never had water service...."[17]  The <u>Cooke</u> complaint also alleged that the CCMO interfered with the Cookes' housing rights.[18]  The Cookes asserted FHA claims based on 42 U.S.C. §§ 3604(a), 3604(b), 3604(f), and 3617.[19]  The Cookes and the State also asserted various claims under the AFHA[20] and the State asserted a pattern and practice claim under the AFHA based on allegations that defendants had a pattern and practice of denying utilities to non-FLDS individuals.[21]

The <u>Cooke</u> case went to trial and on March 20, 2014, the jury returned a verdict in favor of the Cookes and the State.  The jury found that defendants had "violated the federal Fair Housing Act and the Arizona Fair Housing Act by discriminating against the Cookes in the provision of services or facilities because of religion."[22]  The jury found that

---

[17]Joint Second Amended Complaint at 10, ¶ 38, Exhibit 1, Hildale Defendants' Controverting Statement of Facts [etc.], Docket No. 563.

[18]<u>Id.</u> at 20-22, ¶¶ 85-91.

[19]<u>Id.</u> at 24, ¶¶ 107-109.

[20]<u>Id.</u> at 25-28, ¶¶ 119-140.

[21]<u>Id.</u> at 29, ¶¶ 141-146.

[22]Order at 3, Docket No. 703 in Case No. 3:10-cv-8105-PCT-JAT.

defendants had "violated the federal Fair Housing Act and the Arizona Fair Housing Act by coercing, intimidating, threatening, interfering with, or retaliating against the Cookes in the enjoyment of their dwelling because (1) of religion or (2) the Cookes asserted rights, or encouraged others to assert their rights, protected by the federal Fair Housing Act or the Arizona Fair Housing Act."[23]  And, the jury found that defendants "violated the Arizona Fair Housing Act by engaging in a pattern and practice of resistance to the full enjoyment of any right granted by the" AFHA.[24]

Plaintiff now moves for partial summary judgment, arguing that collateral estoppel applies to the issue of defendants' liability on Count II.  Colorado City, joined by the Hildale defendants, moves for summary judgment on Count I of plaintiff's complaint and on Count II damages.  And, the Hildale defendants move for summary judgment on plaintiff's request for injunctive relief under the FHA and for summary judgment dismissing plaintiff's Count II against TCP and TCWA.

## Discussion

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The initial burden is on the moving party to show that there is an absence of genuine issues of

---

[23]Id.

[24]Id. at 4.

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party meets

its initial burden, then the non-moving party must set forth specific facts showing that there

is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In

deciding a motion for summary judgment, the court views the evidence of the non-movant

in the light most favorable to that party, and all justifiable inferences are also to be drawn

in its favor.  Id. at 255.  "[T]he court's ultimate inquiry is to determine whether the 'specific

facts' set forth by the nonmoving party, coupled with undisputed background or

contextual facts, are such that a rational or reasonable jury might return a verdict in its

favor based on that evidence."  T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,

809 F.2d 626, 631 (9th Cir. 1987).

Count I

In Count I, plaintiff asserts a claim under the Violent Crime Control and Law

Enforcement Act of 1994, 42 U.S.C. § 14141.  Section 14141 provides in relevant part:

> It shall be unlawful for any governmental authority, or any
> agent thereof, or any person acting on behalf of a governmen-
> tal authority, to engage in a pattern or practice of conduct by
> law enforcement officers ... that deprives persons of rights,
> privileges, or immunities secured or protected by the Constitu-
> tion or laws of the United States.

Plaintiff alleges that the CCMO has engaged in a pattern or practice of conduct that

deprived persons of their rights under the First, Fourth, and Fourteenth Amendments.

As an initial matter, defendants argue that Count I should be limited to allegations that the CCMO engaged in a pattern or practice of conduct that violated the Fourteenth Amendment.  Defendants argue that the First and Fourth Amendment do not apply to claims under 42 U.S.C. § 14141.  See Whren v. United States, 517 U.S. 806, 813 (1996) ("We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment."); United States v. Johnson, 28 F. Supp. 3d 499, 514 (M.D.N.C. 2014) ("to the extent the Government is challenging a pattern of allegedly discriminatory individual traffic stops on the basis of ethnicity, Johnson is correct that the Equal Protection Clause, not the Fourth Amendment, applies"); United States v. City of Columbus, Ohio, Case No. CIV.A.2:99CV1097, 2000 WL 1133166, at *9 (S.D. Ohio Aug. 3, 2000) ("the Court concludes that § 14141 is a valid and proper exercise of congressional authority under § 5 of the Fourteenth Amendment").  Defendants argue that because any claim related to a pattern and practice of misconduct under § 14141 falls solely within the Fourteenth Amendment, they are entitled to summary judgment on the First and Fourth Amendment components of plaintiff's § 14141 claim.

Defendants' reliance on Whren is misplaced because that case did not involve a § 14141 claim.  Defendants' reliance on Johnson is also misplaced.  There, the government

alleged that "Johnson, in his official capacity as Sheriff of Alamance County, North Carolina, engaged in a pattern or practice of discriminatory law enforcement activities directed against Latinos, in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution." Johnson, 28 F. Supp. 3d at 502. On cross-motions for summary judgment, the court concluded that there were material questions of fact as to the government's claim based on the Fourteenth Amendment. Id. at 512-13. As to the government's claim based on the Fourth Amendment, the government contended that this claim "encompasse[d] the ACSO's alleged discrimination on the basis of ethnicity in initiating traffic stops and use of vehicular checkpoints for general law enforcement purposes." Id. at 513. "Johnson contends that the first does not state a claim under the Fourth Amendment, but rather under the Equal Protection Clause of the Fourteenth Amendment." Id. at 514. The court concluded that "to the extent the Government is challenging a pattern of allegedly discriminatory individual traffic stops on the basis of ethnicity, Johnson is correct that the Equal Protection Clause, not the Fourth Amendment, applies." Id. But, the court did not hold that a § 14141 claim can never be based on the Fourth Amendment. Rather, "the court conclude[d] ... that the complaint raises a proper Fourth Amendment challenge to the extent it contends that the ACSO, as part of its alleged targeting of Latinos, has conducted checkpoints with a programmatic purpose that violates the Fourth Amendment." Id. at 516 (emphasis omitted); see also, United States v. Maricopa County, Ariz., 915 F. Supp. 2d 1073,

1081 (D. Ariz. 2012) ("[t]he plain language of the statute allows for a Section 14141 claim based on a First Amendment deprivation").

Defendants' reliance on <u>City of Columbus</u> is also misplaced. There, the court considered an argument that "Congress exceeded its constitutional authority in promulgating ... 42 U.S.C. § 14141." <u>City of Columbus</u>, 2000 WL 1133166, at *1. The court rejected this argument because it concluded "that § 14141 is a valid and proper exercise of congressional authority under § 5 of the Fourteenth Amendment." <u>Id.</u> at *9. The court did not hold that § 14141 claims could only be based on violations of the Fourteenth Amendment.

Thus, defendants' argument that plaintiff cannot base its § 14141 claim on violations of the First and Fourth Amendments fails. Although the protections of the First and Fourth Amendments are effective against the states through the Fourteenth Amendment, <u>see Vlasak v. Superior Court of Calif. ex rel. County of Los Angeles</u>, 329 F.3d 683, 687 n.2 (9th Cir. 2003) ("The First Amendment applies to the States and their political subdivisions through the Fourteenth Amendment"); <u>Molina v. Richardson</u>, 578 F.2d 846, 848 n.4 (9th Cir. 1978) ("The protections of the Fourth Amendment are effective against the states through the Fourteenth" Amendment), that does not mean that plaintiff cannot attempt to prove its § 14141 claim by establishing that the CCMO had a pattern and practice of violating the First and Fourth Amendments.

-10-

Defendants next argue that they are entitled to summary judgment on Count I because plaintiff has no evidence to support its allegation that the CCMO engaged in a pattern and practice of religious discrimination.  Plaintiff alleges that the CCMO engaged in a pattern and practice of religious discrimination because it "fails to protect non-FLDS individuals from victimization by FLDS members, fails to investigate crimes against non-FLDS individuals and their property, and refuses to arrest FLDS individuals who have committed crimes against non-FLDS individuals."[25]  These are allegations that the CCMO violated the equal protection clause of the Fourteenth Amendment.  See Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)) ("'The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike.'").  Plaintiff has alleged several examples of the CCMO's discriminatory conduct in paragraphs 18, 22, 23, 28, 30, and 32 of its complaint, but defendants argue that none of these examples involve religious discrimination.

But even if none of these examples suggest that the CCMO was treating non-FLDS individuals differently, plaintiff has come forward with other evidence which is sufficient to create issues of material fact as to whether the CCMO had a pattern and practice of

---

[25]Complaint at 5, ¶ 16, Docket No. 1.

violating the Equal Protection Clause of the Fourteenth Amendment.  This evidence includes the arrest of Harvey Dockstader, a non-FLDS individual,[26] the February 2013 ECO Alliance incident,[27] and the arrest of William E. Timpson Jessop in 2011.[28]

There are also questions of material fact as to whether the CCMO violated the First Amendment.  "The First Amendment provides that, 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof....'" Williams v. Calif., 764 F.3d 1002, 1011 (9th Cir. 2014).  "The First Amendment's protection of the freedom of religion is considered to be embodied in two clauses: the 'Establishment Clause' and the 'Free Exercise Clause.'"  Id.  This case involves the Establishment Clause, which "prohibits the Government from compelling an individual to participate in religion or its exercise, or otherwise from taking action that has the purpose or effect of promoting religion or a particular religious faith."  Id.

"There are three possible tests for determining whether [conduct] violates the Establishment Clause—the Lemon test, the Endorsement test and the Coercion Test." Newdow v. Rio Linda Union School Dist., 597 F.3d 1007, 1017 (9th Cir. 2010).  "Under the

---

[26]Dockstader Statement, Exhibit 44, United States' Controverting Statement of Facts [etc.], Docket No. 565.

[27]Exhibit 41, United States' Controverting Statement of Facts [etc.], Docket No. 565.

[28]Deposition of William E. Timpson Jessop at 97:19-98:20 & 115:20-116:14, Exhibit 24, United States' Controverting Statement of Facts [etc.], Docket No. 565.

Lemon test, to be constitutional (1) the challenged governmental action must have a secular purpose; (2) 'its principal or primary effect must be one that neither advances nor inhibits religion'; and (3) it 'must not foster an excessive government entanglement with religion.'" Id. (quoting Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971)). "Under the Endorsement Test, [the court] look[s] to see whether the challenged governmental action has the purpose or effect of endorsing, favoring, or promoting religion, particularly if it has the effect of endorsing one religion over another." Id. at 1037. "[T]he 'coercion test' emanat[es] from Lee v. Weisman, 505 U.S. 577, 587 (1992), in which the Court observed, "[i]t is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion, or its exercise." Turner v. Hickman, 342 F. Supp. 2d 887, 893-94 (E.D. Cal. 2004).

Plaintiff has come forward with evidence that FLDS leaders direct who becomes an officer and the Marshal.  For example, Helaman Barlow testified that he was the interim Marshal for a period of time but then John Wayman, who was a FLDS church leader, "told me to let the city manager and council know that he okayed me becoming the permanent chief."[29]  This evidence suggests control by the FLDS of government law enforcement, which may  constitute unconstitutional fusion and entanglement.  See Larkin v. Grendel's Den, Inc., 459 U.S. 116, 127 (1982 ("important, discretionary governmental powers [cannot]

---

[29]Deposition of Helaman Barlow (April 2014) at 27:22-28:4, Exhibit 14, United States' Controverting Statement of Facts [etc.], Docket No. 565.

be delegated to or shared with religious institutions"). Plaintiff has also come forward with evidence that suggests that CCMO officers endorsed and protected the FLDS church, often in violation of the oaths they took to uphold the law. For example, Dowayne Barlow testified that several CCMO officers, including Fred Barlow, Jonathan Roundy, Sam Johnson, and Helaman Barlow, dropped off parcels, letters, and contributions to couriers to give to Warren Jeffs, while he was a fugitive.[30] And, plaintiff has come forward with evidence that CCMO officers were aware of marriages involving underage girls but did not open any criminal investigations regarding these illegal acts.[31]

Plaintiff has also come forward with evidence that creates issues of fact as to whether the CCMO had a pattern and practice of violating non-FLDS individuals' Fourth Amendment rights. "'The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.'" Ramirez v. City of Buena Park, 560 F.3d 1012, 1020 (9th Cir. 2009) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). A reasonable factfinder could conclude that some of the incidents mentioned above objectively violate the Fourth Amendment. In addition, plaintiff has come forward with

---

[30]Deposition of Dowayne A. Barlow at 31:13-34:23, Exhibit 20, United States' Controverting Statement of Facts [etc.], Docket No. 565.

[31]Helaman Barlow Deposition at 66:9-67:15, Exhibit 14, United States' Controverting Statement of Facts [etc.], Docket No. 565.

evidence of investigatory stops which a reasonable factfinder could find violated the Fourth Amendment. For example, Sam Brower testified that he believed he was stopped "without any probable cause merely because I was in town trying to serve Haven Barlow with legal process."[32] Brower testified that he was cited for following too close even though the officer who stopped him was not a witness to the alleged incident.[33]

In sum, plaintiff may attempt to prove its § 14141 claim by establishing that defendants violated the First, Fourth, or Fourteenth Amendments, and there are material questions of fact as to whether there have been any constitutional violations on the part of defendants. Thus, defendants are not entitled to summary judgment on Count I of plaintiff's complaint.

<u>Count II</u>

Count II is plaintiff's FHA claim in which plaintiff alleges that defendants have engaged in a pattern and practice of housing discrimination based on religion. Plaintiff argues that defendants are collaterally estopped from arguing that they are not liable under the FHA because the issue of whether defendants engaged in a pattern and practice of housing discrimination has been established in the <u>Cooke</u> case. "[O]ffensive nonmutual issue preclusion ... prevents 'a defendant from relitigating the issues which a defendant

---

[32]The Deposition of Samuel E. Brower at 192:3-7, Exhibit 30, United States' Controverting Statement of Facts [etc.], Docket No. 565.

[33]<u>Id.</u> at 192:8-17.

previously litigated and lost against another plaintiff.'"   Syverson v. Int'l Business

Machines Corp., 472 F.3d 1072, 1078 (9th Cir. 2007) (quoting Parklane Hosiery Co. v. Shore,

439 U.S. 322, 329 (1979)).

> [T]he application of offensive nonmutual issue preclusion is
> appropriate only if (1) there was a full and fair opportunity to
> litigate the identical issue in the prior action, (2) the issue was
> actually litigated in the prior action, (3) the issue was decided
> in a final judgment, and (4) the party against whom issue
> preclusion is asserted was a party or in privity with a party to
> the prior action[.]

Id. (internal citations omitted).  The court has "'broad discretion' ... to take potential

shortcomings or indices of unfairness into account when considering whether to apply

offensive nonmutual issue preclusion, even where the above-listed standard prerequisites

are met."  Id. at 1078-79 (quoting Parklane Hosiery, 439 U.S. at 331).  "'Whether collateral

estoppel is available is a mixed question of law and fact in which the legal issues

predominate.'"  Visa U.S.A. Inc. v. First Data Corp., 369 F. Supp. 2d 1121, 1123 (N.D. Cal.

2005) (quoting Davis & Cox v. Summa Corp., 751 F.2d 1507, 1519 (9th Cir. 1985),

superseded in part by statute on other grounds as stated in Northrop Corp. v. Triad Int'l

Mktg., S.A., 842 F.2d 1154, 1156 (9th Cir. 1988)).

     Plaintiff argues that defendants had a full and fair opportunity to litigate in the

Cooke case the issue of whether they engaged in a pattern and practice of housing

discrimination, which is the identical issue raised in Count II.  Four factors courts consider

in determining whether issues are identical are:

> "(1) is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?
>
> (2) does the new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding?
>
> (3) could pretrial preparation and discovery related to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?
>
> (4) how closely related are the claims involved in the two proceedings?"

Kamilche Co. v. United States, 53 F.3d 1059, 1062 (9th Cir. 1995) (quoting Restatement

(Second) of Judgments § 27 cmt. c).

There is no dispute that any new evidence that plaintiff would present on Count II

in this case would involve the same rule of law that was applied to the pattern and practice

claim in Cooke.  Although the State's pattern and practice claim in Cooke was based on the

AFHA, rather than the FHA, these statutes are substantially equivalent and courts look to

cases interpreting the FHA to interpret the AFHA.  See, e.g., Canady v. Prescott Canyon

Estates Homeowners Ass'n, 60 P.3d 231, 233 n.3 (Ariz. Ct. App. 2002) ("Because the

provisions of Arizona's Fair Housing Act involved in this appeal are virtually identical to

those provisions of the federal Act, federal case authority is persuasive in interpreting Arizona's statute.").

As for the other three factors, plaintiff argues that there is a substantial overlap of evidence, which in turn means that the pretrial preparation and discovery in Cooke embraced matters that will be presented in this case and also means that the claims in both cases are closely related. Plaintiff contends that the State in Cooke presented evidence that the FLDS church controls defendants, that defendants refused to cooperate with the Trust to make Trust land available to individuals regardless of their religion, that defendants denied water service to non-FLDS individuals, that the CCMO was controlled by the FLDS church and interfered with housing rights, that defendants frustrated the ability of non-FLDS members to enjoy Trust leases and occupancy agreements, and that defendants conspired with the FLDS church to use culinary water issues to deny housing on the basis of religion.[34] Plaintiff contends that in this case, it will present evidence that defendants acted in concert with the FLDS leadership to deny non-FLDS individuals housing, that defendants operated as an arm of the FLDS church, that defendants denied water service to non-FLDS individuals, that defendants refused to issue building permits to non-FLDS individuals, that defendants used an alleged water shortage as a pretext for discrimination,

---

[34]To support its contentions as to what evidence was offered in the Cooke case, plaintiff relies on the judgment that was proposed by the State. Docket No. 687-1, Case No. 3:13-cv-08105-PCT-JAT. As defendants are quick to point out, this proposed judgment, which contained over 400 paragraphs, was not adopted by the court.

and that the CCMO interferes with housing rights by, among other things, arresting non-FLDS individuals for trespass on properties they have a right to enter.  Thus, plaintiff insists that there is a substantial overlap in evidence between the two cases.

The court disagrees.  First, as defendants have pointed out,  the two cases involve different subsections of the FHA, which presumably means that the evidence necessary to prove plaintiff's FHA claim in this case will be different from the evidence that was offered in the Cooke case.  More importantly,  the Cooke case focused on the water issue, which is only one of the issues that plaintiff has raised in its pattern and practice claim in this case. The issues raised by plaintiff in Count II in this case are much broader than the issues that were raised in the Cooke case and thus there is not a substantial overlap of evidence as to the two cases.  Because there is not a substantial overlap of evidence, the issues in the two cases are not identical.  Because the issues in the two cases are not identical, non-mutual collateral estoppel has no application here.

Because the court declines to apply issue preclusion broadly as to plaintiff's entire FHA pattern and practice claim, plaintiff would then have the court apply issue preclusion to the factual issues with respect to discrimination in the provision of utilities, the provision of building permits, and CCMO trespass arrests.  ""If the court does not grant all the relief requested by [a summary judgment] motion, it may enter an order stating any material fact--including an item of damages or other relief--that is not genuinely in dispute and

treating the fact as established in the case."  Fed. R. Civ. P. 56(g); <u>see</u> <u>also</u>, <u>McCoy v. Foss</u>

<u>Maritime Co.</u>, 442 F. Supp. 2d 1103, 1112-13 (W.D. Wash. 2006) (court adopted some factual

findings from a prior action but required the plaintiff to "make an individualized showing

of his own treatment and injury" and allowed the defendant "to show it acted exception-

ally with regard to" the plaintiff).

It is within the court's discretion to enter an order treating certain facts as

established.  <u>See</u> <u>U.S. Bank Nat'l Assoc. v. Verizon Communications, Inc.</u>, 761 F.3d 409, 427

n.15 (5th Cir. 2014) ("The Rule's use of the word 'may', as opposed to 'shall',  indicates that

district courts are not required to enter a separate order under Rule 56(g)").  Although

defendants can hardly contest the fact that they violated the FHA as regards the

habitability of the Cookes' property, "[t]he court ... conclude[s] that it is better to leave open

for trial facts and issues that may be better illuminated by the trial of related facts that must

be tried in any event." Fed. R. Civ. P. 56(g) advisory committee's cmt. (2010 amd.).  What

plaintiff is requesting here still involves issue preclusion and it is the court's perception that

it would be potentially unfair to deprive defendants of the opportunity to defend against

plaintiff's FHA claim in its entirety.  If the jury were instructed that defendants are already

liable as to some of the FHA issues, the jury may take such an instruction as an invitation

to assume that because defendants had engaged in some unlawful conduct, all of

defendants' conduct was unlawful.  Moreover, although it is a somewhat minor

consideration, declining to enter a Rule 56(g) order will avoid the Hildale defendants'

somewhat logical argument that plaintiff should be limited to the scope of the Cooke

injunction if defendants are to be bound by the factual findings of the Cooke case.

In sum, non-mutual collateral estoppel does not apply here, and the court declines

to enter a separate Rule 56(g) order.  Thus, plaintiff's motion for summary judgment as to

defendants' liability on its FHA claim is denied.

Turning then to the issues of relief as to Count II, the Hildale defendants argue that

plaintiff's request for injunctive relief has been rendered moot by the injunction that was

entered in the Cooke case.  "Article III's 'case-or-controversy' requirement precludes

federal courts from deciding 'questions that cannot affect the rights of litigants in the case

before them.'"  Protectmarriage.com-Yes on 8 v. Bowen, 752 F.3d 827, 834 (9th Cir. 2014)

(quoting  DeFunis v. Odegaard, 416 U.S. 312, 316 (1974)).  "'The central question of all

mootness problems is whether changes in the circumstances that prevailed at the beginning

of litigation have forestalled any occasion for meaningful relief....'"  West v. Sec. of Dep't.

of Transp., 206 F.3d 920, 925 n.4 (9th Cir. 2000) (quoting 13A Federal Practice and

Procedure § 3533.3 at 268 (1984)).  If plaintiff has already been awarded in the Cooke case

the FHA injunctive relief it seeks here, there would be no meaningful injunctive relief that

this court could award.

In its complaint, plaintiff requests that defendants be enjoined from:

      i.      Refusing to negotiate for the sale of housing, denying housing, or otherwise making housing unavailable because of religion, in violation of 42 U.S.C. § 3604(a);

      ii.     Discriminating in the terms, conditions, or privileges of rental of a dwelling because of religion, in violation of 42 U.S.C. § 3604(b); and

      iii.    Coercing, intimidating, threatening, or interfering with a person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, a right granted or protected by Section 804 of the Fair Housing Act, in violation of 42 U.S.C. § 3617[.][35]

In the <u>Cooke</u> case, the court enjoined defendants, for a period of ten years, from

> (1) discriminat[ing] because of religion against any person in the terms, conditions, or privileges of the provision of services or facilities in connection with the sale or rental of a dwelling; or (2) coerc[ing], intimidat[ing], threaten[ing], interfer[ing] with, or retaliat[ing] against any person in the enjoyment of his or her dwelling because of religion or because that person has asserted rights, or encouraged others to assert their rights, protected by the federal Fair Housing Act or the Arizona Fair Housing Act.[[36]]

The Hildale defendants argue that because the <u>Cooke</u> injunction is not limited to preventing discrimination against the specific parties involved in <u>Cooke</u> but rather precludes discrimination against "any person", the <u>Cooke</u> injunction provides the same

---

[35]Complaint at 17-18, Docket No. 1.

[36]Amended Judgment and Permanent Injunction at 2, ¶ 7, Case No. 10-cv-8105-PCT-JAT, Exhibit A, Hildale Defendants' Separate Statement of Facts [etc.], Docket No. 549.

relief that plaintiff has requested in this case.  But even if plaintiff's request for FHA injunctive relief is not moot, the Hildale defendants argue that they should still be granted summary judgment on plaintiff's request for injunctive relief under the FHA because plaintiff cannot establish that it is entitled to injunctive relief.  "The requirements for the issuance of a permanent injunction are (1) the likelihood of substantial and immediate irreparable injury, and (2) the inadequacy of remedies at law."  G.C. and K.B. Invs., Inc. v. Wilson, 326 F.3d 1096, 1107 (9th Cir. 2003).  The Hildale defendants argue that plaintiff cannot demonstrate that there is a continuing threat that they will violate the FHA because they are prohibited from doing so because of the Cooke injunction, and, the Hildale defendants argue that the Cooke injunction provides an adequate remedy at law.

The Hildale defendants' argument that plaintiff's request for FHA injunctive relief is moot is rejected.  As discussed above, plaintiff's FHA claim in this case is broader than the pattern and practice claim in Cooke.  Because plaintiff's FHA claim is considerably broader than what was litigated in Cooke, there may be a need for a broader injunction in this case if plaintiff prevails on its FHA claim.  As to the Hildale defendants' contention that plaintiff cannot prove the need for injunction, that contention is premature.  It remains to be seen whether plaintiff can prove such a need.  Thus, the Hildale defendants' motion for summary judgment as to  Count II injunctive relief is denied.

Next, defendants argue that plaintiff cannot seek any FHA damages for the sixteen aggrieved persons it has disclosed.[37]  "The Fair Housing Act allows courts to award damages to persons aggrieved by a defendant's pattern of discrimination[.]" Balistrieri, 981 F.2d at 935.  "In order to establish that a [person] is an 'Aggrieved Person,'" plaintiff "must demonstrate that [the person] suffered a concrete injury in fact or one that is actual and imminent; that such injury is fairly traceable to [the d]efendants' allegedly illegal actions; and that it is likely that such injury will be redressed by a favorable decision." Savanna Club Worship Service, Inc. v. Savanna Club Homeowners' Ass'n, Inc., 456 F. Supp. 2d 1223, 1226 (S.D. Fla. 2005).

Defendants first argue that plaintiff cannot offer at trial any evidence regarding the damages that these aggrieved persons suffered because plaintiff failed to provide any computation of these damages as required by Rule 26(a)(1)(A)(iii), Federal Rules of Civil Procedure.  Rule 26(a)(1)(A)(iii) requires "a computation of each category of damages claimed by the disclosing party...."  "If a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

---

[37]United States' Eleventh Supplemental Initial Disclosures at 2-5, Exhibit 7, Statement of Facts [etc.], Docket No. 545.

In its Eleventh Supplemental Initial Disclosure, dated July 3, 2014, plaintiff stated

that it

> will be seeking monetary relief for aggrieved persons, ...
> including their out-of-pocket and economic costs, lost housing
> opportunities, and emotional distress, embarrassment and
> humiliation.  The precise amount needed to compensate
> aggrieved persons for the emotional distress they suffered will
> be determined by the jury.  The United States continues to
> evaluate the evidence in this case to determine the identity of
> aggrieved persons as well as the monetary damage amounts
> sought on their behalf, and will supplement these responses
> accordingly.[38]

Plaintiff has not provided defendants any supplemental disclosures as to the damages that

it is seeking on behalf of the 16 identified aggrieved persons and thus defendants argue that

they are left to guess as to what damages plaintiff might be seeking on behalf of the sixteen

aggrieved persons.

As an initial matter, plaintiff argues that defendants' Rule 26 argument is not timely,

but the authority to which plaintiff cites does not support its argument.  And, as defendants

point out, "Rule 37(c)(1) is a 'self-executing,' 'automatic' sanction designed to provide a

strong inducement for disclosure."  Goodman v. Staples The Office Superstore, LLC, 644

F.3d 817, 827 (9th Cir. 2011) (quoting Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259

F.3d 1101, 1106 (9th Cir. 2001)).

---

[38]Id. at 31.

Turning then to the merits of defendants' Rule 26 argument, plaintiff represents that it is only seeking "damages for the aggrieved persons for emotional distress, embarrassment, and humiliation."[39]  The court will hold plaintiff to that representation.  As to these damages only, the court finds that plaintiff has not violated Rule 26.  Such damages are not subject to any mathematical calculation and are for a jury to decide.  See Williams v. Trader Pub. Co., 218 F.3d 481, 486 n.3 (5th Cir. 2000) ("Since compensatory damages for emotional distress are necessarily vague and are generally considered a fact issue for the jury, they may not be amenable to the kind of calculation disclosure contemplated by Rule 26(a)(1)(C)"); First v. Kia of El Cajon, Case No. 10–CV–536–DMS (BGS), 2010 WL 3069215, at *1 (S.D. Cal. Aug. 4, 2010) (citation omitted) ("[w]hile Rule 26 generally requires a party to provide a computation of such damages, emotional distress damages, because of their vague and unspecific nature, are oftentimes not readily amendable to computation").

Defendants' reliance on Museum Associates, Ltd. v. Midzor, Case No. CV 10–01042–PHX–NVW, 2012 WL 14026 (D. Ariz. Jan. 4, 2012), is misplaced.  That case involved the disclosure (or lack thereof) of medical records and documents to support the plaintiff's claim for emotional distress damages.  Here, there is no suggestion that there are medical or other records which support the emotional distress damage claims of the aggrieved persons that plaintiff has failed to produce.  To the extent that plaintiff has such

---

[39]United States' Opposition to Colorado City's Motion for Summary Judgment at 15, Docket No. 564.

evidence, plaintiff will not be permitted to offer any such evidence at trial since plaintiff did not timely disclose this evidence to defendants.

Defendants next argue that they are entitled to summary judgment as to ten of the sixteen aggrieved persons because there is no evidence that these ten individuals suffered damages, emotional or otherwise, due to defendants' conduct.  The sixteen persons who plaintiff has identified as aggrieved persons are:  Patrick Barlow, Andrew Chatwin, John Cook, Ron and Jinjer Cooke, Ross and Lori Chatwin, Richard Holm, Christopher and Jesseca Jessop, Willie R. Jessop, Ron Rohbock, Jerold Williams, Elizabeth Wayman, Dan Wayman, and Isaac Wyler.  Defendants argue that there is no evidence that John Cook, Ross Chatwin, Lori Chatwin, Christopher Jessop, Jesseca Jessop, Willie R. Jessop, Ron Rohbock, Jerold Williams, Elizabeth Wayman, or Isaac Wyler suffered any damages as result of defendants' alleged violations of the FHA.

The question here is whether plaintiff has any evidence that any of these ten people suffered any emotional distress.  "[A] court may not presume emotional distress from the fact of discrimination.  A plaintiff  must actually prove that he suffers from emotional distress and that the discrimination caused that distress." Balistrieri, 981 F.2d at 931.  "This is not to say, however, that an injured person's testimony can never be sufficient by itself, or in conjunction with the circumstances of the particular case, to establish damages for emotional distress."  Id. at 932.

As for John Cook, defendants point out that he testified that he had "no knowledge" as to any damages that he was seeking in this case.[40]  But, plaintiff has come forward with a declaration from John Cook in which he avers that his inability to get a water connection for his residential property caused him to feel "dejected and hurt.  I was devastated by [the Cities'] attitude.  It was a big blow to me.  It was frustrating and egregious, the way they treated me."[41]  This declaration creates a question of fact as to whether John Cook suffered emotional distress.

As for Ross and Lori Chatwin, Ross claims that he was falsely arrested by the CCMO in connection with a dispute with his brother over a residence.  Ross testified that he believed that he was entitled to monetary damages for his false arrest but that he did not know exactly how much he would be entitled to.[42]  Plaintiff presents no evidence that suggests that Ross and Lori Chatwin suffered any emotional distress, which are the type of damages plaintiffs may seek on the behalf of aggrieved persons.  Defendants are entitled to summary judgment as to Count II damages for Ross and Lori Chatwin.  Plaintiff may not request damages on behalf of these aggrieved persons.

---

[40]The Deposition of John Cook at 60:7-16, Exhibit 8, Statement of Facts [etc.], Docket No. 545.

[41]Declaration of John Cook at 2, ¶ 9, Exhibit 39, United States' Controverting Statement of Facts [etc.], Docket No. 565.

[42]Deposition of Charles (Ross) Chatwin at 136:12-25, Exhibit 9, Statement of Facts [etc.], Docket No. 545.

As for Christopher and Jesseca Jessop, defendants point out that Jesseca testified about a 2013 property dispute to which a police officer responded and that she was not looking to get anything personally out of this case, that she was not looking for money.[43] Plaintiff, however, has offered declarations from both Christopher and Jesseca. Christopher avers that his

> family's experience with the Marshal's office makes me feel insecure.  I was surprised to feel like I cannot truly trust my local police.  It causes me concern and worry.  I worry about my family, especially my youngest daughter and son.  I understand how FLDS Church security operates in Short Creek.  My family has been harassed before, and I have no idea what Church security could do to my family if they were ever ordered to.  I feel like I could not count on the Marshal's office in that situation.[[44]]

Jesseca avers that her "treatment at the hands of the Marshal's office stressed me out and made me angry" and that their investigation of a hit-and-run involving her son "made me furious and frightened.  I feel frustrated.  Because of the discriminatory treatment I have experienced with the Marshal's office I feel like I cannot get real justice where I live."[45] These declarations are sufficient to create questions of fact as to whether the Jessops

---

[43]The Deposition of Jesseca Jessop at 83:14-22, Exhibit 10, Statement of Facts [etc.], Docket No. 545.

[44]Declaration of Christopher Jessop at 1-2, ¶ 4, Exhibit 34, United States' Controverting Statement of Facts [etc.], Docket No. 565.

[45]Declaration of Jesseca Jessop at 1, ¶ 3 & 2, ¶ 6, Exhibit 35, United States' Controverting Statement of Facts [etc.], Docket No. 565.

suffered any emotional distress, although it is not entirely clear whether the Jessops' alleged emotional distress had anything to do with defendants' alleged violations of the FHA.

As for Willie R. Jessop, plaintiff has not come forward with any evidence suggesting that Willie Jessop suffered any emotional distress as a result of any of the alleged violations of the FHA by defendants. Defendants are entitled to summary judgment as to Count II damages for Willie Jessop. Plaintiff may not request damages on behalf of this aggrieved person.

As for Ron Rohbock, he testified about a 2013 property dispute to which a police officer responded. Rohbock was asked if he was seeking any kind of compensation in this case and he testified that

> [i]f there is some compensation I would be glad for it because I am very indigent. I have nothing to show for my 50 years of [what] I would call back breaking slave labor for a religion that I got nothing from. So, yeah, I would ... accept it, yes. But have I sought it? Have I sat down and said this is what I want? No.[46]

Defendants argue that this testimony shows that Rohbock does not have any damages against defendants, although he would like compensation from the FLDS church. Plaintiff offers, however, a declaration from Rohbock, in which he avers:

---

[46]Deposition of Ron Rohbock at 75:10:16, Exhibit 12, Statement of Facts [etc.], Docket No. 545.

> I am 63 years old.  I witnessed my wife break down in tears over how the Marshal's office has treated us.  I felt like the Marshal's Office blew us off completely when we needed help, including when our property was vandalized. My interactions with the Marshal's office have caused me stress.  For an older couple to have to deal with this kind of discrimination is very upsetting.  It makes me concerned and extremely upset to feel like I cannot enjoy my home or trust my local police.  The situation has cost me sleep and upset me repeatedly.  I feel that my wife and I are at the mercy of police we cannot trust.[47]

This declaration creates a question of fact as to Rohbock's emotional distress damages.

As for Jerold Williams and Elizabeth Wayman, Jerold testified about the time in 2012 when he was arrested after he entered or attempted to enter a residence where his family was staying.  Jerold was asked if he was seeking any money from this case and he testified that

> I'm letting things come however they do.  I have not asked or petitioned for money, no.  I'm not saying I would refuse some if it's a result of it, but I'm saying that I have not petitioned and said that I am owed anything, any kind of damages or any-thing like that.[48]

Plaintiff, however, offers declarations from Jerold Williams and Elizabeth Wayman.

Wayman avers that her husband's

---

[47]Declaration of Ron Rohbock at 1, ¶ 4, Exhibit 36, United States' Controverting Statement of Facts [etc.], Docket No. 565.

[48]The Deposition of Jerold Williams at 96:23-97:3, Exhibit 5, Statement of Facts [etc.], Docket No. 545.

> arrest and the events surrounding the arrest had an emotional impact. I felt as rock-bottom emotionally as I could get. My children and grandchildren were horror-struck and running around because we returned to the home & police were summoned. I felt as bad as I have ever felt. I felt that the Marshal's office, which we knew, turned on us and treated us like vipers because we were no longer members of the FLDS Church. I cried untold tears about [that] night. The event was traumatic and I still feel the effects. I had a hard time for two or three months dealing with emotions caused by that night.[49]

Jerold avers that "[i]t was humiliating to be arrested and hauled away in handcuffs in front of my own children."[50] He further avers that

> I felt betrayed and frustrated that the FLDS Church used the Marshal's office to keep me from my family. It caused feelings that were hard to deal with. Those feelings are still hard for me to deal with. It was a deep enough hurt that I don't know how I will recover from it. I am still dealing with it. Putting it in words doesn't seem to do justice to what I felt.[51]

These declarations create issues of fact as to whether Williams and Wayman suffered emotional distress.

As for Isaac Wyler, plaintiff offers no evidence that suggests that Wyler suffered any emotional distress as a result of any alleged violations of the FHA by defendants. Thus,

---

[49]Declaration of Elizabeth Wayman at 1, ¶ 2, Exhibit 37, United States' Controverting Statement of Facts [etc.], Docket No. 565.

[50]Declaration of Jerold Williams at 1, ¶ 3, Exhibit 38, United States' Controverting Statement of Facts [etc.], Docket No. 565.

[51]Id. at ¶ 4.

defendants are entitled to summary judgment as to Count II damages for Isaac Wyler. Plaintiff may not request damages on behalf of this aggrieved person.

Finally, as to Count II, the Hildale defendants argue that plaintiff's FHA pattern and practice claim against TCWA and TCP should be dismissed because these entities no longer exist.  Plaintiff does not oppose the dismissal of TCP.[52]  Plaintiff does oppose dismissing TCWA.

TCWA was incorporated as a non-profit corporation in the State of Utah in 1996 for the primary purpose of repaying a debt owed to the Rural Utility Service.[53]  TCWA entered into an intergovernmental agreement with the Cities to manage, operate, and maintain the Cities' shared water system and to repay the debt.[54]  TCWA was dissolved in July 2014.[55] Its restated articles of incorporation provide that "[u]pon dissolution ... the assets of TCWA shall be dedicated to an appropriate public agency for purposes similar to those for which TCWA was created."[56]  The Hildale defendants contend that the assets of TCWA have been

---

[52]United States' Response to Hildale Defendants' Partial Motion for Summary Judgment at 1, n.1., Docket No. 559.

[53]Articles of Incorporation at 1, Exhibit B, Hildale Defendants' Separate Statement of Facts [etc.], Docket No. 549.

[54]Exhibit C,  Hildale Defendants' Separate Statement of Facts [etc.], Docket No. 549.

[55]Exhibit D, Hildale Defendants' Separate Statement of Facts [etc.], Docket No. 549.

[56]Article 5, Restated Articles of Incorporation at 3, Exhibit E, Hildale Defendants' Separate of Facts [etc.], Docket No. 549.

returned to the Cities.  Because TCWA no longer exists and its liabilities have been absorbed by the Cities, the Hildale defendants argue that if TCWA remains a defendant in this case and plaintiff prevails, plaintiff will be able to recover twice against the Cities, which would be unfairly punitive.

TCWA's voluntary dissolution does not mean that plaintiff's FHA claim against TCWA should be dismissed.[57]  Utah's Revised Non-Profit Corporation Act provides that "[d]issolution of a nonprofit corporation does not ... abate or suspend a proceeding pending by or against the nonprofit corporation on the effective date of dissolution."  Utah Code § 16-6a-1405(3)(g).  Because the dissolution of TCWA took place after plaintiff filed its complaint,  its dissolution has no effect on plaintiff's pending FHA claim.  As for the Hildale defendants' contention that if plaintiff prevails on its FHA claim against TCWA, the Cities will be "fined" twice, it is within the court's discretion whether civil penalties will be awarded.  42 U.S.C. § 3614(1)(c).  The court will not allow plaintiff to recover twice for the same damage or harm.

Secondly, the Hildale defendants argue that TCWA is entitled to summary judgment on plaintiff's FHA claims because there is no evidence that TCWA engaged in a pattern or practice of religious discrimination.  The Hildale defendants' argument focuses on the 16

---

[57]Plaintiff "concedes that its demand for injunctive relief against ... TCWA is rendered moot by [its] dissolution...."  United States' Response to Hildale Defendants' Partial Motion for Summary Judgment at 9 n.9, Docket No. 559.

persons that plaintiff has identified as aggrieved persons.  But, as plaintiff points out, these 16 individuals have not brought FHA claims.  Rather, plaintiff has a brought a single FHA claim under § 3614(a), alleging that defendants, including TCWA, engaged in a pattern and practice of violating the FHA on the basis of religion.  Plaintiff can prevail on its FHA claim against TCWA by either showing that TCWA engaged in a pattern or practice of violating the FHA or that it denied rights granted by the FHA to a group of persons, which denial raises an issue of general public importance.  If it establishes that TCWA engaged in a pattern and practice of violating the FHA, then plaintiff may seek civil penalties and/or it may seek to recover damages on behalf of aggrieved persons.  In other words, even if none of the aggrieved persons testified that they were harmed by the TCWA's conduct, plaintiff could still prevail on its claim against TCWA.

As for whether plaintiff may request damages from TCWA on behalf of any of the aggrieved persons, plaintiff does not dispute that the incidents involving Andrew Chatwin, Christopher and Jesseca Jessop, Willie R. Jessop, Ron Rohbock, Jerold Williams, Elizabeth Wayman, and Isaac Wyler had nothing to do with the provision of culinary water and thus it cannot, and will not, seek damages from TCWA for these individuals.[58]  Plaintiff also states that "it no longer intends to seek monetary damages" for Ron and Jinjer Cooke in

---

[58]As discussed above, plaintiff may not seek any Count II damages as to Willie Jessop and Isaac Wyler.

this case.[59]  And, as discussed above, plaintiff cannot seek any Count II damages against any defendant on behalf of Ross and Lori Chatwin.  The question here then is whether plaintiff can seek damages from TCWA on behalf of Patrick Barlow, John Cook,  Richard Holm, and Dan Wayman should plaintiff prevail on its pattern and practice claim in Count II.

The Hildale defendants argue that any damage claims of Patrick Barlow, John Cook, and Richard Holm are moot due to their involvement in the <u>Cooke</u> case.  The <u>Cooke</u> judgment required defendants to provide utilities to John Cook and Patrick Barlow,[60] and Richard Holm was granted utility connections pursuant to an agreement reached between the parties and he no longer owns the property in question.  However, none of these three individuals were awarded emotional distress damages in <u>Cooke</u>.  Thus, plaintiff is not precluded from seeking damages from TCWA on behalf of these three individuals in this case, should plaintiff prevail on its Count II FHA claim.

As for Dan Wayman, the Hildale defendants contend that his deposition testimony shows that his only interactions concerning his water connection were with the Cities'

---

[59]United States' Response to Hildale Defendants' Partial Motion for Summary Judgment at 16 n.21, Docket No. 559.

[60]Amended Judgment and Permanent Injunction at 2, ¶ 6, Exhibit A, Hildale Defendants' Separate Statement of Facts [etc.], Docket No. 549.

utilities department, and not with TCWA.[61]  Plaintiff makes no argument in response. Thus, the Hildale defendants are entitled to summary judgment as to damages from TCWA for Dan Wayman.  Plaintiff may not seek damages from TCWA for Dan Wayman should plaintiff prevail on its Count II FHA claim against TCWA.

Conclusion

Plaintiff's motion for partial summary judgment[62] is denied.

Colorado City's motion for partial summary judgment,[63] in which the Hildale defendants join, is granted in part and denied in part.  The motion is granted as to plaintiff's request for Count II damages on behalf of Isaac Wyler, Willie R. Jessop, and Ross and Lori Chatwin.  Plaintiff is precluded from requesting FHA damages from any defendant on behalf of these aggrieved persons, should plaintiff prevail on its FHA claims in Count II.  Colorado City's motion is otherwise denied.

The Hildale defendants' motion for partial summary judgment[64] is granted in part and denied in part.  The motion is granted as to TCP.  Plaintiff's claims against TCP are dismissed with prejudice.  The motion is also granted as to plaintiff's request for FHA

---

[61]Exhibit R, Hildale Defendants' Separate Statement of Facts [etc.], Docket No. 549.

[62]Docket No. 541.

[63]Docket No. 544.

[64]Docket No. 548.

damages from TCWA on behalf of Dan Wayman.  Plaintiff is precluded from seeking FHA damages from TCWA on behalf of Dan Wayman.  The Hildale defendants' motion is otherwise denied.

DATED at Anchorage, Alaska, this 17th day of June, 2015.

/s/ H. Russel Holland
United States District Judge