UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | No.  CV-12-8123-PCT-HRH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | February 3, 2016 |
| Town of Colorado City, | ) | 9:00 a.m. |
| Arizona, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

BEFORE:  THE HONORABLE H. RUSSEL HOLLAND, SENIOR JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL – DAY 10 A.M. SESSION

(Pages 1975 through 2100, inclusive.)


Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2

       For the Plaintiff:
 3
               U.S. Department of Justice
 4             By:  MATTHEW J. DONNELLY, ESQ.
                    SEAN RICHARD KEVENEY, ESQ.
 5                  JESSICA CLARKE, ESQ.
                    EMILY SAVNER, ESQ.
 6             950 Pennsylvania Avenue NW
               Washington, DC 20530
 7

 8     For the Defendant Town of Colorado City:

 9             Graif Barrett & Matura
               By:  JEFFREY CHARLES MATURA, ESQ.
10                  MELISSA JANE ENGLAND, ESQ.
               1850 North Central Avenue, Suite 500
11             Phoenix, AZ 85004

12     For the Defendants City of Hildale and Twin City Water
       Authority:
13
               Durham Jones & Pinegar
14             By:  R. BLAKE HAMILTON, ESQ.
                    ASHLEY M. GREGSON, ESQ.
15             111 East Broadway, Suite 900
               Salt Lake City, UT 84111
16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

INDEX

SUMMARY OF COURT PROCEEDINGS                          PAGE:

Discussion held at sidebar on the record       2036, 2045


INDEX OF WITNESSES

WITNESSES FOR THE          Direct    Cross      Redirect
PLAINTIFF:

Videotape Deposition
of Timothy Rohbock                      1978

Helaman Barlow            2013


INDEX OF EXHIBITS

EXHIBIT NO.:          DESCRIPTION:                RECEIVED:

294        Applications for CCMO 2014            2047

295        Dispatch Call Logs from
           4/1/2010 to 7/1/2010                  2089

296        CCMO Report Re Willie Jessop
           Volume 1 (Dec. 18. 2013)              2095

309        CCMO Report involving Jesseca
           and Christopher Jessop
           (Apr. 6, 2013)                        2083

310        FRE 803(6) and 902(11)
           Certification and Lydia Cook
           Phone Records                         2087

1073       Utah POST Revocation of
           Jesse Barlow 12/22/2010               2076

UNITED STATES DISTRICT COURT

─── **Videotape Deposition of Timothy Rohbock** ───

1      (Proceedings begin at 9:00 a.m.)

2          THE COURT:  Good morning, ladies and gentlemen.  This

3  is the continuation of the trial in case 12 civil 8123, United

4  States versus Town of Colorado City and others.

5          We're in the middle of a deposition I believe, and        09:00:41

6  we're ready for the defendants' side of the deposition.

7          MR. DONNELLY:  Yes, Your Honor.

8          Proceed?

9          THE COURT:  Proceed.

10     (The following is the videotaped deposition testimony of

11  Timothy Rohbock.)

12         "Videographer:  It's 10:23 a.m. Mountain Standard

13  time and we're back on the record.

14                          Examination

15  By Mr. Hamilton:

16  Q.  Good morning, sir.

17  A.  Good morning.

18  Q.  Mr. Donnelly asked you some questions.  I'm just going to

19  ask some follow-up questions to those.

20         Mr. Donnelly was talking to you and you at one point      09:01:10

21  said that you lived in constant fear of being kicked out of the

22  FLDS Church.  Do you remember that?

23  A.  Okay.

24  Q.  And you said that you didn't know why you were kicked out

25  of the FLDS Church.  Do you remember that?                       09:01:24

1979

─────────── **Videotape Deposition of Timothy Rohbock** ───────────

1    A.  Oh, I know why.

2    Q.  And it was because you committed adultery, isn't it?

3    A.  One of the reasons.

4    Q.  And, in fact, you started a relationship with Samantha

5    Johnson.                                                    09:01:35

6    A.  Cooke, yeah.

7    Q.  And you had an extramarital affair with her, correct?

8    A.  Correct.

9         Mr. Donnelly:  I'm going to object to relevance and

10   403.                                                       09:01:44

11   Q.  (By Mr. Hamilton:)  Now, you also -- and it was for

12   that -- that was one of the reasons why you were excommunicated

13   from the FLDS Church, true?

14   A.  Yes.  One of them.

15   Q.  You also have mentioned a few things today about the United  09:01:54

16   Order.  Do you remember that?

17   A.  Yes.

18   Q.  In fact, you talked about the fact that you had been in the

19   United Order from 2011 to 2013.

20   A.  Right.

21   Q.  Is that correct?

22   A.  That's correct.

23   Q.  And you said that during that period of time that you

24   witnessed Richard Allred attending United Order meetings.  Do

25   you remember that?                                         09:02:17

UNITED STATES DISTRICT COURT

**Videotape Deposition of Timothy Rohbock**

1   A.  I do.

2   Q.  And it's true that Richard Allred was not in the

3   communities at that point in time, and had been excommunicated

4   from the FLDS Church, correct?

5   A.  For part of that time.                                    09:02:25

6   Q.  No, he --

7   A.  He was -- he came back.

8   Q.  He was excommunicated back in 2002; isn't that correct?

9   A.  No.

10  Q.  You were not in a meeting in 2002 or '3 when he was told   09:02:32

11  that he had lost Priesthood and he was to leave his family?

12  A.  No.  That's much later than 2002, 2003.

13  Q.  Okay.  So it's your testimony that in 2011 and '13, that

14  Richard Allred was here in the community?

15  A.  Yeah, that's absolutely.                                  09:02:52

16  Q.  You said that you were the one that was in charge of

17  setting up the Bishop's Storehouse; is that correct?

18  A.  Correct.

19  Q.  And that you were the overseer of the Bishop's Storehouse;

20  is that right?                                                09:03:04

21  A.  Correct.

22  Q.  And you talked about the fact that Kimball Barlow and

23  Joseph Allred were in management.  What was their position?

24  A.  Just handling departments, different departments.  They

25  handled different departments.                               09:03:19

UNITED STATES DISTRICT COURT

1981

─── **Videotape Deposition of Timothy Rohbock** ───

1   Q.  What departments did they head up?

2   A.  Food.  The food department.  Food and clothing department.

3   Q.  Who handled the food department?

4   A.  Kimball, I believe.  And Joseph.  Joseph was more

5   specifically tasked for the underwear project.          09:03:33

6   Q.  Well, sir, if you were the one that set this up, wouldn't

7   you know what positions they actually held?

8   A.  Sir, let me explain.  I initially was the one that was put

9   overseer to it.  I was initially the one that set it up.  When

10  Seth Jeffs came from Texas, he took over, and that's when      09:03:53

11  Joseph and Kimball took managerial positions.

12  Q.  Okay.  So you don't know exactly what positions they took?

13  A.  I know they took managerial positions.

14  Q.  Okay.  Sir, you said that during your time when you were

15  overseer of the Bishop's Storehouse that there were            09:04:08

16  prescription medications that were dispensed out of the

17  Bishop's Storehouse, correct?

18  A.  I did not say dispensed.

19  Q.  Well, if you look at Exhibit No. 44.  Exhibit No. 44 is

20  just sitting on your lap.                                      09:04:26

21  A.  This has got nothing to do --

22          Mr. Donnelly:  I think he wants -- was it 291?

23          The Witness:  292?

24  Q.  (By Mr. Hamilton:)  Well, 292, I guess.  Yes, 292.

25          Turn to page 2 of 292.  You specifically talked about   09:04:42

UNITED STATES DISTRICT COURT

─────────── **Videotape Deposition of Timothy Rohbock** ───────────

1  the fact that prescription drugs were listed here, correct?

2  A.  That's right.

3  Q.  And so it's your testimony that they were turned into the

4  Bishop's Storehouse but were never dispensed?

5  A.  My testimony is they were turned into the bishop's          09:05:04

6  office -- to the Storehouse, and I witnessed them being

7  dispensed.

8  Q.  Oh, so they were dispensed while you were in charge of the

9  Bishop's Storehouse?

10  A.  Yes.                                                         09:05:16

11  Q.  And so you understand, sir, that that was a crime.

12  A.  I understand.

13  Q.  So you understand that you committed a crime during that

14  period of time by dispensing those prescription drugs.

15  A.  I didn't personally dispense any.                           09:05:25

16  Q.  You were the one that was in charge, the overseer of the

17  Bishop's Storehouse, though, correct?

18  A.  Yeah, whatever.  That works.

19  Q.  So you were in charge of the Bishop's Storehouse at the

20  time that it was illegally dispensing prescription medication,  09:05:38

21  true?

22  A.  Correct.

23  Q.  Have you ever been criminally prosecuted for that?

24  A.  Negative.

25  Q.  And you obviously told the Department of Justice that that   09:05:46

1983

1   was the case, true?

2   A.   True.

3   Q.   And have they given you immunity because of your testimony

4   in this case?

5   A.   No.                                                          09:05:55

6   Q.   You have no immunity at this time from the United States

7   Government?

8   A.   Not that I'm aware of.

9   Q.   Okay.  So even though you have admitted to an illegal act,

10  the United States has not prosecuted you, correct?            09:06:04

11  A.   Correct.

12  Q.   You also spoke about a time when you worked for R&W.  Do

13  you remember that?

14  A.   Yes.

15  Q.   And you specifically talked about the fact that you went to 09:06:16

16  R&W, and I think your term was, it was a clandestine operation.

17  Do you recall that?

18  A.   Correct.

19  Q.   You said that during this clandestine operation that you

20  went there and you started removing legal documents from R&W;   09:06:30

21  is that correct?

22  A.   Yeah.

23  Q.   And those legal documents, they were in the possession of

24  the FLDS Church, true?  They were the FLDS's property.

25  A.   I don't -- I'm not clear on that.                          09:06:46

UNITED STATES DISTRICT COURT

1984

—— **Videotape Deposition of Timothy Rohbock** ——

1    Q.  Okay.  Well, R&W you said was an excavation company,

2    correct?

3    A.  (Witness nods head.)

4    Q.  Was R&W -- is that a yes?  I need a verbal answer, sir.

5    A.  R&W is an excavation company.  It is also a front for where    09:07:01

6    Lyle was operating out of at the time.

7    Q.  Okay.  And R&W wasn't in the business of providing legal

8    services, true?

9    A.  No.

10   Q.  And so any kind of legal documents involving the FLDS legal    09:07:14

11   affairs would have been the FLDS's legal property, true?

12   A.  I disagree.

13   Q.  You believe that that was R&W's property?

14   A.  I don't believe it was R&W's.  I believe it was ours, the

15   people that was working on that stuff.                            09:07:33

16   Q.  Okay.  And were you one of those people?

17   A.  I was.

18   Q.  So did you believe that that was your personal property?

19   A.  I did.  I believe it -- yes.

20   Q.  And so you believed that you were just recovering your        09:07:42

21   personal property?

22   A.  Correct.

23   Q.  Okay.  And it's true that even though you have now admitted

24   to taking those documents in what you are now calling a

25   clandestine operation, that you have never been criminally       09:08:07

UNITED STATES DISTRICT COURT

_Videotape Deposition of Timothy Rohbock_

1    prosecuted for that, true?

2    A.   I haven't.

3    Q.   And the United States Government has not prosecuted you,

4    correct?

5    A.   No.                                                    09:08:16

6    Q.   And Washington County is not prosecuting you for that; is

7    that true?

8    A.   That's true.

9    Q.   Okay.  Did you know that Mr. Willie Jessop considered that

10   to be a theft of property?                                  09:08:28

11        Mr. Donnelly:  Object, hearsay and relevance.

12        The Witness:  I'm not aware of what Willie Jessop

13   thought.

14   Q.   (By Mr. Hamilton:)  Did you know that Willie Jessop

15   contacted legal authorities and -- because he believed that he   09:08:38

16   had been robbed from?

17        Mr. Donnelly:  Object to foundation and relevance.

18        The Witness:  I heard, but I didn't -- I wasn't aware

19   of what -- the specifics at all.

20   Q.   (By Mr. Hamilton:)  Did you ever come forward and inform   09:08:54

21   authorities that you had been involved in this operation of

22   stealing this property until you told the United States

23   government in this case?

24   A.   No, I didn't.

25   Q.   Okay.  And again, you admit that you took that property   09:09:03

1986

1   without Willie's permission, true?

2   A.  True.

3   Q.  And again, has the United States government given you

4   immunity for committing that crime?

5          Mr. Donnelly:  Object to asked and answered.          09:09:38

6   Q.  (By Mr. Hamilton:)  You can answer that question, sir.

7   A.  I choose not to.

8   Q.  You choose not to?

9   A.  Uh-huh.

10  Q.  You're choosing not to answer the question?          09:09:49

11  A.  Standing on the Fifth.

12  Q.  You're asserting your Fifth Amendment rights; is that

13  correct, sir?

14  A.  That's correct.

15  Q.  Are you asserting your Fifth Amendment rights with respect          09:09:59

16  to the fact that you committed that theft?

17  A.  I will.

18  Q.  Are you asserting your Fifth Amendment rights with respect

19  to dispensing prescription medication out of the Bishop's

20  Storehouse when you were in charge of it?          09:10:18

21  A.  I will.  I didn't dispense them.  I didn't -- I didn't know

22  what was going on.

23  Q.  Well, you said you were in charge, sir, correct?

24  A.  It's a big operation.

25  Q.  Well, I mean, again --          09:10:33

—Videotape Deposition of Timothy Rohbock—

1    A.  I wasn't in charge of everything.

2    Q.  -- Exhibit No. 292.

3    A.  Yeah.

4    Q.  Page 2, you specifically testified with the Department

5    of -- when Mr. Donnelly was asking you questions, that you          09:10:43

6    realized that there was prescription medication, and that you

7    had been present when prescription -- when the order had been

8    given that prescription medication be turned over to the

9    Bishop's Storehouse --

10   A.  Correct.                                                        09:10:57

11   Q.  -- and that you were the one that was in charge, and you

12   were the one in charge when it was being dispensed out of the

13   Bishop's Storehouse.

14           Mr. Donnelly:  Objection, compound.

15   Q.  (By Mr. Hamilton:)  Are you going to take the Fifth with        09:11:08

16   respect to that?

17   A.  I take the Fifth, yes.

18   Q.  And, sir, you would assert the Fifth Amendment with respect

19   to those people that were also involved in these operations,

20   correct?                                                            09:11:26

21           Mr. Donnelly:  Object, confusing.

22   Q.  (By Mr. Hamilton:)  So, for example, you earlier said that

23   Kimball Barlow and Joseph Allred were in management of the

24   United Order; is that right?

25   A.  No.  They were in management of the Bishop's Storehouse.        09:11:38

UNITED STATES DISTRICT COURT

1988

**Videotape Deposition of Timothy Rohbock**

1  Q.  Okay.  And they weren't in management during the time that

2  you were overseeing that operation; is that correct?

3  A.  They were working there, but they weren't in management.

4  They were doing what I told them to do.

5  Q.  Okay.  And you weren't telling them to be in charge of          09:11:54

6  dispensing the prescription medication, did you?

7  A.  Of course not.

8  Q.  Okay.  So you never told Joseph Allred that they were -- he

9  was in charge of dispensing the prescription medication?

10  A.  No.                                                            09:12:07

11  Q.  And you never told Kimball Barlow that he was in charge of

12  dispensing the prescription medication?

13  A.  No.

14  Q.  And you just said a minute ago that it was a large

15  operation, correct?                                               09:12:16

16  A.  It is.

17  Q.  And so you don't know whether they were even aware that

18  prescription medication was being dispensed out of the Bishop's

19  Storehouse, do you?

20  A.  I do know they were aware, because they were right on the      09:12:26

21  shelf when you walked up the stairs.  You could see the whole

22  line of them.

23  Q.  Okay.  But you don't know -- you don't have personal

24  knowledge that they knew that the Bishop's Storehouse was

25  dispensing that.                                                  09:12:40

UNITED STATES DISTRICT COURT

─── **Videotape Deposition of Timothy Rohbock** ───

1      Mr. Donnelly:  Objection, asked and answered.

2    Q.  (By Mr. Hamilton:)  They weren't in charge of dispensing

3    that, correct?

4    A.  No, they weren't.

5      Mr. Donnelly:  Objection, asked and answered.                    09:12:51

6      Court Reporter:  What was your answer?

7      The Witness:  No, they weren't.

8      Court Reporter:  And your objection?

9      Mr. Donnelly:  Asked and answered.

10   Q.  (By Mr. Hamilton:)  You were the one that was overseeing      09:12:56

11   that operation at that time, true?

12   A.  I believe so.

13   Q.  Okay.  Let's get back to that R&W incident.  You just a

14   minute ago asserted your Fifth Amendment rights with respect to

15   the fact that you had taken property, when I asked you the        09:13:17

16   question that you had -- whether you had taken property from

17   R&W without Willie's permission.  Do you remember that?

18   A.  Yes.

19   Q.  And so you would assert the Fifth Amendment with respect to

20   who was involved in that operation, correct?                      09:13:31

21      Mr. Donnelly:  Objection, confusing.

22      The Witness:  No.  No, I wouldn't.

23   Q.  (By Mr. Hamilton:)  So let me ask you this.  Were you

24   present when David Darger was removing property?

25      And let me back up.  Did you help David Darger remove          09:13:48

UNITED STATES DISTRICT COURT

Videotape Deposition of Timothy Rohbock

1  property from R&W without Willie's permission?

2  A.  I did.

3  Q.  You're not going to assert your Fifth Amendment with

4  respect to that, sir?

5  A.  No.                                                          09:14:02

6  Q.  So you will assert the Fifth Amendment about whether you

7  did it, actually removed the property, but not David Darger?

8  A.  I was present when he moved stuff, yes.

9  Q.  And you also moved stuff, correct?

10  A.  I stand on the Fifth.                                       09:14:14

11  Q.  And were you present when Kimball Barlow removed stuff,

12  removed stuff from R&W without Willie Jessop's permission?

13  A.  I was.

14  Q.  And did you help Kimball Barlow remove stuff from R&W

15  without Willie Jessop's permission?                            09:14:36

16  A.  I stand on the Fifth.

17  Q.  Sir, are you admitting to aiding and abetting in the theft

18  of property from R&W?

19        Mr. Donnelly:  Objection, argumentative.

20        The Witness:  I'm standing on the Fifth.                  09:14:52

21  Q.  (By Mr. Hamilton:)  You talked about Daniel Roy Barlow

22  being a police officer that taught security -- Church Security.

23  Do you remember that?

24        Mr. Donnelly:  Objection, that misstates previous

25  testimony.                                                      09:15:22

UNITED STATES DISTRICT COURT

─────Videotape Deposition of Timothy Rohbock─────

1      The Witness:  That's right.

2      Court Reporter:  What's your answer?

3      The Witness:  That's right.

4  Q.  (By Mr. Hamilton:)  Earlier, sir, you talked about certain

5  officers that helped teach Church Security, and the names that      09:15:28

6  you gave were Curtis Cooke, correct?

7  A.  Correct.

8  Q.  Helaman Barlow, correct?

9  A.  Correct.

10 Q.  Jonathon Roundy, correct?                                       09:15:40

11 A.  Correct.

12 Q.  And Daniel Roy Barlow.

13     Mr. Donnelly:  Objection, misstates his testimony.

14     The Witness:  Yeah.

15     Mr. Hamilton:  It's not a proper objection.                     09:15:50

16 Q.  (By Mr. Hamilton:)  You previously testified to that, sir.

17     It's true that Daniel Roy Barlow was not an officer

18 during the time that you served on Church Security from 2011 to

19 2013, true?

20 A.  I believe I specifically said that when I answered the          09:16:06

21 question.

22 Q.  It's true that Jake Barlow was not an officer during the

23 time that you served on Church Security from 2011 to 2013,

24 true?

25 A.  True.                                                           09:16:19

UNITED STATES DISTRICT COURT

—Videotape Deposition of Timothy Rohbock—

1  Q.  It's true that Daniel Roy Barlow was not an officer during

2  2000 -- the time that you served on Church Security, true?

3  A.  True.

4  Q.  You said that the role of Church Security was to protect

5  the VIP, keep the VIP apprised of what is around him, and give          09:16:44

6  the VIP time to escape outside law enforcement, correct?

7  A.  Misstated.  That's not what I said.

8  Q.  Sir, did you ever assist any VIP escape outside law

9  enforcement?

10  A.  Negative.                                                         09:17:05

11  Q.  So that never happened?

12  A.  It never happened with me.

13  Q.  Okay.  Let's talk about the incident that happened with

14  respect to Jerold Williams.  I kind of want to have an

15  understanding about who was in the home at that time that you         09:18:18

16  were the caretaker for.

17       It's true that there were some of Jerold Williams'

18  spiritual wives in there, correct?

19  A.  I don't recall.

20  Q.  You don't recall who was in the home that you were the            09:18:34

21  caretaker for?

22  A.  I don't.

23  Q.  Elizabeth Wayman is your mother; is that correct?

24  A.  My maternal mother, yes.

25  Q.  Okay.

—Videotape Deposition of Timothy Rohbock—

1        Court Reporter:  I can't hear you.

2        The Witness:  I'm sorry, my maternal mother, yes.

3   Q.  (By Mr. Hamilton:)  And Jerold Williams you testified was

4   your stepfather; is that correct?

5   A.  He is, yes.                                        09:19:10

6   Q.  And your biological father is Ron Rohbock; is that correct?

7   A.  That's correct.

8   Q.  So when Ron Rohbock was kicked out of the FLDS Church,

9   Jerold Williams spiritually married your maternal mother,

10  correct, Elizabeth Wayman?                             09:19:23

11  A.  Yes.

12  Q.  And you were assigned to Ron Rohbock -- or to Jerold

13  Williams' family; is that correct?

14  A.  Correct.

15  Q.  And that made him your stepfather; isn't that true?   09:19:33

16  A.  That's what I said.

17  Q.  Okay.  And isn't it true that Jerold Williams then also

18  married some of your sisters spiritually?

19  A.  I'm unaware.  I don't know.

20  Q.  Sir, you are not aware of that?                    09:19:47

21  A.  Huh-uh.

22  Q.  You're not aware of the fact that your sisters were in the

23  home?

24  A.  Well, I know they were there at the home.

25  Q.  And they had had children that were Jerold Williams'   09:19:59

UNITED STATES DISTRICT COURT

─────── **Videotape Deposition of Timothy Rohbock** ───────

1   children?

2          Mr. Donnelly:  Objection to relevance and foundation.

3   Q.  (By Mr. Hamilton:)  You weren't aware of that, sir?

4   A.  I'm aware my sisters were in the home.

5   Q.  And your sisters had children, correct?                    09:20:20

6   A.  Yes, they did.  Well, one.

7   Q.  And that sister, the father of that child was Jerold

8   Williams, true?

9          Mr. Donnelly:  Objection to relevance, 403.

10         The Witness:  I don't know who the father was.          09:20:35

11  Q.  (By Mr. Hamilton:)  And you're the caretaker for this home,

12  correct?

13  A.  Only for two weeks, dude.

14  Q.  Okay.  And you got a call and that call, you said, informed

15  you that you needed to get over there, correct?               09:20:45

16  A.  That's right.

17  Q.  And when you got over there, you saw that your sister and

18  her child and the other people that were in the home, your

19  other sisters, were scared, correct?

20         Mr. Donnelly:  Objection, compound.                     09:21:00

21         The Witness:  No.  I didn't see that they were scared.

22  Q.  (By Mr. Hamilton:)  They hadn't locked themselves in

23  another room?

24  A.  They had all gathered somewhere and had locked it so he

25  couldn't come in.                                              09:21:12

UNITED STATES DISTRICT COURT

**Videotape Deposition of Timothy Rohbock**

1    Q.   Okay.  So they had separated themselves from where Jerold

2    was, correct?

3    A.   That's correct.

4    Q.   And had locked themselves in a room, true?

5    A.   Correct.                                                          09:21:20

6    Q.   Including your sisters that were also Jerold's spiritual

7    wives, correct?

8             Mr. Donnelly:  Objection, relevance, 403.

9             The Witness:  I'm unaware of who his spiritual wife

10   was and who wasn't.                                                    09:21:37

11   Q.   (By Mr. Hamilton:)  Including your sister who had

12   fathered -- or your sister who had had a child fathered by your

13   stepfather; correct?

14            Mr. Donnelly:  Objection, relevance, foundation, 403.

15   Q.   (By Mr. Hamilton:)  And when you got there, you said that        09:21:49

16   you also had a direct connect communication with Curtis Cooke

17   and he was asking you what was going on, correct?

18   A.   Correct.

19   Q.   And then at some point Curtis Cooke came over to the home,

20   true?                                                                  09:22:19

21   A.   True.

22   Q.   And he did that because he had received a call from your

23   sisters and the other people that were in the home that had

24   locked themselves in that room, correct?

25            Mr. Donnelly:  Objection, foundation.                        09:22:34

UNITED STATES DISTRICT COURT

1996

─────────── **Videotape Deposition of Timothy Rohbock** ───────────

1    The Witness:  I'm unaware of that, what happened

2    there.  I don't know who called who.

3    Q.  (By Mr. Hamilton:)  Sir, it's true that you actually

4    arrived at the same time that Curtis Cooke did, correct?

5    A.  No, I was there before him.                                09:22:54

6    Q.  You didn't pull into the driveway at the same exact time?

7    A.  No.  I had -- never mind.

8    Q.  It's true that Curtis Cooke told you that the family living

9    in the home had asked him to come to the scene.

10    Mr. Donnelly:  Objection, hearsay.                           09:23:16

11    The Witness:  I don't recall him telling me that.

12    Q.  (By Mr. Hamilton:)  It's true that you then walked into the

13    home and you left the door open, and that Curtis Cooke walked

14    in behind you.

15    A.  I don't know if I left the door open or not, but I was    09:23:30

16    there minutes, several minutes before Curtis Cooke got there.

17    Q.  It's true while you were in the home that you heard Jerold

18    say that he did not want the family that was living there to

19    leave.

20    A.  Correct.                                                  09:23:50

21    Q.  It's true that you witnessed Curtis Cooke telling Jerold

22    that he was going to talk to the person or the people that had

23    called him.

24    Mr. Donnelly:  Objection, hearsay.

25    The Witness:  I don't remember anything like that            09:24:03

UNITED STATES DISTRICT COURT

────────── **Videotape Deposition of Timothy Rohbock** ──────────

1    being said.

2    Q.  (By Mr. Hamilton:)  You don't recall Curtis Cooke telling

3    Jerold that he needed to talk to the people that had reported

4    the crime?

5              Mr. Donnelly:  Objection, hearsay.                    09:24:14

6              The Witness:  I don't.  I don't.

7    Q.  (By Mr. Hamilton:)  You don't recall Curtis Cooke then

8    asking you who is the -- who in that room was the one that

9    actually called?

10   A.  I do not recall any conversation of the sort.             09:24:26

11   Q.  You don't recall Curtis Cooke asking you to point out which

12   individual in that room that you were the caretaker for had

13   made the call?

14   A.  It didn't happen.

15   Q.  You don't recall showing Curtis Cooke to the room where the  09:24:44

16   family had locked themselves in?

17   A.  I didn't recall that.

18   Q.  Do you recall knocking on the door and identifying

19   yourself?

20   A.  I do.                                                       09:25:05

21   Q.  Do you recall asking them -- those individuals that were in

22   the room who was the person that made the call?

23   A.  I don't.

24   Q.  Do you recall that Angelina Rohbock was the one that

25   identified herself as the one that made the call?             09:25:29

─────────────Videotape Deposition of Timothy Rohbock─────────────

1    A.  I am aware that that is the case, but that was afterwards.

2    Q.  Do you recall Curtis Cooke then talking to Angelina

3    separately to find out why she called?

4            Mr. Donnelly:  Objection to foundation, hearsay.

5            The Witness:  I have no recollection of that.              09:25:48

6    Q.  (By Mr. Hamilton:)  You didn't witness Curtis Cooke talking

7    to Angelina?

8    A.  That's correct.

9    Q.  You don't recall Angelina specifically telling Curtis Cooke

10   that Jerold had came to the house and that she was frightened?    09:26:06

11           Mr. Donnelly:  Objection, hearsay.

12       (Videotape stopped.)

13           MR. DONNELLY:  Your Honor, I apologize.  At this point

14   I'm going to object to the next couple pages where Mr. Hamilton

15   simply asks Mr. -- Timothy Rohbock a bunch of questions that      09:26:20

16   asked people about what other people said for about three pages

17   here.  It's all hearsay, or most of it.

18           MR. HAMILTON:  Well, I can't respond to every one of

19   them because there's different responses to every one.  This

20   question right here was asking about Angelina and what she had    09:26:37

21   stated.  I believe it's an excited utterance and then existing

22   emotion, so it would not be -- or it would meet those

23   exceptions to the hearsay rule.

24           THE COURT:  You can proceed with it.

25       (Videotape resumed.)                                          09:26:53

─── **Videotape Deposition of Timothy Rohbock** ───

1    The Witness:  I wasn't there when she said it.

2  Q.  (By Mr. Hamilton:)  You don't recall her making the

3  statement that she was scared for her life?

4    Mr. Donnelly:  Objection, hearsay.

5    The Witness:  I didn't hear her say it.                09:27:05

6  Q.  (By Mr. Hamilton:)  Do you recall Jerold coming over to the

7  room where they were standing and talking to Curtis Cooke and

8  Angelina?

9  A.  Jerold followed Curtis and I when we were going to the

10  room, was instructed to go back to the dining room, which he    09:27:23

11  complied.

12  Q.  Do you recall that Curtis Cooke specifically told Jerold

13  that he needed to get Angelina's version of the events?

14    Mr. Donnelly:  Objection, hearsay.

15    The Witness:  I don't.                                 09:27:39

16  Q.  (By Mr. Hamilton:)  Do you recall Curtis Cooke saying that

17  Jerold had made claims to the home and had shown him an

18  Occupancy Agreement?

19    Mr. Donnelly:  Objection, hearsay.

20    The Witness:  I guess I don't understand the question.  09:27:51

21  What's the question again?

22  Q.  (By Mr. Hamilton:)  Do you recall Officer Cooke telling

23  Angelina that Jerold had made a claim to the house and had an

24  Occupancy Agreement?

25    Mr. Donnelly:  Objection, hearsay.                     09:28:05

—Videotape Deposition of Timothy Rohbock—

1          The Witness:  Yeah.  No, I don't.  I was not involved

2   in that conversation.

3   Q.  (By Mr. Hamilton:)  You weren't involved in the

4   conversation with Angelina and Curtis Cooke?

5   A.  No, I was not.  I was not there.  I was not involved.  I                09:28:18

6   went back out to the dining room and continued to talk to

7   Jerold.

8   Q.  Okay.  So you weren't present when this conversation was

9   taking place?

10  A.  Correct.                                                               09:28:26

11  Q.  Do you recall Curtis Cooke specifically asking Jerold who

12  the utilities names and power was in?

13          Mr. Donnelly:  Objection, hearsay.

14          The Witness:  I don't recall him asking that.

15  Q.  (By Mr. Hamilton:)  Do you recall Jerold telling Curtis               09:28:50

16  Cooke that he believed that those accounts were in the names of

17  Jeremiah Johnson and Boyd Roundy?

18          Mr. Donnelly:  Objection, hearsay.

19          The Witness:  I do recall that being brought up, yes.

20  Q.  (By Mr. Hamilton:)  Do you recall that being brought up by            09:29:07

21  Jerold?

22  A.  I do.

23  Q.  Do you recall Curtis Cooke telling everyone there present

24  that he needed to speak with the city prosecutor?

25          Mr. Donnelly:  Objection, hearsay.                                 09:29:19

2001

—— **Videotape Deposition of Timothy Rohbock** ——

1          The Witness:  I was aware.

2    Q.  (By Mr. Hamilton:)  Do you recall him saying that?

3          Mr. Donnelly:  Objection, hearsay.

4          The Witness:  He told us after who he had talked to.

5    Q.  (By Mr. Hamilton:)  Do you recall being handed a witness          09:29:32

6    statement on scene that day by Curtis Cooke?

7    A.  No.

8    Q.  Do you recall Curtis -- Officer Cooke asking you to write

9    the statement about how the family living arrangements were?

10          Mr. Donnelly:  Objection, hearsay.          09:29:57

11          The Witness:  I do.

12          Mr. Donnelly:  Foundation.

13          The Witness:  I do.

14   Q.  (By Mr. Hamilton:)  Do you recall Officer Cooke telling

15   Jerold that the town prosecutor, Mr. Brindle, had told him to          09:30:20

16   ask Jerold to leave?

17          Mr. Donnelly:  Objection, hearsay.

18          The Witness:  I do.

19   Q.  (By Mr. Hamilton:)  Do you recall Jerold saying that he

20   would not leave?          09:30:29

21   A.  I do.

22   Q.  Do you recall Officer Cooke saying that if he did not

23   leave, he'd be arrested?

24          Mr. Donnelly:  Objection, hearsay.

25          The Witness:  I do.          09:30:37

─── **Videotape Deposition of Timothy Rohbock** ───

```
 1   Q.  (By Mr. Hamilton:)  Do you recall Jerold saying that he

 2   needed a moment to decide --

 3            Mr. Donnelly:  Objection, hearsay.

 4   Q.  (By Mr. Hamilton:)  -- whether he was going to leave?

 5            Mr. Donnelly:  Objection, hearsay.

 6            The Witness:  I do.

 7   Q.  (By Mr. Hamilton:)  Do you recall that Jerold then picked

 8   up the phone and made a call?

 9   A.  I am.

10   Q.  Did you see Jerold write something on a piece of paper      09:30:52

11   while he was on the phone?

12   A.  I don't recall.

13   Q.  Do you recall Jerold then hanging up the phone and calling

14   the Sheriff's Office?

15   A.  Yes.                                                        09:31:16

16   Q.  Do you recall Curtis Cooke telling Jerold to leave the

17   property and immediately?

18            Mr. Donnelly:  Objection, hearsay.

19            The Witness:  Yes.

20   Q.  (By Mr. Hamilton:)  Do you recall that Officer Cooke made   09:31:36

21   that statement multiple times?

22            Mr. Donnelly:  Objection, hearsay.

23            The Witness:  I don't recall him making it multiple

24   times.

25   Q.  (By Mr. Hamilton:)  You don't recall him repeating the      09:31:47
```

UNITED STATES DISTRICT COURT

2003

**─────Videotape Deposition of Timothy Rohbock─────**

1   order to leave the property immediately?

2           Mr. Donnelly:  Objection, hearsay.

3           The Witness:  I do.

4   Q.  (By Mr. Hamilton:)  Do you recall at one point that Jerold

5   said he was going to leave the property?                          09:32:00

6           Mr. Donnelly:  Objection, hearsay.

7           The Witness:  When -- yeah.  Yes.

8   Q.  (By Mr. Hamilton:)  And then at some point he decided as he

9   was walking out the door that he wasn't going to leave the

10  property and made that known to Officer Cooke?                    09:32:23

11  A.  He didn't say he wasn't going to leave the property.  He

12  said he wasn't going to leave until Mohave County officers

13  showed up.

14  Q.  Do you recall that Deputy Johnson showed up to the scene as

15  well?                                                             09:32:46

16  A.  I do.

17  Q.  Do you recall that Deputy Johnson gave a victim's right

18  form to Danette Williams, who was also living in the home?

19  A.  I don't.

20  Q.  You said that the next day that Curtis Cooke came back to    09:32:56

21  the home; is that correct?

22  A.  Correct.

23  Q.  And you said that Officer Cooke at that point gave witness

24  statements; is that true?

25  A.  Correct.                                                      09:33:25

2004

1    Q.  Did he also ask at that time for copies of the utility and

2    power bills?

3    A.  I believe so.

4    Q.  Did you during that conversation the second day tell

5    Officer Cooke that you believed that Jerold had entered the      09:33:40

6    home by removing a screen from the basement window?

7    A.  Yes.

8             Court Reporter:  Sorry?

9             The Witness:  Yes.

10   Q.  (By Mr. Hamilton:)  You specifically told Mr. Donnelly that  09:33:48

11   you recalled filling out your own statement.  Do you remember

12   that?

13   A.  Yes, I do.

14   Q.  Do you recall in your statement that you wrote that Jerold

15   had not assisted the family in their daily living at the         09:35:01

16   residence for the last several years?

17            Mr. Donnelly:  Objection, hearsay.

18            The Witness:  Yes.

19   Q.  (By Mr. Hamilton:)  Is it your testimony that that was not

20   truthful?                                                        09:35:12

21   A.  It is.

22   Q.  Your testimony today is that the statements you made in

23   your witness statement were not truthful?

24   A.  They are.

25   Q.  So you admit -- you admit to lying in your witness           09:35:20

2005

──────── **Videotape Deposition of Timothy Rohbock** ────────

1   statement, correct?

2   A.  I do.

3   Q.  Do you recall that a Mohave County officer ended up coming

4   to the scene the day that Jerold was arrested?

5   A.  I don't recall any Mohave County ever being there.  They          09:35:47

6   had it locked up and gone in minutes.

7   Q.  You don't recall Mohave County Deputy Kristi arriving and

8   speaking with you?

9   A.  No.

10       Mr. Donnelly:  Objection, asked and answered.                     09:36:08

11  Q.  (By Mr. Hamilton:)  You don't recall coming out of the

12  residence and identifying yourselves to a Mohave County deputy?

13       Mr. Donnelly:  Objection, foundation.

14       The Witness:  I don't.

15  Q.  (By Mr. Hamilton:)  You don't recall telling a Mohave             09:36:23

16  County deputy that Elizabeth Wayman was your mother and that

17  Timothy Rohbock was legally married to one of your sisters who

18  lived at the home?

19       Mr. Donnelly:  Objection.

20   (Videotape stopped.)                                                  09:36:39

21       MR. DONNELLY:  Your Honor, I have an objection.

22       At this point Mr. Rohbock has testified to at least

23  three questions that he doesn't recall Mohave County being

24  there, talking to them.  And then Mr. Hamilton asks him a

25  string of hearsay questions about conversations with Mohave          09:36:52

UNITED STATES DISTRICT COURT

2006

─────── **Videotape Deposition of Timothy Rohbock** ───────

1  County that he's already testified he doesn't -- he wasn't

2  there.  And so it's -- the question is not evidence.  And so we

3  would ask that these questions be not asked, as Mr. Rohbock has

4  already testified that it didn't occur.

5        MR. HAMILTON:  They're prior inconsistent statements        09:37:17

6  from Mr. Rohbock.  They're also -- they're being played for the

7  effect on the listener, because Mohave County showed up that

8  same day that Jerold Williams was arrested.

9        THE COURT:  You may proceed with it.

10     (Videotape resumed.)                                          09:37:36

11        Mr. Donnelly:  Objection, foundation, hearsay,

12  relevance.

13        The Witness:  No, I don't recall.

14  Q.  (By Mr. Hamilton:)  Earlier you said that you couldn't

15  recall if Jerold Williams had married one of your sisters,       09:37:44

16  correct?

17  A.  I don't.  I don't recall.

18  Q.  You don't remember telling a Mohave County deputy that

19  Jerold Williams was married to one of your sisters?

20        Mr. Donnelly:  Objection, foundation, hearsay, 403.        09:38:01

21        The Witness:  I don't.

22  Q.  (By Mr. Hamilton:)  You don't recall specifically telling

23  this Mohave County deputy that the situation was complicated,

24  and not to try to, quote, wrap your head around it --

25        Mr. Donnelly:  Objection.

UNITED STATES DISTRICT COURT

─────── **Videotape Deposition of Timothy Rohbock** ───────

1   Q.  (By Mr. Hamilton:)  -- close quote?

2          Mr. Donnelly:  I'm sorry.  Objection, foundation,

3   relevance, hearsay, 403.

4          The Witness:  I don't.

5   Q.  (By Mr. Hamilton:)  You don't recall telling this Mohave        09:38:26

6   County deputy that Jerold Williams was madly in love with your

7   sister and that's why he came back to the residence?

8          Mr. Donnelly:  Objection, relevance, 403, hearsay,

9   foundation.

10          The Witness:  Absolutely not.                               09:38:38

11   Q.  (By Mr. Hamilton:)  So if Deputy Kristi put this in his

12   police report, would he be lying?

13   A.  Evidently.

14   Q.  You don't recall telling that deputy that you were thankful

15   for him not being a jerk?                                          09:38:59

16          Mr. Donnelly:  Objection, foundation, relevance,

17   hearsay.

18          The Witness:  I don't recall.

19   Q.  (By Mr. Hamilton:)  You don't recall telling a Mohave

20   County deputy that Jerold Williams did not live at that           09:39:18

21   residence?

22          Mr. Donnelly:  Objection, foundation, hearsay.

23          The Witness:  I don't.

24   Q.  (By Mr. Hamilton:)  You don't recall telling a Mohave

25   County deputy that no one at the residence wanted him to be        09:39:34

1   there?

2          Mr. Donnelly:  Objection, foundation, hearsay,

3   relevance.

4          The Witness:  I don't.

5   Q.  (By Mr. Hamilton:)  You would agree with me that on that          09:39:41

6   day in question that the occupants of the house did not want

7   Jerold Williams there, correct?

8          Mr. Donnelly:  Objection, foundation.

9          The Witness:  Correct.

10  Q.  (By Mr. Hamilton:)  I mean, they locked themselves in a          09:39:52

11  room.

12  A.  We've gone through this.

13  Q.  They expressed that they were frightened.

14         Mr. Donnelly:  Objection, hearsay.

15         The Witness:  I don't know what they said.

16     (Court reporter interruption.)

17         The Witness:  I said, I don't know what they said.

18  Q.  (By Mr. Hamilton:)  Do you recall seeing the witness

19  statements filled out by Angelina?

20  A.  I don't.          09:41:00

21  Q.  Were you aware of a time that Jerold Williams came to the

22  home three weeks prior to the date in question?

23  A.  I was.

24  Q.  Were you aware that at the time that he came to the home

25  three weeks prior to that he told the family that was living          09:41:29

UNITED STATES DISTRICT COURT

1    there that he would not harm them or hurt them?

2            Mr. Donnelly:  Objection, foundation, hearsay.

3            The Witness:  I'm not aware of that.

4    Q.  (By Mr. Hamilton:)  Were you aware that he told them that

5    he would not be coming back to the home?                              09:41:45

6            Mr. Donnelly:  Objection, foundation, hearsay.

7            The Witness:  I'm not aware of that.

8    Q.  (By Mr. Hamilton:)  Sir, you said that you recalled making

9    a witness statement with respect to this incident.

10   A.  Yes.                                                              09:42:24

11   Q.  And in that witness statement, it's true that you said that

12   Jerold Williams' family had lived at that residence for nine

13   years, with one short hiatus, otherwise this has been the main

14   residence that that family had lived there, correct?

15           Mr. Donnelly:  Objection, foundation, hearsay.                09:42:50

16           The Witness:  Correct.

17   Q.  (By Mr. Hamilton:)  And was that truthful?

18   A.  Yes, it was.

19   Q.  And in the witness statement you stated, in that time

20   Jerold has never lived here.                                          09:43:01

21           Mr. Donnelly:  Objection, foundation, hearsay.

22   Q.  (By Mr. Hamilton:)  Do you recall making that statement in

23   your witness statement?

24           Mr. Donnelly:  Foundation, hearsay.

25           The Witness:  I said that, yes.                               09:43:11

UNITED STATES DISTRICT COURT

2010

─────────────── Videotape Deposition of Timothy Rohbock ───────────────

1   Q.  (By Mr. Hamilton:)  Was that truthful?

2   A.  No.

3   Q.  So that first sentence was truthful?

4   A.  Uh-huh.

5   Q.  But that sentence was not truthful, is that your testimony?    09:43:18

6           Mr. Donnelly:  Objection, compound.

7           The Witness:  Yes, sir.

8   Q.  (By Mr. Hamilton:)  The next sentence you stated, in that

9   time Jerold has never lived here.

10          After that sentence you said, he has put, quote,    09:43:35

11  nothing into the maintenance or upkeep, utilities or anything

12  else.

13          Mr. Donnelly:  Objection, foundation, hearsay.

14          Mr. Hamilton:  I haven't asked my question.

15          Mr. Donnelly:  I apologize.    09:43:48

16  Q.  (By Mr. Hamilton:)  Do you recall putting that in your

17  witness statement?

18          Mr. Donnelly:  Objection, foundation, hearsay.

19          The Witness:  I do.

20  Q.  (By Mr. Hamilton:)  And was that truthful?    09:43:56

21  A.  No.  Not totally.

22  Q.  You next stated, I have since the birth of Isaac J.

23  Williams.

24          And again, that was your nephew, correct?

25  A.  Uh-huh.    09:44:20

UNITED STATES DISTRICT COURT

2011

—Videotape Deposition of Timothy Rohbock—

1   Q.  From your sister who was legally married to Jerold

2   Williams, true?

3            Mr. Donnelly:  Object --

4            The Witness:  Legally, no.  I don't have any idea

5   what --                                                              09:44:30

6   Q.  (By Mr. Hamilton:)  You have no idea what their

7   relationship was?

8   A.  No.

9   Q.  You don't know who the father of Isaac J. Williams is?

10  A.  No.                                                              09:44:39

11  Q.  You stated that you had been taking care of the hospital

12  and medical needs with most of the cost being covered by Social

13  Security and out-of-pocket by me and others.

14           Do you recall making that statement?

15           Mr. Donnelly:  Objection, foundation, hearsay.            09:44:56

16           The Witness:  Yes.

17  Q.  (By Mr. Hamilton:)  Was that statement true?

18  A.  Yes.

19  Q.  You also stated, in all that time since 2004, two other

20  families lived here and he's raised no quarrel or                   09:45:12

21  demonstrations.

22           Do you remember making that statement?

23           Mr. Donnelly:  Objection, foundation, hearsay.

24           The Witness:  I do.

25  Q.  (By Mr. Hamilton:)  Was that truthful?                         09:45:22

UNITED STATES DISTRICT COURT

──────── **Videotape Deposition of Timothy Rohbock** ────────

1   A.  Yes.

2   Q.  You then stated, he has not lived in this house for no more

3   than a total of one month out of seven years.

4           Do you remember making that statement?

5           Mr. Donnelly:  Objection, foundation, hearsay.          09:45:39

6           The Witness:  Yes.

7   Q.  (By Mr. Hamilton:)  Was that truthful?

8   A.  No.

9           Mr. Hamilton:  Let's take just a brief break, and I

10  think I'm close to being done.                                  09:45:54

11          The Witness:  Yeah.  Your time is about up.

12          Mr. Hamilton:  Thanks.

13          Videographer:  Off the record at 11:06 a.m.

14          Videographer:  Back on the record at 11:13 a.m.

15  Q.  (By Mr. Hamilton:)  Do you recall that Deputy Kristi told   09:46:16

16  Elizabeth Wayman that he guessed that Jerold had made, quote,

17  the wrong decision, close quote?

18          Mr. Donnelly:  Objection, foundation, hearsay.

19          The Witness:  I heard nothing of the sort.

20          Mr. Hamilton:  I have nothing further.                  09:46:28

21          Mr. Donnelly:  I have one follow-up.

22      (Videotape stopped.)

23          MR. DONNELLY:  Your Honor, unless there's any

24  objection by the defendants, I don't need to play the redirect,

25  it's very short and I don't think it adds that much.            09:46:39

UNITED STATES DISTRICT COURT

1          MR. HAMILTON:  I have no objection to that.

2          THE COURT:  Good.  We'll end the testimony of

3    Mr. Rohbock at that point.

4          MR. DONNELLY:  Next witness, Your Honor?

5          MR. KEVENEY:  The United States calls Helaman Barlow.      09:47:00

6          THE CLERK:  Please raise your right hand.

7      (HELAMAN BARLOW, PLAINTIFF WITNESS, SWORN.)

8          THE CLERK:  Please state your name for the record,

9    spelling your first and last name.

10         THE WITNESS:  Helaman Barlow, H-E-L-A-M-A-N,      09:47:57

11   B-A-R-L-O-W.

12         THE COURT:  You may inquire.

13                      DIRECT EXAMINATION

14   BY MR. KEVENEY:

15   Q.  Good morning, Mr. Barlow.      09:48:27

16         Could you tell the jury, please, a little bit about

17   yourself by way of background?

18   A.  My name is Helaman Barlow.  I was born and raised in

19   Colorado City or Short Creek.  I became a police officer in

20   1994, spent about 19 years there as a police officer.      09:48:43

21   Ultimately was the chief of police for about two years.

22   Q.  Where did you grow up?

23   A.  I grew up there in Colorado City/Hildale, collectively

24   known as Short Creek.

25   Q.  And while you were growing up, what was your religious      09:49:00

UNITED STATES DISTRICT COURT

1  background?

2  A.  I was born into the FLDS Church.  I'm the first child of my

3  father's second wife.

4  Q.  Was there a point in time when you considered Rulon Jeffs

5  to be your Prophet?                                                    09:49:20

6  A.  Yes, I did.

7  Q.  And was there a point in time where you considered Warren

8  Jeffs to be your Prophet?

9  A.  Yes, I did.

10  Q.  What's your current relationship with the FLDS Church?           09:49:27

11  A.  The FLDS Church, as I was born and raised and grew up,

12  definitely changed to an entirely different religion, different

13  doctrine, and then ultimately changed to a completely different

14  religion called the United Order.

15  Q.  Would you say that you left the FLDS Church or that the          09:49:47

16  Church left you?

17  A.  Both.  I wasn't able to -- I wasn't okay with the changes

18  that were made and the control and the secrecy that came into

19  the religion, and so I just quit going.

20  Q.  I want to come back to that more later.  But I want to talk      09:50:13

21  a little bit about your background as police officer.

22          You indicated earlier that you became a police officer

23  in what year?

24  A.  1994.

25  Q.  And take us through the process of your becoming a police        09:50:24

—— **Helaman Barlow – Direct Examination** ——

1    officer, please.

2    A.  Well, my father was a police officer with Mohave County.  I

3    had been working for my uncle Dan Barlow, who was then the

4    mayor.  And in 1994 the then Chief of Police Sam Roundy, Jr.

5    and Mayor Barlow approached me and asked me if I would be          09:50:47

6    willing to go to the police academy.

7    Q.  What did you do after the Mayor asked you if you would be

8    willing to go to the academy?

9    A.  I told him that I would consider it, but I felt that I

10   needed to talk to the Prophet and make sure it was okay with       09:51:01

11   the Church.

12          MR. HAMILTON:  Objection.  At this point in time he's

13   testifying to hearsay.

14          MR. KEVENEY:  Your Honor, the Prophet at that time,

15   his instruction on whether he should become a police officer is    09:51:14

16   directly relevant to our case.

17          THE COURT:  You may proceed.

18   BY MR. KEVENEY:

19   Q.  Why did you feel like you needed to talk to the Prophet

20   before you decided to go to the police academy?                    09:51:23

21   A.  Well, because every -- everything in my life that I'd been

22   taught from infancy was that the Church was everything, was the

23   ultimate power in my life.

24   Q.  What happened when you talked to the Prophet Rulon Jeffs

25   about going to the academy?                                        09:51:44

2016

Helaman Barlow – Direct Examination

1    A.  He told me that he had already previously talked to my

2    father and to Mayor Barlow, Dan Barlow, and he felt like that

3    was a good thing for me to do.

4    Q.  What did you do after that, did you go to the academy?

5    A.  Yeah, I went to the police academy in Utah.                    09:52:00

6    Q.  Tell the jury about your graduation from the academy.

7    A.  When I graduated from the police academy, my wife, my dad

8    was there, my mom.  And after the graduation ceremony, then it

9    was quite a privilege that I got to go meet with Rulon Jeffs,

10   the Prophet at that time.                                          09:52:22

11   Q.  Where did this meeting take place?

12   A.  At his favorite restaurant, New Hong Kong, I think was the

13   name of it, in Salt Lake City.

14   Q.  Tell the jury what happened at the meeting after your

15   graduation with the Prophet.                                       09:52:34

16   A.  I went to lunch with him in full dress uniform.  And after

17   the meeting -- after the lunch, as we were leaving I asked him,

18   I said, you know, Uncle Rulon, Prophet, do you have any advice

19   for a brand new cop?  And, you know, it was a big thing to me,

20   and I remember it in great detail, when he said, well, number     09:52:56

21   one, you're not a cop, you're a police officer, you're a peace

22   officer.  And secondly he said, your job is to stand between

23   the Church and all harm.  That's your calling from the Church,

24   to be a police officer.

25   Q.  When Rulon Jeffs said to you that your job was to stand        09:53:16

2017

1   between the Church and all harm, that that was your calling --

2   is that right?

3   A.  Yes.

4   Q.  What did you understand him to mean when you got that

5   instruction?                                          09:53:29

6   A.  I understood that to mean that as a police officer my job

7   was to protect the Church.

8   Q.  Over the 19 years that you served as a police officer with

9   the Colorado City Marshal's Office, did you put that

10  instruction into action?                              09:53:46

11  A.  Yes, as best I could.  Yes.

12  Q.  I want to talk a little bit now about the hiring of

13  Marshal's Officers during the 19 years that you were there.

14        Was the FLDS Church involved in any way in the hiring

15  of the Marshal's Officers when you were serving at the   09:54:01

16  Marshal's Office?

17  A.  Oh, yes.  Not only marshals, but all City officials.

18  Q.  Can you give us some examples of how the Church was

19  involved in the hiring of officers with the Colorado City

20  Marshal's Office?                                     09:54:16

21  A.  Well, under the two previous marshals that I served under,

22  I was directly involved in putting together a list of names

23  that would be submitted to the Bishop or to the Prophet, either

24  Lyle Jeffs or Warren Jeffs, and they would review those names

25  and make -- and then instruct someone to go fill that position.  09:54:33

2018

**Helaman Barlow – Direct Examination**

1   Q.  Can you identify any specific officers who were hired

2   through the process you just described?

3   A.  Sam Johnson, Preston Barlow, Curtis Cooke, Hyrum Roundy,

4   Jesse Barlow and Jerry Darger.

5   Q.  You also indicated earlier that while you were serving in          09:54:59

6   the city government as a police officer, that many members of

7   the Marshal's Office and the City government were members of

8   the Church; is that right?

9   A.  No, all of them were.  Not many of them, all of them.

10   Q.  I'd like to look at a document that's already in evidence         09:55:15

11   that will help illustrate that, if you could, please.

12           MR. KEVENEY:  Would please blow up 43?

13           May I publish this, Your Honor?

14           THE COURT:  Has it been admitted?

15           MR. KEVENEY:  I believe it came in on the first day          09:55:29

16   through Mr. Barlow.

17           THE COURT:  You may.

18   BY MR. KEVENEY:

19   Q.  Do you see the document?

20   A.  I do.                                                             09:55:43

21   Q.  Do you recognize this document?

22   A.  I do.

23   Q.  Is this something that you signed?

24   A.  Yes, I did.

25   Q.  And can you identify for the jury where your signature           09:55:51

2019

—— **Helaman Barlow – Direct Examination** ——

1   appears on this document?

2   A.  It would be on line 6.

3   Q.  Do you recognize the signatures of any other Colorado City

4   Marshal's Officers on this document?

5   A.  Yes.  I recognize the signature of Curtis Cooke.          09:56:03

6   Q.  Just so we're very clear, how do you recognize Mr. Cooke's

7   signature?

8   A.  I was involved in his hiring, and I was his sergeant and

9   ultimately his chief.  I've seen his signature very many –– a

10   lot of times.                                                09:56:20

11   Q.  Is this a document that was signed only by members of the

12   Church?

13   A.  Yes.  This was a document that was prepared by the Church

14   and –– as a petition to the court.  And then in Church services

15   we were asked as we left Church services that there would be    09:56:33

16   petitions out on tables in the hall of the church house that we

17   could sign.

18   Q.  Let's look at page 105 of this document, please.

19          Do you recognize the name that appears at line 1 on

20   this page?                                                   09:56:55

21   A.  Yes, I do.

22   Q.  What is that name?

23   A.  That's my cousin Andrew Barlow.

24   Q.  And do you recognize Andrew Barlow's signature?

25   A.  Yes.                                                     09:57:05

2020

1   Q.  And is he a current Colorado City employee?

2   A.  Yes.  He's the building inspector.

3          MR. KEVENEY:  Could we look, please, at page 170 of

4   this document?

5   BY MR. KEVENEY:                                                09:57:19

6   Q.  Do you recognize the name that appears at line 3?

7   A.  I do.  That's Mayor Joseph Allred, yes.

8   Q.  And how do you recognize his signature?

9   A.  I've seen his signature on many City documents.

10         MR. KEVENEY:  Let's turn now, please, to page 180.     09:57:40

11  BY MR. KEVENEY:

12  Q.  Do you recognize the names of any Colorado City Marshal's

13  Officers on this page?

14  A.  Yes.  I recognize Jonathon Roundy, who was the chief of

15  police prior to -- before I was.                              09:57:58

16  Q.  And you recognize his signature?

17  A.  Yes.

18  Q.  I want to get through this quickly, so I'll just put it

19  this way, you recognize because you served with him in the

20  Marshal's Office, is that fair to say?                        09:58:10

21  A.  Yes.

22         MR. KEVENEY:  Let's look at page 286, please.

23  BY MR. KEVENEY:

24  Q.  Do you recognize on this page the signatures of any City

25  officials?                                                    09:58:28

**Helaman Barlow – Direct Examination**

1    A.  Yes.  I recognize Brian Jessop's signature.  He was a

2    Hildale City Councilman.

3           MR. KEVENEY:  Let's look now, please, at page 339 of

4    this document.

5    BY MR. KEVENEY:                                              09:58:52

6    Q.  Do you recognize any names and signatures on this page?

7    A.  Yes, several of them.

8    Q.  Do you see any Marshal's Officer's names on here?

9    A.  Yes.  On line 10, Sam Johnson was a marshal.

10   Q.  And you recognize Sam Johnson's signature from having     09:59:06

11   served with him in the Marshal's Office; is that right?

12   A.  Yes.

13   Q.  Do you see any other City officials's names on here?

14   A.  I recognize Carvel Nielsen's signature on line 3.  I don't

15   know if he was currently at that time a City Council member,   09:59:23

16   but he is a Hildale City Council member now.

17   Q.  He is as we sit here today a City Councilman?

18   A.  I believe so.

19           And I also recognize Willie Jessop's signature.

20   Q.  Mr. Jessop is not officially with City government; is that   09:59:36

21   right?

22   A.  No, but I recognize his signature.

23   Q.  How do you recognize Willie Jessop's signature?

24   A.  I've seen his signature on several -- many occasions.

25   Q.  I'd like you to now tell the jury, please, how it was that   09:59:48

1    you filled the role of chief of police.  How were you chosen

2    for that position?

3            And let's begin, I guess, with starting with when you

4    became the acting chief of police, when was that?

5    A.  In around April of 2012, when Chief Jonathon Roundy          10:00:03

6    resigned.

7    Q.  And approximately how long were you the acting chief of

8    police?

9    A.  Several -- about six months.  It was I think -- I don't

10   remember exactly, but I think it was in August when I was        10:00:22

11   actually appointed by the City Council to be the permanent

12   chief of police.

13   Q.  Tell the jury, please, how it was that it came to be that

14   you were appointed by the City Council.  What was that process?

15   A.  Well, the City Council could have appointed me at any time,  10:00:36

16   being the ranking officer and the senior officer there.

17   However, we were kind of waiting for word from the Church that

18   that was okay to do.

19           Several times I approached Bishop John Wayman and

20   asked him if he'd ever had word back whether I was to be the     10:00:56

21   permanent chief or who was to be the chief of police.

22   Q.  What did John Wayman, the bishop at the time, say to you?

23   A.  That was there no word back from Warren Jeffs or anyone

24   from the Church.

25           Ultimately after about six months or so I had occasion   10:01:12

—————— Helaman Barlow – Direct Examination ——————

1    to meet with him and I said, you know, this is getting kind of

2    awkward, being an interim chief of police for, you know, so

3    many months.  We need to make a decision, I felt like.

4    Q.  And you were meeting with John Wayman, the bishop?

5    A.  Yes.  And he said, well, go ahead and fill that position,          10:01:34

6    and have Dave Darger and Joseph Allred, the Mayor and City

7    Manager, call me and I'll tell them I've okayed it.  Which I

8    did.  And then the next City Council meeting I was appointed

9    chief.

10   Q.  Now, Mr. Barlow, it's fair to say that in your 19 years in          10:01:50

11   the Marshal's Office you've testified many times; is that

12   right?

13   A.  Yes, I have.

14   Q.  And, in fact, in the Cooke case and in depositions in this

15   case, you have specifically testified previously about the             10:02:02

16   Church's relationship to the Cities.  Do you recall that?

17   A.  Yes, I do.

18   Q.  Is it fair to say, Mr. Barlow, that there have been times

19   in the past under oath when you have given very different

20   testimony than what you're giving right now?                           10:02:15

21   A.  Yes, I have.  I've admitted to perjury and other things

22   that I'm not real proud of.

23   Q.  I want to ask you why you chose to do that.

24          Why was it that over all the years that this lawsuit

25   was pending, and the Arizona Attorney General's lawsuit was            10:02:32

2024

Helaman Barlow – Direct Examination

1    pending, you gave different testimony then than what you're

2    giving today?

3    A.  Well, the biggest reason is the Church had total control

4    over my family, my kids.  I watched my dad be -- family taken

5    from him and exiled.  I watched -- Mayor Dan Barlow had his          10:02:50

6    family taken from him, exiled.  My own brothers, many of my

7    friends.  And I was very aware that to implicate or cross the

8    Church, I could very well lose my family.  So I had a very

9    difficult choice to make.

10   Q.  What was that choice you had?                                    10:03:08

11   A.  That was I could tell the truth, risk losing my family,

12   being retaliated against, losing my job from the City, and

13   being exiled, or I could lie under oath, and if I was caught

14   then I could face charges that way.  But my family would not be

15   taken from me.                                                       10:03:29

16   Q.  Did there come a point where you started making efforts to

17   prevent the Church from being able to take your family from

18   you?

19   A.  Yes.  When I found out with my -- from my own eyes what was

20   really going on, I read Mr. Jeffs' personal writings, and I         10:03:46

21   came to a realization of what really was happening.  But my

22   family was still in, in the Church.  And I knew that at any

23   point, you know, that the Church could call her and say, you

24   have to leave him and she would do it.

25   Q.  Let's talk a little bit about that, please.                     10:04:12

Helaman Barlow – Direct Examination

```
 1            When you say the Church would call her, who were you

 2   referring to?

 3   A.   My wife Enid.

 4   Q.   How long have you been married to her?

 5   A.   Just going on 27 years.                                    10:04:21

 6   Q.   And how many children have you had with Enid?

 7   A.   Eleven.

 8   Q.   Is she here in the courtroom today?

 9   A.   Yes.  She's in the courtroom right -- sitting right there

10   on the front row.                                               10:04:30

11   Q.   Could you identify her by what she's wearing, please, for

12   the record?

13   A.   Yeah, black dress, white sweater.

14            MR. KEVENEY:  The record reflect the identification,

15   Your Honor?                                                     10:04:39

16            THE COURT:  Yes.

17   BY MR. KEVENEY:

18   Q.   So it's fair to say you were able to keep your wife and

19   your children?

20   A.   Yes.  I was willing to do whatever it took to keep my wife 10:04:46

21   and children, including doing some things that I'm not really

22   proud of.

23   Q.   How was it -- explain to the jury how it was that you were

24   eventually able to get your family out from under this control

25   by the Church.                                                  10:05:03
```

UNITED STATES DISTRICT COURT

Helaman Barlow – Direct Examination

```
 1   A.  Well, as the Church became more and more restrictive and

 2   more rules and -- to the point where it was so restrictive,

 3   finally at some point -- at one point in July of 2012 as we

 4   were leaving a United Order meeting where the whole community

 5   had been excommunicated and everyone had to go back and be          10:05:26

 6   re-interviewed by Lyle Jeffs to be back in the Church, my wife

 7   made a comment, she said, I can't do it.  I can't do it

 8   anymore.  And I said, okay, we're out.  We're -- we were out at

 9   that point.

10   Q.  Let me talk to you a little bit more about that.              10:05:46

11        You said that was July in 2012 when your wife finally

12   got on the same page as you, is that fair to say?

13   A.  Yes.

14   Q.  Walk us through July of 2012 until your deposition with the

15   Justice Department in November of 2013.  You continued to stay    10:06:00

16   employed by the Marshal's Office; is that right?

17   A.  Yes.

18   Q.  At that point you were fairly comfortable that your wife

19   wouldn't be taken from you; is that right?

20   A.  Yes.                                                          10:06:13

21   Q.  What was your position like with respect to the City's from

22   that point until 2013?

23   A.  There was -- it was -- how to explain it?  Although I was

24   out and my family was not at risk of being taken away, my

25   extended family could be taken away, my brothers, my sisters.    10:06:37
```

UNITED STATES DISTRICT COURT

2027

**Helaman Barlow – Direct Examination**

1    In fact, my mother ultimately was taken away from me.  I

2    haven't seen her for close to three years.  Well, I haven't

3    talked to her.  I've seen her driving by in the community.

4            But -- and then I knew that the City -- the other

5    police officers, the City Manager, the City Council, the          10:06:55

6    mayors, would want -- would be required by the Church to

7    dissociate me and I would then lose my job.  I'd already put a

8    lot of years into that career, and I didn't want to lose my

9    job.

10   Q.  Did you initially keep your departure from the Church         10:07:11

11   secret?

12   A.  Oh, very much so.

13   Q.  Did it start to become over the course of the next year

14   obvious, however, that you had started to leave the Church?

15   A.  Yes.  Being the fact that I wasn't going to Church.  And I     10:07:26

16   wasn't taking calls from the bishop's office.  There were a lot

17   of the instructions and things that the Church was being given

18   that I didn't know about.  And so people watching me would say,

19   well, how come he's not complying by the rules?  Because didn't

20   know what they were at that point.                                 10:07:47

21   Q.  How did your relationship to your fellow officers and City

22   employees change, if at all?

23   A.  Several of them became very distrustful of me.  And

24   particularly when I would, as a sergeant and then as the chief,

25   I would not allow them to be vindictive towards non-Church         10:08:06

UNITED STATES DISTRICT COURT

2028

Helaman Barlow – Direct Examination

1    members or apostates as they were called.

2    Q.  Did there come a point where it was clear to everybody in

3    City government that you had broken from the Church?

4    A.  Yes.  I believe that would have been during the deposition

5    in November of 2012 or '13.                                    10:08:26

6    Q.  Do you recall coming down to Phoenix in November of 2013

7    and going to the office of the United States Attorney for your

8    testimony to be taken?

9    A.  Oh, yes, very well.

10   Q.  Explain to the jury what happened in that deposition that   10:08:41

11   solidified your break in the eyes of the City from the Church?

12   A.  Well, one of the main rules of the Church was that you were

13   not to go look at the personal writings of Warren Jeffs.

14   Q.  That's called the Priesthood records?

15   A.  No, they referred to it as the Sacred Record.              10:09:02

16          And during that deposition I was presented with

17   Warren Jeffs' writings.

18   Q.  In fact, I gave you a copy.  Do you remember that?

19   A.  That is correct.

20   Q.  Tell the jury what happened when I handed you that copy of  10:09:16

21   Warren Jeffs' writings.

22   A.  I was asked to read part of it, which I started to read.

23   And City Manager David Darger jumped up, rushed out of the

24   room, banging all the chairs around, and interrupted the

25   deposition by trying to leave the room so that he wouldn't be   10:09:32

**Helaman Barlow – Direct Examination**

1    out of compliance with the Church in knowing or seeing what was

2    on those Warren Jeffs' personal writings.

3    Q.  It's fair to say that David Darger, before he got out of

4    the room, he saw that you were reading Warren Jeffs' personal

5    writings?                                                        10:09:49

6    A.  Yes.

7    Q.  What happened after that deposition, after you broke that

8    sacred rule?

9    A.  Well, it wasn't -- that was kind of the straw that

10   broke -- broke it.  I think that was on a Thursday.  By Monday   10:10:01

11   of the next week when I came to work, then Dave Darger had

12   started a campaign of making a complaint about anything

13   that -- about me.  And then any decisions I would make as the

14   marshal after that, he countered them.  And suddenly the first

15   time in 19 years I was getting write-ups in my personnel file   10:10:28

16   by the City Manager.

17   Q.  Is it fair to say the City Manager David Darger was

18   starting to create a paper trail against you?

19   A.  Yes, it was -- to me it was obvious that he had received

20   instructions to dissociate me.  The other officers didn't want  10:10:44

21   to associate with me.  They -- it was the beginning of

22   attempting to terminate my employment.

23   Q.  Did David Darger make false accusations against you?

24   A.  Yes, he did.

25   Q.  What were some of the false accusations that the City        10:10:59

2030

**Helaman Barlow – Direct Examination**

1    Manager made against you?

2    A.  Well, the very first one is, he came up to my motel room

3    prior to me going into the November deposition, and observed

4    several beer bottles in the garbage can in the bathroom.  So

5    after my deposition and we got home, then when I came to work          10:11:21

6    on Monday, the next Monday, then he had a write-up accusing me

7    of being under the influence of alcohol during my deposition,

8    which was just absolutely not true.

9    Q.  Let's make sure we're very clear about that.  How many

10   beers had you had the night before your deposition?                    10:11:39

11   A.  Three.

12   Q.  And your deposition didn't start first thing in the

13   morning, did it?

14   A.  No.

15   Q.  Do you remember what time it started?                              10:11:46

16   A.  I don't remember exactly.  At around 10:00 or so.

17   Q.  Was there any possibility that you were under the influence

18   of alcohol when you gave your testimony that day?

19   A.  No, not even slightly.

20   Q.  And are you aware that David Darger knew the accusation he          10:11:58

21   was making was false?

22   A.  Oh, I believe he knew it to be false.  But it was a way to

23   start this paper trail of dissociation or to terminate me.

24   Q.  What other false accusations, if any, did the City Manager

25   make against you to set up your firing?                                10:12:16

Helaman Barlow – Direct Examination

1    A.  Well, at that point I pretty much knew that Dave Darger was

2    targeting me.  And so I tried to limit any contact I had with

3    him.  He didn't really make a lot more accusations, it's more,

4    if I made a decision as the marshal he would counter it and

5    change it and make a different decision.                          10:12:36

6           He went to the deputies and talked to them about

7    whether or not I was still faithful to the Church or not.

8    Q.  Did there come a point when David Darger tried to change

9    one of your police reports?

10   A.  Oh, yes.                                                      10:12:57

11   Q.  We'll talk a little bit more about that later, but is it

12   fair to say that the City Manager tried to change the meaning

13   of one of your reports?

14   A.  He did that on several reports.

15   Q.  Did there come a point when you were put on administrative   10:13:10

16   leave --

17   A.  Yes.

18   Q.  -- after this paper trail grew?

19   A.  Yes.

20   Q.  What happened immediately after you were put on              10:13:19

21   administrative leave?

22   A.  Well, I didn't believe they had a reason to put me on

23   administrative leave, other than the other -- the City didn't

24   want to work with me, and they had a Church edict to dissociate

25   from me.  But immediately after being placed on paid             10:13:38

UNITED STATES DISTRICT COURT

1  administrative leave, because they really didn't have any way

2  to terminate me, they didn't have any cause to, I -- at that

3  point I made the decision, I said, you know, it's time for me

4  to move on.

5  Q.  What was the first thing you did the day after you were put          10:13:59

6  on administrative leave?

7  A.  The first thing I did was -- the next morning I actually

8  called Washington County Sheriff Cory Pulsipher.

9         MR. HAMILTON:  Objection, he's now going to testify to

10  hearsay.                                                               10:14:15

11         MR. KEVENEY:  Your Honor, the statement is offered for

12  the effect on the sheriff, and the warning that the former

13  chief -- well, not even the former chief, he was on paid

14  administrative leave, he hadn't been fired, so the statement of

15  a party opponent, to put the Washington County Sheriff on       10:14:27

16  notice of an imminent danger.

17         THE COURT:  You may proceed.

18  BY MR. KEVENEY:

19  Q.  Tell the jury why you called Sheriff Pulsipher the day you

20  were put on administrative leave.                                      10:14:39

21  A.  Well, it was the next day after I was put on administrative

22  leave.  But I called him -- and I've known Cory Pulsipher for

23  many years.  And I told him, well, they've put me on leave.

24  There are several officers, and particularly Hyrum Roundy, that

25  were extremely bigoted towards nonmembers of the Church.  And    10:14:54

—Helaman Barlow – Direct Examination—

1   particularly there was an ongoing confrontation between Willie

2   Jessop and Hyrum Roundy.

3   Q.  Why did you feel that you needed to tell Cory Pulsipher

4   this?

5   A.  Well, I called the Sheriff and I said, I'm no longer there.   10:15:09

6   I've heard Hyrum Roundy make statements that he knows Willie's

7   armed and he would be treating any further contact with Willie

8   Jessop as an armed encounter.

9   Q.  Did that concern you?

10  A.  It concerned me a lot.  And I told the Sheriff, I said, you   10:15:25

11  know, there's nobody there -- I'm not there anymore to try and

12  temper this, to keep the lid on this, and you need to have

13  deputies out there, and we need to be careful.

14       Sheriff Smith told me -- or Sheriff Pulsipher called

15  up and told me that I should immediately call Willie Jessop and   10:15:44

16  tell him that also, which I also did.

17  Q.  And remind us -- why you warned Willie Jessop about what

18  was going on.

19  A.  I called him and I said, Willie, I'm not there, and you

20  know how vindictive the officers are, and how bigoted and   10:15:58

21  zealous they are towards nonmembers of the Church.  And I said,

22  Willie, you need to just tone it down.  You need to watch your

23  back.  Don't create any conflicts.  Just don't get yourself

24  hurt.

25  Q.  Were you specifically concerned that Hyrum Roundy would try   10:16:14

UNITED STATES DISTRICT COURT

2034

—Helaman Barlow – Direct Examination—

1    to provoke a violent confrontation and use deadly force against

2    Willie Jessop?

3    A.  Yes, I was.  I mean, we had already had an ongoing history

4    of this happening, that I was trying to -- as the chief -- I

5    had no control over Willie Jessop, but I definitely had          10:16:31

6    controlled over Deputy Roundy.  And I had gave him written

7    warnings not to have contact with Willie.  I told him any

8    contact that Willie -- he had with Willie, another officer was

9    to handle, particularly Sergeant Johnson.

10           In fact, I got to a point where at one point I            10:16:54

11   suspended Deputy Roundy for five days without pay because he

12   had another conflict with Willie Jessop.

13   Q.  After you warned Washington County Sheriff Pulsipher, and

14   after you warned Willie Jessop, did you approach any other

15   outside law enforcement officers?                                 10:17:12

16   A.  Not immediately.  At that point, after talking it over with

17   my wife and decided where we were going to go, I then retained

18   an attorney at that point.

19   Q.  What did you do after you retained an attorney?

20   A.  I told him what I had done and why I'd done it, and asked     10:17:32

21   him if he could help me get -- fix the problem, help me not go

22   to jail for one thing, and basically start correcting the

23   mistakes I'd made.

24   Q.  Did that attorney put you in touch with Washington County

25   Chief Prosecutor Brock Belnap?                                    10:17:55

2035

Helaman Barlow – Direct Examination

1    A.  Yes, he put me in touch with Washington County, with Utah

2    and Arizona POST, with the Department of Justice.  He basically

3    just took over my case.

4    Q.  Now I want to be very clear about the timeline at this

5    point.  At the time you retained an attorney and you reached          10:18:14

6    out to outside law enforcement, you were on paid administrative

7    leave; is that right?

8    A.  Yes, I was.

9    Q.  Had the City initiated a formal investigation into you at

10   that point?                                                           10:18:25

11   A.  No, they had not.

12   Q.  Once your attorney put you in touch with the Justice

13   Department, did that attorney negotiate an immunity agreement

14   with the Department of Justice?

15   A.  Yes, and with other agencies.                                     10:18:35

16   Q.  Now I want to talk to you about what your understanding is

17   of the immunity agreement you have with the Department of

18   Justice.  What's your understanding of what that immunity

19   letter provides you?

20   A.  Well, it was explained in great detail by my attorney to          10:18:48

21   me.  And my understanding is that I only have immunity in

22   regards to this proceeding.  And even that immunity is limited

23   to if -- only if I tell the truth.

24   Q.  So is it your understanding that the Government has

25   promised not to prosecute you, period?                                10:19:10

Helaman Barlow – Direct Examination

A.   No.   I suppose they could.   I hope they don't.   If they was

to find evidence outside of this proceeding that I –– one, I'm

not telling the truth or, two, that what I did admit to in the

immunity they find it through another source, I could very well

be prosecuted.                                                                                10:19:32

Q.   After you obtained this immunity letter from the Justice

Department, did the Department take your deposition a second

time?

A.   Yes, they did.

Q.   And who represented you in that second deposition?                                        10:19:42

     That would have been in April of 2014; is that right?

A.   Yes.   I would have been represented by my own attorney,

Mr. Winward.

Q.   And you gave that deposition then pursuant to the agreement

that if you told the truth in that deposition, what you said      10:19:58

just in that deposition couldn't be held against you.   Do you

remember that?

A.   That's my understanding.

     MR. HAMILTON:   Your Honor, may I have a sidebar?

     THE COURT:   Yes.                                                                          10:20:08

   (At sidebar on the record.)

     MR. HAMILTON:   I believe the United States has just

violated this Court's order about attempting to get Helaman

Barlow to testify about the sealed motion in limine.

Specifically asking who represented him at this next                                            10:20:36

Helaman Barlow – Direct Examination

1  deposition, intimating that there was then previously something

2  wrong with his representation.

3        MR. KEVENEY:  I adamantly disagree with that,

4  Your Honor.  He obtained personal criminal defense counsel to

5  represent him and obtained an immunity letter.  And I'm simply      10:20:52

6  going to ask him what he said in his deposition.  I haven't

7  mentioned anything about Mr. Hamilton, the subornation of

8  perjury, or anything along those lines.

9        THE COURT:  I understand your anxiety over this, but I

10  don't think there's a problem.  The Government's not going to     10:21:06

11  get into --

12        MR. KEVENEY:  I have absolutely no intention to do

13  that.  We've counseled the witness, as has his personal

14  attorney, repeatedly not to mention subornation of perjury

15  issues.                                                            10:21:18

16        THE COURT:  Be careful with your questions, because --

17        MR. HAMILTON:  My concern --

18        THE COURT:  -- you can't go there.

19        MR. KEVENEY:  I understand.

20        MR. HAMILTON:  My concern is the Federal Government         10:21:25

21  continues to push the line.  For example, the order

22  yesterday -- on Monday that they could bring up the time of the

23  Cooke verdict, but couldn't bring up the substance of the Cooke

24  verdict, and Mr. Keveney stood up and asked a question where he

25  read from the order before he started to ask his question.  I     10:21:40

1    believe they keep pushing these lines, and I'm concerned about

2    the specific issue where we have a motion in limine in place

3    and an order and it's been sealed.

4              MR. KEVENEY:  Your Honor, the order I read from

5    question was only to establish that the witness testified about      10:21:52

6    a pattern of discrimination.  I didn't introduce the Cooke

7    verdict.  I also made very clear that if I overstepped the

8    line, then I confess to error.  I did not intend to.  I thought

9    the Court had ruled that the door hadn't been opened.

10             With respect to this issue, Your Honor, I have           10:22:06

11   absolutely no intention --

12             THE COURT:  That's behind us, and you're going to be

13   careful with what you ask this witness.

14             MR. KEVENEY:  Absolutely.

15        (End of discussion at sidebar.)                               10:22:13

16   BY MR. KEVENEY:

17   Q.  What did you do in that April deposition?

18   A.  I told the truth.

19   Q.  How did that feel?

20   A.  It felt very good.  I -- at that point where I could          10:22:33

21   actually -- I could tell the truth without any fear of

22   repercussions from the Church against my family or -- and at

23   that point from the City really.  They'd already started the

24   process of terminating me and dissociating me.  And it -- quite

25   frankly, it was very refreshing, and very easy.                   10:23:04

1    Q.  Why was it easy to finally tell the truth?

2    A.  Well, I didn't have to worry about if I said something that

3    I would be putting my family at risk or my career at risk or

4    anything else.  I could just tell the truth as it is.

5          And the second part was that I -- it was my                    10:23:28

6    opportunity to have the immunity if I told the truth.

7    Q.  After that deposition, after you testified about the real

8    relationships between the Marshal's Office and the Church, at

9    that point did the City initiate an investigation into you?

10   A.  Yes, they did.                                                   10:23:52

11   Q.  Were other officers, during the time period that you were

12   giving false testimony -- 2011, '12, '13 -- were other officers

13   in the Marshal's Office aware that you were not telling the

14   truth under oath?

15   A.  Yes, I believe --                                               10:24:11

16          MR. HAMILTON:  Objection, calls for speculation.

17   BY MR. KEVENEY:

18   Q.  How do you know that the other officers knew that you were

19   not telling the truth under oath?

20   A.  Well, they were in the same Church with me.  They would see     10:24:20

21   me in Church.  They would see the rules -- they were under the

22   same restrictions I was under.

23   Q.  So it's fair to say that during this years long time period

24   when you were not telling the truth, and other officers knew

25   it, nobody in the City opened an investigation into you, did       10:24:38

1   they?

2   A.  No.

3   Q.  There was no internal affairs investigation?

4   A.  No.

5   Q.  There was no outside investigator brought in to do an          10:24:45

6   independent investigation?

7   A.  No.  In fact, I don't believe anyone could have gone back

8   through my own testimony except me, would have even known where

9   I had not told all of the truth or an outright lie.  I'm the

10  one that went back through my own deposition and said, this is    10:25:05

11  where I may -- I did not tell the truth.  These are the things

12  I want to correct.

13  Q.  And you did that in your April 2014 deposition?

14  A.  Yes.  That's what the deposition was about.

15  Q.  So it was only after that point when you publically came       10:25:19

16  forward with the truth, it was only after that point that the

17  City opened an investigation into you?

18          MR. HAMILTON:  Objection, leading.

19  BY MR. KEVENEY:

20  Q.  When did the City open its formal outside investigation        10:25:31

21  into your conduct?

22  A.  I'm not sure exactly when they opened it.  But when I was

23  placed on administrative leave, it was administrative leave

24  pending an investigation.

25  Q.  The investigation was completed, it's fair to say, well        10:25:43

Helaman Barlow – Direct Examination

1    after your April deposition?

2    A.  Yes, I was only aware of the -- that they hired a private

3    investigator to do the investigation after that deposition.

4    Q.  And did there come a point in time when you were terminated

5    from the Marshal's Office?                                    10:26:00

6    A.  Yes, I was.

7    Q.  And approximately when was that?

8    A.  August or September of 2013.

9    Q.  Your deposition was April of '14, do you remember?

10   A.  Yes.                                                      10:26:12

11   Q.  So when would you have been terminated?

12   A.  Later that year.

13   Q.  The Fall of '14?

14   A.  Right.

15   Q.  I want to talk now a little bit about hiring in the       10:26:17

16   Marshal's Office.  We talked a little bit about some of the

17   former officers during the 19 years you were there.  Were you

18   involved in the most recent round of hiring for the Marshal's

19   Office?

20   A.  Yes, I was.                                               10:26:36

21   Q.  And how many officers were hired?

22   A.  Three.

23   Q.  What would their names be?

24   A.  Daniel Roy Barlow, Daniel Musser and Jacob Barlow, Jr.

25   Q.  And you testified earlier that the process prior to these 10:26:47

**Helaman Barlow – Direct Examination**

1  three new officers was that you would submit a list and the

2  Church would approve the officers to go to the academy.  Do you

3  recall that?

4  A.  Yes, I do.

5  Q.  Did that process change with respect to the three newest          10:27:00

6  officers?

7  A.  Yes, it did.

8  Q.  And at the time these three new officers were hired, the

9  Marshal's Office was already involved in this lawsuit; is that

10  right?                                                               10:27:13

11  A.  Yes, they were.

12  Q.  The Marshal's Office, it's fair to say, knew it was under

13  scrutiny?

14  A.  Yes.

15         MR. HAMILTON:  Objection, leading.                           10:27:18

16  BY MR. KEVENEY:

17  Q.  At the time you hired these three new Marshal's officers,

18  who was looking at the Marshal's Office closely?

19  A.  My understanding the Department of Justice and I believe

20  Post was -- also had an open investigation.                         10:27:31

21         MR. HAMILTON:  Objection, Your Honor.  May I be heard

22  at sidebar?

23         THE COURT:  Let's take our morning recess at this

24  point.  And counsel stay with us for just a minute.

25         (Jury out at 10:27 a.m.)                                     10:27:49

—————————— **Helaman Barlow – Direct Examination** ——————————

1          THE COURT:  Please be seated.

2          Mr. Hamilton?

3          MR. HAMILTON:  Yes, Your Honor.  The witness was

4    getting into testimony about a current Post investigation, I

5    believe, which was subject to a motion in limine that that type          10:28:37

6    of evidence wouldn't be introduced in this trial.

7          MR. KEVENEY:  The witness was simply testifying that

8    he was aware that the Marshal's Office was under intense

9    outside scrutiny, not the details of any investigation.

10          Defense counsel objected to foundation when I asked          10:28:53

11   was the Marshal's Office under scrutiny.  So I tried to lay the

12   foundation, Your Honor.  And I have no intention of getting

13   into the details of an investigation that he wasn't conducting.

14          THE COURT:  So do we have a problem?

15          MR. HAMILTON:  I'd ask that the Court admonish the          10:29:08

16   jury to -- to strike the testimony regarding the Utah POST

17   investigation, pursuant to the previous ruling on the motion in

18   limine regarding current ongoing Post investigations.

19          MR. KEVENEY:  Your Honor, I was not asking about a

20   current investigation as of this day.  Defense counsel made a          10:29:26

21   foundation objection to whether the Marshal's Office was under

22   scrutiny.  When he makes the foundation objection he has to

23   live with the foundation that has to be then laid.

24          MR. HAMILTON:  I made an objection with leading.

25          THE COURT:  Let's back up and be very specific about          10:29:41

─────── **Helaman Barlow – Direct Examination** ───────

1    the time period that you're inquiring about.

2          And please, please do stay away from the current POST

3    situation.

4          MR. KEVENEY:  I'd also like if I could,

5    Your Honor -- I will absolutely do that.  But I'd also like          10:29:56

6    more clarification on the specific motion in limine.  Perhaps

7    we can look at the break.  I'm not recalling the

8    specific -- rather, my co-counsel is telling me they don't

9    recall the specific ruling.

10          MR. HAMILTON:  And I don't have the citation in front          10:30:09

11    of me right now.  But my recollection was that there was a

12    motion in limine and order prohibiting any testimony about any

13    ongoing or current POST investigation.

14          THE COURT:  There were so many motions in limine in

15    this case that I'm not possessed of total recall about all of          10:30:25

16    them.

17          MR. KEVENEY:  We'll look it up at the break,

18    Your Honor.  I was just assuming that Mr. Hamilton was correct,

19    but I'm being told that's not the case.  But we'll look it up.

20          THE COURT:  I was make the assumption too.  You all          10:30:42

21    look it up and we'll be back in 15 minutes.

22          (Recess at 10:30 a.m., until 10:45 a.m.)

23          MR. KEVENEY:  Can we approach, Your Honor?

24          THE COURT:  Are we ready to proceed?

25          MR. KEVENEY:  Yes.  Can we approach first?          10:45:19

1          THE COURT:  Can we what?

2          MR. KEVENEY:  May we approach about the issue just

3     before?

4          THE COURT:  Yes.

5       (At sidebar on the record.)                          10:45:32

6          MR. KEVENEY:  Your Honor, we confirmed and the

7     defendants agree that there was no such motion filed.

8          THE COURT:  The only what I found that was close was

9     one that had to do with legislation.

10          MR. HAMILTON:  Right.  I thought it was either that   10:45:45

11     one or the Grand Jury one.  And I apologize, I misspoke.  I

12     think the arguments are the exact same though, that we

13     shouldn't be getting into current ongoing POST investigations.

14          THE COURT:  I think you said you weren't going to do

15     that anyway.                                             10:45:58

16          MR. KEVENEY:  The fact that an investigation is opened

17     is all I intended to elicit, Your Honor.  We have no intention

18     of calling any investigators from POST to talk about their

19     current investigations or their findings.

20          THE COURT:  Okay.                                  10:46:10

21       (End of discussion at sidebar.)

22     BY MR. KEVENEY:

23     Q.  Before the break we were talking about what scrutiny was

24     being directed at the Marshal's Office at the time that you

25     hired these three new officers.  Do you remember that?    10:46:29

1   A.  Yes.

2   Q.  Just to reorient you to where we were, the Marshal's Office

3   knew it was under investigation by the Justice Department; is

4   that right?

5   A.  Yes, it did.                                              10:46:40

6   Q.  And the Marshal's Office knew it was under investigation by

7   POST agencies; is that right?

8   A.  Yes.

9   Q.  Did the Marshal's Office do anything different with respect

10  to hiring these three new officers because of the intense       10:46:49

11  scrutiny it was under?

12  A.  Yes.  I think that's part of it.  The other part was the

13  fact that they knew I was not controlled by the Church as in

14  previous hires.

15  Q.  So how was this new hiring process for these three new       10:47:05

16  officers different from how the hiring had been in the past?

17  A.  To begin with, the posting the notice for new officers,

18  I -- typically before it would be posted for a minimum amount

19  of time before the hiring.  In this case I posted it a month

20  ahead of time in different communities and everywhere.          10:47:29

21  Q.  Why did you do that?

22  A.  I was hoping to hire officers that were not Church

23  controlled.

24  Q.  What was the actual hiring process that was then set up?

25  A.  Well, there was, I think, nine or ten applicants.  And so    10:47:46

—————— **Helaman Barlow – Direct Examination** ——————

1    for the first time that I'm aware of, they were all given a

2    questionnaire to fill out, and then a review board consisting

3    of myself, Manager David Darger and Mayor Joseph Allred, was

4    set up to do an oral review of the applicants.

5    Q.  What was your understanding as to why it was a three-person        10:48:08

6    review board?

7    A.  Oh, I think it was definitely three -- or two against the

8    one, in opposition of me.

9    Q.  So the Board was intentionally set up to be able to cancel

10   out your vote as the non-Church controlled member?                    10:48:20

11   A.  Yes.

12          MR. KEVENEY:  Would you bring up, please, 294?

13          Your Honor, 294 has been stipulated.  Move it into

14   evidence.

15          THE COURT:  Agreed?                                            10:48:37

16          MR. HAMILTON:  Yes, that is, Your Honor.

17          THE COURT:  294 is admitted.

18      (Exhibit No. 294 admitted into evidence.)

19          MR. KEVENEY:  Permission to publish, Your Honor.

20          THE COURT:  You may.                                          10:48:43

21   BY MR. KEVENEY:

22   Q.  Do you see 294 in front of you, sir?

23   A.  Yes, I do.

24   Q.  Do you recognize that document?

25   A.  Yes.                                                             10:48:55

2048

Helaman Barlow – Direct Examination

1   Q.  Tell the jury, please, what this is.

2   A.  This is the notice of employment opportunity that was

3   posted prior to hiring the last three new officers for the

4   Marshal's Office.

5   Q.  Did this notice set minimum requirements for applications?          10:49:07

6   A.  Yes, it did.

7        MR. KEVENEY:  Can we blow up that portion, please?

8   BY MR. KEVENEY:

9   Q.  Did the notice specifically provide that new officers had

10  to have a high school diploma or G.E.D. equivalent?                     10:49:26

11  A.  Yes.

12  Q.  Let's look at some of the specific applications.

13       Now you said that Jacob Barlow, Jr. was hired.  Do you

14  remember that?

15  A.  Yes.                                                                10:49:38

16  Q.  And he is now a current officer with the Marshal's Office;

17  is that right?

18  A.  Yes.

19       MR. KEVENEY:  Could we look at page 246?

20  BY MR. KEVENEY:

21  Q.  Do you recognize Jacob Barlow, Jr.'s application for the

22  Marshal's Office?

23  A.  Yes, I remember that.

24  Q.  And -- again, he was hired; is that right?

25  A.  Eventually, yes.                                                    10:50:01

UNITED STATES DISTRICT COURT

Helaman Barlow – Direct Examination

1    Q.  Did he meet the minimum qualifications when he was hired?

2    A.  Where he wrote, currently obtaining a G.E.D.?

3    Q.  Yes.

4    A.  I think that was a minimum requirement to get into police

5    academy.                                                        10:50:17

6    Q.  The application itself says you wanted applicants who had a

7    high school degree; is that right?

8    A.  Yes.

9    Q.  It's fair to say that his application on its face did not

10   meet the minimum requirements?                                 10:50:28

11   A.  Yes.

12   Q.  Do you see a phone number on this exhibit?

13   A.  I do.

14   Q.  Do you recognize the area code for that phone number?

15   A.  I actually saw -- I looked that up on Google.              10:50:39

16   Q.  And is that -- well, tell us where the area code is.

17   A.  The phone number is a phone number from San Angelo, Texas.

18   Q.  And is that in the area where the YFZ Ranch is located?

19   A.  Yes.

20        MR. KEVENEY:  Can we pull up the next page of his         10:50:59

21   application, please?

22   BY MR. KEVENEY:

23   Q.  Does the application reflect that Jacob Barlow, Jr. worked

24   for Paragon Contractors Corporation and Jack Daniels, Inc,?

25   A.  Yes.                                                       10:51:14

2050

1   Q.  What did you know at the time that Jake Barlow, Jr. applied

2   about those two companies?

3   A.  Both of those companies were controlled by the FLDS Church.

4           MR. KEVENEY:  May we now look, please, at Exhibit 45?

5           Which was admitted yesterday, Your Honor.                    10:51:32

6           THE COURT:  I didn't -- is it admitted, Madam Clerk?

7           THE CLERK:  Yes.

8           THE COURT:  She says it is, so it's admitted

9   yesterday.

10          MR. KEVENEY:  Permission to publish, Your Honor?            10:51:56

11          THE COURT:  Yes.

12  BY MR. KEVENEY:

13  Q.  Do you see this exhibit in front of you?

14  A.  I see that.

15  Q.  This was admitted yesterday after testimony establishing      10:52:03

16  that it's a Church Security roster.

17          MR. KEVENEY:  Can you pull up the phone number we were

18  looking at, please?

19  BY MR. KEVENEY:

20  Q.  Do you see a phone number there for Jacob L. Jessop?           10:52:16

21  A.  Yes, I see that.

22          MR. KEVENEY:  Could we please compare that to the

23  employment application we were looking at?

24  BY MR. KEVENEY:

25  Q.  Do those phone numbers match?                                  10:52:31

Helaman Barlow – Direct Examination

1    A.  Yes, they do.

2    Q.  So Jacob Barlow, Jr., the applicant and now officer with

3    the Marshal's Office, his phone number is listed on the Church

4    Security roster, is that fair to say?

5    A.  Yes.  On the security roster, it's listed under his Church          10:52:46

6    name.

7    Q.  That was my nest question.  Do you have an understanding as

8    to why that's a different name?

9    A.  Yes.

10   Q.  We've heard a lot about Church names, so I won't go into           10:52:57

11   the details of that.

12           Let's move to the next applicant, Daniel Musser.

13           MR. KEVENEY:  Could you bring up 258, please?

14   BY MR. KEVENEY:

15   Q.  Do you recognize Daniel Musser's employment application?          10:53:11

16   A.  Yes.

17   Q.  And did he at the time of his application meet the minimum

18   requirements to apply to become a Marshal's Officer?

19   A.  Wherein it says, G.E.D. in progress, no.  That was not a

20   minimum.                                                              10:53:31

21           MR. KEVENEY:  Let's look, please, at 260.

22   BY MR. KEVENEY:

23   Q.  Do you recognize this as a letter of recommendation that

24   was included in his application packet?

25   A.  Yes.                                                              10:53:49

Helaman Barlow – Direct Examination

1    Q.  And did Daniel Musser also work for Jack Daniels

2    Construction, a known FLDS affiliated company?

3    A.  Yes.

4            MR. KEVENEY:  Publish, please.  I'm sorry.  May we

5    publish this, Your Honor?                                   10:54:01

6            THE COURT:  Yes.

7    BY MR. KEVENEY:

8    Q.  Let's look now, please, at the next applicant who was

9    hired, Daniel Roy Barlow.

10           MR. KEVENEY:  270, please.                           10:54:16

11   BY MR. KEVENEY:

12   Q.  At the time the time Daniel Roy Barlow applied to be a

13   Marshal's Officer, did you understand that he had a Church

14   name?

15   A.  Yes, I did.                                              10:54:28

16   Q.  What was his Church name?

17   A.  I believe his Church name was Allred.

18   Q.  Let's look, please, at the phone number he put on his

19   application.

20           MR. KEVENEY:  Page 277.                              10:54:38

21   BY MR. KEVENEY:

22   Q.  Do you see a mobile phone number that he listed there?

23   A.  This isn't his application, this is -- this is out of the

24   police RMI file.

25   Q.  This portion, this document from the Marshal's Office would   10:55:06

UNITED STATES DISTRICT COURT

2053

Helaman Barlow – Direct Examination

1    have been included in his packet though at some point to be

2    reviewed; is that right?

3    A.  Yes.

4    Q.  And do you see the phone number that he listed there?

5    A.  Yes, I do.                                                    10:55:16

6          MR. KEVENEY:  Could we bring back up 45 again, please?

7          Can we compare those two phone numbers, the one from

8    the Church Security roster with his employment application?

9          Could we please publish again?

10          THE COURT:  Yes.                                           10:55:39

11   BY MR. KEVENEY:

12   Q.  Is that the same number?

13   A.  Yes, it is.

14   Q.  Does that indicate to you that at the time he applied to

15   become a Marshal's Officer Daniel Roy Allred was affiliated     10:55:56

16   with Church Security?

17   A.  That's what it looks like, yeah.

18   Q.  So it's fair to say that for at least two of the new

19   applicants, Jacob Barlow, Jr. and Daniel Roy Barlow, they moved

20   right from Church Security to the Marshal's Office?              10:56:08

21   A.  Yes.  And Jacob Barlow, Jr. actually moved from Texas from

22   Warren Jeffs' security to the Marshal's Office.

23   Q.  So he moved from an even higher level --

24   A.  Yes.

25   Q.  -- from Church Security at the YFZ Ranch to the Marshal's    10:56:20

UNITED STATES DISTRICT COURT

Helaman Barlow - Direct Examination

1    Office.

2    A.  Yes.

3    Q.  Was it your understanding at the time that these three new

4    officers were hired, that they were all loyal to the FLDS

5    Church?                                                      10:56:33

6    A.  Yes, that's what I understood.

7    Q.  And is that why they were hired?

8    A.  That's my belief, yes.

9    Q.  I want to talk a little bit more about your prior

10   membership in Warren Jeffs' FLDS Church.                    10:56:45

11          When you became a member of the Church, what did the

12   Church mean to you?

13   A.  Well, it was the church that my family belonged to.  It

14   was -- I guess I was born into it.

15   Q.  Did you witness changes in the Church from the          10:57:05

16   administration of Leroy Johnson to the administration of

17   Rulon Jeffs?

18   A.  Yes, I did, a lot of changes.

19   Q.  What were some of those charges?

20   A.  The Church became much more restrictive, a lot more rules. 10:57:16

21   I remember when I first -- remember growing up as a young boy

22   there was community dances, plays, ball games, even occasional

23   movies.  To where in the late '90s, early 2000 it was

24   restricted down to -- very restrictive, not even no -- no

25   entertainment at all, no ball games.  There was a lot of    10:57:46

Helaman Barlow - Direct Examination

1    changes.

2    Q.  Were there more changes when Warren Jeffs became the

3    Prophet?

4    A.  Yeah, it became a lot more restrictive.  I guess one of the

5    big changes that I -- that was problematic to me was the fact          10:58:02

6    that when I married my wife, even though it was a

7    Church-arranged marriage 27 years ago, there was a wedding

8    reception, all the family was involved.  To where some of

9    my -- even my younger sisters were married in secret ceremonies

10   in motel rooms in the middle of the night, and nobody even             10:58:26

11   knew.

12   Q.  I want to talk to you a little bit more about marriages in

13   the Marshal's Office, knowledge of them during the time that

14   you were an officer.

15       Was the Marshal's Office, during the time that you                 10:58:40

16   were an officer, aware that underage marriages were being

17   performed within the Church?

18   A.  Yes, we were aware of a few.

19   Q.  Did the Marshal's Office ever initiate an investigation

20   into those underage marriages?                                         10:58:56

21   A.  Well, no.  We were all members of the FLDS Church, and

22   if -- if it was a Church marriage, I as a marshal considered it

23   a valid marriage, the same as my own marriage was an FLDS

24   marriage.

25   Q.  Was it the culture of the Marshal's Office to look the             10:59:11

1    other way with respect to these illegal underage marriages?

2    A.  Well, yes, because we -- we believed in our faith that it

3    was a valid marriage.

4    Q.  At some point did the Marshal's Office become aware that

5    Mohave County law enforcement was actively investigating          10:59:28

6    underage marriages?

7    A.  Yes, we did.

8    Q.  How did the Marshal's Office become aware of outside law

9    enforcement efforts to investigate underage marriages?

10   A.  I think Mohave County -- I heard about it from Mohave         10:59:40

11   County officers, particularly from their special investigator

12   Gary Ingalls.

13   Q.  Tell us who Gary Ingalls was and what he was doing in the

14   community.

15   A.  He was a Mohave County Attorney special investigator that     10:59:55

16   was tasked specifically with finding underage marriages within

17   the FLDS Church.

18   Q.  What time period are we talking about that Investigator

19   Ingalls was actively investigating these marriages?

20   A.  Late '90s through the 2000's.                                 11:00:10

21   Q.  Did the Marshal's Office cooperate with the Mohave County

22   Investigator Gary Ingalls?

23   A.  No, not so much, no.

24   Q.  When you say "not so much," can you elaborate on that?

25   A.  We felt like he was there -- I mean, the Marshal's Office,    11:00:25

1    all being members of the FLDS Church, felt like he was there to

2    attack our religion, our religious beliefs.

3    Q.  Did the Marshal's Office turn over information to

4    Investigator Ingalls that it knew about underage marriages?

5    A.  No, we didn't have much interaction with him at all.          11:00:47

6    Q.  Did you at any point become aware of an illegal underage

7    marriage between now Colorado City Mayor Joseph Allred and a

8    15-year-old girl at the time named Julia Williams?

9    A.  I became aware of it in a deposition from the Justice

10   Department.                                                        11:01:08

11   Q.  Were you aware -- had you previous to that deposition ever

12   made any effort to look into Church records, birth certificates

13   or marriage license, any publically-available investigative

14   tools to learn about that particular underage marriage?

15   A.  No.  I wasn't even aware there was one.                        11:01:25

16   Q.  Were you aware at any point of a marriage between then

17   Colorado City Chief of Police Jonathon Roundy and a girl named

18   Lucille Steed?

19   A.  I was aware of it.  I never saw them together.  My

20   understanding it was very short.  But, yes, I was aware that      11:01:41

21   that had happened.

22   Q.  And did the Marshal's Office initiate any kind of internal

23   affairs investigation into Jonathon Roundy's conduct?

24   A.  No.

25   Q.  Did the Marshal's Office turn over to outside law             11:01:51

Helaman Barlow – Direct Examination

1    enforcement any information it had about Jonathon Roundy's

2    illegal conduct?

3    A.  No.

4    Q.  You talked earlier about how there came a point where you

5    decided you weren't happy with what was going on in the Church.    11:02:05

6    Can you be more specific about what you meant by that?

7    A.  Well, there was just a lot of restrictions and doctrine

8    that didn't make sense, that didn't follow the early teachings

9    of the Church.  But I guess I really hoped that that wasn't the

10   case, but I had some questions.  And it wasn't until after the    11:02:31

11   YFZ raid in Texas where I became involved in assisting with

12   some of the legal issues of the Church that I actually read for

13   myself and saw for myself what Warren Jeffs was doing.  And he

14   was considered our -- the Prophet.

15           And suddenly, you know, that one immovable rock that    11:02:58

16   you tie your faith to isn't something you want to be tied to.

17   And that's when I can say my faith was shaken.

18   Q.  So it's fair to say that you, while with the Marshal's

19   Office, went to Texas to help with some of those legal issues?

20   A.  Yes.  Originally I went down -- I was subpoenaed down there    11:03:22

21   by the Church attorneys originally.  And then down there I had

22   a couple of sisters that had children taken away from them, and

23   I stayed.  I ended up hooking up with Willie Jessop, and I

24   spent three months down there with him working on trying to get

25   the FLDS children returned.    11:03:43

1    Q.  As a result of your being exposed to the evidence that came

2    out of the YFZ raid, did you become aware of illegal conduct

3    that Warren Jeffs had engaged in?

4    A.  Yes, I did.

5    Q.  And you're aware that he was eventually convicted on two        11:03:58

6    counts of sexual misconduct with minors?

7    A.  Yes.

8    Q.  You were aware that Warren Jeffs was a fugitive for many

9    years prior to the time that he was eventually arrested and

10   then convicted; is that right?                                     11:04:15

11   A.  Yes.

12   Q.  Now I want to focus you on that time period.

13        Warren Jeffs went on the run from civil lawsuits in

14   2004, is that fair to say?

15   A.  Yes.                                                           11:04:25

16   Q.  And in the summer of 2005 he became a federal fugitive.

17   You were aware of that as a Marshal's Officer?

18        MR. HAMILTON:  Objection, leading.

19        THE COURT:  Sustained.

20   BY MR. KEVENEY:                                                    11:04:36

21   Q.  When did you become aware that Warren Jeffs had become a

22   federal fugitive?

23   A.  I believe it was around 2005 when the FBI put out a most

24   wanted poster on him.

25   Q.  During the time period that you were a Marshal's Officer       11:04:47

1  and Warren Jeffs was a fugitive, did Warren Jeffs' fugitive

2  status affect your ability to perform law enforcement functions

3  in the community?

4  A.  Not as far as just enforcing the statutes.  But it -- or

5  the laws.  It definitely affected our relationship -- the          11:05:04

6  Marshal's Office relationship with other law enforcement

7  agencies.

8  Q.  Can you explain what you mean by that?

9  A.  Meaning that -- I mean, this was our religious leader, and

10 to try to reconcile -- for me, the idea that if I met this         11:05:23

11 person who I believed to be the Prophet and God I would have to

12 do harm to him or I'd arrest him, it was quite a conundrum for

13 me on how to deal with that.  And I guess the way we

14 rationalized it was we said, well, if that happens it needs to

15 be somebody that's not FLDS.  I mean -- I guess the way I put     11:05:49

16 it was, if I'm Catholic and I have to go arrest the Catholic

17 Bishop for abuse, could -- would there please be someone that's

18 not of that faith do that for me.

19 Q.  During the time period that you were experiencing this

20 tension between your faith and your duties as an officer, did     11:06:08

21 the Marshal's Office actively do anything to assist in the

22 investigation into Warren Jeffs' location?

23 A.  No.  We -- and, in fact, I believe the Marshal's Office was

24 actually part of that investigation.  The gap between the

25 Marshal's Office and other law enforcement agencies became        11:06:30

2061

1    huge.

2    Q.  Did the Marshal's Office, in fact, do things to hinder

3    outside law enforcement?

4    A.  Yes.

5    Q.  What did the Marshal's Office do?                          11:06:42

6    A.  There was several things that I was aware of.  One of them

7    was, we would report to the Church what outside law enforcement

8    officers were doing, where they were looking.  If people came

9    with -- looking for information, we'd do, I guess -- I call it

10   slow walking, where we would do everything we could to slow     11:07:09

11   them down and give Church members or people the opportunity to

12   either disappear or get their affairs in order before they had

13   outside -- other law enforcement would approach them.

14   Q.  During this same period, was the Marshal's Office and you

15   specifically aware of a courier network that had been set up to  11:07:35

16   communicate with Warren Jeffs as a fugitive?

17   A.  Yes.

18   Q.  And how were you aware of that secret courier network?

19   A.  I was told if I needed to get a message to the Church or to

20   Warren Jeffs, I could contact certain individuals and they       11:07:51

21   could get that message to them.  Or I would put in a request to

22   talk to the Bishop or Lyle Jeffs or a Church member, I would

23   put my phone number on a list of -- in a list, and then I would

24   wait at a specific time, then an unknown number would call me

25   and that would be a Church official.                            11:08:19

1    Q.  Who were some of the couriers that you knew about during

2    this time period?

3    A.  Lindsey Barlow was the main one that I worked with.  Brian

4    Jessop, J.D. Roundy.  I'm sure there were others that I'm not

5    aware of.                                                           11:08:36

6    Q.  Did you ever send anything to Warren Jeffs through this

7    courier network?

8    A.  Yes, I did.

9    Q.  What did you send to Warren Jeffs?

10   A.  I sent -- well, on one occasion I actually recorded outside   11:08:47

11   law enforcement FBI and others, and I sent a copy of those

12   recordings through that network to him.

13   Q.  Did you record the FBI with the FBI agent's knowledge?

14   A.  They didn't know.

15   Q.  Why not?                                                       11:09:07

16   A.  I never told them, I just had a recorder in my pocket.

17   Q.  What was the purpose of recording the FBI agent?

18   A.  Protect the Church, let the Church know what was going on,

19   who was looking for who.

20   Q.  In your 19 years in law enforcement, you've had occasion      11:09:23

21   where you've had to track down a suspect, is that fair to say?

22   A.  Yes.

23   Q.  Is it correct that if the Marshal's Office had gone to the

24   FBI and told them -- I'm asking you based on your experience as

25   a law enforcement officer, had gone to the FBI and told them      11:09:42

Helaman Barlow – Direct Examination

1    about some of these couriers, could the FBI have followed some

2    of those couriers to Warren Jeffs, or attempted to follow them

3    to Warren Jeffs?

4    A.  Oh, yes, definitely.

5    Q.  So just so we're perfectly clear, why did the Marshal's       11:09:54

6    Office not alert the FBI about the Marshal's Office knowledge

7    of these couriers?

8    A.  Because we were all FLDS.  We were all of the same faith.

9    It would be like attacking our own church.

10   Q.  After Warren Jeffs became a fugitive, were there other       11:10:10

11   things that the City did to limit its liability or its ability

12   to expose its relationship with Warren Jeffs?

13   A.  Well, we did a lot of things, not necessarily only because

14   of Warren Jeffs, but also because of media, news -- because of

15   the attention Warren Jeffs was getting to the community.  We     11:10:36

16   had reporters who would show up and just do huge records

17   requests of all government documents.  And we felt like that

18   was a liability to the City.

19   Q.  What did the City do to deal with this liability?

20   A.  At that time we developed a records retention schedule so    11:10:53

21   we could destroy records legally.  We switched from City-owned

22   cellphones to a stipend so that if somebody did a records

23   request they couldn't get all the officer's cellphones or City

24   officials cellphones and be able to see who they'd been

25   calling.  Those are the two big things.                          11:11:18

1   Q.  What kind of records did the Cities destroy after

2   Warren Jeffs became a fugitive?

3   A.  A lot of -- anything -- basically anything we could under

4   the legal records retention, like police logs, misdemeanor

5   reports, misdemeanor citations.  I mean, up until that time I          11:11:38

6   don't know that much of anything was ever gotten rid of by the

7   City.

8   Q.  But once Warren Jeffs became a fugitive, then there was

9   this purging, is that fair to say?

10  A.  Right.                                                              11:11:53

11  Q.  I want to talk to you a little bit more in general about

12  the relationship between the Church and the Cities and the

13  Marshal's Office.  You talked earlier about hiring, and we

14  looked at the new officers.

15      Did the Marshal's Office -- can you give us other          11:12:04

16  examples of the relationship between the Marshal's Office and

17  the Church?

18  A.  Well, I personally talked to -- with the exception of the

19  last three officers, Daniel Roy, Daniel Musser and Jake Barlow,

20  Jr., I've had personal conversations with all of the current          11:12:23

21  officers wherein we acknowledged and discussed with each other

22  how being an officer there was actually -- was a Church

23  calling, and how we were called by the Church to go do that.

24  Q.  Are you aware of any City employees or Marshal's Officers

25  who reported on City business to the Church?                          11:12:43

Helaman Barlow - Direct Examination

1    A.  I'm aware of it, yes.

2    Q.  And can you tell the jury about that, please?

3    A.  On one occasion Sam Roundy, Jr. took all of the current

4    officers up and met with Rulon Jeffs and Warren Jeffs and

5    talked about different cases.                                    11:13:01

6    Q.  And when you say "talked about different cases," you mean

7    ongoing criminal investigations?

8    A.  Or citations that had been issued or what -- yes.

9    Q.  Are you aware of any meetings that took place on a regular

10   basis between Church leaders and City officials about City      11:13:18

11   business?

12   A.  Yes, in sort of a way.  Yes.

13   Q.  What do you mean by that?

14   A.  In the FLDS Church Saturdays were considered -- they

15   belonged to the Church.  Any efforts that were made on a        11:13:38

16   Saturday should be consecrated to the Church.  And so there

17   were many, many Saturdays where myself, Manager Dave Darger,

18   other City officials would meet with Church officials, Willie

19   Jessop, others, and assist in the legal defense of the Church.

20   And I think there was a lot of commingling with Church issues   11:14:02

21   and City issues.  They were -- we talked about all of that.

22   Q.  Where did these meetings take place?

23   A.  Generally at R&W.

24   Q.  And specifically where at R&W Excavation did these meetings

25   take place?                                                     11:14:20

1   A.  Well, they had built a conference room there and like a

2   lunch room.  That was basically the headquarters of where the

3   Church legal defense was done, that I assisted with.

4   Q.  You mentioned that City Manager David Darger and then City

5   Manager Barlow were at some of these meetings?                    11:14:43

6   A.  Yes.  Jerry Barlow was -- myself, Dave Darger, Jerry

7   Barlow, Jake Barlow, were pretty much the regulars that went to

8   assist with the legal defense.

9   Q.  Do you recall any of the specifics topics that were

10  discussed between Church and City officials at these meetings?   11:14:59

11  A.  I think all the topics from -- everything from the Church

12  legal defense, to subdividing the Town, to litigation of the

13  Town.  I mean, we -- we just talked about all legal issues

14  involving the Church and the Town.

15  Q.  Who was calling the shots generally at these meetings?       11:15:20

16  A.  Usually one of the Church First Presidency would be

17  generally the one that we would review them with, Merril

18  Jessop, Wendell Nielsen or Lyle Jeffs.

19  Q.  Do you recall any specific discussions at these meetings

20  about occupancy agreements?                                      11:15:43

21  A.  Yes.

22  Q.  What do you recall the discussion being about occupancy

23  agreements?

24  A.  We as a whole in the Church felt like they were an attack

25  on our religious property -- the property that belonged to the   11:15:55

UNITED STATES DISTRICT COURT

1    Church and that had been illegally taken from us.  And

2    eventually at some point, and I'm not sure which one of the

3    Church leaders made the decision, that Church members should

4    sign their occupancy agreements and try and maintain control of

5    the property in hopes that in the future they could return it          11:16:17

6    to the Church.

7    Q.  So is it fair to say the Church position on occupancy

8    agreements changed over the years?

9    A.  Oh, yes, several times.

10   Q.  Were you aware, from living in the community and being in         11:16:29

11   the Marshal's Office, of people moving around between houses?

12   A.  Yes.  I moved around between houses.

13   Q.  Explain to the jury, why was that happening?  What was the

14   point of that?

15   A.  I think for two reasons.  One, would be so that no one           11:16:42

16   became permanently attached to the property.  And secondly, it

17   was just so people -- there was plausible deniability that no

18   one knew where anyone else lived.

19   Q.  Was it your understanding that that shuffling of people

20   made things difficult for the UEP management?                        11:17:07

21   A.  I think it made it difficult for UEP management and for

22   outside law enforcement, and even for the Marshal's Office.

23   Many times we were unsure who lived in a house.

24   Q.  Are you familiar with something called the United Order?

25   A.  Yes, I am.                                                       11:17:23

1    Q.  And I know you mentioned it earlier, I think you said that

2    your Church became the United Order.  Am I remembering that

3    right?

4    A.  Well, it's my belief that the United Order is an entirely

5    different religion than the FLDS Church.                        11:17:37

6    Q.  Why do you think that?

7    A.   I was rebaptized into an entirely different religion with

8    different doctrine.

9    Q.  So it's fair to say that you at one point were baptized

10   into the United Order?                                          11:17:51

11   A.  Yes.

12   Q.  Tell the jury a little bit about the United Order.  What

13   was it?

14   A.  It was a new religion that basically was turning yourself

15   completely over to the Church.  Everything you owned, including 11:18:06

16   your personal property down to your clothing and vehicles, your

17   wife, your children, were all given to the Church, to the

18   United Order, and then the Order would then give them back

19   whatever portion they felt like to you as a stewardship.  But

20   there was no ownership.  The Church owned everything, including 11:18:30

21   you.

22   Q.  Did you turn property -- or consecrate property to the

23   United Order?

24   A.  I did.

25   Q.  Do you recall any specific property that you turned into    11:18:39

UNITED STATES DISTRICT COURT

1    the United Order?

2    A.  Everything I owned was listed.

3    Q.  What about vehicles?

4    A.  Yes.

5    Q.  How did you turn a vehicle into the United Order?    11:18:47

6    A.  I took the title to the vehicle that was paid off -- they

7    wouldn't accept a vehicle that a lien on it because that wasn't

8    your property, it was a bank's.  A vehicle that was completely

9    paid for, I took the title to it, signed off the title, left

10   the new owner blank, and turned it over to the United Order.    11:19:06

11   Q.  What about any firearms that you carried on duty with the

12   Marshal's Office?

13   A.  If I owned them, I listed them as a consecration to the

14   Order.

15   Q.  So there was a point in time then, it's fair to say, that    11:19:18

16   the firearm that you owned but that you carried as a Marshal's

17   Officer, you consecrated to the Church?

18   A.  Yes, I did.

19   Q.  Are you aware of any other Colorado City Marshal's Officers

20   who were also members of the United Order?    11:19:35

21   A.  I believe all of them were at one point.

22   Q.  Did members of the United Order have to make any covenants

23   or promises?

24   A.  Yes.

25   Q.  What were some of those?    11:19:46

1    A.  That we could never disclose that we were in the Order.

2    That we could never talk about any of the doctrines of the

3    Order.  And we could never reveal to anyone -- anyone else that

4    was in the Order.

5    Q.  And did not revealing anything about the Order include not     11:20:01

6    telling the truth about the United Order to outside law

7    enforcement?

8    A.  To anyone.

9    Q.  Are you aware of any situations where the United Order

10   directed that families be separated?                              11:20:16

11   A.  Yes.

12   Q.  How were you aware of that?

13   A.  My own father was separated from his family.  Friends, and

14   my wife's father was separated from my -- the grandparents.  My

15   brother was separated from his family.  In my case, some of my    11:20:34

16   older boys were not members of the Order and so they had to

17   be -- live in an entirely separate house than me, because I was

18   in the Order and they were not.

19   Q.  Did you comply with that directive?

20   A.  Yes.  In order to comply I purchased an RV and parked it      11:20:52

21   off the property, and my boys lived in the RV.

22   Q.  As a Marshal's Officer were you familiar with other

23   families and children that were being separated?

24   A.  Yes.  Many of them, yes.

25   Q.  Were you familiar with any other City employees who were      11:21:12

Helaman Barlow – Direct Examination

1  separated from their families?

2  A.  I was aware that Dave Darger, the City Manager, was

3  separated.  And Hyrum Roundy was separated, a deputy at that

4  time.

5  Q.  Based on your experience in the United Order, when somebody    11:21:28

6  is kicked out of the United Order, kicked out of the Church and

7  separated from their family, does that person have a strong

8  incentive to try to get back in?

9  A.  Well, yes, if they want their family back.

10  Q.  What do you do to try to get back in?    11:21:43

11  A.  Whatever the Church requires.

12  Q.  So while you're out, a person can testify truthfully that

13  they're not a member of the Church; is that right?

14        MR. HAMILTON:  Objection, leading.

15  BY MR. KEVENEY:    11:21:55

16  Q.  If somebody's out of the United Order and they were asked,

17  are you a member of the Church, based on your understanding of

18  the Church, how could that person answer that question?

19        MR. HAMILTON:  Objection, calls for speculation.

20        THE COURT:  You may answer.    11:22:05

21        THE WITNESS:  If you're not a member of the Church at

22  that very moment that you're asked the question, you could

23  truthfully say, no, I'm not a member of the Church.

24  BY MR. KEVENEY:

25  Q.  But that same person could be at that same point in time    11:22:16

UNITED STATES DISTRICT COURT

**Helaman Barlow – Direct Examination**

1    separated from their wives and children.

2    A.  Yes.  And that same person could very much wish they were

3    back in the Church.

4    Q.  To your knowledge were any City initials or Marshal's

5    Officers in that exact position we just described?                11:22:30

6    A.  Well, I know that Dave Darger was.

7    Q.  How do you know that Dave Darger, City Manager, was in that

8    position?

9    A.  I helped him purchase an RV that he could live in off of

10   the property while he was separated from his family.             11:22:42

11   Q.  I want to talk to you now a little bit about some other

12   Marshal's Officers during the time period that you were there.

13          MR. KEVENEY:  Can we look, please, at Exhibit 34?

14          Permission to publish, Your Honor?

15          THE COURT:  You may.                                       11:23:14

16   BY MR. KEVENEY:

17   Q.  Do you recognize this letter?

18   A.  Yes, I've seen that before.

19   Q.  And do you recognize the signature of Fred Barlow who was

20   the chief of police at the time?                                  11:23:25

21   A.  Yes, that's his Church name.

22   Q.  Do you recall that Fred Barlow was fired by the Marshal's

23   Office after he was decertified in 2007?

24   A.  Yes, I remember that.

25   Q.  Am I correct that Fred Barlow continued to be employed by    11:23:40

UNITED STATES DISTRICT COURT

1    the Marshal's Office between the time that this letter became

2    public and Arizona POST decertified him?

3    A.  Yes.  He was still the chief of police until he was

4    decertified.

5    Q.  Even though this letter was public?                           11:23:55

6    A.  Yes.

7    Q.  Who was the Marshal's Officer at the time of this letter

8    that is still on the Marshal's Office?

9    A.  I think the only one would be Sam Johnson.

10   Q.  You would have been an officer at this time?                  11:24:13

11   A.  Yes.

12   Q.  Was there any internal affairs investigation by the

13   Colorado City Marshal's Office after this letter became public?

14   A.  No.

15   Q.  Let's look, please, at -- actually let me ask you something   11:24:26

16   else.

17          What happened to Fred Barlow after he was decertified,

18   do you know?

19   A.  He started a shoe store, a retail outlet store there in the

20   community.  I don't really know exactly what happened to him      11:24:42

21   after that.

22   Q.  What was -- what was his standing in the Church after he

23   wrote this letter?

24   A.  He was still a member of the Church, yes.

25   Q.  Did his standing improve in any way after this letter         11:24:55

1   became public?

2   A.  I don't know.

3   Q.  Will you look, please, as Exhibit 35?

4        MR. KEVENEY:  Permission to publish, Your Honor?

5        THE COURT:  You may.                                  11:25:12

6   BY MR. KEVENEY:

7   Q.  Do you recognize the signature on this letter?

8   A.  Yes, I recognize Mica Barlow's signature.

9   Q.  And he was a Colorado City Marshal's Officer at the time he

10  wrote this letter to fugitive Warren Jeffs?          11:25:23

11  A.  In 2000 -- yes, he was.

12  Q.  Did the Marshal's Office ever open any formal Internal

13  Affairs investigation into Mica Barlow?

14  A.  No.

15  Q.  Did the Marshal's Office fire Mica Barlow prior to when AZ    11:25:35

16  POST decertified him?

17  A.  No.  He was put on leave, an unpaid leave for a while,

18  prior to his termination.

19  Q.  Is there any reason the Marshal's Office couldn't have

20  investigated and fired Fred Barlow and Mica Barlow before they   11:25:55

21  were decertified?

22  A.  Oh, they could have.

23  Q.  And, in fact, you were fired before you gave up your

24  certification; is that right?

25  A.  I gave up my certification in Utah but not in Arizona prior   11:26:08

—Helaman Barlow – Direct Examination—

1   to me being terminated, yes.

2   Q.  I want to talk to you now a little bit about two other

3   Colorado City Marshal's Officers that we've heard about.

4          Do you recall an officer named Jesse Barlow?

5   A.  I do.                                              11:26:29

6   Q.  And did Jesse Barlow lose his certification?

7   A.  Yes, he did.

8          MR. KEVENEY:  Could we pull up defense Exhibit 1073?

9          Move to admit Defense Exhibit 1073 as a public record.

10         THE COURT:  Is there an objection?              11:26:52

11         MR. HAMILTON:  Yes, Your Honor.

12         This is an attempt by the Federal Government to back

13  door this in.  They tried to introduce this through Lyle Mann

14  and were unable to.  This document is -- it's not a

15  decertification.                                       11:27:05

16         MR. KEVENEY:  May I be heard, Your Honor?

17         THE COURT:  Mr. Keveney.

18         MR. KEVENEY:  The reason, if I understand correctly

19  why Mr. Mann was not allowed to talk about this, was because of

20  his witness disclosure.  The authenticity of this document has  11:27:35

21  been stipulated to.  It is a public record.  And this witness

22  has direct knowledge as an officer of why Jesse Barlow -- his

23  police certification was revoked.

24         THE COURT:  The number is 10 --

25         MR. KEVENEY:  1073, Your Honor.                 11:27:54

UNITED STATES DISTRICT COURT

2076

**Helaman Barlow – Direct Examination**

1              THE COURT:  -- 73.  1073 is admitted.

2         (Exhibit No. 1073 admitted into evidence.)

3              MR. KEVENEY:  May I get the easel, Your Honor?

4              THE COURT:  Yes.

5    BY MR. KEVENEY:                                               11:28:09

6    Q.  Did you know Jesse Barlow?

7    A.  Yes, I do.

8    Q.  Was his police certification revoked?

9    A.  Yes, it was.

10   Q.  And approximately when was Jesse Barlow's police          11:28:17

11   certification revoked?

12   A.  2010, I think.

13             MR. KEVENEY:  Can we publish 1073, please, Your Honor?

14             THE COURT:  Yes.

15             MR. KEVENEY:  And can we bring up this part, please?   11:28:54

16   BY MR. KEVENEY:

17   Q.  Could you just read the bottom half to the jury,

18   Mr. Barlow?

19   A.  The default issued by Administrative Law Judge J. Richard

20   Catten, the Council hereby finds that you violated Utah Code   11:29:15

21   53-6-21, subsection 1, (1)(a) and willfully

22   falsified -- willfully falsifies any information to obtain

23   certification, and Utah Code -- again refusing to respond -- or

24   failed to respond truthfully to questions after having been

25   issued a warning based on *Garrity*.                          11:29:39

2077

—Helaman Barlow – Direct Examination—

1   Q.  And the last sentence, POST's recommendation?

2   A.  POST recommends sanction for these violations is

3   revocation.

4        MR. KEVENEY:  Could we look at the second page,

5   please, of this document?                              11:29:51

6   BY MR. KEVENEY:

7   Q.  And can you tell the jury the date on which Jesse Barlow's

8   certification was revoked?

9   A.  December 2010, the 22nd of December.

10  Q.  Are you familiar with former Chief Jonathon Roundy?      11:30:03

11  A.  Yes.

12  Q.  Does Jonathon Roundy still have, to your knowledge, a

13  police officer certification?

14  A.  No, he does not.

15       MR. KEVENEY:  May we show defense Exhibit 1785 to the   11:30:27

16  witness, Your Honor?

17       JUROR NO. 7:  Excuse me.  We already see it.

18     (Discussion off the record between the Court and courtroom

19  deputy.)

20       THE COURT:  We'll check that out.  There was some kind  11:31:06

21  of glitch, apparently, and we'll check it out.

22       MR. KEVENEY:  We can come back to that.

23  BY MR. KEVENEY:

24  Q.  Approximately, to the best of your recollection, when did

25  Jonathon Roundy lose or give up his certification?           11:31:18

2078

—————— **Helaman Barlow – Direct Examination** ——————

1   A.   In 2012.

2   Q.   And to your knowledge was Jonathon Roundy under

3   investigation by POST at the time he relinquished his

4   certification?

5   A.   I don't recall if he was or not.                    11:31:35

6   Q.   I'd like to talk to you now a little bit about Church

7   Security.

8           As a member of the Marshal's Office, did you become

9   aware of a group known as Church Security?

10  A.   Yes.  I think everybody in the community, whether they're   11:31:52

11  in the Church or out of the Church, knew about Church Security.

12  Q.   Tell the jury, please, a little bit about what you knew

13  about Church Security.

14  A.   Church Security was a group of Church members, usually men,

15  that were tasked with protecting Church leadership, Church   11:32:08

16  buildings, and just generally to be a lookout for the Church.

17  Q.   Was there any interaction at any point between the

18  Marshal's Office and Church Security?

19  A.   Yes.

20  Q.   Tell the jury a little bit about what those interactions   11:32:24

21  were.

22  A.   The way I look at it is we were -- the Marshal's Office was

23  basically a tool in the tool belt of the Church Security

24  when -- if they felt like they needed us, they would call us

25  for anything from violations to training to whatever they   11:32:41

UNITED STATES DISTRICT COURT

1    wanted.

2    Q.  What kind of training did the Marshal's Office provide to

3    Church Security?

4    A.  I was directly involved in a couple of trainings, and then

5    I was aware of other officers that were giving Church Security    11:32:58

6    training.

7    Q.  How were you aware of other officers giving Church Security

8    training?

9    A.  I talked to the officers.

10   Q.  Which other officers assisted Church Security by providing    11:33:08

11   training?

12   A.  Curtis Cooke did basically takedown or nonlethal way to

13   control somebody.  Jonathon Roundy did some firearms training,

14   what to do if someone presented a gun in the crowd.  I talked

15   to Church Security about what -- how -- what was the legal way    11:33:34

16   they could, you might say, slow walk a paper service, with

17   being compliant.  And just like don't -- never touch an

18   officer, you'll get arrested or hurt.  Just general guidelines

19   on how to deal with an event.

20   Q.  Did you understand when you provided this training to    11:34:01

21   Church Security on how to slow walk an officer, that that

22   was intended to be used to interfere with outside law

23   enforcement?

24   A.  Absolutely.  There was at least two occasions that I

25   participated in where the Marshal's Office pretended to be    11:34:16

2080

1    outside law enforcement and came in with police cars like they

2    were going to raid the building to -- so that the Church

3    Security could have practice in what to do.

4    Q.  So it's fair to say we're not talking about, you know, a

5    normal police department having a relationship with like a          11:34:36

6    neighborhood watch group, is that fair to say?

7    A.  Yes.

8              MR. HAMILTON:  Objection, leading.

9    BY MR. KEVENEY:

10   Q.  Explain to us a little bit more, what was the real             11:34:44

11   relationship between the Marshal's Office and Church Security.

12   A.  I think the Marshal's Office and Church Security both had

13   the same Church instructions, and that was to protect the

14   Church.

15   Q.  Did the Marshal's Office at any point share information       11:34:58

16   from law enforcement data bases with Church Security?

17   A.  Yes.

18   Q.  Tell the jury about that, please.

19   A.  There were -- there was a period of time where certain

20   members of Church Security, generally the leader, the squad       11:35:13

21   leaders, would contact the Marshal's Office and ask them to run

22   a license plate or something like that, find out whose vehicle

23   they were looking at.

24   Q.  And did the Marshal's Office provide law enforcement

25   information back to Church Security?                              11:35:33

1    A.  Yes.

2    Q.  How many times approximately did that happen?

3    A.  I don't know, maybe hundreds.  It got to a point where it

4    was a big enough liability that myself and then Chief Jonathon

5    Roundy actually talked to the security leaders and said, look,        11:35:51

6    you're going to get us in trouble.  From here on out we can't

7    do anything like that without somebody putting their name down

8    as a reporting party.  We can't just have -- you know, run a

9    license plate with no -- no problem.  You have -- and when we

10   actually kind of taught the security, we said, when you call us   11:36:11

11   and you want us to run a plate, you need to say, this vehicle's

12   parked in my driveway, or this vehicle's drove around my yard

13   three times, or something.  Not just -- give us a probable

14   reason so that we're not going to get in trouble for running

15   the plate.                                                         11:36:32

16   Q.  You said the reason you gave this advice to Church Security

17   was so the Marshal's Office wouldn't get in trouble; is that

18   right?

19   A.  Yes.

20   Q.  Was it fair to say the Marshal's Office was giving Church      11:36:40

21   Security what Marshal's Office and Church Security needed to

22   create the necessary paper trail to keep the Marshal's Office

23   from getting in trouble?

24          MR. HAMILTON:  Objection, leading.

25   BY MR. KEVENEY:                                                    11:36:54

1  Q.  What was the point of cleaning up this relationship between

2  Church Security and the Marshal's Office?

3  A.  So the Marshal's Office wouldn't get in trouble.

4  Q.  As the -- I want to talk a little bit now about Marshal's

5  Office record keeping and police reports, those kinds of                  11:37:11

6  things.

7        You, it's fair to say, were the records custodian,

8  head of the Marshal's Office; is that right?

9  A.  Yeah, when I became the chief, the marshal, then that by

10 default was my responsibility, yes.                                        11:37:27

11 Q.  And as the sergeant and then the chief of the Marshal's

12 Office, were you involved in producing records from the

13 Marshal's Office to the Justice Department as part of the

14 Department's investigation?

15 A.  Yes.                                                                   11:37:40

16 Q.  And you were also involved in producing records from the

17 Marshal's Office to the Justice Department as part of this

18 lawsuit; is that right?

19 A.  Yes.

20 Q.  I want to look at a couple of those, please.                          11:37:47

21        MR. KEVENEY:  Could we bring up 309 for the witness?

22 BY MR. KEVENEY:

23 Q.  Do you see that, Mr. Barlow?

24 A.  I do.

25        (Discussion held off the record.)                                 11:38:28

2083

Helaman Barlow – Direct Examination

1           MR. KEVENEY:  Let's do it the old-fashioned way.

2    BY MR. KEVENEY:

3    Q.  Do you have a book in front of you?

4    A.  I do.

5    Q.  There should be tabs in there.  There should be one for          11:38:33

6    Exhibit 309.

7    A.  3 --

8    Q.  309.

9    A.  Okay.

10          MR. KEVENEY:  Your Honor, I believe this document is,          11:38:58

11   in fact, stipulated.  Move for its admission.

12          MR. HAMILTON:  No objection.

13          THE COURT:  309 is admitted.

14      (Exhibit No. 309 admitted into evidence.)

15          MR. KEVENEY:  Could we publish it, please?                     11:39:08

16          THE COURT:  Yes.

17   BY MR. KEVENEY:

18   Q.  Does this appear to you to be a typical Marshal's Office

19   case file?

20   A.  Yes.                                                             11:39:23

21   Q.  How do you know that it's a typical Marshal's Office case

22   file?

23          MR. DONNELLY:  Your Honor, sorry to interrupt.  I

24   believe we're having some technical difficulties.

25          THE COURT:  Are we okay now?  Go ahead.                        11:39:43

UNITED STATES DISTRICT COURT

2084

—Helaman Barlow – Direct Examination—

1    BY MR. KEVENEY:

2    Q.  How do you know that it's a typical Marshal's Office case

3    file?

4    A.  I've seen hundreds, thousands of these reports.

5    Q.  And does this one involve complainants named Christopher          11:39:56

6    Jessop and Penny Barlow?

7    A.  Yes.

8    Q.  Can you flip through all the pages of this case file for

9    us, please?

10   A.  Okay.                                                            11:40:26

11   Q.  Do you see any witness statements in this case file?

12   A.  I see one.

13   Q.  So when the Marshal's Office compiles a case file, what

14   should that case file have in it?

15   A.  Well, if it's the complete case file, it should have all        11:40:39

16   the documents involved in the case, including witness

17   statements.

18   Q.  So the complete case file should have all of the witness

19   statements in it, is that fair to say?

20   A.  It should have all documents.  Like I also notice this also      11:40:50

21   has the Occupancy Agreement, and all the paperwork associated

22   with the file.

23   Q.  How many witness statements do you see in this file?

24   A.  Just the one.

25   Q.  If there were more witness statements taken at the event         11:41:02

UNITED STATES DISTRICT COURT

1  reflected in this report, those witness statements should be in

2  here?

3  A.  That should be, yes.

4  Q.  And those witness statements, the entire file then should

5  have been provided to the Justice Department; is that right?        11:41:11

6  A.  If they asked for the entire file.

7         MR. HAMILTON:  Objection, Your Honor.  At this point I

8  don't see the relevance.  This is not a discovery dispute.  The

9  Department of Justice has specific claims.  If they thought

10  this --                                                            11:41:24

11        THE COURT:  Where are we going with this?

12        MR. KEVENEY:  We will establish with another witness

13  later this week, Your Honor, that other witnesses connected

14  with this event provided witness statements, and that those

15  witness statements never made it into the file, and were never    11:41:34

16  given to the Justice Department.

17        THE COURT:  Let's proceed.

18        MR. HAMILTON:  Again, Your Honor, if I may be heard on

19  the relevancy.  Again, this is not a discovery dispute.  They

20  have specific claims.                                              11:41:45

21        MR. KEVENEY:  Those claims are police misconduct.  And

22  altering public records and police reports is pretty obvious

23  police misconduct, Your Honor.

24        MR. HAMILTON:  But it's a religious discrimination

25  claim.                                                             11:41:58

Helaman Barlow – Direct Examination

1          THE COURT:  We're going to proceed with this.

2    BY MR. KEVENEY:

3    Q.  If there were other witness statements taken as part of

4    this event, is it fair to say, as the former Chief of the

5    Marshal's Office, those witness statements should have made it          11:42:10

6    into this case file?

7    A.  Absolutely, yes.

8          MR. KEVENEY:  Can we look now at 310?  If we go to

9    page 3.

10          Your Honor, the authenticity of 310 has been               11:42:39

11    stipulated to.  The Government moves for its admission.

12          THE COURT:  Is there an objection?

13          MR. HAMILTON:  I apologize, Your Honor, I'm just

14    looking for the document.

15          I would object to relevance.  There's also -- I mean,       11:43:20

16    it's just a list of phone numbers.

17          THE COURT:  How is this relevant?

18          MR. KEVENEY:  Your Honor, these are phone records

19    from the victim -- one of the victims in this case to the

20    Marshal's Office.  We will establish with the next witness       11:43:37

21    that Marshal's records were altered to hide the fact that the

22    victim was calling the Marshal's Office, a non-FLDS victim.

23    It goes to the same issue, the Marshal's Office, in its effort

24    to discriminate against non-FLDS persons, was altering its

25    public records to conceal evidence of its discriminatory        11:43:59

─────── **Helaman Barlow – Direct Examination** ───────

1    conduct.

2              THE COURT:  The Exhibit 310 is admitted.

3          (Exhibit No. 310 admitted into evidence.)

4    BY MR. KEVENEY:

5    Q.  Could you look, please, at page 13 of this document.  And        11:44:06

6    it should be a phone call dated April 17th.

7              MR. KEVENEY:  Permission to publish, Your Honor.

8              THE COURT:  Yes.

9    BY MR. KEVENEY:

10   Q.  Do you see that phone call on April 14th at 2157?               11:44:20

11             THE COURT:  Excuse me.  How do we find page 13 on this

12   document?

13             MR. KEVENEY:  It should be the 15th total page.  At

14   the top of the page it will have a date, Your Honor, of April

15   14th, and a phone call made 9:57 or 2157.                          11:44:36

16             I don't believe that the phone company produced them

17   with page numbers.  I apologize, Your Honor.

18             THE COURT:  Okay.  Go ahead.

19   BY MR. KEVENEY:

20   Q.  Do you see that phone call up there?                           11:44:58

21   A.  Yes, I do.

22   Q.  Do you recognize the phone number that was called?  In

23   other words, the receiving end of the phone call.

24   A.  The 875-2695?

25   Q.  That's correct.                                                11:45:10

1    A.  That is the business non-emergency line to the Marshal's

2    Office.

3    Q.  What happens, based on your experience in the Marshal's

4    Office, when somebody calls that number?  What's supposed to

5    happen, let's put it that way.                                  11:45:22

6    A.  If it's during business hours the secretary would probably

7    answer it, unless she's away.  If it's after business hours,

8    the dispatch would answer it.

9    Q.  And if -- the procedure, if somebody calls that number with

10   a complaint, say any criminal activity or an assault, anything  11:45:37

11   like that, what record is supposed to be made when the person

12   calls that number?

13   A.  Well, if someone called the nonemergency line and -- with

14   an emergency or a complaint or a crime, it would be immediately

15   transferred to the dispatch center and a dispatch record would  11:45:56

16   be made.

17   Q.  If somebody calls with a complaint, then the procedure that

18   is to be followed is that call is then transferred and a record

19   is made, is that fair to say?

20          MR. HAMILTON:  Objection, leading.                       11:46:08

21   BY MR. KEVENEY:

22   Q.  Describe again for us the procedure if somebody calls with

23   a complaint.  What record is supposed to be made?

24   A.  If someone called this number to the Marshal's Office, if

25   it was a complaint, it would go to the dispatch center.  The    11:46:21

1    dispatch center would create a dispatch log and notify the

2    on-duty officer that there was a complaint that they needed to

3    go handle.  If it wasn't an emergency or a complaint, the

4    secretary could -- would answer it and take care of it.

5    Q.  So let's take a look at some of those dispatch logs you          11:46:41

6    mentioned.

7              MR. KEVENEY:  Could we bring up Exhibit 295, please?

8              Your Honor, this has also been stipulated to.  The

9    Government moves for its admission.

10             MR. HAMILTON:  No objection.                               11:46:52

11             MR. KEVENEY:  Permission to publish, Your Honor?

12             THE COURT:  295 is admitted.

13        (Exhibit No. 295 admitted into evidence.)

14             MR. KEVENEY:  Permission to publish, Your Honor.

15             I'm sorry, it's not in this -- it should be in this        11:47:25

16   witness's binder.  But it's certainly in Lieutenant Servis'

17   binder, who is the next witness.

18             THE COURT:  295 is this?

19             MR. KEVENEY:  Yes, Your Honor.  We're not going to go

20   through the whole thing.  I'll be brief.                             11:47:36

21             THE COURT:  Please.

22             MR. KEVENEY:  Permission to publish, Your Honor?

23             THE COURT:  Publish what?

24             MR. KEVENEY:  The first page.

25             THE COURT:  Go ahead.                                      11:47:48

2090

1    BY MR. KEVENEY:

2    Q.  Do you recognize this to be a dispatch call log?

3    A.  Yes, that is a dispatch call log.

4    Q.  I want to talk about some of the types of calls that are

5    entered into the dispatch call log.                                11:48:03

6         Do you see the third entry?

7    A.  Yes.

8    Q.  Tell the jury what type of entry that is.

9    A.  The lost property?  Is that the one you're looking at?

10   Q.  If somebody called about a missing -- somebody found a        11:48:17

11   bike, and that -- somebody finding a bike, that gets entered

12   into the dispatch call logs, is that fair to say?

13   A.  Yes.

14        MR. KEVENEY:  Could we look at page 4?

15   BY MR. KEVENEY:

16   Q.  Do you see the second entry down there?

17   A.  Yes.

18   Q.  What's being reported there?

19   A.  The report -- the way the dispatch log works is the note

20   would be what the dispatcher typed in, and then the call sign     11:48:51

21   or 10X5 with the officer's initials would be what the officer

22   typed in.

23        So the dispatch put in there, this person reported a

24   loose dog.  And then the officer then put in, I called

25   somebody, I did this, I found -- I impounded, whatever they       11:49:13

1  did.

2  Q.  Specifically this dispatch entry about retrieving a horse,

3  that was significant enough to be put into the dispatch call

4  logs; is that right?

5  A.  Well, the dispatcher put in, it's a report of a loose                     11:49:26

6  horse.  The officer then put in, I called -- I had dispatch

7  call Tusk -- who was our animal control guy at the time -- take

8  care of the horse.  When we arrived on the scene, Mrs. Council

9  called saying she was missing a horse.  Mrs. Council responded

10  and retrieved the horse.  That was the officer's note.                       11:49:45

11  Q.  So this part here is what dispatch entered when it got the

12  call?  (Indicating.)

13  A.  Yes.

14  Q.  And this part is part is what -- 10X5 would be Curtis

15  Cooke; is that right?                                                        11:50:00

16  A.  That's correct.  CC is for Curtis Cooke.

17  Q.  Do you know a Miss Council?

18  A.  I do.

19  Q.  How do you know her?

20  A.  She's a lady that lives in our community.                               11:50:07

21  Q.  And was she an FLDS member at the time of this entry?

22  A.  I believe so.  I don't know for sure.

23  Q.  So let's go to the next one.  We'll just look at one more.

24       This is on the same page.  This is, somebody called

25  about a missing dog?                                                        11:50:33

1    A.  Yes, I see that.

2    Q.  And dispatch -- and the call came at what time?

3    A.  At 9:07.

4    Q.  That's during business hours; is that right?

5    A.  Yes.                                                          11:50:48

6    Q.  And then dispatch made a note of the loose dog?

7    A.  Yes.

8    Q.  And then the officer specifically made a note that they

9    couldn't find the dog?

10   A.  That's correct.                                              11:50:56

11   Q.  So if somebody makes a complaint about valuable missing

12   property to dispatch, that complaint should go in these logs?

13   A.  Yes.

14   Q.  I want to talk --

15        MR. KEVENEY:  You can take it down.                         11:51:14

16   BY MR. KEVENEY:

17   Q.  I want it talk a little bit more about the Marshal's Office

18   record keeping specifically in this case.

19        After the Justice Department requested documents from

20   the Marshal's Office, did the Marshal's Office edit any of       11:51:25

21   those documents?

22        MR. HAMILTON:  Objection, relevance, 403.

23        THE COURT:  You may answer.

24   BY MR. KEVENEY:

25   Q.  Did the Marshal's Office edit any documents, police         11:51:37

1    records, after the Justice Department asked for them?

2    A.  Yes, to some degree.  I mean, there were a lot of

3    incomplete records that, once we started pulling all the

4    records to give to the Justice Department, then we find

5    incomplete cases or still open cases, we would send them back          11:51:55

6    to the officer and say, before we turn these over to the

7    Justice Department you need to go fix them, finish them,

8    complete them.

9    Q.  What was the point of editing these documents after the

10   Justice Department asked for them?                                     11:52:11

11   A.  Well, I think with any police department giving out

12   incomplete reports is an embarrassment.

13   Q.  So these reports and police records were edited after the

14   Justice Department's request to save the Marshal's Office

15   embarrassment?                                                         11:52:27

16   A.  Right, as we were fulfilling those records requests.

17        MR. KEVENEY:  Could we look now at Exhibit 296?

18   BY MR. KEVENEY:

19   Q.  Do you recognize that document?

20   A.  Yes, I do.                                                         11:52:53

21   Q.  How do you recognize it?

22   A.  This is -- this is I believe my report, involving an

23   incident between Deputy Hyrum Roundy and Willie Jessop.

24   Q.  And are there handwritten notations on this report?

25   A.  Yes.                                                               11:53:14

UNITED STATES DISTRICT COURT

Helaman Barlow - Direct Examination

```
1    Q.  Do you know who made those handwritten notations?

2    A.  Yes.  David Darger made those.

3    Q.  Does this appear to be a true and accurate copy of your

4    report with David Darger's notations on them?

5    A.  Yes.                                                            11:53:26

6         MR. KEVENEY:  Move for the admission of 296,

7    Your Honor.

8         THE COURT:  Any objection?

9         MR. HAMILTON:  Objection on hearsay, relevance and

10   403.  Again, we're bringing up record keeping.  This is not a      11:53:34

11   discovery dispute.  They have specific claims.  He's already

12   testified why records were completed when there was a discovery

13   request made by the Department of Justice.

14        THE COURT:  Where are we going with this, Mr. Keveney?

15        MR. KEVENEY:  Your Honor, the document is relevant on         11:53:52

16   a number of levels.  First of all, it shows consciousness of

17   guilt.  It shows that the Marshal's Office was aware that it

18   was being investigated for a pattern and practice of

19   discrimination, and then altered its records to try to keep

20   that evidence from coming out.                                     11:54:04

21        It's also evidence of Church control.  David Darger,

22   a loyal member of the Church and a United Order member, was

23   altering reports before giving them to the Justice Department

24   to hide evidence of the First Amendment violation in this

25   case.                                                              11:54:16
```

 1          THE COURT:  296 is admitted.

 2      (Exhibit No. 296 admitted into evidence.)

 3          MR. KEVENEY:  Permission to publish, Your Honor?

 4          THE COURT:  You may.

 5   BY MR. KEVENEY:                                              11:54:22

 6   Q.  Now I think you said earlier that this was your report of

 7   an incident between Hyrum Roundy and Willie Jessop; is that

 8   right?

 9   A.  Yes.

10   Q.  Tell us very briefly what that incident was that's        11:54:34

11   reflected in your report.

12   A.  It's part of an ongoing issue between Willie Jessop and

13   Hyrum, where Hyrum already had been given written orders that

14   he was to not have contact with Willie because there was

15   confrontation.  They pushed each other's buttons, really.     11:54:51

16   And this is an incident where Willie Jessop came into the

17   front lobby of the office, and Deputy Hyrum Roundy was not on

18   duty, yet still went in and had a confrontation with Willie

19   Jessop.

20          And this was myself -- my writing a report of what     11:55:12

21   happened.

22   Q.  And this is the same conflict between Hyrum Roundy and

23   Willie Jessop that you were concerned would result in the use

24   of deadly force; is that right?

25   A.  Yes.  This particular incident is the reason I suspended   11:55:26

1    Hyrum Roundy for five days without pay.

2    Q.  At the time you made this report, there was a pending

3    request from the Justice Department for copies of all Marshal's

4    Office reports; is that right?

5    A.  I believe so.                                              11:55:40

6    Q.  Now you indicated earlier that there's handwriting on this

7    document.  Remind us again whose handwriting this is.

8    A.  That's City Manager David Darger's.

9    Q.  What's your view of the edits that David Darger was trying

10   to make to your report?                                       11:55:55

11   A.  I think David Darger was just trying to, number one,

12   protect the City and the Church.  And also this particular

13   report was during that time frame when any report I made or

14   anything I did David Darger was contradicting it to create a

15   paper trail or a reason to terminate me.                      11:56:23

16   Q.  Let's look at the date of this report.  It's December 27th,

17   2013; is that right?

18   A.  Right.

19   Q.  And is that after David Darger walked out of your Justice

20   Department deposition?                                        11:56:36

21   A.  Yes.

22   Q.  To go back to your earlier testimony, this is when David

23   Darger was trying to create that paper trail against you;

24   right?

25   A.  Yes.                                                      11:56:44

Helaman Barlow – Direct Examination

1   Q.  Let's look at some of the specific changes that David

2   Darger tried to make to your report.

3          MR. KEVENEY:  Can we go to the last page, please?

4          And can we bring up this section, please?

5   BY MR. KEVENEY:                                              11:57:01

6   Q.  Correct me if I'm wrong in any of this, your report as

7   originally written said:  The actions of Mr. Jessop did not

8   appear to substantially disrupt the City business.

9          Is that what the original report said?

10  A.  That's what I originally wrote, yes.                     11:57:16

11  Q.  And then David Darger changed it to:  The actions of

12  Mr. Jessop did appear to disrupt the City business.

13         Is that right?

14  A.  Yes, that's correct.

15  Q.  Fair to say he tried to completely reverse the meaning of  11:57:26

16  your report?

17  A.  Yes.  As I said before, anything that I did that he could

18  create a conflict over to have a problem with me, he was doing

19  at that time.

20  Q.  Let's look at another section of this, please.           11:57:41

21         In this section your report originally said:  I found

22  the evidence showed there was a possible threatening or

23  intimidation and false reporting.  I'm sorry, false

24  reporting -- I found the evidence showed there was a possible

25  threatening or intimidation.  I also found there was not      11:57:59

2098

1   sufficient evidence to charge Mr. Jessop with an assault or

2   with disorderly conduct.

3           And David Darger then tried to change it to:  I found

4   the evidence showed there was a possible threatening or

5   intimidation and false reporting.  I also found there may          11:58:13

6   not -- there may be sufficient evidence to charge Mr. Jessop

7   with an assault.

8           Is it fair to say that he was trying to reverse the

9   meaning of your report here too?

10  A.  Exactly, yes.                                                  11:58:25

11  Q.  In your view as the chief of police, is it inappropriate

12  for the civilian city manager to be changing an official law

13  enforcement record?

14  A.  Yes.  This is why I kept this record.

15  Q.  How was it that the Justice Department was actually able to    11:58:39

16  get these attempted changes to your report?

17  A.  I think they came through my attorney.

18  Q.  And that was after you received an immunity letter?

19  A.  Yes.

20  Q.  So we have no idea sitting here today how many other           11:58:52

21  documents were changed.

22  A.  No, I don't.

23  Q.  I want to talk to you now about --

24          MR. KEVENEY:  You can bring it down.

25  BY MR. KEVENEY:

─Helaman Barlow – Direct Examination─

1    Q.  -- about some specific incidents involving the police and

2    the Church.

3            THE COURT:  Let's hold that at this point.  It's noon.

4            We'll adjourn for the noon hour, ladies and gentlemen.

5    We'll reconvene at 1:00 o'clock, please.                    11:59:20

6        (Proceedings recessed at 11:59 a.m.)

7

8                            -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                    C E R T I F I C A T E

6

7          I, CANDY L. POTTER, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 3rd day of February,

16   2016.

17

18

19                             s/Candy L. Potter_____

20                             Candy L. Potter, RMR, CRR

21

22

23

24

25