Steven H. Rosenbaum (NY Bar #1901958)
Sameena Shina Majeed (DC Bar # 491725)
R. Tamar Hagler (CA Bar #189441)
Christy E. Lopez (DC Bar #473612)
Eric W. Treene (NY Bar #2568343)
Sean R. Keveney (TX Bar #24033862)
Matthew J. Donnelly (IL Bar #6281308)
Emily M. Savner (NY Bar #5214358)
Sharon I. Brett (NY Bar #5090279)
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Phone: (202) 514-4838
Facsimile: (202) 514-1116
E-mail: sean.keveney@usdoj.gov

Attorneys for the United States

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States,<br><br>Plaintiff;<br><br>v.<br><br>Town of Colorado City, Arizona, *et al.*,<br><br>Defendants. | No. 3:12cv8123-HRH<br><br>**UNITED STATES' POST-TRIAL BRIEF REGARDING INJUNCTIVE RELIEF** |

Pursuant to this Court's post-trial Scheduling Order, ECF No. 936, the United States submits this brief addressing the appropriate scope of injunctive relief necessary to remedy Defendants' violations of 42 U.S.C. § 14141 ("Section 14141") and the federal Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq.*, and outlines the anticipated evidence in support of such relief.

## I. INTRODUCTION

On March 7, 2016, following a six-week trial, the jury returned a unanimous verdict for the United States on all claims. Specifically, the jury found that Defendants Colorado City, Arizona and Hildale, Utah ("Cities"), through their joint police force, the Colorado City Marshal's Office ("CCMO"), engaged in patterns or practices of conduct that violated the: (1) First Amendment's Establishment Clause; (2) Fourth Amendment's prohibitions on unreasonable seizures of persons and property and arrests without probable cause; and (3) Fourteenth Amendment's Equal Protection Clause. The jury also found that Colorado City, Hildale, and their joint water company, Defendant Twin City Water Authority, engaged in a pattern or practice of conduct that violated the FHA in three ways, namely by: (1) making housing unavailable or denying housing opportunities to individuals because of religion; (2) discriminating against individuals in the terms, conditions, or privileges of the sale or rental of a dwelling or in the provision of services or facilities in connection therewith, because of religion; and (3) coercing, intimidating, threatening, or interfering with an individual's exercise of his or her rights under the FHA.[1]

The jury's unequivocal verdict confirmed Defendants' long history of impermissible entanglement with the Fundamentalist Church of Jesus Christ of Latter-day Saints ("FLDS Church") and resulting discrimination against non-FLDS individuals.[2] Moreover, Defendants intentionally and persistently engaged in these systemic violations. The trial evidence and the jury's verdict underscore that comprehensive injunctive reform

---

[1] While the jury's verdict on the United States' FHA claim is binding, the jury's verdict on the United States' claim under Section 14141 is advisory and it is the United States' understanding that the Court will enter findings of fact and conclusions of law regarding liability following the evidentiary hearing and the parties' submission of proposed findings of fact and conclusions of law. *See* post-trial Scheduling Order, ECF No. 936. The proposed injunctive relief related to the United States' Section 14141 claims is of course dependent upon the Court agreeing with the jury's Section 14141 verdict.

[2] This case's verdict came approximately two years after the *Cooke* jury similarly found that Defendants engaged in conduct that violated the federal Fair Housing Act and a pattern or practice of violating the Arizona Fair Housing Act. *See* Verdict Forms 1, 3, and 5, *Cooke v. Colorado City*, No. 3:10-cv-8105 (D. Ariz. Mar. 20, 2014), ECF No. 584.

is both appropriate and necessary to remedy Defendants' continued, intentional misconduct and to ensure the equal protection of the rights of all individuals in the Cities. In this brief, the United States proposes the injunctive relief necessary to remedy the systemic constitutional and statutory violations that the jury found. The brief also highlights for the Court the evidence in support of the proposed relief that the United States anticipates presenting at the upcoming evidentiary hearing.[3]

As explained below, this Court should: (1) transfer the provision of policing services to an outside law enforcement agency and disband the CCMO; (2) order Colorado City to approve the United Effort Plan ("UEP") Trust's subdivision proposal; (3) impose detailed injunctive relief governing the provision of certain housing-related municipal services; and (4) appoint a monitor, who would have access to the Cities' documents, meetings, staff, etc., to oversee all relief ordered under the FHA and report regularly to the United States and the Court.[4] This relief is necessary to remedy Defendants' intentional, entrenched patterns and practices of violating basic constitutional rights and federal law.

## II. LEGAL STANDARD

Generally, a permanent injunction is appropriate where: (1) a plaintiff has suffered an irreparable injury; (2) remedies available at law are inadequate to compensate for that injury; (3) considering the balance of the hardships between the parties, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)

---

[3] Consistent with this Court's Order, this brief "outlines" the injunctive relief the United States seeks. After briefing and depositions, the United States intends to provide a detailed proposed order, consistent with the relief outlined below, in advance of the evidentiary hearing scheduled to begin on October 24, 2016. The United States will provide a more detailed analysis of how it has satisfied the four-part test discussed below concerning a plaintiff's entitlement to a permanent injunction in its proposed findings of fact and conclusions of law, following the evidentiary hearing.

[4] This Court's injunctive relief should also order that the United States be given access to Defendants' records and personnel that are necessary to ensure compliance with the Court's relief regarding the Section 14141 and FHA remedies.

("According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."); *see also La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 879 (9th Cir. 2014) (same); *Indep. Training and Apprenticeship Program v. California Dep't of Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013).

In light of the egregiousness of Defendants' conduct, which the jury found amounted to multiple pattern or practice violations of the United States Constitution and the FHA, a permanent injunction is necessary, reasonable, and consistent with the "'salutary principle that when one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts.'" *United States* v. *Ward Baking Co.,* 376 U.S. 327, 332 (1964) (citation omitted). Indeed, courts in civil rights cases have "'not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 364 (1977) (citation omitted); *accord United States v. Warwick Mobile Homes Estates, Inc.*, 558 F.2d 194, 197 (4th Cir. 1977) ("The primary purpose of an injunction in Fair Housing Act cases is to prevent future violations of the Act and to eliminate any possible recurrence of a discriminatory housing practice."). Strong injunctive relief to prevent future violations of the Constitution and the FHA is particularly important here, as the harm caused by these violations is irreparable. *See Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014) ("The deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("We have held that where a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation.").

Furthermore, this Court should grant the injunctive relief necessary to remedy the injury found unless Defendants can demonstrate that "'there is no reasonable expectation that the wrong will be repeated.'" *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (citation omitted). Defendants bear the burden of establishing that there is

insufficient danger of continuing unlawful conduct to warrant a permanent injunction. *See United States v. Balistrieri*, 981 F.2d 916, 934 (7th Cir. 1992) (holding that once the United States establishes a pattern or practice of housing discrimination, there is a "presumption that an injunction is appropriate; the defendant can rebut this presumption 'by showing that such relief is not necessary because there is little or no danger of current violations.'").

Injunctive relief is an essential means of enforcing civil rights statutes. Moreover, injunctive and declaratory relief are the only remedies available under Section 14141. *See* 42 U.S.C. § 14141(b). A strong injunction is also consistent with Congress' intent in enacting the FHA. Congress intended that the broadest possible remedies be available in pattern or practice cases brought by the United States under the FHA. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982) (recognizing "the broad remedial intent of Congress embodied in the Act"). Thus, in addition to awarding damages for aggrieved persons and civil penalties, Congress specifically provided that courts "may award such preventive relief, including a *permanent or temporary injunction*… against the person responsible for a violation of this subchapter as is necessary to assure the full enjoyment of the rights granted by this subchapter." 42 U.S.C. § 3614(d)(1)(A) (emphasis added); *see also* 42 U.S.C. § 3614(d)(1)(B) (providing authority to "award such other relief as the court deems appropriate").

## III. DISCUSSION

### A. Disbanding the CCMO is Necessary to Remedy Defendants' Multiple Patterns and Practices of Violating the Constitution.

Defendants' decades of refusing to prevent the FLDS Church from impermissibly interfering with law enforcement services, alongside their refusal voluntarily to stop the CCMO's constitutional violations, underscore the necessity of preventing Defendants from having any future control over policing services in the Cities.

At trial, the evidence established the deep-rooted fusion of the FLDS Church and the CCMO and the CCMO's resulting, repeated failure to enforce the law in a non-discriminatory manner. Given the proven control that the FLDS Church exercises over the Cities and their police force, and Defendants' facilitation of that control, this Court's

remedy must ensure that, going forward, Defendants are no longer in a position to allow policing in the Cities that is discriminatory or under the influence of the FLDS Church. Based on the trial evidence and the anticipated evidence at the upcoming evidentiary hearing, the United States submits that the only sufficient and realistic remedy to ensure constitutional policing in the Cities is disbandment of the CCMO and the transfer of all policing services for the Cities to an outside law enforcement agency.

Disbandment is necessary and appropriate because of the severity and nature of the Constitutional violations; because previous, less-comprehensive reform attempts have failed; and because disbandment represents the most practical way for Defendants to provide constitutional policing services.

**1. The Severity and Unique Nature of the CCMO's Constitutional Violations Make Disbandment of the CCMO Necessary.**

The nature of Defendants' violations makes disbandment necessary. Lesser relief—even comprehensive oversight of the CCMO through a receiver—could not realistically be expected to reorient the CCMO to police pursuant to the Constitution rather than the edicts of the FLDS and would thus only further delay long-awaited constitutional policing in the Cities. As the jury verdict confirmed, for decades Defendants have used the CCMO consistently to ensure that the law of the FLDS Church is the law of the Cities. With the consent of the Cities, which bear oversight responsibility for the CCMO, the seven-officer police force has existed for decades, and exists to this day, primarily to provide security to the FLDS Church and further serve Church needs, not to act pursuant to rule of law as a legitimate law enforcement agency. Because of its history and because of the place the CCMO currently holds in the community, as an arm of the Church reasonably lacking the trust of the non-FLDS segment of the community and consistently refusing to cooperate with outside law enforcement, no relief short of disbandment can be expected to prevent future constitutional violations. The trial record makes clear, and the pending evidentiary hearing on injunctive relief will show further, that while the CCMO remains in existence, there is every likelihood that the CCMO will remain entangled with the FLDS Church in violation of the First Amendment, to the harm of all non-FLDS individuals who may seek police protection.

The depth of the Church's control over the CCMO, at Defendants' direction, extends to CCMO officers committing crimes to protect the Church, helping protect the Church from criminal liability, and disregarding crimes that the Church or its leaders have committed. *See, e.g.*, Ex. 34 (then-Chief Marshal Fred Barlow letter pledging loyalty of all officers to fugitive FLDS Leader Warren Jeffs); Helaman Barlow, Trial Tr. 2078-80 (CCMO provided training to Church, including raid drills on how to obstruct outside law enforcement); Dowayne Barlow, Trial Tr. 300-01 (CCMO ignored Church's illegal distribution of prescription drugs); Thomas Jeffs, Trial Tr. 1338-40 (current Chief Marshal Darger ignored illegal distribution of prescription drugs); Helaman Barlow, Trial Tr. 2055-58 (CCMO ignored underage marriages, including Chief Marshal Jonathan Roundy's marriage).

**2. Previous Remedial Attempts Short of Disbandment have Failed.**

Previous, less intrusive remedies short of disbandment have failed, even where the remedies were directed specifically at dissuading and preventing the CCMO from acting pursuant to the dictates of the FLDS Church rather than the rule of law. In the last 15 years, the Police Officer Standards and Training ("POST") agencies have decertified 30% of CCMO officers for putting the Church above their police duties, a decertification rate dramatically higher than other similar agencies. Lyle Mann, Trial Tr. 1566-69; Joseph DeLopez, Trial Tr. 2264. Since Warren Jeffs took control of the FLDS Church in the early 2000s, all four previous Chief Marshals either have been decertified or have relinquished their certification while under POST investigation. *E.g.*, Exs. 241 & 1785. Two of these were directly due to the Chief Marshals' resistance to outside agencies investigating Church leaders and their control over the CCMO. Former Chief Marshal Helaman Barlow's recent relinquishment of his certification in 2014 for providing untruthful testimony to protect the Church from outside agencies confirms that this resistance is current. *See* Helaman Barlow, Trial Tr. 2072-75.

There is every indication, from the prior conduct of both Defendants and the FLDS Church, that the Church will continue to control policing services, even if this ongoing, but piecemeal, removal of CCMO officers continues. Thomas Jeffs, Trial Tr. 1310-11 (Lyle Jeffs stating POST can continue to decertify officers and Church will continue to fill

decertified officers' vacancies). The ineffectiveness of this officer-by-officer approach over the past 15 years at reforming the department as a whole indicates that any remedy short of disbandment similarly would fail.

Defendants' determination to stamp out efforts by recent Chief Marshal Helaman Barlow to curb internally the Church's control further shows the uniqueness of the law-enforcement misconduct here and underscores why no remedy short of disbandment is likely to prevent future unconstitutional police conduct. After Chief Marshal Helaman Barlow left the Church and attempted to temper the Church's control, other CCMO officers resisted, and ignored or sidestepped his authority. *See, e.g.*, Ex. 1262 (CCMO Hyrum Roundy sidestepping Chief Marshal Barlow during the ECO Alliance incident); Helaman Barlow, Trial Tr. 2027-28 (other officers resisting his efforts to not allow them to retaliate against non-FLDS individuals), 2031-34 (calling Washington County Sheriff to alert Sheriff that Cities had put him on administrative leave and that he was no longer there to temper CCMO's confrontations with non-FLDS individuals). Defendants supported these CCMO officers in their efforts to circumvent the rule of law, rather than Chief Marshal Barlow's efforts to push toward following the rule of law. Indeed, Defendants, including current Colorado City Town Manger David Darger, and their CCMO officers, altered Chief Marshal Barlow's police reports, along with other police reports and call logs, to hide their misconduct during discovery in this case. *E.g.*, Exs. 296-97 (altered police reports); Helaman Barlow, Trial Tr. 2174-75; James Randolph Servis, Trial Tr. 2198-2201 (altered call logs).[5] Defendants even recently revamped the CCMO's hiring process both to create the façade of conducting a merit-based hiring process and to override Chief Marshal Barlow's non-FLDS influence over who they hired. This process, however, which bore the appearance of legitimacy, resulted in the CCMO hiring officers out of the Church's Security Force, no different in result than the more overtly Church-based hiring that Defendants had used before. Helaman Barlow, Trial Tr.

[5] Indeed, this Court has previously held that Defendants altered or destroyed public records. *See* Order at 5, 9-11, 15, 19-20, ECF No. 438; *see also* Order at 2, ECF No. 609 ("It was also clear that unaltered versions of [certain CCMO] police reports could not then be located. The court inferred (and it now appears correctly) that the unaltered or original police reports had been overwritten or deleted from Colorado City computers.").

2045-46, 2053-54, 2172-2173. Shortly after this hiring cycle, the Cities terminated Chief Marshal Barlow's employment.

The CCMO, at Defendants' direction, has continued to violate the law by carrying out the will of the FLDS Church rather than acting pursuant to the rule of law despite more than a decade of decertifications; years of intense outside scrutiny from the Department of Justice, the FBI, the Arizona Attorney General's Office, Arizona and Utah POST, and other government entities; and a general injunction in *Cooke* ordering the Cities to stop discriminating on the basis of religion with respect to housing.

Even after the *Cooke* jury found Defendants engaged in a pattern or practice of housing discrimination in 2014 and the *Cooke* Court enjoined Defendants from violating fair housing laws, and on the eve of trial in this case, current Chief Marshal Jerry Darger and the other CCMO officers continued to engage in discriminatory arrests in the context of property disputes.[6] *E.g.*, Patrick Pipkin, Trial Tr. 2419-36 (CCMO arrested Patrick Pipkin twice in October 2015 for trespassing on property for which his company held a lease after Mohave County Sheriff's Deputies approved his presence on the property and helped him complete a commercial eviction at that same property); Richard Holm, Trial Tr. 1768-76 (CCMO arrested and charged Richard Holm with felony trespass when he towed a vehicle that was parked on his property without permission); Isaac Wyler, Trial Tr. 501-04 (describing how, when serving a restitution order on UEP property, Wyler was arrested for trespass, held in handcuffs for two hours, and never charged).

The Cities and the CCMO have not only disregarded the general injunction issued in *Cooke*, they have also consistently ignored specific direction from the Utah court with jurisdiction over the UEP Trust concerning the operation of the Trust. So egregious and consistent have been Defendants' and the CCMO's lack of cooperation with the Utah court that Judge Lindberg, in issuing a preliminary injunction in 2012 wrote:

---

[6] These arrests and other CCMO misconduct continued after the *Cooke* court denied the Arizona Attorney General Office's request to order the disbandment of the CCMO to remedy the CCMO's involvement in Defendants' Arizona and federal Fair Housing Act violations. Order 6-7, *Cooke*, (D. Ariz. entered Sept. 4, 2014), ECF No. 703.

> 23. This Court is deeply distressed to hear about the lack of law enforcement and protection of Trust assets offered by Hildale City and, in related matters, Colorado City, Arizona.
>
> 24. It is in the public interest that peace and order and respect for the rule of law be maintained in those communities; that orders of this court be recognized and enforced by appropriate law enforcement officers.
>
> 25. If those law enforcement officers do not recognize the orders of this Court, including the actions of the Fiduciary taken pursuant to the authority this Court has vested in him, as binding on them, then it may very well be appropriate to have further action taken in the appropriate setting against these law enforcement officers, who are sworn to uphold the law.

Ex. 3154; *see also* Ex. 328 (video showing CCMO Officer Hyrum Roundy's resistance to a valid, UEP Trust Occupancy Agreement issued to a non-FLDS family). That "further action" is now necessary and long overdue.

Thus, previous court remedies, intense outside scrutiny from multiple agencies, and the piecemeal removal of FLDS-controlled officers—including four previous Chief Marshals—have not curbed Defendants' determination that the CCMO remain controlled by the FLDS Church. *See generally Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (finding "history of noncompliance with prior orders can justify greater court involvement than is ordinarily permitted") (quoting *Sharp v. Weston*, 233 F.3d 1166, 1173 (9th Cir. 2000)), *cert. denied sub nom. Maricopa Cty., Ariz. v. Melendres*, 136 S. Ct. 799 (2016). Given this determined, decades-engrained resistance to ensuring that its law enforcement officers adhere to the rule of law, no measure short of disbandment stands a realistic chance of bringing Defendants' policing services into accord with the Constitution.

**3. Disbandment Represents the Most Practical Way for Defendants to Provide Constitutional Policing Services.**

CCMO disbandment is also the most practical and comprehensive solution to the CCMO's systemic unconstitutional misconduct. The Sheriffs of Mohave County, Arizona, and Washington County, Utah, (the "County Sheriffs") and an expert in police administration and practices are expected to testify that disbanding the CCMO and transferring policing services to the Counties will immediately result in more efficient, reliable, and constitutional policing services. Contrary to other potential remedies, which

will be expensive, time-consuming, and ultimately ineffective given Defendants' history of recalcitrance, transferring policing services to an outside entity is the most practical and expeditious means of ensuring constitutional policing in the Cities.

Law enforcement officials who have been closely involved with the CCMO for years are expected to testify that disbandment is the only viable remedy. The County Sheriffs and representatives from the Arizona Attorney General's office are expected to testify that despite repeated efforts to work with and help reform the CCMO, the CCMO has been unwilling to reject FLDS control.[7]

Given the nature and severity of the constitutional violations here, attempting to ensure constitutional policing in the Cities by putting a receiver at the helm of the CCMO would result in time-consuming, cumbersome, and ultimately unsuccessful efforts to wrestle the CCMO away from the Church. Even if these efforts could somehow erase the deeply entrenched nature of the Church's control over Defendants' conduct, such changes would be years away and would come at significant financial and emotional cost to resident taxpayers. Outside oversight and dramatic changes to the CCMO's policies, procedures, practices, and personnel thus would likely constitute yet another costly, ineffective, and inadequate attempt to rectify Defendants' pattern and practice of unconstitutional conduct.

In contrast, disbandment would be an efficient and expeditious remedy to this history of unconstitutional policing. Instead of paying for a receiver and significantly overhauling every aspect of CCMO operations while continuing to pay the costs associated with maintaining their own police department, Defendants would instead contract with an outside law enforcement agency, such as the Counties, to provide regular policing and dispatch services. The County Sheriffs, and their respective Mohave County Supervisors and Washington County Commissioners, are expected to testify that they can

---

[7] Both the Utah and Arizona Attorney General's Offices have indicated that disbandment is the only viable remedy that will stop the FLDS control over policing services in the Cities. Arizona Mot. to Reopen at 9, *Cooke*, (D. Ariz. lodged June 16, 2014), ECF No. 686; *see also* Letter from Sean Reyes, Utah Attorney General, to Tom Horne, Ariz. Attorney General, Re: Disbandment of the Hildale and Colorado City's Marshal's Office, July 18, 2014, *Cooke*, ECF No. 696-1.

and would assume coordinated responsibilities for dispatch, patrol, and policing in the Cities. Several towns in Arizona and Utah have such arrangements with county law enforcement. Further, Washington County and Mohave County representatives are expected to testify that such a contract would be cost-effective.

Disbandment likely will also reduce the oversight necessary by this Court. Disbandment assures this Court that policing services rest with outside law enforcement agencies, rather than a police department with a history of unconstitutional entanglement with a religious institution. Without disbandment, the Court would need to remain actively involved in the implementation of strict injunctive terms to ensure that deadlines are met and the ordered reforms are carried out consistently. Disbandment thus would conserve the judicial resources of this Court.

For the foregoing reasons, this Court should find that the appropriate and necessary injunctive relief for Defendants' longstanding, repeated pattern and practice of constitutional violations is disbandment of the CCMO and transfer of all policing services to an outside law enforcement agency.

### B. Specific and Comprehensive Injunctive Relief is Necessary to Remedy Defendants' Violations of the Fair Housing Act.

In addition to disbanding the CCMO, further comprehensive injunctive relief is warranted to protect against Defendant Cities' future violations of the Fair Housing Act.[8] The United States requests that the Court permanently enjoin the Cities from violating the FHA and from directly or indirectly discriminating against non-FLDS individuals in the provision of housing and utility and municipal services. The United States further requests that the Court impose specific measures, described below, to remedy the effects of Defendants' conduct and prevent future occurrences of such conduct.

---

[8] The United States does not seek relief specifically regarding Defendant Twin City Water Authority as that entity is no longer in existence. *See* Order Denying Motions for Partial Summary Judgment, ECF No. 618 at 33-34.

Detailed injunctive relief, like that outlined below, is appropriate in civil rights cases[9] and has been used to redress civil-rights violations in the areas of education,[10] voting,[11] and prisons,[12] as well as housing. *See Groome Res. Ltd., L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 197 (5th Cir. 2000) (affirming a district court injunction issued pursuant to the FHA); *see also* Department of Justice website, https://www.justice.gov/crt/housing-cases-summary-page (giving numerous examples of detailed, injunctive relief orders in suits brought under the Fair Housing Act by the United States).

As described below, the varied means the Cities used to deny housing and discriminate in the provision of services necessitate comprehensive reforms to the Cities' procedures and practices. Those reforms should be coupled with sufficient mechanisms to ensure effective oversight and compliance.

Furthermore, the need for specific, detailed, and enforceable reforms is even more apparent when viewed in light of the failure of the injunction issued in the *Cooke* case to put an end to Defendants' discriminatory conduct. As the Court is aware, the verdict in the *Cooke* case was followed by an order enjoining Defendants only generally from

---

[9] *See, e.g.*, *Green v. McKaskle*, 788 F.2d 1116, 1123 (5th Cir. 1986) (collecting cases and noting that district courts possess the authority to "develop[ ] the broad remedial decrees often necessary in civil rights actions"); *Young v. Pierce*, 640 F. Supp. 1476, 1487 (E.D. Tex. 1986) (requiring HUD to dismantle the system of racial segregation in publicly funded housing in East Texas and noting, "When litigation exposes violations of the Constitution in public institutions, a court of equity must take steps, including the appointment of persons outside the court system, to eliminate the constitutional infirmities."), *vacated and remanded on other grounds*, 822 F.2d 1368 (5th Cir. 1987); *Paralyzed Veterans of America v. Ellerbe Becket Architects & Engineers*, 950 F. Supp. 393, 405 (D.D.C. 1996) (ordering the production of a retrofit plan under the Americans with Disabilities Act).

[10] *See, e.g.*, *Milliken v. Bradley*, 433 U.S. 267 (1977).

[11] *See, e.g.*, *United States v. Blaine County*, 363 F.3d 897, 901 (9th Cir. 2004).

[12] *See, e.g.*, *Brown v. Plata*, 563 U.S. 493, 516 (2011) (noting that, even in the prison context where federal statute limits the scope of injunctions, "[w]hen a court attempts to remedy an entrenched constitutional violation through reform of a complex institution, such as [a] prison system, it may be necessary in the ordinary course to issue multiple orders directing and adjusting ongoing remedial efforts."); *Glover v. Johnson*, 138 F.3d 229, 234 (6th Cir. 1998).

engaging in housing discrimination or from coercing or intimidating individuals who asserted rights or encouraged others to assert rights protected by the federal and Arizona FHA. *See* Amended Judgment and Permanent Injunction ¶ 7, *Cooke* (D. Ariz. Nov. 26, 2014), ECF No. 723. First, the *Cooke* injunction does not address fully the violations that the United States proved at trial in this case. *See* Order Denying Motions for Partial Summary Judgment at 23, ECF No. 618 ("[The United States'] FHA claim in this case is broader than the pattern and practice claim in *Cooke*. Because plaintiff's FHA claim is considerably broader than what was litigated in *Cooke*, there may be a need for a broader injunction in this case if plaintiff prevails on its FHA claim.").

Second, the *Cooke* injunction has been ineffective. While that order required Defendants to connect certain non-FLDS households to the Cities' water system, which the Cities did, that order neither ended Defendants' discriminatory housing policies or practices nor deterred them from harassing or intimidating Government witnesses. That order has also served as an inadequate vehicle to hold Defendants in contempt for future violations. Indeed, as the evidence in this case established, Defendants continued to harass and intimidate known Government witnesses in the months leading up to trial in this case. For example, with trial pending, they unjustifiably arrested Isaac Wyler, Richard Holm, and Patrick Pipkin, all of whom were clearly identified as witnesses for the United States. *See supra* Section III.A.2. Such conduct should be answered with comprehensive injunctive relief that goes further than a general injunction to follow a law that Defendants have flouted for decades.

**1. The Court Should Order the Cities to Adopt New Policies, Procedures, and Ordinances to Govern Issues Including Municipal Services and Land Use, and Require Training on These and Other Reforms and Obligations.**

The Cities should be required to adopt certain non-discriminatory policies and procedures. Specifically, (1) non-discriminatory standards and procedures for providing municipal services to residents, including permits, licenses, and utility service connections, and (2) non-discriminatory and comprehensive zoning, planning, and subdivision ordinances. Discovery and trial in this case revealed either no existing policies or procedure, or, in the case of Colorado City's subdivision ordinance (as

described below), evidence that Colorado City adopted the ordinance with the specific intent to hinder the UEP Trust's efforts to subdivide land in the Town. The lack of such written and public documents encourages the misuse of discretion, makes it impossible for residents to conform their actions to applicable law or policy, and makes it more difficult for third parties, including the Court, to assess the reasonableness of official actions. *See generally Vill. of Arlington Heights v. Metro. Hous. Dev't Corp.*, 429 U.S. 252, 267 (identifying "[d]epartures from the normal procedure sequence" as evidence to which a court may look to determine whether official actions are taken with invidious purpose); *see also* Settlement Agreement Between the United States of America and the City of New Orleans at ¶¶ 11, 13, 14-18, *United States v. City of New Orleans, et al.*, No. 12-CV-2011 (E.D. La. April 21, 2014), ECF No. 128 (ordering amendment of city's zoning ordinance, adoption of new policies, and training of city officials) (attached as Exhibit 1); Settlement Agreement Between the United States and St. Bernard Parish at ¶¶ 22-36, 50-63, *United States v. St. Bernard Parish*, No. 2:12-CV-00321 (E.D. La. May 10, 2013), ECF No. 334-1 (ordering defendants to establish a new municipal department to address fair housing issues and ordering the establishment of a land grant program) (attached as Exhibit 2).

Training of Defendant officials not only on the constitutional provisions for which a finding of liability is made and the Fair Housing Act, but also on these new procedures, policies, and ordinances will also be necessary to ensure that the individuals responsible for the day-to-day operations of the Cities fully understand their responsibilities with respect to any relief ordered. The evidence at trial substantiated the need for such training. That the Mayor of Hildale, Philip Barlow, admitted that he did not understand the importance of putting municipal laws and policies in writing and communicating their content to residents highlights the need for training of all municipal officials. Philip Barlow, Trial Tr. 3194-95.

**2. As was Ordered with Respect to Hildale, the Court Should Order Colorado City to Approve the UEP Trust's Subdivision Proposal**

Colorado City should also be ordered to approve the proposal of the UEP Trust to subdivide UEP-owned land within the city limits. Evidence offered at trial established

that City officials opposed, for religious reasons, the subdivision of UEP land, the only aim of which was to deed existing homes and property to UEP beneficiaries who would include non-FLDS individuals. *See* Ex. 43 (declaration opposing the reformed UEP whose signatories include current and former City officials Joseph Allred, Philip Barlow, David Darger, Vincen Barlow, Justin Barlow, Anthus Barlow, Victor Jessop, Vergel Steed, and Warren Barlow); Philip Barlow, Trial Tr. 3206-07; Andrew Barlow, Trial Tr. 3379-80. At trial, Expert Zachary Renstrom, an engineer for the UEP Trust on the proposed subdivision, testified concerning the numerous roadblocks that the Cities erected to obstruct the UEP's efforts to subdivide what was previously Church-controlled land. Zachary Renstrom, Trial Tr. 4781-88 (City staff yelled and cursed at UEP-hired surveyors; City employees refused to talk to Mr. Renstrom; City staff would miss appointments with UEP representatives; the Cities claimed they had no knowledge of where underground utility infrastructure was located, requiring the UEP to map the infrastructure at tremendous cost; protracted litigation of the proposed subdivision of Hildale; and City representatives refused to attend a meeting with UEP in 2015, effectively suspending discussions on the subdivision proposal). Subdivision on the Hildale side took place only after a 2014 ruling by the Utah Supreme Court. Zachary Renstrom, Trial Tr. 4784–85; *Wisan v. City of Hildale*, 330 P.3d 76 (Utah 2014) (affirming dismissal of Hildale and TCWA's appeal of default judgment entered against them).

Colorado City continues to oppose subdivision. The Town's decision-making officials are the same individuals who have admitted their religious-based opposition not only to the neutral administration of the UEP Trust generally, but also specifically to the sale and distribution of Trust-owned land without Church approval. *See* Ex. 43 ¶¶ 3 & 5 (signatories attesting, in part, "I am directly affected by how the UEP is administered, which was always intended to be managed by religious principles and not by secular business judgments which disregard the intent of the settlers of the UEP;" "I am opposed to the sale of any sacred or consecrated UEP property . . . without the approval of the Church").

Colorado City's continued rejection of the UEP's subdivision proposal comes despite the significant expenditures the UEP made to comply with what can only be described as an onerous and ill-suited subdivision ordinance, the Land Division Ordinance, which Colorado City adopted *following* the UEP's submission of its subdivision application. The trial testimony established that the UEP has already been forced, unnecessarily, to expend large amounts of money in an effort to subdivide, including money spent mapping existing utilities and gathering data that Defendants should have been able to provide. In addition, representatives of the UEP will testify at the upcoming evidentiary hearing that Colorado City adopted this ordinance in 2007, almost immediately after Colorado City was on notice of the UEP's intention to subdivide. Representatives of the UEP will testify that the Ordinance includes overly stringent requirements that are not in keeping with the existing level of development in Colorado City and that requiring the UEP to comply fully with this ordinance (*e.g.*, provide for installation of sidewalks, storm drains, rebuilding of roads, etc.) in re-drafting its subdivision proposal would be prohibitively expensive.

Based on the evidence presented at trial, and further evidence that will be presented at the evidentiary hearing from UEP and county representatives concerning the benefits of subdivision and the Cities' religious-based efforts to block subdivision efforts to date, the Court should order Colorado City to approve the UEP's most recent subdivision proposal—a proposal on which the UEP's and the City's engineers had agreed prior to Colorado City's suspending negotiations (*see* Zachary Renstrom, Trial Tr. 4786-88)—notwithstanding any potential non-compliance with Colorado City's current Land Division Ordinance.[13]

---

[13] Three years after the United States filed this action, Colorado City filed a complaint in Maricopa County Superior Court seeking declaratory relief regarding "whether it has the authority under Arizona law to regulate subdivision issues pursuant to ordinance for real property located within its municipal boundaries" and "whether it can require the UEP Trust to comply with its Land Division ordinance for all property that the UEP Trust seeks to subdivide." *Town of Colorado City v. UEP Trust*, No. CV2015-007706 (Ariz. Sup. Ct. June 30, 2015). On a motion by the UEP to hold Colorado City in contempt of the *Cooke* injunction for the Town's failure to approve the UEP's subdivision proposal, the *Cooke* Court, citing abstention doctrines and the pending state action, questioned the

### 3. The Court Should Order the Cities to Adopt New Policies and Procedures for Handling Building Permits.

As highlighted at trial, and as representatives of the UEP Trust will explain further at the evidentiary hearing, specific relief is also needed as to the Cities' procedures for handling building permits. Uncontroverted trial evidence showed that after the non-FLDS special fiduciary's takeover of the UEP Trust, the largest owner of real property in the Cities, the Cities altered their building permit application form to remove the line for signature by the property owner, resulting in those occupying UEP Trust property – both with and without valid occupancy agreements – being able to seek and receive City-approved permits to modify Trust property without the consent of the Trust. *Compare* Ex. 277 at BP000339 *with* Ex. 261 at HILDALEDOJ12779 (Hildale); *compare* Ex. 276 at BP000086 *with* Ex. 17 at CookTR-086.015 (Colorado City); Jethro Barlow, Trial Tr. 1622-28; Andrew Barlow, Trial Tr. 3361-62; Vincen Barlow, Trial Tr. 2384-85. This was yet another means by which the Cities, in furtherance of City officials' and FLDS Church leaders' religious opposition to the new UEP management, hampered the UEP's ability to maintain control over, and management oversight of, the property it owns. *See* Jethro Barlow, Trial Tr. 1625-27. Additionally, as established through the testimony of Jinjer Cooke, John Cook, and Jethro Barlow, the Cities inconsistently grant building permits and

---

propriety of a federal court decision on the UEP's subdivision proposal. *See* Order, *Cooke* (D. Ariz. Feb. 16, 2016), ECF No. 748. Colorado City's filing of a state-court suit after the United States initiated this action should not prevent this Court from enjoining the Defendants. Abstention here would result in the denial of federally protected civil rights. *See, e.g.*, *Miofsky v. Superior Court of the State of California*, 703 F.2d 332, 337-38 (9th Cir. 1983) (declining to extend *Younger* abstention to "conventional civil litigation" and noting "that federal courts' unflagging obligation to exercise their jurisdiction . . . is particularly weighty when those seeking a hearing in federal court are asserting . . . their right to relief under 42 U.S.C. § 1983.") (internal citations and quotations omitted). In addition, abstention is inappropriate where the state proceedings "do not present [a plaintiff] with an adequate opportunity to challenge the offending state statute." *American Motors Sales Corp. v. Runke*, 708 F.2d 202, 209 (6th Cir. 1983); *Fireman's Fund Ins. Co. v. Garamendi*, 790 F. Supp. 938, 952 (N.D. Cal. 1992) (discussing abstention doctrines, including requirement that abstention apply only when there is adequate state-court review). The United States is not a party to Colorado City's action filed in Maricopa County, making abstention inapplicable here.

inconsistently enforce the 180-day limit on a building permit in order to prevent non-FLDS families from occupying homes on UEP land. Jethro Barlow, Trial Tr. 1629-30; Jinjer Cooke, Trial Tr. 2832-37; John Cook, Trial Tr. 2753-56.

The UEP Trust, and all other property owners in the Cities, should be entitled to assent to or refuse modifications made to its property and the Cities should be required to apply permitting rules in a non-discriminatory manner. The Court should order the Cities to reform their building permit procedures and forms to require that the property owner either make or sign off on all building, construction, demolition, or similar permit applications before the Cities grant such permits. The Cities' building permitting procedures must also provide that Defendants may not void, cancel, withhold, or withdraw any building permit for arbitrary reasons, or on the basis of religion or religious affiliation.

**4. The Court Should Order the Elimination of Discriminatory Water Policy and Establish Controls to Ensure Implementation of Non-Discriminatory Water Policy.**

Significant evidence was presented at trial that the Cities adopted the policy prohibiting residents from obtaining water connections unless they brought new water into the system specifically to prohibit non-FLDS individuals from moving into the Cities. *See, e.g.*, Joseph Allred, Trial Tr. 2813-14 (asserting Fifth Amendment to whether he "participated in a conspiracy hatched in secret back-room meetings at R&W to use the city's water policy to discriminate against non-FLDS members"); Dowayne Barlow, Trial Tr. 239-40 ("Lyle [Jeffs] clearly made this comment in one of those meetings [at R&W Excavation]: They can subdivide all they want but we own the water."); Vincen Barlow, Trial Tr. 2384-90; Willie Jessop, Trial Tr. 772-73. Both Cities codified this discriminatory policy in 2010. *See* Exs. 1 & 3. Although the Cities, following the *Cooke* verdict, abandoned the discriminatory water policy, the ordinances remain on the books. The Court should therefore order the Cities to repeal these ordinances and enact revised ordinances codifying a non-discriminatory policy for providing residents with connections to the Cities' culinary water system and requiring the Cities to use best efforts to develop new water resources.

In light of the history of the Cities' use of their control over water connections to deny housing to non-FLDS individuals and to discriminate in the services provided to residents on the basis of religion, the Court should further ensure that the Cities handle the provision of water connections in a non-discriminatory manner. The Court should require that Defendants regularly provide the UEP Trust, the United States, and a monitor, *see infra* Section III.B.5, with information concerning persons and entities that have applied for and that are receiving culinary water service from Defendants. Representatives from the UEP Trust will testify that this would be helpful to its continued management of housing on Trust property.

Additionally, should Defendants choose to continue using impact fees to finance and control access to their culinary water system (a policy that the United States has not challenged and a policy to which the United States does not object, *per se*), this Court should require Defendants to submit to a monitor, *see infra* Section III.B.5, and to the United States for their approval, any impact fee amount, along with the documents supporting this amount so that it may be determined whether the assessed fee is reasonable and based on sound engineering. *See generally Vill. of Arlington Heights*, 429 U.S. at 267 (identifying "[s]ubstantive departures" as evidence of invidious purpose).

**5. The Court Should Appoint a Monitor to Oversee FHA-Related Injunctive Relief.**

Finally, the Court should adopt procedures, including the appointment of a monitor, to ensure that Defendants comply with the terms of the Court's injunction under the FHA and to ensure that the Court and the United States remain informed regarding Defendants' future conduct.[14]

---

[14] Although disbanding the CCMO is the most effective and pragmatic way to remedy the Defendants' police misconduct, the same approach is not practical with respect to the other municipal functions through which the Defendants violated the FHA, such as water policies, utility services, zoning or subdivision, or the issuance of building permits. It is not practical to eliminate all of the municipal departments that handle those functions or to turn over all of those functions to county officials. Furthermore, the CCMO directly contributed to many of the FHA violations, for example, the arrests of Isaac Wyler and Richard Holm. An injunction that reforms and ensures oversight of other municipal

Such an order is not uncommon where, as here, detailed remedial measures are necessary to reverse a lengthy history of civil-rights violations. Other courts have appointed a monitor to oversee and report on compliance with injunctions remedying civil rights violations. In *Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 544-45 (9th Cir. 1987), for example, the Ninth Circuit upheld the district court's appointment of a special master to monitor claims of noncompliance with the terms of a preliminary injunction after the district court concluded that the defendants had continued to fail to comply with the terms of that injunction. Similarly, in *United States ex rel. Anti-Discrimination Ctr. of Metro. New York v. Westchester Cnty.*, No. 06-CV-2860 (S.D.N.Y. Aug. 10, 2009), ECF No. 320 (attached as Exhibit 3), the court signed and approved a settlement that included detailed injunctive provisions regarding the development and location of affordable housing units. Not only did the *Westchester* court mandate the development of housing, but it also approved the appointment of a monitor who was tasked with, among other things, the responsibility to "[t]ake reasonable and lawful steps to be fully informed about all aspects of the County's compliance with [the] Stipulation and Order." Exhibit 3 at ¶ 13.[15] Indeed, this Court recently approved the appointment of a monitor to oversee compliance with the terms of an injunction governing the Maricopa County Sheriff's Office. *See, e.g.*, *Melendres v. Arpaio*, No. 7-CV-2513, 2014 WL 1017909, at *1 (D. Ariz. Mar. 17, 2014) (ordering parties to attend a hearing to address reports from a monitor appointed to report on, and make recommendations regarding, compliance with an injunction setting forth detailed remedies with respect to the Maricopa County Sheriff's Office); *see also Coleman v. Wilson*, 912 F. Supp. 1282, 1324 (E.D. Cal. 1995) (concluding, in a prison-reform case, that the "constitutional violation which has been found is the product of systemic deficiencies" and appointing a special master "to monitor compliance with the court-ordered injunctive relief.").

---

departments, when done in conjunction with disbanding the CCMO, will likely be sufficient to prevent further FHA violations.

[15] The monitor was also given access to the Defendants' records and documents, and was asked to "[m]ake recommendations, if needed, to the County and the [United States] of any remedies to foster compliance with applicable laws and regulations." Exhibit 3 at ¶ 13.

Here, the appointment of a monitor is necessary to report on, and ensure compliance with, the detailed injunctive relief outlined above. The evidence adduced at trial establishes that Defendants cannot be trusted to maintain and provide records that would permit the United States or this Court to evaluate Defendants' conduct. As noted above, Defendants have repeatedly altered or destroyed public records in an attempt to frustrate efforts by outside agencies to investigate Defendants' conduct. *See supra* Section III.A.2. Appointing a monitor who has access to Defendants' records, including electronic files, and who has the authority to interview Defendants' employees and attend municipal meetings and functions is the only means by which the Court can be assured that it will receive accurate information about Defendants' conduct.

Appointing a monitor is also necessary to ensure that Defendants are not engaged in continued surreptitious efforts to discriminate. For example, requiring Defendants to adopt new policies and procedures for issuing building permits is a necessary first step toward ending a discriminatory practice. Ensuring that Defendants actually apply new building permit procedures in a nondiscriminatory manner, however, will require close review of Defendants' actual municipal operations. Similarly, requiring Defendants formally to rescind their prior water policy and adopt a non-discriminatory policy is a necessary first step toward ending Defendants' practice of using control over water resources to discriminate against non-FLDs individuals. Ongoing monitoring, including a requirement that Defendants explain to a neutral third-party the reasons why they may deny any specific application for municipal services is necessary to guarantee that Defendants do not apply a new water policy in a discriminatory manner. In short, a monitor who has the authority, among other things, to review individual applications for services, such as utility connections or building permits; to interview city officials, attend meetings, including executive sessions, and review records; and who has the clear responsibility to report on Defendants' operations to the United States and the Court is necessary to guarantee that municipal policies are being applied in a nondiscriminatory manner.

## IV. CONCLUSION

For the foregoing reasons, and in light of the trial record and the evidence the United States will present at the October hearing, evidence that will demonstrate the United States' entitlement to a permanent injunction and the need for the specific relief requested, the United States requests that the Court: (1) disband the CCMO; (2) order Colorado City to approve the UEP's subdivision proposal; (3) impose detailed injunctive relief governing the provision of certain housing-related municipal services; and (4) appoint a monitor to oversee all relief ordered under the FHA.

Respectfully submitted this 29th day of April 2016,

STEVEN H. ROSENBAUM
Chief
Special Litigation Section

SAMEENA SHINA MAJEED
Acting Chief
Housing and Civil Enforcement Section

R. TAMAR HAGLER
CHRISTY E. LOPEZ
Deputy Chiefs

ERIC W. TREENE
Special Counsel

*/s/ Emily M. Savner*
SEAN R. KEVENEY
MATTHEW J. DONNELLY
EMILY M. SAVNER
SHARON I. BRETT
Attorneys
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Phone: (202) 353-4081
Facsimile: (202) 514-1116
E-mail: emily.savner@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on April 29, 2016, I caused a copy of the foregoing to be sent via the Court's ECF system to the following:

Jeffrey C. Matura
Asha Sebastian
Melissa J. England
Graif Barrett & Matura, P.C.
1850 North Central Avenue, Suite 500
Phoenix, Arizona 85004
*Attorneys for Defendant Town of Colorado City*

R. Blake Hamilton
Ashley M. Gregson
Durham Jones & Pinegar
111 East Broadway, Suite 900
Salt Lake City, Utah 84111
*Attorneys for Defendants City of Hildale, and Twin City Water Authority*

*/s/ Emily M. Savner*
EMILY M. SAVNER
Attorney for the United States