Jeffrey C. Matura, State Bar No. 019893
Melissa J. England, State Bar No. 022783
Asha Sebastian, State Bar No. 028250
**Graif Barrett & Matura, P.C.**
1850 North Central Avenue, Suite 500
Phoenix, Arizona 85004
Telephone: (602) 792-5700
Facsimile: (602) 792-5710
jmatura@gbmlawpc.com
mengland@gbmlawpc.com
asebastian@gbmlawpc.com

Attorneys for Defendant Town of Colorado City

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Town of Colorado City, Arizona; City of Hildale, Utah; and Twin City Water Authority, Inc.,<br><br>Defendants. | Case No. CV-12-8123-PCT-HRH<br><br>**DEFENDANTS' JOINT RESPONSE TO THE UNITED STATES' POST-TRIAL BRIEF REGARDING INJUNCTIVE RELIEF** |

Pursuant to this Court's Order [Doc. 936], defendants Town of Colorado City, Arizona, and the City of Hildale, Utah, (collectively "the Cities") submit the following joint response to the United States' Post-Trial Brief Regarding Injunctive Relief.[1]

## I. INTRODUCTION.

The United States requests broad injunctive relief in two areas: disbanding the Marshal's Department and imposing a monitor to oversee housing-related municipal functions. Both would strap the Cities with layers of bureaucracy, increased costs, and governmental intrusion disconnected from the facts in this case. And neither is supported by the case law or the jury's findings.

[1] The United States does not seek any injunctive relief against defendant Twin City Water Authority. See the United States' Post-Trial Brief [Doc. 939], at p. 12, footnote 8.

The United States' request to disband the Marshal's Department is unprecedented. The United States has not requested to disband police departments that have engaged in systemic racial profiling, theft, drug trafficking, perjury, and other atrocities.[2] Yet the United States wants this Court to disband the Marshal's Department even though the jury concluded that the officers did not engage in unreasonable searches of property, unreasonable investigatory stops, or excessive force.[3] The United States' request also ignores that neither Arizona POST nor Utah POST has decertified a single officer since 2007, which gives the Marshal's Department a decertification rate of 0% during that timeframe – a rate better than, or as good as, every other police department in Arizona and Utah.

As to the United States' request for injunctive relief under the federal Fair Housing Act, the Cities are already operating under, and complying with, a permanent injunction that Judge Teilborg issued after the Cooke case.[4] A second, duplicative injunction is unnecessary. The United States' request that this Court order Colorado City to accept the United Effort Plan Trust's subdivision proposal is also contrary to the evidence, would intrude upon Colorado City's duty under Arizona law to regulate land division, and would violate the principles of judicial abstention because the Mohave County Superior Court is already reviewing the issue. Finally, the Cities are willing to adopt new non-discrimination policies and undergo non-discrimination training, but the United States' request that this Court order the Cities to eliminate their prior water policy is moot because the Cities already eliminated that policy.[5]

---

[2] See e.g., Press Releases from the United States Department of Justice and the Federal Bureau of Investigations regarding the Suffolk County Police Department (discrimination against Latinos), the Meredian Police Department (unconstitutional youth arrests and probation practices), the Missoula Police Department (untimely and unreliable responses to sexual assault complaints), and the East Haven Police Department (conspiracy, intimidation, excessive force, and unreasonable searches and seizures), all attached as Exhibit 1.

[3] See Jury Verdict Forms [Doc. 932].

[4] See Judge Teilborg's November 26, 2014 Amended Judgment and Permanent Injunction [Doc. 723] in the Cooke case, attached as Exhibit 2.

[5] The United States failed to submit any details with respect to its requested injunctive

## II. LEGAL STANDARD.

The United States ignores the standard this Court must apply to any request for injunctive relief. The Cities therefore provide that standard here.

Injunctive relief should be "no more burdensome to the defendants than necessary to provide complete relief to the plaintiffs." Califano v. Yamasaki, 442 U.S. 682, 702 (1979). In the Ninth Circuit, this means that injunctive relief "must be tailored to remedy the specific harm alleged." Lamb-Weston, Inc. v. McCain Foods, Ltd., 941 F.2d 970, 974 (9th Cir. 1991). An overbroad injunction "is an abuse of discretion" subject to reversal on appeal. United States v. BNS, Inc., 858 F.2d 456, 460 (9th Cir. 1988). Courts must therefore impose only the least restrictive form of injunctive relief necessary to remedy the harm about which the plaintiff complains. See United States v. Warwick Mobile Homes Estates, Inc., 558 F.2d 194, 197 (4th Cir. 1977) (stating that "[e]stablished principles of equity dictate that in considering whether to grant injunctive relief a court should impose upon a defendant no restriction greater than necessary to protect the plaintiff from the injury of which he complains."). And even when a Constitutional violation is found, Courts are cautioned "not to use a sledgehammer where a more delicate instrument will suffice," not to "move too quickly where it appears the state, in the exercise of its administrative authority, will in its own way adopt reforms bringing its system into compliance with the Constitution," and advised "to give the state a reasonable opportunity to remedy a constitutional deficiency, imposing upon it a court-devised solution only if the state plan proves to be unfeasible or inadequate for the purpose." Dean v. Coughlin, 804 F.2d 207, 213 (2nd Cir. 1986).

Issuing injunctive relief that requires affirmative steps is also "a massive judicial intrusion on private autonomy." Metropolitan Housing Develop. Corp. v. Vill. of Arlington Heights, 558 F.2d 1283, 1293 (7th Cir. 1997). Courts have thus recognized a

---

relief, and instead intends to submit a "detailed proposed order" at some future, undetermined time. See the United States' Post-Trial Brief [Doc. 939], at p. 3, footnote 3. The Cities will object to any future proposed order as untimely and prejudicial.

"general reluctance of the judiciary to impose affirmative relief." MHANY Mgmt., Inc. v. Vill. of Garden City, 05-CV-2301 ADS WDW, 2013 WL 6334107 (E.D.N.Y. Dec. 6, 2013). This general reluctance applies even when the United States requests injunctive relief under the Fair Housing Act. See United States v. City of Parma, Ohio, 661 F.2d 562, 576 and 579 (6th Cir. 1981) (stating in a Fair Housing case that "Courts must carefully tailor the remedy in cases of statutory violations, limiting it to relief necessary to correct the violation" and reversing the appointment of a special master to oversee the implementation of a Court order because it is "an extraordinary remedy" that would not "represent the least intrusive method of achieving the government's stated goal" of removing discrimination); United States v. Jamestown Center-In-The-Grove Apartments, 557 F.2d 1079, 1080-81 (5th Cir. 1977) (holding that relief for violating the Fair Housing Act should be "tailored in each instance to the needs of the particular situation" and should "minimize federal intrusion and assure that defendants could retain maximum control of their business operations consistent with the national policy of equal housing opportunity.").

The State of Arizona requested injunctive relief from Judge Teilborg that was similar to what the United States requests here, including the disbandment of the Marshal's Department, the appointment of a monitor, and other items. Judge Teilborg rejected this request and explained his reasoning as follows:

> The Court is mindful that the State has requested a permanent injunction that mandates, in part, the disbandment of the Colorado City's Marshal's Office and the Hildale City Police Department, the replacement of these law enforcement agencies with county sheriffs, the appointment of a monitor to observe and report on Defendants' activities, training for Defendants' employees concerning discrimination, and the securing of new water sources. But "[i]njunctive relief may be inappropriate where it requires constant supervision." Natural Res. Def. Council, Inc. v. EPA, 966 F.2d 1292, 1300 (9th Cir. 1992).
>
> The State's proposed relief, if granted, would burden both Defendants and the State with a layer of bureaucracy extending into

> potential perpetuity. The Court does not doubt that the disbanding of the local law enforcement and the appointment of a monitor would be effective at preventing future discrimination by Defendants. However, considering all the facts of the case, more narrowly tailored injunctive relief is appropriate.[6]

Judge Teilborg's reasoning is consistent with Supreme Court and Ninth Circuit law regarding the imposition of injunctive relief. This Court should apply the same reasoning in this case and deny the United States' request for broad injunctive relief.

## III. DISBANDING THE MARSHAL'S DEPARTMENT IS NOT THE LEAST INTRUSIVE MEANS TO ENSURE CONSTITUTIONAL POLICING.

The United States bases its request to disband the Marshal's Department upon the following arguments: (1) the severity and nature of the Constitutional violations makes disbandment necessary; (2) previous remedial attempts have failed; and (3) disbandment is the most practical way to provide Constitutional policing. These arguments are contrary to the facts and the case law that governs such a broad request.

### A. The Nature Of The Police Officers' Conduct, As Found By The Jury, Does Not Support Disbandment.

The United States' argument regarding the nature of the Marshal's Department's conduct is based more upon what the United States wishes the jury had found than what the jury actually found. For example, the jury did not find that the Marshal's Department exists "primarily to provide security to the FLDS Church and further serve Church needs," that it "provided training to [the] Church, including raid drills on how to obstruct law enforcement," or that it "ignored [the] Church's illegal distribution of prescription drugs."[7] If the United States wanted the jury to decide these issues, it should have submitted special jury interrogatories. It chose not to, and instead wants this Court to speculate on what the jury may have found and impose injunctive relief based upon those speculative findings.

---

[6] See Judge Teilborg's September 14, 2014 Order [Doc. 703], attached as Exhibit 3.

[7] See the United States' Post-Trial Brief [Doc. 939], at p. 6, lines 19 – 20, and p. 7, lines 1 – 10.

This Court's focus, then, should be on what the jury did actually find. The jury found that the Marshal's Department violated the Establishment Clause of the First Amendment, engaged in an unreasonable seizure of property, an unreasonable seizure of a person, and an arrest without probable cause in violation of the Fourth Amendment, and violated the Equal Protection Clause of the Fourteenth Amendment.[8] Importantly, the jury also found that the Marshal's Department did not engage in unreasonable searches of property, person unreasonable investigatory stops, or use excessive force under the Fourth Amendment.[9] The United States therefore cannot argue that the Marshal's Department "will remain entangled with the FLDS Church" or "harm . . . all non-FLDS individuals who may seek police protection" because the jury rejected this argument with respect to property searches (which was the primary issue the United States presented at trial), investigatory stops, and excessive force.

This Court should also compare the jury's findings in this case with the conduct of other police departments that the United States has investigated and that did not result in any request from the United States to disband those departments. For example, the United States recently investigated the Calexico Police Department after the former Chief of Police described it as "[e]xactly like the Mafioso in New York."[10] The investigation revealed that police officers and city employees were involved in stealing guns and money, drug trafficking, and theft.[11] The United States also found "a general lack of supervision and accountability, absence of community policing, poorly functioning internal affairs department, no analysis of crime data or sharing of information internally or externally, and lack of commonly used tools to detect problem officers."[12] Yet, the

---

[8] See Verdict Forms [Doc. 932].

[9] Id,

[10] See May 18, 2016 Press Release from the United States Department of Justice, Office of Community Oriented Policing Services, and May 18, 2016 News Articles, all attached as Exhibit 4.

[11] Id.

[12] Id.

United States did not request to disband the Calexico Police Department; rather, it made 169 recommendations to help improve the department and the community.[13]

Or this Court can look to the United States' recent investigation into the Ferguson Police Department. The United States concluded that the Ferguson police officers engaged in a pattern of unconstitutional stops, arrests, and excessive force that violated the Fourth Amendment, and a pattern of misconduct that violated the First Amendment.[14] The excessive force violations included officers using Tasers on individuals for no reason and releasing canines on unarmed suspects, particularly African Americans.[15] The First Amendment violations included officers arresting individuals for recording public police activities and using their authority to retaliate against individuals who spoke back to the officers.[16] Despite these Constitutional violations, the United States did not request to disband the Ferguson Police Department. Instead, it recommended that the department adopt new policies, provide training to its officers, implement measures to reduce bias, improve supervision, and develop mechanisms to deal with officer misconduct.[17]

Or this Court can look to the United States' recent investigation into the Cleveland Police Department, after which the United States concluded that the officers engaged in a pattern or practice of unconstitutional policing by using excessive and unnecessary deadly force that violated the Fourth Amendment.[18] The officers' conduct was particularly targeted against individuals with mental illnesses or impaired faculties.[19] The United

---

[13] Id.

[14] See March 4, 2015 Report on the Investigation of the Ferguson Police Department, as completed by the United States Department of Justice, Civil Rights Division, at pp. 15 – 41, attached as Exhibit 5.

[15] Id. at p. 28.

[16] Id. at pp. 24 – 25.

[17] Id., at pp. 90 – 96.

[18] See December 4, 2014 Investigation of the Cleveland Division of Police, as completed by the United States Department of Justice, Civil Rights Division, a pp. 2 – 7, attached as Exhibit 6.

[19] Id. at pp. 22 – 24.

States believed that a monitor to oversee reforms within the department was the proper remedy, not disbandment.[20]

The jury's findings against the Marshal's Department in this case are less severe than the United States' findings regarding the Calexico, Ferguson, and Cleveland Police Departments. The United States concluded that disbandment was unnecessary with those departments; it is equally unnecessary with the Marshal's Department.[21]

**B. Previous Remedial Attempts Have Not Failed Because No Decertifications Have Occurred Since 2007.**

The United States' argument that previous remedial attempts against the Marshal's Department have failed is again contrary to the facts.

The United States' first argument on this issue is that Arizona POST has decertified 30% of the officers within the Marshal's Department in the last 15 years. The United States is simply playing with statistics. The Cities do not dispute that police officers were decertified in the mid-2000's because of choices they made with respect to their personal religious beliefs. But Lyle Mann, the Executive Director of Arizona POST, testified that Arizona POST has not decertified a single officer within the Marshal's Department since 2007, which is a decertification rate of 0% – the best rate for any police department in all of Arizona.[22] This Court cannot ignore this evidence, nor should it usurp the authority of the state agency charged with regulating police officers.

The United States' second argument is that the trial testimony of Helaman Barlow, the former Chief of Police, shows that the current officers do not follow the law. Helaman Barlow is a serial perjurer who admits that he has lied to judges, juries, and others, including in this very case.[23] This Court should therefore decline to base any part of its

---

[20] Id. at pp. 2 – 7, 58.

[21] The Cities will also present evidence that representatives from the Arizona and Utah legislatures previously introduced bills to disband the Marshal's Department. Those bills failed, thereby confirming that the citizens of both states do not support disbandment.

[22] See Lyle Mann's Trial Testimony, at p. 1576, line 16 to p. 1577, line 23, attached as Exhibit 7.

[23] See Helaman Barlow's Trial Testimony, at p. 2117, lines 7 – 19, attached as Exhibit 8.

decision on his testimony. And Helaman Barlow's testimony that the Cities implemented their new hiring process for police officers as a façade to hire members of Church Security is contrary to the uncontested testimony about this process and the individuals actually hired.[24]

The United States' third argument is that the officers improperly arrested individuals involved in UEP Trust property disputes after the Cooke case ended.[25] This argument is false. The United States references Isaac Wyler, who was arrested after he tried to enter a residence to enforce a restitution order. The Cities will present evidence during the October 2016 hearing that one of the UEP Trust's lawyers sent an e-mail to the Hildale City Prosecutor on December 23, 2015, to confirm that only the Sheriff or a Constable (and not Isaac Wyler) could use force to effectuate the physical eviction of the occupant from the residence. The United States therefore wants this Court to disband the Marshal's Department because the officers acted consistent with the advice from the UEP Trust's lawyer (and the Hildale City Prosecutor) on a UEP Trust property dispute. The United States' request makes no sense.

The United States' final argument is that the officers ignored an order that Judge Lindberg, a former Utah Probate Court Judge, signed in 2012. Neither the Cities nor the Marshal's Department were parties to the proceeding before Judge Lindberg. The United States also ignores the testimony of Sergeant Sam Johnson, who stated that Judge Lindberg's order was read, respected, and followed.[26] If the United States argues that Judge Lindberg's order confirms that the officers have acted improperly, then how does it

---

[24] See David Darger's Trial Testimony, at p. 3834, line 1 to p. 3842, line 19, attached as Exhibit 9; see also Daniel Musser's Trial Testimony, at p. 4221, line 14 to p. 4226, line 9, attached as Exhibit 10.

[25] The jury did not make any specific finding with respect to any incident. The United States presented the jury with numerous alleged incidents that spanned more than a decade, and therefore it cannot argue that the jury found that any particular or recent incident violated 42 U.S.C. § 14141.

[26] See Sam Johnson's Trial Testimony, at p. 4469, line 15 to p. 4472, line 19; and p. 4567, lines 11 – 20, attached as Exhibit 11.

explain the lack of any decertifications from Arizona POST or Utah POST since the order? This is another example of the facts not supporting the United States' requests.

The system to discipline and remove police officers who do not uphold their oaths of office has worked within the Marshal's Department. Yes, there were some officers who were previously decertified and then fired from the Marshal's Department. But the fact that not a single officer has been decertified since 2007 – despite the constant scrutiny the officers are under from federal, state, and county officials[27] – confirms that the system works. Disbandment is therefore wholly improper and contrary to the facts.

### C. Disbandment Is Not Practical Or Supported By The County Sheriffs.

The United States also argues that the Washington County and Mohave County Sheriffs support disbandment and the transfer of police services because it will result in more efficient, reliable, and Constitutional policing services. This argument is contrary to the actual statements and conduct of the two County Sheriffs.

Washington County Sheriff Cory Pulsipher has expressed concerns about his office being able to provide police services to the Cities, stating: "I don't have the manpower and resources to put somebody out there [in the Cities] full-time."[28] Sheriff Pulsipher has also expressed that Utah POST already has the authority to address any police misconduct without interference from the Washington County Sheriff's Office.[29]

Mohave County Sheriff Jim McCabe has a long-standing bias against Colorado City and the Marshal's Department, as he has referred to the officers as "bullies with guns" and stated that the Sheriff's Office will "keep at it because we're making their life harder and we'll continue to make it harder until they decide to move somewhere else."[30] Sheriff McCabe has also stated: "If you haven't already heard, we put Colorado City up

---

[27] The UEP Trust has also used the POST investigative process to lodge constant and repetitive complaints against the officers related to civil property disputes and evictions.

[28] See May 28, 2016 News Article, attached as Exhibit 12.

[29] Id.

[30] See November 18, 2014 News Article, attached as Exhibit 13.

for sale on Craigslist last night. They've been a thorn in our side for years."[31] This is the savior that the United States has chosen to provide fair police services to all residents of Colorado City, including those who belong to the FLDS Church. But despite his deep-seated expressions of bias, Sheriff McCabe still does not support disbandment. Instead, he favors the imposition of some form of oversight for the Marshal's Department.[32]

The United States also argues that any result short of disbandment would be "time-consuming, cumbersome, and ultimately unsuccessful," but does not explain why.[33] It also ignores the costs associated with disbandment. See United States v. Puerto Rico, 922 F.Supp.2d 185 (D. Puerto Rico 2013) (rejecting proposed settlement agreement under 42 U.S.C. § 14141 because it was likely Puerto Rico could not afford the proposed changes). The Cities will present evidence that they cannot afford the sweeping changes that the United States' requests. In contrast, policy changes, training, education, improved supervision, efforts to include the community in decisions, and other remedial efforts are more cost-effective and less intrusive. If these remedial efforts short of disbandment were appropriate for the Calexico Police Department, the Ferguson Police Department, and the Cleveland Police Department, this Court should also start with these remedial efforts.

Disbandment is an extreme and Constitutionally-questionable remedy that should be reserved for only the most violent and dire police misconduct that is systemic throughout an entire police department. It does not belong as an option in this case, where the police conduct at issue largely involved UEP Trust property disputes, and where the jury found that the officers did not engage in unreasonable searches of property, conduct unreasonable investigatory stops, or use excessive force.[34] The officers within the Marshal's Department are not killing people, raping women, stealing guns or money, running a drug-trafficking operation, or engaging in any similar misconduct. This case

---

[31] Id.

[32] See May 28, 2016 News Article, attached as Exhibit 12.

[33] See the United States' Post-Trial Brief [Doc. 939], at p. 11, lines 8 – 11.

[34] Id,

involves issues that training, supervision, and oversight can resolve. The officers deserve a chance to comply – as they have since 2007 – before this Court takes away their jobs.[35]

## IV. INJUNCTIVE RELIEF UNDER THE FEDERAL FAIR HOUSING ACT IS UNNECESSARY.

The United States also requests that this Court "permanently enjoin the Cities from violating the FHA and from directly or indirectly discriminating against non-FLDS individuals in the provision of housing and utility and municipal services."[36] Within the confines of this request, the United States asks this Court to: (1) order the Cities to adopt new policies, procedures, and ordinances, and to obtain training for their employees; (2) require Colorado City to accept the UEP Trust's subdivision proposal as submitted; (3) order the Cities to adopt new policies and procedures for building permits; (4) order the Cities to eliminate the old water policy regarding new connections; and (5) appoint a monitor to oversee the Cities' compliance. Each request is discussed below.

### A. The United States' Request For Injunctive Relief Under The Fair Housing Act Is Duplicative Of Judge Teilborg's Permanent Injunction.

The United States' request for a permanent injunction under the Fair Housing Act ignores the permanent injunction that Judge Teilborg already issued against the Cities. Judge Teilborg included in this injunction the following language:

> During the ten-year period beginning from the date of this Judgment, Defendants and their agents shall not (1) discriminate because of religion against any person in the terms, conditions, or privileges of the provision of services or facilities in connection with the sale or rental of a dwelling; or (2) coerce, intimidate, threaten, interfere with, or retaliate against any person in the enjoyment of his or her dwelling because of religion or because that person has asserted rights, or encouraged others to assert their rights, protected by the federal Fair Housing Act or the Arizona Far Housing Act.[37]

---

[35] The United States takes the position that anyone who is – or used to be – a member of the FLDS Church is unfit to serve as a police officer or hold public office. This Court should reject such a position, which is itself religiously discriminating.

[36] Id., at p. 12, lines 18 – 20.

[37] See Judge Teilborg's November 26, 2014 Amended Judgment and Permanent Injunction [Doc. 723] in the Cooke case, at p. 2, lines 17 – 24, attached as Exhibit 2.

This language is patterned after the same provisions of the Fair Housing Act that formed the basis of the United States' claims in this case, including 42 U.S.C. § 3604(b) and § 3617.[38] Judge Teilborg has therefore already enjoined the Cities from engaging in the precise conduct that the United States asks this Court to include in a permanent injunction.

But Judge Teilborg went one step farther. He also created an expedited process by which individuals who believe the Cities have violated his injunction can have their complaints heard. On this issue, Judge Teilborg ordered the following:

> The Court will permanently enjoin Defendants from discriminating on the basis of religion in performing their official duties and retain jurisdiction in this case for ten years. If Defendants violate the injunction, the State or an aggrieved party will be able to move for an order finding Defendants in contempt and assessing appropriate remedies. This will lessen the burden of remedying any future discrimination vis-à-vis filing a new lawsuit. This injunction recognizes that because it has been proven that Defendants have engaged in a pattern or practice of discrimination, Defendants' future conduct merits heightened scrutiny.[39]

This expedited process provides more protection against future discrimination than even the United States has requested in this case. No reason exists for this Court to change, supplement, or contradict Judge Teilborg's injunction.

The United States' argument that the Cities have violated Judge Teilborg's injunction is also without merit. First, no one has successfully used the expedited process to remedy a violation, which is evidence that the Cities have complied.[40] Second, the injunction required the Cities to pay statutory penalties and provide culinary water connections to identified individuals, all of which the Cities completed.[41] And third, the

[38] See Complaint [Doc. 1], at ¶¶ 57 – 61.

[39] See Judge Teilborg's September 14, 2014 Order [Doc. 703], at p. 7, lines 3 – 10, attached as Exhibit 3.

[40] The UEP Trust filed a motion for an order to show cause and to hold Colorado City in contempt for violating the injunction, but Judge Teilborg denied that motion. See Judge Teilborg's Order [Doc. 748] in the Cooke case.

[41] See Judge Teilborg's November 26, 2014 Amended Judgment and Permanent Injunction [Doc. 723] in the Cooke case, at p. 2, lines 17 – 24, attached as Exhibit 2.

United States' faulty suggestion that the Cities harassed or intimidated its witnesses by arresting them for criminal conduct before the trial in this case has no bearing on Judge Teilborg's injunction. And surely the United States does not suggest that the Marshal's Department is precluded from arresting an individual for suspected criminal conduct just because the United States listed that individual as a potential witness, as such a suggestion would eradicate the rule of law, grant immunity to individuals who violate the law, and promote civil disobedience and disrespect toward law enforcement officers.

Everything the United States seeks with respect to injunctive relief under the Fair Housing Act is already included within Judge Teilborg's injunction. A second, duplicative injunction would cause confusion and could contradict or minimize Judge Teilborg's injunction. This Court should therefore deny the United States' request for additional injunctive relief under the Fair Housing Act.

**B. The Cities Agree To Adopt Non-Discrimination Policies And To Obtain Training; However, No Evidence Supports Ordering The Cities To Adopt New Ordinances On Zoning, Planning, And Subdivision.**

The United States' request for non-discrimination policies and training is one area with which the Cities can agree. The Cities are willing to adopt new policies (or amend existing policies) that prohibit discrimination with respect to housing and municipal services. The Cities also agree to provide copies of these policies to the United States and post them at the Cities' respective City Halls for 30 days after they are adopted (or amended) so that the public can view them.

The Cities also agree to non-discrimination training and will require their officials (including Board members), supervisors, and all employees who participate in any housing-related decisions to undergo at least 2 hours of training on compliance with the Fair Housing Act. This training will be conducted by an industry-recognized and qualified trainer and shall occur within 3 months after this Court issues its final order.

The United States' argument that the Cities do not have any policies or procedures is incorrect. The Marshal's Department has its own policies and procedures,[42] which are standard in the industry,[43] and both Cities have their own comprehensive set of policies and procedures.[44] The Cities will present additional evidence regarding these policies and procedures during the October 2016 hearing.[45]

The United States' request that this Court order the Cities to adopt new zoning, planning, and subdivision ordinances is also without merit. Zoning and planning were not issues in this case, and both Cities already have a subdivision ordinance that complies with state law and their respective set of codes.[46] Further, requiring the Cities to adopt new ordinances invades upon the Cities' legislative processes and exceeds the authority of this Court. See City of Los Angeles v. Lyons, 461 U.S. 95, 112 (U.S. 1983) (noting that the "need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions . . . .")

### C. Ordering Colorado City To Accept The UEP Trust's Subdivision Proposal Is Contrary To Arizona Law And Would Violate The Principles Of Judicial Abstension.

In perhaps its most illogical request, the United States asks this Court to order Colorado City to accept a UEP Trust subdivision proposal as may be submitted, which would require Colorado City to violate Arizona law and disregard its statutory duty to

---

[42] See 2007 CCMO Policies and Procedures Manual (Trial Ex. 1172).

[43] See Greg Meyer's Trial Testimony, at p. 4707, line 23 to p. 4708, line 7, attached as Exhibit 14.

[44] See e.g., Water Service Regulations (Trial Ex. 330), Subdivision Ordinance (Trial Ex. 1022), Code of Ordinances for Animals (Trial Ex. 1806), and Building Permit Application (Trial Ex. 3286).

[45] The United States' references to settlement agreements with other jurisdictions are immaterial because those disputes involved their own unique set of facts. For example, the dispute with the City of New Orleans involved reclassifying property to keep out individuals with disabilities, and the St. Bernard Parish dispute involved the enactment of permissive use permits to disadvantage African Americans. See Exhibits 1 and 2 to the United States' Post-Trial Brief [Doc. 939].

[46] See David Darger Trial Testimony, at p. 3796, line 15 to p. 3797, line 14, attached as Exhibit 9.

protect the health, safety, and welfare of all residents who reside within its municipal boundaries. It would also violate a fundamental principle of judicial abstention because the Mohave County Superior Court is already addressing the subdivision issues between Colorado City and the UEP Trust.

**1. Colorado City's Subdivision Ordinance is Appropriate and Provides the UEP Trust With a Mechanism to Subdivide.**

This Court heard substantial and uncontroverted testimony regarding Colorado City's subdivision ordinance and the UEP Trust's refusal to comply with that ordinance or Arizona subdivision laws. Colorado City provides a brief review here.

In March 2007, the UEP Trust began discussions to subdivide. Colorado City explained that no property owner had previously sought to subdivide and that Arizona law required it to first adopt a subdivision ordinance.[47] Colorado City invited the UEP Trust to provide input and comments on the ordinance. The UEP Trust did not respond. Colorado City then adopted a subdivision ordinance, known as the Land Division Ordinance, in June 2007.[48] This ordinance was patterned after ordinances from neighboring communities and was approved by Colorado City's legal counsel.[49] Colorado City also provided a copy of the adopted ordinance to the UEP Trust.[50]

The UEP Trust then submitted rough draft subdivision plats for partially-developed property of approximately 19 preliminary subdivisions. Colorado City agreed to review subdivision Plat A first to define the review process. Colorado City conditionally approved Plat A in January 2008 and sent a letter to the UEP Trust's engineer to identify the conditions that it had to resolve to obtain final approval.[51] The UEP Trust did not respond or take any steps to resolve the conditions, which included such items as

---

[47] See A.R.S. § 9-463.01(A) and (B).

[48] See Land Division Ordinance (Trial Ex. 1022).

[49] See David Darger's Trial Testimony, at p. 3881, line 24 to p. 3908, line 13, attached as Exhibit 9.

[50] See July 25, 2007 E-Mail from David Darger to Bruce Wisan (Trial Ex. 1288).

[51] See January 18, 2008 Letter from David Darger to Clint Peatross (Trial Ex. 1307).

obtaining a public report from the Arizona Department of Real Estate, a water report from the Arizona Department of Environmental Quality, and other state-mandated requirements.[52] Because the UEP Trust failed to address the conditions, and pursuant to the language contained within the subdivision ordinance, the approval for Plat A expired one year later, in January 2009.[53]

The UEP Trust did not take any steps in 2010, 2011, 2012, or 2013 to move forward with any subdivision proposals. Then, in 2014, a UEP Trust representative inquired about subdividing land. Colorado City agreed to work through the issues and hired Rick Engineering from Phoenix. The UEP Trust hired Zach Renstrom as its engineer.[54] Rick Engineering thoroughly reviewed the subdivision ordinance and invited comments and input from the UEP Trust, which it again declined. Colorado City thereafter agreed to an "abbreviated and modified platting process" for property that had an existing dwelling. To subdivide vacant property, the UEP Trust still had to comply with the requirements of the Land Division Ordinance. The UEP Trust refused to submit a new subdivision application, and instead argued that it was not subject to the ordinance.[55]

In February 2015, Colorado City formally approved the abbreviated and modified platting process, and in March 2015 adopted a Memorandum of Understanding and proposed Development Agreement with the UEP Trust. These documents confirmed that the abbreviated and modified platting process was a one-time exception for property that had an existing dwelling.[56]

---

[52] Id.

[53] See Land Division Ordinance, at Article 9.3 (Trial Ex. 1022).

[54] Mr. Renstrom was also the paid expert witness for the United States in this case and the State of Arizona in the Cooke case.

[55] See David Darger's Trial Testimony, at p. 3881, line 24 to p. 3908, line 13, attached as Exhibit 9.

[56] Id.

The UEP Trust rejected the Memorandum of Understanding and proposed Development Agreement. Instead, it demanded that Colorado City apply the abbreviated and modified platting process to all property, including vacant property. The UEP Trust also demanded that Colorado City not conduct any reviews, analysis, or hearings on its subdivision proposals and that it sign an Agreement to Record Subdivision, which the UEP Trust drafted. This Agreement required Colorado City to violate Arizona state law regarding subdivision,[57] including eliminating required reviews and public hearings, exempting the UEP Trust from having to make any public improvements, and eliminating required fees to record the plats.[58]

When considering the issue, of particular importance was a letter that Colorado City received from the Arizona Attorney General's Office, which suggested it could be discriminatory for Colorado City to grant certain exceptions to one property owner and not to others, or to treat property with an existing dwelling different than vacant property. Thus, the proposed exceptions being considered could have been construed as discriminatory. Colorado City therefore declined the Agreement to Record Subdivision, and because other exceptions had been rejected, told the UEP Trust to comply with the Land Division Ordinance for any subdivision proposals. Colorado City also invited the UEP Trust to request any variances within the process set forth in that ordinance. The UEP Trust responded with legal threats.[59]

The United States' argument that "Colorado City continues to oppose subdivision" is a complete perversion of the facts.[60] Colorado City is not opposed to the UEP Trust subdividing and has never precluded the UEP Trust – or any property owner – from subdividing. In fact, the UEP Trust could submit a subdivision application tomorrow to move the process forward. It has chosen not to. Instead, it wants to force Colorado City

---

[57] See e.g., A.R.S. § 9-463.01(A), (C)(5), (R), and (U).

[58] See David Darger's Trial Testimony, at p. 3881, line 24 to p. 3908, line 13, attached as Exhibit 9.

[59] Id.

[60] See the United States' Post-Trial Brief [Doc. 939], at p. 16, line 19.

to allow it to subdivide property without complying with any requirements to ensure the health, safety, and welfare of the residents. When Colorado City requests that the UEP Trust comply with the subdivision ordinance (which Arizona law requires), the UEP Trust claims religious discrimination and improperly tries to piggyback the United States so that it can avoid the costs necessary to properly subdivide.[61] Colorado City has never denied any subdivision application from the UEP Trust, nor has it placed any requirements upon the UEP Trust that it would not also place upon any developer or proposed subdivider.[62]

These facts confirm that the UEP Trust already has the right to subdivide and that Colorado City has repeatedly tried to work through the issues with the UEP Trust, but at every turn, the UEP Trust refuses. And the minute Colorado City requires the UEP Trust to comply with Arizona state law regarding subdivision, the UEP Trust (and now the United States) claims discrimination. An order from this Court requiring Colorado City to disregard Arizona's subdivision statutes and to accept the UEP Trust's subdivision proposal as submitted is therefore absurd and legally untenable.

### 2. Principles of Federal Abstention Confirm that this Court Should Not Address the Subdivision Issue Between Colorado City and the UEP Trust.

In April 2015, Colorado City filed a request for declaratory relief with Judge Teilborg to obtain guidance on the subdivision dispute with the UEP Trust.[63] Judge Teilborg declined jurisdiction.[64] Colorado City then filed a Complaint for Declaratory

---

[61] It becomes clear from the United States' brief that money is the driving force with respect to the UEP Trust. The United States admits that it wants this Court to order Colorado City to accept any subdivision proposal from the UEP Trust because it would be "prohibitively expensive" for the UEP Trust to submit a proposal that complies with Arizona law and the Land Division Ordinance. See the United States' Post-Trial Brief [Doc. 939], at p. 17, lines 10 – 14. Just because compliance costs money does not mean that the Land Division Ordinance is discriminatory. Rather, the fact that the UEP Trust has to spend money to do it right underscores why it would be absurd for this Court to require Colorado City to accept a non-compliant proposal.

[62] See David Darger's Trial Testimony, at p. 3881, line 24 to p. 3908, line 13, attached as Exhibit 9.

[63] See Colorado City's Update and Request for Declaratory Relief [Doc. 725], filed in the Cooke case.

[64] See Judge Teilborg's May 28, 2015 Order [Doc. 734], attached as Exhibit 15.

Relief in the Maricopa County Superior Court to determine whether it has the authority under Arizona law to regulate subdivision issues within its municipal boundaries and whether the UEP Trust must comply with the Land Division Ordinance.[65] This Complaint was transferred to Judge Conn with the Mohave County Superior Court, and Judge Conn will now resolve the same issues regarding the UEP Trust and Colorado City's subdivision ordinance that the United States requests that this Court resolve.[66]

Under the abstention doctrine set forth in Colorado River Water Conservation District v. United States, 428 U.S. 800 (1976), "a federal district court may postpone or decline to exercise its jurisdiction in deference to a parallel state proceeding." Weitz Co. LLC v. RCI Systems Inc., 2014 WL 3720543, *2 (D. Ariz. July 28, 2014). Courts are to consider "wise judicial administration, . . . conservation of judicial resources, . . . and comprehensive disposition of litigation" to evaluate whether to stay or dismiss the federal litigation when parallel state-court litigation is pending. Id. More specifically, this abstention doctrine applies in the following situations: (1) when the state court has assumed jurisdiction over the property; (2) convenience of the state forum over federal forum; (3) the desirability of avoiding piecemeal litigation; (4) when the state court obtained jurisdiction of a matter first; (5) when state law controls; (6) when the state proceeding adequately protects the parties' rights; (7) when the state and federal cases are substantially similar; (8) when the second suit is an attempt to forum shop or avoid adverse rulings by the state court; or (9) when the state proceedings will resolve all of the issues in the federal action. Id. Not all nine factors must exist; rather, a Court is to apply them "in a pragmatic and flexible way, as part of a balancing process rather than as a 'mechanical checklist.'" Id.

---

[65] See Colorado City's Complaint for Declaratory Relief, attached as Exhibit 16.

[66] The UEP Trust also filed: (1) a motion with Judge Teilborg to hold Colorado City in contempt, which Judge Teilborg denied, see Judge Teilborg's February 16, 2016 Order [Doc. 748], attached as Exhibit 17; (2) a motion to stay with the Utah Probate Court, which the Utah Probate Court denied, see Utah Probate Court's Ruling and Order, attached as Exhibit 18; and (3) a motion to dismiss the Complaint for Declaratory Relief, which Judge Conn has not yet ruled upon.

These factors favor this Court abstaining from ruling upon the subdivision issues. First, Judge Conn will resolve the issues regarding the subdivision dispute, during which the UEP Trust will fully participate. In contrast, the UEP Trust is not a party to this case. Second, Arizona state law controls the issues between Colorado City and the UEP Trust; specifically, Arizona's subdivision statutes, including A.R.S. § 9-463.01(A) and (B). Third, the UEP Trust has fought to avoid having these issues heard in a state court, first by going to Judge Teilborg, then to the Utah Probate Court, then back to the federal court via removal (which was remanded), and now to this Court through the United States. Every Court has rebuffed the UEP Trust's efforts. Finally, state court exercised jurisdiction over these issues before the United States filed its request for injunctive relief; therefore, priority favors the state-court action.

The Colorado River factors favor abstention. This Court should therefore refrain from making any rulings with respect to the UEP Trust and the subdivision issues. Instead, it should allow the Mohave County Superior Court to resolve those issues while this Court focuses upon the issues actually presented in this case.

**D. No Evidence Supports The Need For New Policies Or Procedures Regarding Building Permits.**

The United States' request that this Court order the Cities to adopt new policies and procedures regarding building permits is contrary to the evidence.

Andrew Barlow is the Building Official for Colorado City and Hildale. He testified about the Building Permit Application.[67] He also testified about the process he uses when an applicant requests a building permit, including meeting with the applicant, reviewing the plan submittal checklist, examining the proposed building plans, determining the permit fee, ensuring that the plans comply with the applicable state and local codes, issuing and signing the permit, and completing a final inspection.[68] The United States did not contest any of this evidence.

[67] See Building Permit Application (Trial Ex. 3286).

[68] See Andrew Barlow's Trial Testimony, at p. 3314, line 25 to p. 3318, line 20, attached as Exhibit 19.

Andrew Barlow also testified that he handles the building-permit process the same for everyone, regardless of the applicant's religion. For example, he worked with Willie Jessop (an outspoken critic of the FLDS Church and one of the United States' primary witnesses) to help him obtain a permit and then waived the fee for working without a permit.[69] He also waived the fee for Christopher and Jesseca Jessop, long before they became two of the United States' aggrieved persons in this case.[70] In contrast, Andrew Barlow did charge a fee to a company that appeared to be affiliated with the FLDS Church and that performed work without a permit.[71] The United States did not contradict any of this evidence.

The building permit process is working in the Cities. This Court should therefore deny the United States' request for injunctive relief with respect to the building permits.

### E. The Cities Already Eliminated Their Prior Water Policy And Now Require An Impact Fee.

After the Cooke case ended in 2014, the Cities eliminated their water policy that required additional water to be brought to the system prior to a new connection. This policy no longer exists, and so an order from this Court directing the Cities to eliminate a non-existent policy is unnecessary.

The Cities now charge an impact fee. The United States does not challenge this fee,[72] and nor should it, as communities throughout Arizona charge an impact fee to help finance extensions to their water systems. The Cities hired engineers, who developed a capital improvement plan and an impact fee study. The engineers then determined what improvements are eligible for an impact fee, and from that determination calculated the

---

[69] Id. at p. 3326, line 21 to p. 3332, line 11.

[70] Id. at p. 3333, line 16 to p. 3334, line 17.

[71] Id. at p. 3334, line 19 to p. 3337, line 8.

[72] See the United States' Post-Trial Brief [Doc. 939], at p. 20, lines 9 – 11, in which the United States confirms that it "has not challenged" the Cities' impact fee policy.

amount of the fee. The impact fee is $12,000.00, which is lower than neighboring communities.[73]

The United States' request that this Court order the Cities to provide the UEP Trust with a list of all persons and entities that apply for, and receive, water service is not only unnecessary, but wholly improper. The UEP Trust wants this information to aid its civil litigation against its beneficiaries and so that it can continue to track down and evict these beneficiaries and their families from their homes. Any dispute regarding these issues is between the UEP Trust and its beneficiaries. This Court should not get involved, nor should it push the Cities into the dispute by requiring it to provide this information to the UEP Trust, a non-party in this case.

### F. A Monitor Is Costly, Unnecessary, And Not The Least Intrusive Means To Ensure The Cities' Compliance.

Courts are generally reluctant to impose a monitor, special master, or other affirmative injunctive relief. In fact, at least one Appellate Court has reversed a trial court that imposed a special master in a dispute involving the United States and the Fair Housing Act. See e.g., United States v. City of Parma, Ohio, 661 F.2d 562, 576 and 579 (6th Cir. 1981) (reversing the appointment of a special master to oversee the implementation of a Court order because it is "an extraordinary remedy" that would not "represent the least intrusive method of achieving the government's stated goal" of removing discrimination); United States v. Jamestown Center-In-The-Grove Apartments, 557 F.2d 1079, 1080-81 (5th Cir. 1977) (relief for violating the Fair Housing Act should be "tailored in each instance to the needs of the particular situation" and should "minimize federal intrusion and assure that defendants could retain maximum control of their business operations consistent with the national policy of equal housing opportunity.").

The cases upon which the United States relies to support its arguments regarding a monitor do not apply in this case. In Nat'l Org. for the Reform of Marijuana Law v.

---

[73] See David Darger's Trial Testimony, at p. 3880, line 14 to p. 3881, line 18, attached as Exhibit 9.

Mullen, 828 F.2d 536 (9th Cir. 1987), the Court appointed a special master only after the defendant violated the Court's injunction. The Cities have not violated this Court's injunction, which it has not yet even entered. In United States ex rel. Anti-Discrimination Ctr. of Metro. New York v. Westchester Cnty., No. 06-CV-2860 (S.D.N.Y. August 10, 2009), the parties jointly agreed to the appointment of a monitor through a settlement agreement. The Cities do not agree to a monitor in this case. And neither Melendres v. Arpaio, No. 7-CV-2513, 2014 WL 1017909 (D. Ariz. March 17, 2014), nor Coleman v. Wilson, 912 F.Supp. 1282 (E.D. Cal. 1995), involved the Fair Housing Act.

The United States requests a monitor to report on the Cities' compliance with any injunctive relief that this Court may issue. But a less intrusive means exists to accomplish the same goal. If this Court enters injunctive relief, it can require the Cities to submit periodic reports and documents to show their compliance. This Court can also create an expedited procedure for the United States to address any alleged non-compliance. This idea is not novel, as Judge Teilborg established the same procedure after he denied the State of Arizona's request for a monitor.[74]

Finally, the United States ignores the cost of a monitor. Cost is a significant factor that this Court must consider. See United States v. Puerto Rico, 922 F.Supp.2d 185 (D. Puerto Rico 2013). The Cities have less than 8,000 residents combined, and they will present evidence that they do not have the money to pay for a monitor.[75] Without the money, the discussion becomes academic, especially when less intrusive and more cost-effective means exist. If this Court enters injunctive relief and the Cities fail to comply, then this Court may consider a monitor to ensure compliance. But right now, a monitor is unnecessary.

---

[74] As discussed in Subsection A above, the Cities do not believe that any injunctive relief is necessary because Judge Teilborg's injunction already covers the same issues, including a means for oversight to ensure compliance.

[75] By way of example, Maricopa County was forced to budget $3,000,000.00 to cover the costs of the Court-appointed monitor that oversees the Maricopa County Sheriff's Office for work completed from 2014 to 2016.

## V. CONCLUSION.

The United States' requested injunctive relief would tear apart the very fabrics of the Cities and the residents they serve. The goal is not to destroy, but for this Court to impose the least intrusive injunctive relief to ensure the Cities' compliance with the law. Disbanding the Marshal's Department is not the least intrusive means to ensure constitutional policing, nor is it a practical result or supported by the County Sheriffs. Imposing a monitor is also not the least intrusive means to ensure compliance with the Fair Housing Act, especially considering Judge Teilborg already issued a permanent injunction and has judicial oversight on the same issues.

For these reasons, the Cities request that this Court deny the broad injunctive relief that the United States requests and instead apply a more commonsense approach to any injunctive relief that this Court deems appropriate.

Dated May 31, 2016.

GRAIF BARRETT & MATURA, P.C.

By: /s/ Jeffrey C. Matura
Jeffrey C. Matura
Melissa J. England
Asha Sebastian
1850 North Central Avenue, Suite 500
Phoenix, Arizona 85004
Attorneys for Defendant Town of Colorado City, Arizona

DURHAM JONES & PINEGAR, P.C.

By: /s/ R. Blake Hamilton
R. Blake Hamilton
Ashley Gregson
Durham Jones & Pinegar, P.C.
111 East Broadway, Suite 900
Salt Lake City, Utah 84111
Attorneys for Defendants City of Hildale, Utah, and Twin City Water Authority

**CERTIFICATE OF SERVICE**

I hereby certify that on May 31, 2016, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF system for filing and transmittal of Notice of Electronic filing to the following CM/ECF registrants:

R. Tamar Hagler
Eric W. Treene
Sean R. Keveney
Matthew J. Donnelly
Emily M. Savner
Sharon I. Brett
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Attorneys for Plaintiff United State of America

R. Blake Hamilton
Ashley Gregson
Durham Jones & Pinegar, P.C.
111 East Broadway, Suite 900
Salt Lake City, Utah 84111
Attorneys for Defendants City of Hildale, Utah,
Twin City Water Authority, and Twin City Power

/s/ Carolyn Harrington
4835-4136-9137