**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TOWN OF COLORADO CITY, ARIZONA, | ) | |
| *et al.,* | ) | No. 3:12-cv-8123-HRH |
| | ) | (Prescott Division) |
| Defendants. | ) | |
| | ) | |

JUDGMENT AND DECREE
GRANTING INJUNCTIVE RELIEF

The constitutional right to free exercise of religion, on the one hand, and the statutory right to housing and constitutional policing, on the other hand, are vitally important to a viable, peaceful community. In Colorado City, Arizona, and the City of Hildale, Utah, those rights have come into conflict over access to residential housing and services. Denial of housing rights and lawful policing to some residents at the behest of the Fundamentalist Church of Jesus Christ of Latter Day Saints ("FLDS Church") has cost the cities dearly – millions of dollars – in the past.

When a disastrous flood hit the cities, the residents came together and successfully addressed their losses. It is now time for the citizens of Colorado City and City of Hildale to come together and accept the fact that communal ownership of residential property in the Defendant Cities is a thing of the past. All residents of the Defendant Cities must be afforded equal access to housing and residential services, to nondiscriminatory law

enforcement, and to free exercise of their religious preferences that are not contrary to law. By this judgment and decree, the court hopes to assist the Defendant Cities and their residents in advancing the protection of civil rights to which they are entitled.

I.

PROCEEDINGS

This case began with the filing of a complaint by the United States of America seeking enforcement of the Violent Crime Control and Law Enforcement Act of 1994 (the Policing Act), 42 U.S.C. § 14141 (plaintiff's first cause of action); the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601, et seq. (plaintiff's second cause of action); and Title III of the Civil Rights Act of 1964, 42 U.S.C. § 2000b (plaintiff's third cause of action). During the development of the case, plaintiff's third cause of action based upon 42 U.S.C. § 2000b was dismissed.[1] The case went forward as to three named defendants: Town of Colorado City, Arizona; City of Hildale, Utah; and Twin City Water Authority, Inc.[2]

After extensive discovery and motion practice, the case went to trial on January 19, 2016. Plaintiff's Fair Housing claim was tried to a jury. Plaintiff's policing claim was tried to the same jury on an advisory basis. On March 7, 2016, the jury returned unanimous verdicts in favor of the United States and against Colorado City, City of Hildale, and Twin City Water Authority with respect to plaintiff's Fair Housing Act claim. As to each defendant, the jury determined that the respective defendants had

---

[1]See Order (Motions to Dismiss) at 7, Docket No. 38. Plaintiff declined to file an amended claim under Section 2000b. Notice Regarding Claim, Docket No. 46.

[2]Plaintiff's claims as to a fourth defendant, Twin City Power, were abandoned by plaintiff. Twin City Water Authority has been dissolved and the water utility is now operated by the Defendant Cities.

"engaged in a pattern or practice of conduct that violated the federal Fair Housing Act by:"

> making housing unavailable or denying housing opportunities to individuals because of religion[;]
>
> discriminating against non-FLDS individuals in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of religion[; and]
>
> coercing, intimidating, threatening, or interfering with an individual in the exercise or enjoyment of the right to equal housing opportunities or the right to equal treatment in the terms, conditions, privileges, and services in connection with housing, or on account of that individual having aided or encouraged any other person in the exercise or enjoyment of those rights.[3]

Having determined liability against the defendants, the jury awarded "damages" for emotional distress, humiliation, and embarrassment in the total amount of $2,215,000 in favor of six identified victims of the defendants' Fair Housing Act violations. While the jury was deliberating as to the Fair Housing Act claim, plaintiff and defendants entered into an oral settlement by which the defendants agreed to pay plaintiff (and the victims) the total sum of $1,600,000 on account of Fair Housing Act violations by the defendants and in satisfaction of all monetary claims of plaintiff against the Defendant Cities. That settlement was reduced to writing[4] and was approved by the court.[5] The settlement left open the matter of injunctive relief for Fair Housing Act violations by the Defendant Cities, a subject taken up in this judgment and decree.

---

[3] See Verdict Forms 7, 9, and 11, Docket No. 932.

[4] Docket No. 938-1.

[5] Docket No. 938.

With respect to plaintiff's policing claim, 42 U.S.C. § 14141, the advisory jury found that the Colorado City Marshal's Office ("CCMO"), which serves both Colorado City and the City of Hildale, engaged in a pattern or practice of unconstitutional policing in violation of the Establishment Clause of the First Amendment of the United States Constitution;[6] engaged in a pattern or practice of unconstitutional policing in violation of the Fourth Amendment of the United States Constitution in three respects:  unreasonable seizure of property, unreasonable seizure of a person, and arrest made without probable cause;[7]  and engaged in a pattern or practice of unconstitutional policing in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.[8]  The advisory jury rejected plaintiff's contention that CCMO officers engaged in unreasonable searches of property, unreasonable investigatory stops, or use of excessive force in making a lawful arrest or other seizure or detention.

By order of March 25, 2016,[9] the court put in place a schedule for further proceedings with respect to injunctive relief sought by plaintiff based upon the Fair Housing Act violations determined by the jury and the jury's advisory findings with respect to policing.  That schedule culminated in an evidentiary hearing commenced on October 24, 2016, and concluded on October 27, 2016.  At the conclusion of the evidentiary hearing, provision was made for the filing of written closing arguments. Arguments were completed by January 24, 2017, and the matter of injunctive relief is now under advisement.

---

[6]Verdict Form 1, Docket No. 932.

[7]Verdict Form 3, Docket No. 932.

[8]Verdict Form 5, Docket No. 932.

[9]Docket No. 936.

II.

FINDINGS OF FACT – BACKGROUND

(1)     The Town of Colorado City is a municipal entity organized under the laws of the State of Arizona.  Colorado City was incorporated in 1985.  The City of Hildale was organized under the laws of the State of Utah.  The Defendant Cities share a common boundary, which is also the boundary between the states of Arizona and Utah.  The Defendant Cities have separate city councils, mayors, and managers.

(2)     Defendant Twin City Water Authority was an entity operated by Colorado City for purposes of supplying potable water to residents of the Defendant Cities.

(3)     The Defendant Cities jointly fund the Colorado City Marshal's Office which provides law enforcement for both Defendant Cities.  The CCMO currently employs a chief marshal, a sergeant, and five deputy officers.  The chief marshal of Colorado City is also the chief of police for Hildale.  CCMO officers are employees of the Town of Colorado City.  At the time of trial, the CCMO consisted of Chief Jerry Darger (brother of Colorado City town manager,  David Darger), Sergeant Sam Johnson, and Deputies Chris Cooke, Hyrum Roundy, Jacob Barlow, Jr., Daniel Musser, Daniel Roy "DR" Barlow, and Shem Jessop.  Colorado City operates a dispatch center that provides emergency services (police, fire, medical) for both Colorado City and the City of Hildale.

(4)     The Colorado City town council has the authority to hire new police officers.  The chief marshal has the authority to discipline or terminate police officers subject to applicable grievance procedures.  CCMO officers are certified in both Utah and Arizona.  The Arizona POST (Peace Officers Standards and Training) is a state agency that certifies police officers to work in Arizona.  Utah POST is a state agency that

certifies police officers who work in Utah.  The CCMO officers are dually certified by the Arizona and Utah POSTs.

(5)      Colorado City and the City of Hildale are sometimes collectively referred to as "Short Creek."  The Short Creek community was established as a fundamentalist Mormon settlement in the late 1920s.  The community is predominantly composed of fundamentalist Mormons, many of whom belong to the FLDS Church.

(6)      The FLDS Church is led by a prophet.  From 1986 until 2002, Rulon Jeffs was the prophet of the FLDS Church.  Following his death in 2002, his son, Warren Jeffs, succeeded him as prophet.  Warren Jeffs is in federal prison, from which he has continued to communicate with FLDS Church members in Short Creek.  The  FLDS Church in Short Creek also has a bishop.  From1936 until 2003, Fred Jessop served as bishop of the community.  William E. Jessop succeeded Fred Jessop, serving until 2007.  Lyle Jeffs succeeded William E. Jessop as bishop, and appears to have served as bishop through the trial of this case.  Lyle Jeffs is under indictment for food stamp fraud in Utah and has absconded from pretrial release.

(7)      The early settlers of Short Creek decided for religious reasons to hold real property in common and, to accomplish this, created a religious land trust:  the United Effort Plan Trust ("UEP Trust").  The UEP Trust was organized under the laws of the State of Utah.  The UEP Trust was formed to hold, manage, and distribute real property and other religious consecrations.  The UEP Trust made real property and other consecrated property available to members of the FLDS Church on a need basis.  It was and is a principal tenet of the FLDS Church that all property of members be consecrated to the church.

(8)     In 2005, at the request of the State of Utah, the Utah probate court took control of the UEP Trust away from the FLDS Church and appointed Bruce Wisan, an accountant from Salt Lake City, as the trustee or special fiduciary to oversee the UEP Trust property.  The UEP Trust is required to operate as a religiously neutral entity. Mr. Wisan served as the special fiduciary for the UEP Trust until 2015, at which time he began to transition management and control to a board of trustees.

(9)     The FLDS Church leadership and members have vigorously opposed Utah's assumption of control of the UEP Trust.  Members were instructed not to respond and not to cooperate with anyone with respect to the neutral operation of the UEP Trust. Members were directed not to associate with Bruce Wisan.  Members were directed to stop developing the community and to contribute their assets to a different project of the FLDS Church in Texas.

(10)    FLDS Church opposition to the UEP Trust was formalized in November of 2008 in an effort to secure the removal of Bruce Wisan as the UEP Trust administrator. FLDS Church members signed a "Declaration of Beneficiaries" which stated in part:

> 1.  I am aware of the original intent of the settlors of the United Effort Plan Trust (the "UEP") and have consecrated my time, talents, materials, monies, and property to the Fundamentalist Church of Jesus Christ of Latter Day Saints (the "Church").  I am a voluntary member of the Church which is an association formed by our mutual consent to promote our common objective to ensure that the UEP is administered in compliance with constitutional requirements and in a manner that meets our "just wants and needs."
>
> 2.  As a member of the Church I am a beneficiary of the UEP and have seen the effects of the administration of the UEP by the States of Utah  and Arizona which have taken the management of the UEP away from the Church ... and which prevents the UEP from meeting my "just wants and needs" ....

> 5. I am opposed to the sale of any sacred or consecrated
> UEP Property including, Sacred Sites, Harker Farm, and
> Berry Knoll Farm without the approval of the Church.[10]

(11)    Beginning in 2008, under the direction of the Utah probate judge and

Mr. Wisan, the UEP Trust began requiring occupants of Trust property to execute

occupancy agreements in order to live in a home on Trust property.  Occupancy

agreement holders were to pay $100 a month, plus a share of real estate taxes assessed by

the county, to live on a Trust property.  At various times, FLDS Church members refused

to sign occupancy agreements and/or refused to pay the $100-a-month occupancy fee.  At

other times, members of the FLDS Church signed occupancy agreements as a means of

maintaining control of property.  The FLDS Church has caused its members to move from

one UEP Trust property to another UEP Trust property without involving the Trust or

securing permission from the Trust as owner of the property.

(12)    The UEP Trust's use of occupancy agreements and Mr. Wisan's efforts to

enforce those occupancy agreements have led to much civil disobedience and unrest.

There has been vandalism of property occupied by non-FLDS Church members.  CCMO

officers have been heavily involved in disagreements between FLDS Church members

who have occupied Colorado City properties as to which others have occupancy

agreements.  Mr. Wisan's efforts to employ self-help in gaining control of UEP Trust

property have sometimes gone awry because of spurious claims of FLDS Members and

due to discriminatory policing by CCMO officers.  Rather than endeavoring to keep the

peace, officers have sometimes inappropriately taken sides in occupancy disputes, and

have engaged in unreasonable arrests of non-FLDS Church members.  In short, control of

---

[10]United States' Admitted Trial Exhibit 43.

Colorado City property is at the heart of the problems which have arisen with respect to housing and policing in Colorado City.

(13)    The ownership of land in Colorado City is a patchwork of properties, the majority of which is owned by the UEP Trust.  There has not been a formal subdivision of Colorado City properties; however a de facto subdivision has developed over time.  With the assistance of professional engineers employed by the UEP Trust and Colorado City, a proposed subdivision plat was developed.  Had that process been completed, the Trust would be in a position to convey legal title to residential properties in place of the current occupancy permits.  Just prior to a final meeting that was intended to finalize the proposed subdivision plat, representatives of the Trust and Colorado City (other than the engineers) became involved.  As part of a pattern or practice of conduct that violated the Fair Housing Act by making housing unavailable or denying housing opportunities to individuals because of religion, Colorado City withdrew its support for developing a recordable subdivision plat for Colorado City properties.

(14)    As prophet of the FLDS Church of Short Creek, Warren Jeffs assumed sweeping powers over the persons and properties of FLDS Church members.  His directions as regards interaction of spouses, communal work projects, and consecration of property were enforced by threat of excommunication that would involve separation of spouses and their families, loss of employment, and banishment from the Short Creek community.

(15)    In 2004, the FLDS Church organized a formal security force for purposes of providing protection to FLDS Church leaders and to keep the leadership informed as to events taking place in the community.  A primary purpose of the FLDS Church security force was to afford leaders an opportunity and time to escape intervention from outside

law enforcement.  By 2007, the FLDS Church security had expanded to several hundred members, some of whom were CCMO officers, and organized into teams assigned to shifts and captains.  City-owned cameras located on city property were connected to a control room at the FLDS Church "Meeting House."  Church officials, with direct assistance from CCMO officers, were able to monitor attendance at meetings and monitor comings and goings within the community.  Both CCMO officers and Church officials surveilled non-FLDS Church residents, UEP Trust representatives, and county law enforcement.

(16)    Control of FLDS Church membership was further expanded beginning in 2010 through the creation of an elite sub-group of the FLDS Church known as the "United  Order."  Members entered into covenants precluding disclosure of their membership in the United Order or discussion of the doctrines of the United Order with anyone, including outside law enforcement officers.  Members of the United Order were required to consecrate everything they owned (real estate and personal property) to the FLDS Church, where the property was inventoried and placed in the "Storehouse."  Members were not supposed to obtain food or any other necessities other than from the Storehouse.  A member who fell out of favor with the FLDS Church leadership could be excluded from the United Order, which appears to have been the functional equivalent of excommunication from the FLDS Church.  Loss of United Order membership could lead to loss of family and loss of access to the Storehouse.

III.

FAIR HOUSING ACT

A.  Law.  The Fair Housing Act, 42 U.S.C. § 3614(a), provides in pertinent part that:

Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter, or that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States district court.

Section 3614(d) of the Fair Housing Act further provides:

(1) In a civil action under subsection (a) or (b) of this section, the court –

(A) may award such preventive relief, including a permanent or temporary injunction, restraining order, or other order against the person responsible for a violation of this subchapter as is necessary to assure the full enjoyment of the rights granted by this subchapter[.]

Based upon the court's instructions,[11] the jury determined that the Town of Colorado City and City of Hildale and Twin City Water Authority violated the Fair Housing Act in the particulars set out above.[12] The jury awarded and the court approved damages in favor of identified victims. In accordance with Section 3614(d)(1)(A) of the Fair Housing Act, it is for the court to decide what (if any) additional remedies should be imposed upon the defendants.

B. Discussion.

Plaintiff argues that the court should permanently enjoin the Defendant Cities from violating the Fair Housing Act, especially as regards non-FLDS individuals, in the provision of housing, utilities, and other municipal services. Plaintiff specifically urges the court to order: (1) that the Defendant Cities adopt new policies, procedures, and ordinances as regards municipal services, land use, and training, (2) that Colorado City

---

[11]See Jury Instruction No. 38, Docket No. 913-1.

[12]See supra p. 3.

approve the UEP Trust subdivision proposal, (3) that the Defendant Cities adopt new policies and procedures for handling building permits, and (4) that the Defendant Cities abandon discriminatory water policies and establish a new, nondiscriminatory, water policy.  Plaintiff urges the court to appoint a monitor to oversee Fair Housing Act related injunctive relief.[13]

The Defendant Cities argue that additional injunctive relief as regards the Fair Housing Act, beyond that imposed by Judge Teilborg in Cooke v. Town of Colorado City, is unnecessary.[14]  The Defendant Cities contend that to do otherwise would cause confusion.  The Defendant Cities argue for various reasons that the court should not involve itself in the subdividing of Colorado City property.  The Defendant Cities argue that no injunctive relief is necessary as regards building permits.  The Defendant Cities argue that they have already revised their domestic water supply regulations to ensure fair treatment of customers, and that there is no legitimate dispute as regards impact fees for new water connections.  The Defendant Cities argue that a monitor is unnecessary.[15]

Cooke involved a single victim and Colorado City's failure to supply utilities in violation of the Fair Housing Act.  This case involves multiple victims and multiple Fair Housing Act violations with respect to housing and services in the Defendant Cities.  The court is persuaded that the jury's findings demand injunctive relief.  Imposition of only

---

[13]See United States' Post-trial Brief Regarding Injunctive Relief at 20-22, Docket No. 939.

[14]See Amended Judgment and Permanent Injunction (dated Nov. 25, 2014), Docket No. 723 in 3:10-cv-08105-JAT Cooke v. Town of Colorado City.

[15]See Defendants' Joint Closing Argument Regarding Injunctive Relief at 24-25, Docket No. 1023.

the general injunctive relief contained in <u>Cooke</u> will not suffice.  A more specific injunction will not cause confusion.

Beyond a general prohibition of Fair Housing Act violations, resolution of the disagreement between Colorado City and the UEP Trust as regards the subdivision of Colorado City property is the most urgent problem.  That disagreement substantially and adversely affects the occupancy and availability of residential properties (housing) for all residents of Colorado City.

Colorado City has adopted a subdivision ordinance, the legality of which is in litigation in Maricopa County Superior Court.  The validity of the Colorado City subdivision ordinance is not a relevant issue in this Fair Housing Act case, nor is there any need for the court to resolve that matter for purposes of this case.  Irrespective of whether the Colorado City subdivision ordinance is or is not valid, legally enforceable property descriptions are a necessary predicate to stabilizing residential property occupancy and availability in Colorado City, free of discrimination based on religious differences.

Without a resolution regarding the subdividing of Colorado City property, the use of UEP Trust occupancy agreements will continue.  The FLDS Church's opposition to the UEP Trust is enabled by uncertainty as to the enforceability of occupancy agreements in Colorado City.  Subdivision of Colorado City residential property will further validate the UEP Trust's ownership of property and diminish the FLDS Church's ability to disrupt or impede transfer of title to residential properties to residents of Colorado City.

The UEP Trust's engineer (Renstrom) believes that a subdivision plat is ready for recording.  The court has not seen and doubts that there is in existence a Colorado City subdivision plat which Colorado City could be ordered to approve for recording.  It will

therefore be necessary for the UEP Trust and Colorado City to restart the process of finalizing a subdivision plat for Colorado City. Inasmuch as the UEP Trust is not a party to this case, the court is not in a position to order that it participate in the process of completing a subdivision plat. Nevertheless, the court believes that self-interest will dictate that the UEP Trust cooperate with plaintiff and Colorado City in producing a recordable subdivision plat.

The court rejects the Defendant Cities' contention that no injunctive relief is necessary as regards building permits. A requirement that the legal owner of property join in a building permit application will prevent the issuance of permits for the improvement of UEP Trust property by those who have no right to do so for lack of an occupancy permit. At present, building officials can turn a blind eye on applications to improve property by persons having no right to do so. A requirement that the legal owner sign a building permit application will impose no significant burden on either permit applicants or Colorado City.

As regards Colorado City water regulations, the initiation, termination, and/or transfer of domestic water service has been a source of Fair Housing Act violations. Plaintiff recognizes that defendant Colorado City has abandoned a former discriminatory water policy. Plaintiff argues, however, that the discriminatory ordinances remain on the books. They must be repealed. Under the court's general injunction against Fair Housing Act violations, the Defendant Cities must of course apply their existing water connection transfer policies in a nondiscriminatory fashion. Existing policies need to be reviewed and amended to assure the Defendant Cities' future compliance with the Fair Housing Act obligations.

As a consequence of the decision in Cooke, Colorado City abandoned a discriminatory water policy and adopted an impact fee system for new water connections. Applied in a nondiscriminatory fashion, impact fees are an appropriate basis for a municipality making new water connections available  However, as a consequence of evidence produced by plaintiff during the remedies hearing, it became apparent to the court that there is reason to believe that the current impact fee of $12,000 may be unnecessarily high.[16]  In light of the jury's finding that Colorado City engaged in a pattern or practice of restricting equal treatment and access to services in connection with housing, a review of Colorado City's entire water policy, including the current impact fee, is in order.

In light of the long history of antagonism between the FLDS Church and non-members, and in particular as a consequence of the entanglement of the FLDS Church and the Defendant Cities, and in light of the history of Fair Housing Act violations, a general review of the Defendant Cities' policies, procedures, and ordinances as regards non-discrimination in  municipal services, land use, and training of city employees is in order.   Engagement of an independent monitor by the Defendant Cities for purposes of assessing compliance with the court's injunction and the requirements of the Fair Housing Act is deemed both appropriate and necessary.

---

[16]Although the current impact fee was the result of the work of a professional engineer, it appears that the data furnished to the engineer by the Defendant Cities failed to segregate usage by residential customers from the usage of commercial or industrial customers, with the result that usage of residential customers was distorted upward.  In addition, there was testimony that water rights held by the UEP Trust might be made available to Defendant Cities on terms that could reduce the overall cost of water service.

IV.

POLICING ACT

A.  Law.  The "pattern or practice" part of the Policing Act, 42 U.S.C.

§ 14141(a), provides:

> It shall be unlawful for any governmental authority, or any
> agent thereof, or any person acting on behalf of a
> governmental authority, to engage in a pattern or practice of
> conduct by law enforcement officers ... that deprives persons
> of rights, privileges, or immunities secured or protected by the
> Constitution or laws of the United States.

Section 14141(b) authorizes civil actions by the Attorney General for violation  of

subsection (a), and provides that "the United States, may in a civil action obtain

appropriate equitable and declaratory relief to eliminate the pattern or practice."

Based upon detailed instructions,[17] the trial jury rendered three advisory verdicts

against the Defendant Cities.  The jury was satisfied by a preponderance of the evidence

that the marshal's office of Colorado City and City of Hildale had engaged in a pattern or

practice of violating the Establishment Clause of the First Amendment of the United

States Constitution and the Equal Protection Clause of the Fourteenth Amendment of the

United States Constitution.[18]  The jury was satisfied by a preponderance of the evidence

that the marshal's office of Colorado City and City of Hildale had engaged in a pattern or

practice of violating the Fourth Amendment of the United States Constitution because of

the unreasonable seizure of property, unreasonable seizure of a person, and arrest without

probable cause.[19]  As regards the Fourth Amendment, the jury advised that the marshal's

---

[17]See Jury Instruction Nos. 25 through 35.  Docket No. 913-1.

[18]See Verdict Forms 1, 5, Docket No. 932.

[19]See Verdict Form 1, Docket No. 932.

office had not engaged in unreasonable searches of property, had not made unreasonable investigatory stops or used excessive force in making a lawful arrest or other seizure or detention.[20]

The court and plaintiff disagreed on one aspect of the Policing Act instructions employed by the court. The court specifically instructed the jury that:

> A pattern or practice may not be established by combining a violation of one constitutional amendment with violations of another constitutional amendment.[[21]]

Even if erroneous, the court's instruction does plaintiff no harm. The jury found that a pattern or practice of unlawful policing had been established as regards all three of plaintiff's constitutional claims. A finding by the advisory jury and/or court of a pattern or practice of violating any one of the three constitutional amendments in question would entitle plaintiff to relief; and knowing the jury's thinking about the separate constitutional claims has informed the court as to the jury's thinking as to each amendment, which in turn will help inform the court as regards the nature and extent of remedies to be imposed.

B.  <u>Findings of Fact</u>.  Except as expressly stated below, the court adopts the jury's advisory verdicts with respect to violations of 42 U.S.C. § 14141.[22]  As expressly stated below, the court adopts the plaintiff's detailed findings of fact. The court makes the following summary findings with respect to the Defendant Cities' violation of the Establishment Clause of the United States Constitution, violation of the Fourteenth Amendment of the United States Constitution, and violation of the Fourth Amendment of the United States Constitution.

---

[20]<u>Id.</u>

[21]Jury Instruction No. 26, Docket No. 913-1.

[22]Verdict Forms 1, 3, and 5, Docket No. 932.

<u>Violation of the Establishment Clause</u>

(1)     The CCMO and other city officials subscribed to the beliefs of and were subject to pressure from the FLDS Church.[23]

(2)     The CCMO officers and city officials personally opposed the non-FLDS administration of the UEP Trust.[24]

(3)     The FLDS Church selected and controlled the CCMO and city officials.[25]

(4)     City officials sought and received direction regarding their official duties from the FLDS Church.[26]

(5)     The CCMO is entangled with FLDS security.[27]

(a)     The CCMO and FLDS Church security worked together to guard FLDS leadership and monitor outside law enforcement in the cities.[28]

(b)     The CCMO improperly provided training and equipment to FLDS security.[29]

(c)     The CCMO illegally shared law enforcement information with FLDS Church security.[30]

---

[23]United States' Digest of Proposed Findings of Fact, Docket No. 1022-2, ¶¶ 64 to 72.

[24]<u>Id.</u>, ¶¶ 73 to 79.

[25]<u>Id.</u>, ¶¶ 80 to 99.

[26]<u>Id.</u>, ¶¶ 100 to 127.

[27]<u>Id.</u>, ¶¶ 128 to 130.

[28]<u>Id.</u>, ¶¶ 131 to 135.

[29]<u>Id.</u>, ¶¶ 136 to 143.

[30]<u>Id.</u>, ¶¶ 144 to 149.

(d)     The CCMO aided FLDS Church security's harassment of non-FLDS members.[31]

(6)     CCMO officers and other city officials communicated with and financially supported FLDS Church's Prophet Warren Jeffs while he was a federal fugitive.[32]

(7)     The Defendant Cities engaged in the religiously biased hiring of three CCMO officers in 2014.[33]

(8)     Based upon the foregoing findings, the Defendant Cities, through the CCMO, engaged in a pattern or practice of discriminatory policing in violation of the Establishment Clause of the First Amendment to the United States Constitution.  That pattern or practice fostered excessive government entanglement with religion – a fusion of government and religion – that had the purpose or effect of endorsing, favoring, or promoting the FLDS Church at the expense of non-FLDS residents of the Defendant Cities.

Violation of Equal Protection Clause

(9)     The foregoing findings as regards the Establishment Clause are relevant with  respect to equal protection, for those findings reflect that FLDS Church leadership insisted upon city officials and CCMO officers advancing church and church members' interests in preference to the needs and interests of non-FLDS Church residents of the Defendant Cities.

(10)     CCMO officers turned a blind eye to criminal activity involving FLDS Church leaders or members.  The officers supported Warren Jeffs when he was a

---

[31] Id., ¶¶ 150 to 152.

[32] Id., ¶¶ 153 to 169.

[33] Id., ¶¶ 170 to 185.

fugitive,[34] ignored underage marriages,[35] ignored unauthorized distribution of prescription drugs,[36] ignored food stamp fraud,[37] and failed to cite or arrest the son of a church bishop.[38]

(11)    CCMO officers stood by while FLDS Church security effected a burglary at R&W Excavation, which had the purpose of stealing evidence of criminal activity by FLDS Church leader Warren Jeffs that had been gathered by a former FLDS Church member and owner of the R&W business.[39]  There were continuing efforts by CCMO officers to prevent the owner of R&W from recovering the materials that he had gathered. CCMO officers refused to provide police protection to R&W's owner and allowed FLDS Church security to steal records a second time.

(12)    CCMO policing – especially as to land access and use – was heavily slanted in favor of the FLDS Church and its members and against non-FLDS residents of the Defendant Cities.  CCMO officers failed to provide effective police services to non-FLDS Church members and the UEP Trust and its representatives.  In particular, officers arrested and harassed non-FLDS individuals for alleged trespassing on property, for which they had UEP Trust issued occupancy agreements, while accepting FLDS members' spurious occupancy claims, and otherwise assisting FLDS Church members in resisting the transfer of possession of UEP Trust property to non-FLDS members.

---

[34]Id., ¶ 193.

[35]Id., ¶ 194.

[36]Id., ¶ 204.

[37]Id., ¶ 209.

[38]Id., ¶ 221.

[39]Id., ¶ 226.

Overall, there was a lack of training as regards investigation and handling of landlord/tenant/trespass incidents, and CCMO reporting and record-keeping procedures were sloppy. CCMO handling of civil disobedience by FLDS members, especially as regards the occupancy of property, was inept and violative of non-FLDS residents' equal protection rights. Reports were sometimes not timely completed. Other reports were modified without preservation of the originals.[40]

(13)    CCMO officers refused to provide police services to UEP Trust's agent Wyler, who was viewed as an apostate working for the non-FLDS Trust.[41]

(14)    CCMO officers harassed and arrested or threatened to arrest Bishop William E. Jessop, failed to provide services and arrested Richard Holm, and arrested Jerold N. Williams because of their status as excommunicated FLDS members.[42]

(15)    CCMO officers ordered Christopher Jessop off property he occupied under a UEP Trust occupancy agreement on the theory that it was "church property."[43]

(16)    CCMO officers discriminated against non-FLDS member Guy Timpson by unreasonably arresting him in 2014 for trespass on a UEP property for which he had obtained an occupancy agreement while Timpson was in the process of posting an eviction notice to remove the occupant of the property who was a brother of FLDS leaders.[44]

---

[40]Id., ¶¶ 263 to 274.

[41]Id., ¶¶ 275 to 288.

[42]Id., ¶¶ 289 to 339.

[43]Id., ¶¶ 340 to 348.

[44]Id., ¶¶ 349 to 356.

(17)    CCMO officers blocked non-FLDS member Patrick Pipkin from entering his home in 2005, even when he obtained a UEP occupancy agreement, because Church leaders had directed Pipkin to leave the home and community.[45]

(18)    CCMO officers unreasonably arrested non-FLDS members Patrick Pipkin and Andrew Chatwin twice for trespassing after they had completed a commercial eviction for the UEP property formerly used as a zoo.[46]

(19)    Based on the foregoing findings, the Defendant Cities' CCMO engaged in a pattern or practice of conduct that violated the Equal Protection Clause of the United States Constitution by selectively enforcing the law based upon religion.

<u>Violation of Fourth Amendment</u>

(20)    CCMO officers properly came into possession of a horse owned by Lydia Stubbs.  The defendants wrongfully seized the horse by causing it to be euthanized, despite the fact that CCMO officers knew that Lydia Stubbs was owner of the horse.[47]

(21)    The advisory jury found that the CCMO violated the Fourth Amendment by the unauthorized seizure of a person.  The court believes that this finding was based upon the brief detention of Steven Bateman.  The advisory jury also found that plaintiff had not established any unreasonable investigatory stop.  The court finds that the CCMO officers' contact with Mr. Bateman was an investigatory stop which was, under all of the circumstances, not unreasonable in nature or duration.  It was not an unauthorized seizure of a person.

---

[45]<u>Id.</u>, ¶¶ 357 to 360.

[46]<u>Id.</u>, ¶¶ 361 to 388.

[47]<u>Id.</u>, ¶¶ 459 to 468.

(22)　The court concurs in the jury's advisory finding that the CCMO did not engage in the unreasonable search of property, unreasonable investigatory stops, or the use of excessive force in making a lawful arrest.  The court further finds that the unlawful arrests effected by CCMO officers did not involve the use of excessive force.

(23)　The arrest of Isaac Wyler in September of 2015, the arrest of Patrick Pipkin and Andrew Chatwin in October of 2015, the arrest of Richard Holm in July of 2015, the arrest of Guy Timpson in 2014, the arrest of Jerold N. Williams in 2012, and the arrest of William E. Jessop were all effected without probable cause.[48]

(24)　Based on the foregoing findings, Defendant Cities' CCMO engaged in a pattern or practice of conduct that violated the unreasonable seizure of property and arrest without probable cause aspects of the Fourth Amendment of the United States Constitution.

Relief Findings of Fact

(25)　Whether considered separately or in combination, the evidence produced at trial establishes by a preponderance of the evidence that Colorado City, the City of Hildale, and their CCMO engaged in a pattern or practice of violating the Establishment Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Fourth Amendment of the United States Constitution.

(26)　The United States  Department of Justice has investigated the operations of numerous, large police departments which were alleged to have engaged  in discriminatory policing in violation of 42 U.S.C. § 14141.  Despite allegations of extensive and extreme wrongdoing which has led to serious personal injury or death and

---

[48]Id., ¶¶ 479 to 484.

rioting with extensive property damage, none of those investigations resulted in the disbandment of local police organizations.

(27)     The Defendant Cities' CCMO has been deficient in many respects as discussed above.  The CCMO has suffered an unusually high rate of decertification by the Arizona and/or Utah POST.  CCMO policies and training of CCMO officers (especially in the handling of landlord/tenant/trespass matters and the enforcement of UEP occupancy permits) have been deficient.  Report-writing and record preservation have been deficient.  Oversight of the CCMO by officials of the Defendant Cities has been deficient.

(28)     Despite the foregoing deficiencies, the court finds that the problems at the CCMO are not so grave that the court should deprive the citizens of the Defendant Cities of the opportunity to police themselves.  The court deems disbandment of the CCMO as a last resort that should be employed only if less drastic remedies fail.

(29)     Disbandment of the CCMO and substitution of Mohave County (Arizona) and Washington County (Utah) sheriffs' deputies  would either be unreasonably expensive or would produce a lower level of police protection.  Disbandment would approximately double the cost of law enforcement for the Short Creek community or would necessitate a reduction in police protection.

C.     Conclusions of Law as to Policing Act.  In consideration of the jury's advisory verdicts[49] and the court's separate fact-finding, the court makes the following conclusions of law.

---

[49]Verdict Forms 1, 3, and 5, Docket No. 932.

(1)     The CCMO of Colorado City and the City of Hildale violated 42 U.S.C. § 14141 by engaging in a pattern or practice of policing that violated the Establishment Clause of the First Amendment of the United States Constitution.

(2)     The CCMO of Colorado City and the City of Hildale violated 42 U.S.C. § 14141 by engaging in a pattern or practice of policing that violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

(3)     The CCMO of Colorado City and the City of Hildale violated 42 U.S.C. § 14141 by engaging in a pattern or practice of policing that violated the Fourth Amendment of the United States Constitution in the following respects:  unreasonable seizure of property and arrests without probable cause.

(4)     Plaintiff and the Defendant Cities have come forward with separate, competing proposals for injunctive relief:  disbandment versus reorganization. Disbandment would in this case be the ultimate sanction and would be disproportionate in light of the nature and seriousness of the Policing Act violations found by the advisory jury and the court.  The relief plaintiff seeks is not reasonably tailored to address CCMO wrongdoing.  See Lamb-Weston, Inc. v. McCain Foods, Ltd., 941 F.2d 970, 974 (9th Cir. 1991) ("Injunctive relief ... must be tailored to remedy the specific harm alleged.")

(5)     At this time, the court is unwilling to give up on community policing for Short Creek by the Defendant Cities' CCMO.  The court is unpersuaded by plaintiff's arguments that the CCMO should be disbanded.  However, given the nature and extent of the violations of the Policing Act found in connection with the Defendant Cities' CCMO, simply enjoining future constitutional violations is insufficient.  The CCMO's Chief Marshal and officers are plainly in need of training and supervision.  The policies and procedures of the CCMO need to be reviewed and revised as detailed in Section V.B.

Engagement of an outside Consultant and independent Mentor for the Chief Marshal by the Defendant Cities for purposes of assuring future compliance with the requirements of the Policing Act, facilitating reformation of the CCMO, and compliance with Section V.B is deemed both appropriate and necessary.

V.

REMEDIES

A.     Law.  Each of the Policing Act, 42 U.S.C. § 14141(b), and the Fair Housing Act, 42 U.S.C. § 3614(d)(1)(a), authorizes the imposition of injunctive relief. Injunctive relief is generally available where:  (1) a plaintiff has suffered an irreparable injury;  (2) remedies available at law are inadequate to compensate for the injury; (3) considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) the public interest would not be disserved by an injunction.  eBay, Inc. v. MERCexchange, LLC, 547 U.S. 388, 391 (2006).  With respect to the Policing Act, only injunctive relief is available.  With respect to the Fair Housing Act, "[t]he primary purpose of an injunction in Fair Housing Act cases is to prevent future violations of the Act and to eliminate any possible recurrence of a discriminatory housing practice." United States v. Warwick Mobile Home Estates, Inc., 558 F.2d 194, 197 (4th Cir. 1977).

In this case, irreparable harm is presumed because the Defendant Cities have violated civil rights statutes.  Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 827 (9th Cir. 2001).  Only injunctive relief is available for Policing Act violations of constitutional mandates.  The monetary remedies that the jury imposed are inadequate to assure the defendant's future compliance with the Fair Housing Act. Certainly compliance with the Policing Act and Fair Housing Act places a burden upon the Defendant Cities; but compliance with the Constitution and the Fair Housing Act is

obligatory.  The Defendant Cities' failure to comply with the Constitution and the Fair Housing Act unduly burdens the residents of the Defendant Cities.  Here the hardships tip sharply in favor of granting an equitable remedy.  Finally, the public interest is plainly served by enforcement of the Constitution and the Fair Housing Act.

B.    <u>Policing Act Injunction</u>.    The advisory jury and court have determined that the Town of  Colorado City and City of Hildale (including the CCMO) engaged in a pattern or practice of conduct violating the First Amendment, Fourth Amendment, and Fourteenth Amendment of the United States Constitution.  In consideration of these violations of 42 U.S.C. § 14141, Colorado City and the City of Hildale (including the CCMO), their officers, employees, and agents, and their successors and all persons in active concert or participation with them, are hereby enjoined as follows:

(1)    they shall not engage in any conduct that

(a)    violates the Establishment Clause of the First Amendment of the United States Constitution; or

(b)    violates the Fourth Amendment of the United States Constitution, including the right of individuals to be free from unreasonable seizures of property and arrests without probable cause; or

(c)    violates the Equal Protection clause of the Fourteenth Amendment of the United States Constitution.

(2)    Within 15 days of the date upon which court approval of the selection of a Consultant is granted, Defendant Cities, at their expense, shall engage the services of a professional consultant in the field of policing and compliance with national guidelines for constitutional policing.  The parties shall confer regarding the selection of a Consultant and provide the court with an agreed-upon selection within 30 days of the

entry of this injunction. If the parties are unable to reach agreement on a Consultant within 30 days of the entry of this injunction, the parties shall, within 40 days of the entry of this injunction, each submit the name(s) of a potential consultant(s) to the court, and the court shall select one or more persons or entities to serve as the Consultant from among the candidates proposed by the parties.

    (3)    With the assistance of the Consultant, the Defendant Cities:

    (a)    Within 60 days of the date of engaging the services of a Consultant, the Defendant Cities shall develop – and upon receipt of approval from the United States shall implement and adhere to – new policies and procedures for hiring new officers. These new policies and procedures shall restructure the hiring committee to remove the Colorado City Town Manager, the Hildale City Manager, and any representative from the Colorado City Town Council and the Hildale City Council from that committee. Once approved, the policies and procedures for hiring new officers shall not be modified, except with the concurrence of the Consultant and the United States, during the term of this injunction.

    (b)    Within 90 days of the date of engaging the services of a Consultant, the Defendant Cities shall advertise and conduct a wide-ranging search for candidates to fill two additional police officer positions. The positions shall be filled within 6 months of engaging the services of a Consultant.

    (c)    Within 60 days of the date of engaging the services of a Consultant, the Defendant Cities shall develop – and upon receipt of approval

from the United States – implement and adhere to new policies and procedures for the conduct of internal affairs investigations. The new policies and procedures shall remove the Colorado City Town Manager, the Hildale City Manager, and any representative from the Colorado City Town Council and the Hildale City Council from being involved in CCMO internal affairs investigations.

(d)     Within 120 days of the date of engaging the services of a Consultant, the Defendant Cities shall conduct a comprehensive review of all CCMO's policies and procedures; all CCMO policies and procedures shall be updated and/or revised after consultation with the Consultant and compiled in a single policies and procedures manual. The policies and procedures manual shall, upon receipt of consent from the United States, be adopted within 45 days by the councils of the Defendant Cities. The policies and procedures should, subject to guidance from the Consultant, include guidelines for the search and seizure of property, the seizure of a person, lawful arrest(s), conduct of investigations, report writing, and record preservation. Once approved, any future modifications to the policies and procedures manual shall not take effect without the concurrence of the Consultant and the United States during the term of this injunction.

(e)     Within 1 year of the date of this injunction, the Defendant Cities shall purchase body cameras for the CCMO officers and implement a pilot program for their use. The Defendant Cities shall also ensure that the new policies and procedures for the CCMO (as discussed in

subsection (d) above) include a policy regarding the use of body cameras and the storage of their data.

(f)     The Defendant Cities shall  provide yearly training to all CCMO officers regarding the First, Fourth, and Fourteenth Amendments, the state and federal Fair Housing Acts, landlord/tenant law, trespass law, and any other topics that the Defendant Cities deem appropriate. The training shall be conducted by a qualified third person or organization other than the Defendant Cities' attorneys, and the qualified person or organization must be approved in advance by the United States.  The training will be of at least three hours' duration and, at the discretion of the trainer, up to six hours.  The Defendant Cities shall bear all costs associated with the training.  The Defendant Cities shall seek and obtain approval from the United States for the training syllabus and/or materials before the training is delivered.  The Defendant Cities shall also provide a copy of the sign-in sheet from each training session to the United States within 14 days after each training session is complete.   The Defendant Cities shall video-record each training session and require each new officer hired since the last training session to watch the recording and receive any materials provided at the training.

(g)     The Chief Marshal for the CCMO shall seek to meet with the Washington County Sheriff and the Mohave County Sheriff to build a better working relationship and to obtain their input on key law enforcement issues facing the CCMO.

(h)     Within 15 days of the date upon which court approval of the selection of a Mentor is granted, the Defendant Cities shall hire a Mentor for the Chief Marshal.  The parties shall confer regarding the selection of the Mentor and provide the court with an agreed-upon selection within 45 days of the entry of this injunction.  If the parties are unable to reach agreement on a Mentor within 45 days of the entry of this injunction, the parties shall, within 60 days of the entry of this injunction, each submit the name(s) of potential mentor(s) to the court, and the court shall select one or more persons or entities to serve as the Mentor from among the candidates proposed by the parties.  The Mentor shall come from a nationally-recognized police organization, such as the Police Executive Research Forum or the International Association of Chiefs of Police.  This Mentor shall meet with the Chief Marshal at least once a month during the first year from the hiring of the Mentor and advise the Chief Marshal in the performance of his job and the conduct of the CCMO.  The Defendant Cities shall pay all costs associated with this Mentor. The length of the contract between the Defendant Cities and the Mentor shall be for at least 1 year, with the option to renew the contract. The Defendant Cities shall provide a copy of this contract to the United States.

C.     Fair Housing Act Injunction.  The jury has determined that the Town of Colorado City and City of Hildale engaged in a pattern or practice of conduct that violated the Fair Housing Act, 42 U.S.C. § 3604(a) and (b) and § 3617.

Section 3614(d)(1)(A) authorizes injunctive relief.  In consideration of violations of the Fair Housing Act, Colorado City and the City of Hildale, their officers, employees, and agents, and their successors and all persons in active concert or participation with them, are hereby enjoined as follows:

(1)     They shall not engage in any conduct that violates Section 3604(a), (b) or Section 3617 of the Fair Housing Act; in particular, the Defendant Cities are enjoined from:

    (a)     making housing unavailable or denying housing opportunities  to individuals because of religion in violation of 42 U.S.C. § 3604(a);

    (b)     discriminating in the terms, conditions, or privileges of the rental or sale of a dwelling because of religion, in violation of 42 U.S.C. § 3604(b); or

    (c)     coercing, intimidating, threatening, or interfering with a person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, a right granted by the Fair Housing Act, in violation of 42 U.S.C. § 3617.

Approval of Subdivision Plat

(2)     Plaintiff shall initiate renewed discussions between the UEP Trust representatives and Colorado City representatives as regards approval of a subdivision plat of Colorado City.  Engineers for the Trust and for Colorado City shall be involved, and they (the engineers) shall identify any issues requiring resolution – and steps to be taken to resolve  them – for purposes of creating a final, recordable subdivision plat of Colorado City.

(a)     Within 30 days of the entry of this injunction, the parties shall report to the court as regards the issues to be resolved and the steps to be taken to resolve them.

(b)     Within 60 days of the entry of this injunction, the parties shall report to the court as regards the resolution of issues and steps taken to create a final subdivision plat.  If there are disagreements that the parties are unable to resolve, plaintiff and defendant shall present the same to the court for resolution.

(c)     Once any outstanding issues have been resolved, the UEP engineer shall produce a final subdivision plat of Colorado City.  The plat will be executed on behalf of the UEP Trust, and Colorado City shall approve the subdivision plat and deliver it to the UEP Trust for recording.

(d)     The UEP Trust and Colorado City shall bear their own engineering fees.  The UEP Trust shall bear the cost of recording the subdivision plat.

<u>Adoption of Building Department Policies and Procedures</u>

(3)     Within 30 days of the entry of this injunction, the Defendant Cities shall develop and submit to the United States for its approval:  objective, uniform, non-discriminatory policies and procedures to govern the operation of the Defendant Cities' building department and the functions of the Defendant Cities' building official(s) ("Building Department Policies and Procedures") related to handling building permits and applications for associated licenses and certificates, including but not limited to building

permit application requirements, the plan review process, building inspections, bases for permit application denials and permit revocations, and the assessment of fees.

(4)     The Building Department Policies and Procedures shall specifically include the following:

(a)     a provision stating that the Defendant Cities may not take any action with respect to any building permit for arbitrary reasons, or on the basis of religion or religious affiliation;

(b)     a provision stating that the Defendant Cities shall not issue a building permit unless the applicant has provided the Defendant Cities with an application form that includes the signature of the property owner;

(c)     a building permit application form that includes lines for the name, contact information, and signature of the property owner or the owner's agent or representative;

(d)     a provision stating that if the Defendant Cities determine that any building permit should be declared void or expired, the Defendant Cities must provide at least 14 days' advance, written notice to the property owner and permit applicant of the permit expiration or cancellation.  The notice must state the basis for the Defendant Cities' decision that the permit is void or expired; and

(e)     a procedure that allows permit holders or permit applicants to file an appeal of an adverse decision by the Defendant Cities with respect to a permit (e.g., a decision to deny, withdraw, void, or cancel a permit).

(5)     Within 30 days of the United States' approval of the Building Department Policies and Procedures, the Defendant Cities shall implement the Building Department Policies and Procedures and make them available upon request in any office where municipal business is conducted or where the Defendant Cities' employees or officials regularly interact with members of the public.

(6)     Upon the United States' approval of Building Department Policies and Procedures, no building permit shall be issued on any application that does not include the signature of the property owner or the owner's agent or representative.

(7)     The Building Department Policies and Procedures may be modified only if written notice is given to counsel for the United States and to the Monitor (see paragraph 29 below) 30 days before the proposed modifications are to take effect and the United States and the Monitor make no objection thereto.  The notice referenced in this paragraph must specify the modification requested and any documentation supporting the modification.

(8)     The Building Department Policies and Procedures may not be enforced in a manner that discriminates based upon religion.

Amendments to Water Services Regulations

(9)     Within 30 days of the entry of this injunction, the Defendant Cities shall repeal outdated water service access regulations based on "new water" requirements and, within 60 days of the entry of this injunction, shall develop and submit to the United States for its approval proposed amendments to their Water Services Regulations to specify that, in order to transfer an existing water connection from the name of an existing customer to the name of a new customer where the existing customer has not applied to transfer service to the new customer's name, the new customer need only:  (a) attest,

under penalty of perjury, by signing and submitting the application for utility services, that the new customer owns the property for which he/she is seeking a utility connection or has the owner's permission to occupy or obtain utility services at the property, and (b) show proof of ownership of the property, permission to occupy, or obtain utility services at the property. Such documentation may take the form of a deed or an occupancy agreement, rental agreement, lease, or other document showing permission by the owner to occupy or seek utility services.

(10)     Under the revised Water Services Regulations, in order to transfer service for water or any other utility service, the Defendant Cities shall not require new customers to:  obtain the permission of the existing customer by using the Utility Services Disconnect or Termination Application form or by any other means; provide proof that the new customer has extinguished all other potential occupants' rights to the property at issue; or wait any period of time for utility service to be transferred so that the existing customer can be contacted if the new customer provides the attestation and proof of ownership or the right to occupy or obtain utility services described in the preceding paragraph.

(11)     Within 30 days of the United States' approval of the revised Water Services Regulations, the Defendant Cities shall implement the revised Water Services Regulations and make them available upon request in any office where municipal business is conducted or where the Defendant Cities' employees or officials regularly interact with members of the public.

(12)     The Water Services Regulations may be modified only if written notice is given to counsel for the United States and to the Monitor 30 days before the proposed modifications are to take effect and the United States and the Monitor make no objection

thereto.  The notice referenced in this paragraph must specify the modification requested and any documentation supporting the modification.

(13)    The Water Services Regulations may not be enforced in a manner that discriminates based upon religion.

Culinary Water Impact  Fee

(14)    The court shall appoint, using the procedures set forth below, a licensed engineer or engineering firm ("Engineer") to perform a review of the Defendant Cities' culinary water impact fee.

(15)    The parties shall confer regarding the selection of the Engineer and provide the court with an agreed-upon selection within 60 days of the entry of this injunction.  If the parties are unable to reach agreement on an Engineer within 60 days of the entry of this injunction, the parties shall, within 70 days of the entry of this injunction, each submit the name(s) of a potential Engineer(s) to the court, and the court shall select one or more persons or entities to serve as the Engineer from among the candidates proposed by the parties.

(16)    Within 90 days of the court's appointment of the Engineer, the Engineer shall perform a review of the Culinary Water Impact Fee Facilities Plan & Impact Fee Analysis for the Defendant Cities conducted by Sunrise Engineering and, after consultation with representatives of the UEP Trust, including the Trust's retained Engineer, the Defendant Cities, and any other person or entity the Engineer deems necessary, provide the parties and the court with an updated Culinary Water Impact Fee Facilities Plan and Impact Fee Analysis ("Updated Impact Fee Report").

(17)    Should the Updated Impact Fee Report recommend a maximum eligible impact fee that is lower than the Defendant Cities' current impact fee, the Defendant Cities shall revise their existing impact fee accordingly within 35 days.

(18)    The Engineer shall have timely, full, and direct access to any of  the Defendant Cities' officials or employees, documents, data, or any other information in the Defendant Cities' possession, custody, or control that the Engineer deems necessary to produce the Updated Impact Fee Report.

(19)    The Defendant Cities shall bear the cost of and cooperate freely and fully with all reasonable activities and requests of the Engineer.

(20)    The Engineer shall not be considered an employee or represented party of the Defendant Cities for purposes of Arizona Rule of Professional Conduct 4.2.

(21)    Except as indicated in paragraph 17, above, the amount of any impact fee for culinary water connections may only be modified if written notice is given to counsel for the United States and the Monitor 30 days before the proposed modification is to take effect and the United States and the Monitor make no objection thereto.  The notice referenced in this paragraph must specify the new impact fee amount and must include any reports or analyses supporting the modification.   The Culinary Water Impact Fee Plan shall be reviewed by a licensed engineer or engineering firm at no less than five-year intervals.

## Websites and Public Notice

(22)    Within 90 days of the entry of this injunction, the Defendant Cities shall develop publicly available internet websites for each municipality, if such websites do not already exist.  The Defendant Cities shall maintain these websites with the information specified below for the duration of this injunction.

(23)     The Defendant Cities shall prominently post on the "home page" for each website the following:

(a)     The identity and contact information for every elected or appointed city official, as well as the head of each city department.

(b)     Notice of all upcoming city council meetings and utility board meetings.  Notice of city council meetings shall be posted at least 24 hours prior to any city council meeting and must include notice of all topics to be addressed at the meeting and copies of any proposed ordinances, policies, or motions that may be the subject of a vote at the meeting.

(c)     An internet link to mechanisms to apply via the internet or access any forms required by the Defendant Cities to apply for any municipal services, including but not limited to building permits, utility connections or transfers, subdivision applications, and public-records requests.

(d)     An internet link to the current versions of all municipal ordinances and codes as well as all municipal regulations, procedures, and policies, including the CCMO policies and procedures manual and any revisions made pursuant to Section V.B. above, the Building Department Policies and Procedures, developed pursuant to Section V.C, paragraphs 3 through 8, above, and the Water Services Regulations, revised pursuant to Section V.C, paragraphs 9 through 13, above.  All documents linked pursuant to this subparagraph shall be updated within 30 business days of any adoption, amendment, or

repeat.  The Defendant Cities shall maintain paper and electronic copies of all versions of the documents described in this paragraph in effect for the duration of this injunction.

(e)     The following language, which will include an internet link to this injunction:

> "The United States District Court for the District of Arizona has held that the City of Hildale and the Town of Colorado City engaged in illegal discrimination on the basis of religion and have violated the federal Fair Housing Act, the First, Fourth, and Fourteenth Amendments of the United States Constitution, and the provisions of 42 U.S.C. § 14141.  The District Court has ordered the City of Hildale and the Town of Colorado City to make certain changes to the operations of the local government to ensure the City and Town are complying with federal law.  You may view and print a copy of that injunction here [linking to this order]."

<u>Mandatory Education & Training</u>

(24)     Within 90 days of the entry of this injunction, and annually thereafter for the duration of this injunction, the Defendant Cities shall provide in-person training on the requirements of this injunction, the policies, procedures, and regulations, and ordinances adopted or amended pursuant to Section V.C of this injunction, the requirements of the First Amendment, the Fourth Amendment, and the Fourteenth Amendment to the United States Constitution, and the requirements of the Fair Housing Act to the following individuals:  (1) all city council members; (2) all elected officials, including the mayors of the Defendant Cities; (3) all members of the Utility Board; (4) the city/town managers; (5) all employees or officials who have duties related to the planning, zoning, permitting, construction, or occupancy of residential housing; and (6) all employees or officials responsible for approving, initiating, or stopping the provision of water service, sewer service, waste-disposal service, or other similar, municipal services

to real property.  In addition to addressing the requirements identified above, the training shall specifically address the appropriate separation between municipal government, and the functions of municipal government and the FLDS Church, or any other religious entity.

(25)    The training shall be conducted by a qualified third person or organization other than the Defendant Cities' counsel, and the qualified person or organization must be approved in advance by the United States.  The training shall be video-recorded and will be of at least 3 hours' duration.  The Defendant Cities shall bear all costs associated with the training.

(26)    Within 60 days of the entry of this injunction, the Defendant Cities shall supply the name of the person(s) or organization(s) proposed to provide training pursuant to this section to counsel for the United States, together with copies of the professional qualifications of such person(s) or organization(s) and copies of all materials to be used in the training.

(27)    Within 30 days of when an official or employee is hired in a position covered by paragraph 24 above, or undertakes new duties that would require him/her to attend training under the terms of this injunction, the Defendant Cities shall require such person to watch the training video and distribute to each such person copies of all written materials from the most recent training session.

(28)    All persons required to attend training under the terms of this injunction shall verify, under penalty of perjury, that they attended each required training session. Verification of attendance shall be submitted to the United States, for the initial training, and to the Monitor, for all trainings thereafter.

## Monitor

(29)    The court shall appoint, using the procedures set forth below, one or more monitors ("Monitor") who shall have the authorities and responsibilities set forth below.

(30)    The parties shall confer regarding the selection of the Monitor and provide the court with an agreed-upon Monitor within 90 days of the entry of this injunction.  If the parties are unable to reach agreement on a Monitor within 90 days of the entry of this injunction. the parties shall, within 100 days of the entry of this injunction, each submit the name(s) of potential Monitor(s) to the court, and the court shall select one or more persons or entities to serve as the Monitor from among the candidates proposed by the parties.

(31)    The Monitor shall have the responsibility of reviewing municipal decisions by the Defendant Cities implicating the Fair Housing Act and overseeing implementation of all aspects and terms of this injunction.  As part of his/her monitoring role, the Monitor shall:

(a)    Conduct regular site visits, during which the Monitor shall interview city officials, review documents, and attend meetings.  The Monitor may also request interviews or meetings with, or request documents from, any other person or entity the Monitor deems relevant to conducting his/her other responsibilities.  Statements made by Hildale and Colorado City officials to the Monitor shall be subject to penalties for perjury.

(b)    Review the Defendant Cities' handling of all applications or requests related to utilities (both new utility connections and utility transfers), building permits and associated licenses and certificates, subdivision,

zoning amendments and variances, and applications for exceptions to or relief from any municipal land-use decisions, rules, or ordinances. In the event that any of the above-described applications or requests are denied or not decided within 30 days, the Defendant Cities must provide to the applicant(s) and to the Monitor the reason(s) for any such situations in writing.

(c)     Review all modifications (including enactments, adoptions, amendments, or repeals) by the Defendant Cities, or any component department or board, to any ordinances, regulations, procedures, or policies affecting housing or related to the provision of municipal services related to housing, including but not limited to those related to zoning, planning, subdivision, building permits, licenses, residential rental taxes, and utility service connections (e.g., culinary water service, irrigation water service, sewer service, and waste disposal).

(d)     Review all complaints by any resident or other person or entity regarding any municipal actions considered or taken by the Defendant Cities potentially affecting rights associated with housing, including associated municipal services and policing services related to housing, and investigate such complaints as the Monitor deems appropriate.

(e)     Review any changes proposed by the Defendant Cities to the Building Department Policies and Procedures, the Water Services Regulations, or the culinary water impact fee and provide a statement

of objection or no-objection to the Defendant Cities and the United
States within 30 days of receiving notice of the proposed changes.

(f)     Issue reports to the parties and the court containing an analysis of the
Defendant Cities' progress towards compliance with the terms of this
injunction, as described in Section V.C, paragraphs 39 through 40,
below.

(32)    The Monitor shall not be considered an employee or represented party of
the Defendant Cities for purposes of Arizona Rule of Professional Conduct 4.2, and
counsel for the parties are not restricted in any way from communicating directly and ex
parte with the Monitor; but any such communication(s) shall be by hard copy or
permanently stored electronic form.

(33)    The services, operations and facilities to be monitored include all the
Defendant Cities' services, operations, and facilities provided in connection with a
dwelling or associated with, affecting, or relating to housing or the ability to own or
occupy a dwelling, including but not limited to culinary water (including service, supply,
connections, fees, and development), building permits, subdivision approval, land use,
planning and zoning, and the provision of police services affecting rights under the Fair
Housing Act, irrespective of how the Defendant Cities have or shall have organized,
structured, incorporated, or titled such services, operations, or facilities.

(34)    The Monitor's obligations and authority shall include monitoring for
compliance with this injunction by the Defendant Cities' councils, commissions, boards,
committees, departments, elected and non-elected and appointed and non-appointed
officials, officers, council or board members, personnel, employees, agents, servants,
delegates, designees, bailees, business partners, and joint venturers.

(35)     The Monitor's ongoing responsibility and authority under this injunction to conduct monitoring shall not be impacted by any modification by the Defendant Cities of who provides or manages any relevant services, operations, or facilities, or how any such services, operations, or facilities are provided or managed.

(36)     The Monitor shall have timely, full, and direct access to any relevant individuals, documents, meetings, reviews, data, or trainings that are in the possession, custody, or control of the Cities and are necessary to evaluate compliance with this injunction.

(37)     The Defendant Cities shall bear the cost of and cooperate freely and fully with all reasonable monitoring activities and requests of the Monitor.  Such cooperation shall include, but is not limited to:

(a)     Providing the Monitor with advance, timely notice of all regular and emergency public meetings of Defendant Cities' councils, boards, commissions,  committees and departments, sufficient to allow the Monitor adequate time to make arrangements to attend such meetings.

(b)     Allowing the Monitor full access to all meetings described in the preceding paragraph.

(c)     Providing the Monitor advance, timely notice of every instance in which a council, board, or other arm or department of the Defendant Cities intends to meet in executive session, with a description of the purposes for the executive session.  The Monitor shall be empowered to request attendance at all such executive sessions and, in the event attendance is denied, the Defendant Cities shall maintain an audio

recording of the executive session and the Monitor shall have the right to petition this court for a further order, upon a showing of good cause to believe that the executive session involves matters relevant to compliance with the terms of this injunction, the United States Constitution, or the Fair Housing Act, requiring the Defendant Cities to allow the Monitor to attend the relevant executive session(s) or, if the executive session has taken place, to have a copy of the recording of the executive session and any documents discussed at the executive session. In the event a Monitor attends an executive session or receives access to a recording of an executive session as provided in this injunction, the Monitor shall comply with the laws of the applicable state governing confidentiality of legitimate executive session information. The Monitor's presence at any executive session, or review of any recording of any executive session, shall not waive any attorney-client privilege between the Defendant Cities and their attorneys in the event their attorneys provided legal advice or consultation during any such executive session.

(d)     Allowing and facilitating the Monitor's full access to all individuals, documents, meetings, reviews, data, and trainings as described in the preceding paragraphs; and

(e)     Providing and facilitating the Monitor's free, open, and immediate access to all documents, records, files, and information of the Defendant Cities, including without limitation: (1) all paper,

electronic, photographic, video and audio data, information, documents, files, or records within the custody or control of the Defendant Cities or their agents; (2) all correspondence or communications (including without limitation all electronic mail, instant messaging, radio, text or other forms of communication) to, from or among any of the Defendant Cities' councils, boards, commissions, departments, committees, elected and non-elected and appointed and non-appointed officials, officers, council members, board members, personnel, employees, contractors, agents, servants, delegates, designees, bailees, business partners, joint venturers, vendors, financers and suppliers; and (3) any and all planning, policy, reporting, decision-making, or investigative records or materials of the Defendant Cities.  This section does not authorize the Monitor to obtain any documents or correspondence covered by the attorney-client privilege between the Defendant Cities and their attorneys.  If the Monitor believes that it is entitled to attorney-client privileged documents or correspondence, it shall file a request with the court.  The Defendant Cities may file a response to this request within 14 days, after which the court will issue any necessary ruling. If the court rules that the Monitor is entitled to attorney-client privileged documents or correspondence, the Monitor shall not disclose these documents or correspondence to the United States or any third party absent prior approval from the court.

(38)     Except as required or authorized by the terms of this injunction or the parties acting together, the Monitor shall not make any public or press statements (at a conference or otherwise) or issue findings with regard to any act or omission of the Defendant Cities or their agents, representatives or employees, or disclose information provided to the Monitor pursuant to this injunction.  Absent a court order, the Monitor shall not testify in any other civil litigation or proceeding with regard to any act or omission of the Defendant Cities or any of their agents, representatives, or employees related to this injunction, nor testify in any other civil litigation or proceeding regarding any matter or subject that he or she may have learned as a result of his or her performance under this injunction, nor serve as a non-testifying expert in any other civil litigation or proceeding regarding any matter or subject that he or she may have learned as a result of his or her performance under this injunction.  Unless such conflict is waived by all parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this injunction, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the Defendant Cities or their departments, officers, agents, or employees.  The Monitor is not a state/county or local agency or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records subject to public inspection.  Neither the Monitor nor any person or entity hired or otherwise retained by the Monitor to assist in furthering any provision of this injunction shall be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to this injunction.  This provision does not apply to any proceeding before a court related to

performance of contracts or subcontracts for monitoring this injunction. The Monitor shall be considered an agent of the court.

(39)     The Monitor shall provide to the parties a written report every 90 days for the first 2 years following the appointment of the Monitor. After the first 2 years, the Monitor shall, in his or her discretion and with the approval of the United States, decrease the frequency of reporting to every 6 months. The Monitor will report to the court upon the court's request.

(40)     The reports to the parties described in the previous paragraph shall set forth the complete efforts and findings of the Monitor over the reporting period regarding compliance by the Defendant Cities with the terms of the injunction. The reports will, at a minimum:  (1) detail the Monitor's activities as described in Paragraph 31, above, and (2) identify any obstacles to the work of the Monitor and any resistance on the part of city officials to the implementation of this injunction or the work of the Monitor.

(41)     Should the Monitor determine that any action or inaction by the Defendant Cities, including but not limited to actions taken in connection with any applications or requests regarding any utility services, building permits, zoning amendments or variances, or subdivision, or any modification to any ordinance, regulation, policy, or procedure, constitutes evidence of a violation of the terms of this injunction, or evidence of discrimination because of religion, or a violation of the Fair Housing Act, the Monitor shall report to the United States and the Defendant Cities in writing and demand immediate action by the Defendant Cities to correct such issues.

(a)     The Monitor  shall promptly report to the parties any alleged non-compliance with the terms of this injunction. The Defendant Cities shall, within 15 days of the date of the Monitor's report (or

such greater time as the Monitor may recommend) provide the United States and the Monitor with a written, comprehensive response to the Monitor's report.

(b)     The Defendant Cities will make available for interviews, to be conducted by the United States, any employees or agents of the Defendant Cities whom the United States wishes to interview in connection with the Monitor's report.

VI.

## RECORDS AND RIGHTS TO ACCESS

(1)     The Defendant Cities shall be responsible for maintaining and preserving, or supervising the maintenance and preservation, of all records, including but not limited to electronic records and files, created in association with complying with this injunction.

(2)     Upon request of the Monitor, the parties and their attorneys shall have full and direct access to all staff, employees, facilities, documents, records, files, and data related to this injunction.  The United States shall also be permitted to accompany the Monitor on any inspections or tours.  Upon reasonable notice to counsel for the Defendant Cities, representatives of the United States or the Monitor shall be permitted to inspect and copy all records associated with compliance with this injunction at any and all reasonable times or, upon request by the United States, the Defendant Cities shall provide copies of such documents.  This right of access shall apply to all aspects of this injunction.

(3)     The United States will work with the Defendant Cities and their attorneys to access involved personnel, documents, and facilities in a reasonable manner that is

consistent with the United States' right to seek enforcement of this injunction and minimizes interruptions to daily operations.

(4)     Any Monitor appointed in this case will, along with the United States, maintain all confidential or non-public information in a confidential manner.

VII.

JURISDICTION, DURATION, ETC.

(1)     This court has jurisdiction of this case pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 3614.  The court shall retain jurisdiction over this case to enforce the terms of this judgment and injunction.

(2)     The injunctive relief granted by this judgment and decree shall be in effect immediately upon entry.  Except as expressly provided otherwise, the injunctive relief (Section V(B) and V(C)) shall remain in effect for ten years or until otherwise ordered by the court.

(3)     Plaintiff may move the court to extend the duration of the injunction in the event of noncompliance, whether intentional or not, with any of its terms, or if it believes the interests of justice so require.

(4)     Modification of this injunction, Sections V(B) and V(C), may be sought as follows:

(a)     Any time limits for performance imposed by this injunction may be extended by mutual written agreement of the parties and notice to the court.   If the parties are unable to reach an agreement as to the extension of a time limit, a party may move, on shortened time, filed before the expiration of the time limit in question, for an order of the court, granting an extension of time.  Extensions of time may be

granted only for good cause shown. After-the-fact motions for extensions of time will not be approved except by mutual written agreement of the parties.

(b)     Provisions of this injunction other than time limits may be modified by motion to and order of the court.

(5)     The parties shall endeavor in good faith to resolve informally any differences regarding interpretation of and compliance with this injunction prior to bringing such matters to the court for resolution. However, in the event the United States contends that there has been a failure by the Town of Colorado City or the City of Hildale, whether willful or otherwise, to perform in a timely manner any act required by this injunction or otherwise to act in conformance with any provision hereof, the United States may move this court to impose any remedy authorized by law or equity, including, but not limited to, an order requiring performance of such act or deeming such act to have been performed, and an award of any damages, costs, and reasonable attorney fees which may have been occasioned by the violation or failure to perform.

(6)     The parties agree that, as of the date of entry of this injunction, litigation is not reasonably foreseeable concerning the matters described herein. To the extent that any party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in this injunction, the party is no longer required to maintain such a litigation hold.

(7)     The preceding paragraph does not relieve the Defendant Cities of any record-keeping responsibilities imposed by the terms of this injunction.

(8)     The United States shall submit its petition for costs within 90 days of the entry of this injunction. All parties shall be responsible for their own attorney fees.

(9)     Communications in furtherance of the implementation, compliance, or enforcement of remedies shall be directed as follows:

    to plaintiff:

        Sean Richard Keveney
        United States Dept. of Justice
        Civil Rights Division
        950 Pennsylvania Ave. NW
        Washington, DC 20053

        Phone:      202-514-4838
        Fax:        202-514-1116
        E-mail:     sean.r.keveney@usdoj.gov

    to Colorado City:

        Jeffrey C. Matura
        Graif Barrett & Matura, P.C.
        1850 North Central Avenue, Ste. 500
        Phoenix, Arizona 85004

        Phone:      602-792-5721
        Fax:        602-792-5710
        E-mail:     jmatura@gbmlawpc.com

    <and>

        Town Manager
        Town of Colorado City, Arizona
        P.O. Box 70
        Colorado City, Arizona 86021

        Phone:      928-875-2646
        Fax:        928-875-2778
        E-mail:     manager@tocc.us

    to Hildale City:

        R. Blake Hamilton
        Durham Jones & Pinegar, P.C.
        111 South Main Street, Ste. 2400
        Salt Lake City, Utah  84111

        Phone:      801-297-1419
        Fax:        801-415-3500
        E-mail:     bhamilton@djplaw.com

    <and>

Mayor – Hildale City, Utah
320 East Newel Avenue
P.O. Box 840490
Hildale, Utah  84784

Phone:          435-874-2323
Fax:            435-874-2603
E-Mail:         mayor@hildalecity.com


DATED at Anchorage, Alaska, this  18th  day of April, 2017.


/s/ H. Russel Holland
United States District Judge