

February 1, 2018     *CV-12-8123- PCT-HRH*

To: United States District Court for the District of Arizona

From: Roger Carter, Court Monitor

**Re: February 2018 Monitoring Report for the cities of Colorado City, Arizona and Hildale, Utah.**

This report is submitted in compliance with § V.C. (39) of the Judgement and Decree Granting Injunctive Relief ("Order"), requiring a written report every 90 days on injunction compliance by the Defendant Cities and the activities of the Court Monitor. This report will cover the period from November 1, 2017, to January 31, 2018, and include a current status of compliance on all the Order requirements, identify any obstacles to the work of the Monitor, and provide general observations (§ V.C. (40)).

<u>Fair Housing Injunction Requirements</u>

<u>Approval of the Subdivision Plat</u>

The Subdivision Plat for Colorado City was recorded in Mohave County, September 26, 2017. Requirements of this Order are complete. The Cities are currently working on establishing their, first-ever, zoning ordinances.

<u>Adoption of Building Department Policies and Procedures</u>

A. The Building Department Policies and Procedures were approved by the United States and adopted by Colorado City, Arizona on September 11, 2017. They were adopted by Hildale, Utah on September 12, 2017. This requirement is complete.

B. The Building Department application was revised, as per the Order, and is currently in use. This requirement is complete.

C. Record audits are conducted by the Monitor to determine compliance with policies and the Order and no incident of non-compliance was found during this reporting period.

D. An electronic system of processing was established with the Cities that allow the Monitor to oversee the application process and to collect data on the responsiveness of the department. An example of the summary page of this collection system is provided[1].

E. No additional changes to policies or procedures have occurred during this reporting period.

Water Service Regulations

A. The Building Department Policies and Procedures were approved by the United States and adopted by Colorado City, Arizona on September 11, 2017. They were adopted by Hildale, Utah on September 12, 2017. This requirement is complete.

B. New Utility Service Applications were developed, as per the requirements of the Order, and are currently being used. This requirement is complete.

C. Record audits are conducted by the Monitor to determine compliance with policies and the Order and no incident of non-compliance was found during this reporting period.

D. Similar to the Building Department application process, an electronic utility application process was established which allows the Monitor to oversee compliance, responsiveness and to collect data. An example of the summary page of this collection system is provided[2].

Culinary Water Impact Fee

As per the Order, a new Culinary Water Impact Fee Facilities Plan & Impact Fee Analysis was completed by Alpha Engineering on January 25, 2018, and submitted to all Parties.[3] This analysis recommends a new impact fee, which will need to be adopted by the Cities within 35 days. **This requirement is complete except for the adoption of the Culinary Water Impact Fee.**

Website

---

[1] Exhibit A
[2] Exhibit B
[3] Exhibit C

A. The Cities have posted all of the contact information for the elected and appointed officials as well as the Department Heads to their website.  This requirement is complete.

B. 24-hour notice of all upcoming meetings, as well as the minutes from previous meetings, have been posted.  **There have, on occasion, been some conflicting meeting dates posted to the website for Hildale, Utah meetings and they have been cautioned to take more care in this area.**

C. All municipal codes, department policies and regulations, Building Department policies and regulations, water connection requirements and regulations, subdivision applications and information, Marshal's Office policies, public records requests, and contact information of the Monitor have all been posted to the Cities websites.  This requirement is complete.

Mandatory Education and Training

The Order required training for all employees outlined in § V.C. (24) in the U.S. Constitution, Fair Housing, and the Orders of the Injunction.

A. Constitutional Training occurred on September 25, 2017.  The recording of this training is to be provided to all new employees within 30-days of hire.  The Monitor was provided an updated list of new employees who have completed this training and those who have yet to be trained.  **In several instances, the training was not completed within the required 30-day period.  Furthermore, there were some missing dates on when the videos were watched by the employees.  The Monitor has since created a new Training Affidavit sheet which will be completed on each employee[4].**

B. Fair Housing Training occurred on September 5, 2017.  The recording of this training is to be provided to all new employees within 30-days of hire.  The Monitor was provided an updated list of new employees who have completed this training and those who have

---

[4] Exhibit D

yet to be trained.  **In several instances, the training was not completed within the required 30-day period.  Furthermore, there were some missing dates on when the videos were watched by the employees.  The Monitor has since created a new Training Affidavit sheet which will be completed by each employee.**

C. **Injunction Training has not occurred to-date.  The Cities are currently non-compliant with this requirement.**  All parties have agreed to complete the training as soon as possible.

Marshal's Office

The Monitor is to ensure that there are no violations of Fair Housing requirements by employees of the Marshal's Office during their interactions with the public.

A. A requirement was placed upon the Marshal's Office to report to the Monitor, within 24 hours, any calls for service that involves housing, land-use, utility, or building issues. **Although complied with, there have been incidents within this reporting period when this has not been reported within the 24-hour timetable.**

B. To verify that the Monitor is receiving all the calls for service, the Marshal's Office is required to turn in a monthly Computer Aided Dispatch ("CAD") report, from Dispatch. This report will then be compared to the reporting of the officers.  **This has been a time-consuming and challenging request.  The Monitor has been working with the Police Consultant to receive this report.  The first report was recently provided to the Monitor.  Often, In reviewing the specific calls of service, there is a lack of detailed information in their Incident Report.  The Monitor would request that, with the assistance of the Police Consultant, the CAD report be regularly provided, with no missing incident numbers, and more detailed reporting.**

C. The Monitor has worked closely with both the Police Consultant and Mentor and provides the following summary as provided by them.

a. Police Consultant-A draft of the policy manual was completed in early December and sent to the Department of Justice (DOJ) for their review. The DOJ indicates that they hope to have these policies reviewed and completed by the end of June 2018. Implementation of these policies will occur as they are approved by the DOJ. Three new officers were hired and are currently in training. They are scheduled to graduate in April 2018. Concern has been raised by the Consultant about the ability of the Marshal's Office to make the necessary adjustments, as outlined in the Order, with the existing staff. The Consultant has expended a great deal of energy in assistance with marginal signs of improvement. Currently, one officer remains charged through the Mohave County Attorney's office, one officer has resigned and will be leaving in two weeks, and another has indicated that he will be resigning as soon as the recruits are in place. Recently the Consultant was asked not to be involved in the CAD or incident reports and to focus on those items that specifically pertain to the Order.

b. Mentor-The Mentor indicates that the Chief of the Marshal's Office has never reached out to him for assistance. During their visits, the Chief often complains about the injustice of the Order and how it has affected him and his officers. This continues to create a challenging environment within the department. When the Mentor leaves messages for the Chief, they are not returned promptly. The Monitor has recently met with the Chief to express these concerns, and the Chief has committed to doing better.

Monitor

During this reporting period, the Monitor:

A. The Monitor attended city and town council meetings, planning commission meetings, utility board meetings and executive sessions.

B. Met with staff and elected officials.

C.  Reviewed modifications to codes or ordinances that pertain to Fair Housing, including early discussions with staff on the developing zoning ordinances.

D.  Followed up on the following complaints by residents:

   a.  A complaint was filed by an insurance agency complaining that their request for home fire inspections has been ignored.  The inability to obtain a fire inspection has resulted in a delay in mortgage approvals.  The Monitor contacted the City and communication has initiated between them and the insurance agency.  Fire inspections are currently happening.

   b.  A complaint was filed by a business owner complaining that the City was not responding or providing information on what he needed to apply for an alcohol license.  This issue has now come before the new Hildale, Utah Town Council and is in the process of being resolved.

<u>Obstacles</u>

Although the work with the Cities has been overall positive, this most recent reporting period has shown a little more effort being required for the Cities to be proactive in their efforts of reporting and responding.  Recently, the Monitor provided a memo[5] to the Cities outlining their reporting requirements and reminding them of their responsibility to proactively comply and report.  There have been several examples of the Cities not monitoring their deadlines or needing the Monitor to remind them, for example:

A.  **Fire Inspections -** Colorado City initially failed to follow up with the Monitor on addressing the fire inspection complaint.

B.  **Providing of Documents -** A complaint was submitted to the Monitor that the previous Hildale Town Council was holding a special meeting to handle a land sale which could be discriminatory.  The Monitor requested documents about this, but no response was

---

[5] Exhibit E

received.  Ultimately, the decision was tabled until the new Town Council could hear the issue.

C. **Training** - The Monitor needed to request timely training and information on two separate occasions.  The Cities are currently out of compliance on this issue.

These examples are provided to note that as specific Order requirements are accomplished, the work of the Monitor will be to ensure that there is sustained and proactive commitment to the intent of the Order.  As was pointed out in my previous report, there is a need for the Cities to make the elements of the Order a systemic part of their organization and not just a required hoop to jump through as part of a court mandate.

Summary

As a summary of this report, the following items continued to be non-compliant.

Non-compliant issues

A. New Impact Fee needs to be adopted by the Cities within 35 days.

B. Greater care in posting of meeting times and dates to ensure that there is no public confusion.

C. Training has not been occurring within 30-days of hire.

D. The training on the Injunction has not occurred to date.

E. CAD accuracy and timely reporting by officers on housing or land-use calls.

F. More timely follow up with citizen and Monitor requests.

Summary

This last reporting period has been significant in the history of these two communities. In November, a new Town Council in Hildale, Utah was elected.  This Town Council consisted of the first-ever female mayor and three new councilmembers.  Each of these newly-elected officials ran on a platform of making change, transparency, equal-treatment, and working towards a more inclusive community.  Having been in office for a month, these officials have already made changes in the legal direction of the community, adopted requirements for council

members to attend council meeting physically, and altered the duties and direction of staff. These changes have not been without consequences.  As of this report, the Town Manager of Hildale has submitted his resignation, the Treasure has vacated his position, and all utility employees have given their notice of departure.  This new Town Council will need to replace each of these employees.

Additionally, there has never been a time in which the two communities leadership has been more diverse.  This has created some initial anxiety, with both Cities, on what the future holds.  Will the Cities be able to function together in the future?  What impact will the change in Hildale have upon Colorado City in the next year?  Will this change help in integrating the diversity of the community or will the pendulum simply swing from one segment of the population to another?  These are questions that are currently at the doorstep of this area.

It is important, as these communities navigate through this period, that the Court Monitor ensure that the basic rights and principles of fair treatment, as outlined in the Court Order and the Constitution, are incorporated in any new governance practices and that all parties, regardless of their belief and position of power, are treated equally.

Communication

This report was provided electronically and in hard copy to:

Court:

Honorable Judge H. Russel Holland
401 West Washington Street, Ste 130, SPC 1
Phoenix, AZ 85003-2118

To plaintiff:

Sean Richard Keveney
United States Department of Justice
Civil Rights Division
950 Pennsylvania Ave, N.W.
Washington, DC 20053

To Colorado City:

Jeffrey C. Matura
Graif Barrett & Matura P.C.
1850 North Central Avenue, Ste. 500
Phoenix, AZ 85004

Town Manager
Colorado City
PO Box 70
Colorado City, AZ 86021

To Hildale City:

R. Blake Hamilton
Durham, Jones & Pinegar, P.C.
111 South Main Street, Ste. 2400
Salt Lake City, UT 84111

Mayor - Hildale City, Utah
320 East Newel Ave
PO Box 840490
Hildale, UT 84784

DATED at Washington, Utah, this 1st day of February 1, 2018.

Roger Carter, Court Monitor

# Exhibit A

| SUM of Date | Type of Record Being Created | | | | Intial Submittal to Revew | Review to Pmt | Pmt to Issude | Application to Issue |
|---|---|---|---|---|---|---|---|---|
| Job Address | Application for Bu | Application Revie | Payment of Fees | Permit Issued | Duration in Days | Duration in Days | Duration in Days | Duration in Days |
| *920 North Maple Street | 12/4/2017 | | | | | | | |
| *940 North Hildale Street | 12/4/2017 | | | | | | | |
| 580 West Mohave Avenue | 12/1/2017 | | 12/1/2017 | 12/1/2017 | | | 0 | 0 |
| 920 North Maple Street | 11/21/2017 | 12/2/2017 | | | 11 | | | |
| 930 North Memorial Street | 1/10/2018 | 1/10/2018 | 1/11/2018 | | 0 | 1 | | |
| 940 North Hildale Street | 11/21/2017 | 12/2/2017 | | | 11 | | | |

# Exhibit B

| SUM of Date | Type of Recored Being Created | | Application to |
| Requested Service Address | Initial Application for Service | Utility Account Created | Account Creation in Days |
|---|---|---|---|
| 1025 N Canyon Street | 1/8/2018 | | |
| 265 SOUTH HOMESTEAD STREET | | 1/18/2018 | |
| 360 S Colvin Street | 1/17/2018 | | |
| 455 N Oak Street | 1/8/2018 | | |
| 565 South Barlow Street C11 | 1/11/2018 | | |
| 585 S Barlow Street D15 | 1/5/2018 | | |
| PIONEER TRAILER COURT # 1 | | 1/18/2018 | |
| PIONEER TRAILER COURT # 31 | | 1/18/2018 | |
| PIONEER TRAILER COURT # 63 | 1/25/2018 | 1/26/2018 | 1 |

# Exhibit C



43 South 100 East, Suite 100   **T** 435.628.6500
St George, Utah 84770   **F** 435.628.6553

**alphaengineering.com**

January 25, 2018

Town of Colorado City
Attn: Mayor Joseph Allred
P.O. Box 70
Colorado City, AZ 86021

**RE:**   **Culinary Water Impact Fee Facilities Plan & Impact Fee Analysis Review for Hildale City and the Town of Colorado City**

Dear Mr. Allred:

As directed by the City of Hildale and Town of Colorado City (the "Client") and the Department of Justice, we have completed a review of the *Culinary Water Impact Fee Facilities Plan & Impact Fee Analysis for Hildale City and the Town of Colorado City* (the "IFFP") prepared by Sunrise Engineering dated December 2014. We have further met and discussed negotiable assets owned by the UEP Trust (the "UEP") to ascertain potential impacts of the final impact fee. Throughout the process, we have coordinated with the involved parties, which included meetings as follows:

-   July 20, 2017
    o   Alpha Engineering, Sunrise Engineering, Town of Colorado City, City of Hildale
-   October 9, 2017
    o   Alpha Engineering and UEP Trust
-   October 26, 2017
    o   Alpha Engineering, Jeff Barlow, and Zachory Renstrom

Based on our review of the IFFP and discussions with the various parties, we have generated the following information:

**Usage Data**

The usage data used in the IFFP was reviewed. The original raw data was provided by the Client for the dates covered in the IFFP, which included data from January 2011 to December 2013. The data was analyzed to determine differences between commercial and residential usage.

In our review of the data, it was observed that meter usage throughout the system was highly inconsistent and not typical for a municipal water system. There were several hundred meters that were sporadic in showing any usage from month to month, and there were other meters that were not used at all during the three-year period of data. The total number of meters varied as follows (method lettering has been assigned to assist in identifying each scenario throughout this letter):

-   Total number of connections [*Method A*]
    o   1,689
-   Total number of connections with a reading during the three-year period of data [*Method B*]
    o   1,331
-   Total number of connections with a reading from month-to-month [*Method C*]
    o   This numbered varied from month-to-month. For comparative purposes, the average number of connections with a reading from month-to-month was 780.

Based on the IFFP, the average overall usage per connection was 1,500 gpd. Using the raw data provided by the Client, we were able to duplicate this usage. It appears that the average usage was calculated based on the total number of meters that gave a reading in each month, which would be *Method C*. Other methods of calculating an average usage were explored as part of our review, including basing the number of total connections on the total number of connections across the system (*Method A*), and the total number of meters that gave a reading at any point during the three-year period (*Method B*).

Our review included all three methods and separated the commercial from the residential accounts as determined by the "Customer Type," which was a data field included in the raw data provided by the Client. Table 1 reflects the total average usage per connection by customer type and Figure 1 reflects the average usage by month by customer type.

*Table 1 Average Usage per Connection*

| Customer Type | Method A | Method B | Method C |
|---|---|---|---|
| Residential | 696 gpd | 869 gpd | 1,493 gpd |
| Commercial | 806 gpd | 1,154 gpd | 1,827 gpd |
| Overall | 711 gpd | 902 gpd | 1,534 gpd |

*Figure 1 Monthly Average Usage by Customer Type*





One of the goals of the IFFP is to establish how much water usage can be expected when adding additional users to the system. As mentioned above, there were several hundred meters that were sporadic in showing any usage from month to month, and there were other meters that were not used at all during the three-year period of data. In further discussions with Justin Barlow, Utility Business Manager, it was determined that the data provided did necessarily include all *"meters"* or hard *"connections,"* but rather *"accounts."* For example, a meter at one specific address could have had two or more accounts for the same meter due to a previous occupant moving and having an unpaid bill with the same meter as a new account for a new occupant. Based on this information, we feel Method C used in the IFFP analysis is appropriate.

In reviewing the difference in usage between commercial and residential connections, the average usage for residential-only connections was decreased by only 2%-4% when the commercial connections were taken out of the calculations. While the average usage for commercial connections was a larger increase as shown in Table 1, the overall average usage difference is minimal because of the large ratio of residential to commercial connections.

It is further noted that the IFFP bases payment of impact fees on meter size. As meter size is calculated according to the water usage of the specific user, we do not see the need to separate commercial from residential. For example, a commercial development will often require more water, which requires a larger meter and larger impact fee. It would be at the Client's discretion to assess and regulate the appropriate sizing of meters. It is typical for water providers to require fixture counts and engineered calculations prior to development and the installation of meter connections.

## Water Rights Purchase Analysis

The IFFP provided for purchase of water rights from 2015 to 2024 at today's cost of $392,477 and from 2025-2034 at today's cost of $376,300 (page 35 Table VII.A-1). A total of 165.8-acre feet of water was required according to the IFFP (page 12 Table III.C-1) for an assumed purchase price of approximately $4,637 per acre foot. It should be noted that additional water rights for the Arizona portion of the water delivery system did not require the purchase of additional water rights according to the IFFP (page 13 paragraph E).

After the completion of the IFFP, the City of Hildale purchased 88.9-acre feet of water from the Utah Community Federal Credit Union for a total purchase price of $355,600 (See Exhibit A attached). The water was purchased at a price of $4,000 per acre foot. In our meetings with the UEP, it was reported that additional water rights for the City of Hildale could be provided at no cost to the community provided the impact fee was reduced to an amount agreeable to the UEP. It was also reported that water rights could be obtained in Arizona for no cost, which the IFFP considered. However, as evidenced by the notes from the public hearing shown in Attachment B, there was no apparent agreement reached at the time the IFFP was prepared. From our discussions with the UEP, it is our understanding that they maintain the position that they are willing to provide the water rights needed as part of the IFFP at no cost provided the impact fee is reduced an amount proportionate to the credit given. The City of Hildale already purchased 88.9-acre feet of water leaving 76.9-acre feet of water to be purchased. However, the additional water rights will not be required in the 10-year horizon provided for in the IFFP (see Table page 44).

Due to the fact the water rights were purchased at a lower rate than contemplated in the IFFP, there could be a reduction to the total impact fee eligible amount of approximately $44,000. During the



10-year planning period it is anticipated that there would be 245 connections for a net reduction of $180.00 per connection.

**Summary**

In summary our findings have established the following as it relates to the Court Order (pgs. 15, 37-38)

1) Segregating commercial and industrial customers from residential customers did not significantly affect the usage assigned for a residential customer.
2) Water rights held by the UEP may be available at no cost, but the Client has already purchased water rights which were within the limits of the costs provided in the IFFP.
3) Due to the fact water rights were purchased at a lower price than contemplated in the IFFP, there could be a reduction to the impact fee of $180.00 per connection. Enough water rights were purchased to provide for the growth of the community for approximately 10 years. It is anticipated that an IFFP has a useful life of 5 to 7 years and if water rights were able to be obtained at no cost or a lower cost for future needs of the communities, the IFFP could be modified at that time.

Let us know if we can provide any additional information concerning this analysis. If you have any questions regarding the above, please feel free to call.

Sincerely,

Brent E. Gardner, PE
ALPHA ENGINEERING COMPANY

Attachments:   Exhibit A – Water right purchase contract
                        Exhibit B – Notes from public hearing

Cc via email:   Raymond Barlow, Manager, Hildale City
                       David Darger, Manager, Colorado City
                       Justin Barlow, Colorado City
                       Roger Carter, Court Monitor
                       Keveney, Sean R (CRT)
                       Donnelly, Matthew (CRT)
                       Ryals, Stephen (CRT)
                       Porter, Nicole (CRT)
                       Sacks, Noah (CRT)



EXHIBIT A

# WATER RIGHTS PURCHASE AGREEMENT

This Agreement is dated the ___3rd___ day of May, 2016, by and between Utah Community Federal Credit Union, a federally-chartered credit union with a place of business at 188 West River Park Drive, Provo, UT  84604 ("Seller"), and the City of Hildale, Utah, a municipality with a place of business at 320 East Newel Ave., Hildale, UT  84784 ("Buyer"). Seller and Buyer may collectively be referred to herein as the "Parties" and may individually be referred to herein as a "Party."

## RECITALS

**WHEREAS,** Seller owns the water right identified by the State of Utah as water no. 81-5104 (the UCCU Water Right);

**WHEREAS,** Buyer desires to purchase 88.9 acre feet of the said water right under the terms and conditions contained herein.

## AGREEMENT

**WHEREFOR,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties hereby agree as follows:

1. Incorporation of Recitals.  The Recitals above are hereby incorporated as if fully restated in this Section 1.

2. Agreement to Sell and Purchase Water Rights. Seller hereby agrees to sell and convey to Buyer, and Buyer hereby agrees to purchase and acquire from Seller 88.9 acre feet of the UCCU Water Right. Buyer acknowledges and agrees that UCCU shall retain 5 acre feet of the UCCU Water Right and shall retain all right, power, and authority to use, sell, transfer, or otherwise exercise ownership over the remaining 5 acre feet of the UCCU Water Right.

3. Deposit and Purchase Price. Upon execution of this Agreement, Buyer shall deposit with UCCU Ten Thousand Dollars ($10,000.00) toward the purchase price of the 88.9 acre feet of the UCCU Water Right. UCCU may keep the deposited funds in a non-interest bearing account and shall not permit withdrawals from the account. In the event that Buyer does not tender the remainder of the total Purchase Price (as defined below) on or before the Closing Date set forth below, the entire $10,000.00 shall be nonrefundable and shall become the property of Seller. Upon closing, Buyer shall pay Seller an additional Three Hundred and Forty-Five Thousand and Six Hundred Dollars ($345,600.00) in exchange for the 89.9 acre feet of the UCCU Water Right for a total purchase price of Three Hundred and Fifty-Five Thousand and Six Hundred Dollars ($355,600.00) (the "Purchase Price"). Upon Closing, Seller may transfer the $10,000.00 deposit to any account owned or controlled by Seller and otherwise exercise ownership over the deposited funds.

4. Warranties. Seller does hereby represent, covenant and warrant to Buyer that Seller has the full right and authority to enter into this Agreement and to consummate the transaction intended in

this Agreement, and no other consent to do so is required. Seller has no knowledge of any outstanding judgments against Seller that would in any manner affect the consummation of this transaction or constitute any cloud upon the title to the water rights. Seller has no knowledge of any pending litigation, proceedings, or investigations, or any threats of litigation, proceedings or investigations, which might result in any cloud upon the title to the water rights, or any other material change in the value of the water rights. Seller does not warrant that the point of diversion for the purchased water can be transferred to any specific geographic location. Buyer expressly waives any and all warranties not expressly set forth in this paragraph 4. Buyer further assumes all risk that the State of Utah or some other governing body will not permit the point of diversion for the subject water to be moved and/or may not permit the subject water to be used for any specific purpose.

5. <u>Documentation and Payment of Transfer Fees</u>. The Parties understand and agree that it will be necessary to execute and record with Washington County a deed to transfer the water right. Seller agrees to provide the deed to Buyer after full payment has been received by Seller; Buyer agrees to promptly record the fully executed deed promptly after receipt of the deed by Buyer. Buyer further agrees that after the Closing, Buyer shall, at its sole expense, file with the State of Utah Water Engineer's Office a Notice of Transfer and an application to change the point of diversion for the subject 89.9 acre feet of water to the point desired by Buyer. Buyer further agrees to execute after Closing any documents requested by Seller for the purpose of demonstrating the transfer of ownership to Buyer. In the event that Buyer and Seller cannot agree upon the form of the deed or any other document necessary for this transaction, Seller may at any time and in its sole discretion terminate and void this Agreement and return to Buyer its deposit as liquidated and total damages and in full settlement of any dispute between the Parties.

6. <u>Closing</u>. Closing of this transaction shall be deemed complete when payment has been made in full to Seller. Closing shall occur on or before June 30, 2016 (the "Closing Date"). Seller shall have up to five business days after Closing to provide Seller with the deed for recording in Washington County.

7. <u>Brokerage Fees</u>. Seller and Buyer shall each indemnify and hold the other harmless from and against any and all claims, demands, causes of action, debts or liabilities arising out of or on account of either party's brokerage fees. Seller and Buyer shall each indemnify and hold the other harmless from and against any and all claims, demands, causes of action, debt or liabilities arising out of or on account of any breach of any provision of this Agreement including, without limitation, the making of a false representation or breach of any covenant or warranty contained herein.

8. <u>Attorney's Fees</u>. Buyer and Seller shall be responsible for any fees or costs of their respective attorneys and consultants in connection to the drafting of this Agreement and the execution of the Closing. In the event that either Party must bring a lawsuit to enforce this Agreement, the Party against whom the contract is enforced shall pay the attorney's fees, consultant's fees, and costs of the prevailing Party.

9. <u>Other provisions</u>. All of the agreements between the parties shall be binding upon and inure to the benefit of the parties, their successors, personal representative, heirs or assigns. The captions of any articles, paragraphs or sections hereof are made for convenience only and shall not control or affect the meaning or construction of any other provisions hereof. This Agreement merges all previous negotiations between the parties hereto and constitutes the entire Agreement and understanding between the Parties with respect to the subject matter hereof. No alteration, modification, or amendment hereto shall be valid except in writing and when signed by the Parties.

Dated as of the date first set forth above.

SELLER:

UTAH COMMUNITY FEDERAL CREDIT UNION


_____
BY:  Brian Luke
ITS:  AVP Business Services


BUYER:

CITY OF HILDALE, UTAH


_____
BY: Justin Barlow
ITS: Utility Business Manager

EXHIBIT B



# TOWN OF COLORADO CITY
P. O. Box 70 ✳ Colorado City, Arizona 86021
Phone & TDD: 928-875-2646 ✳ Fax: 928-875-2778

January 15, 2015

David Darger's Notes:

At the public hearing regarding a proposed water infrastructure facilities plan and possible impact fees, Mr. Wisan, UEP Special Fiduciary spoke very briefly and said that he had some concerns with the report and public notice but did not elaborate further.  He was invited to express his concerns but he declined to do so.

Zachary Renstrom, UEP Engineer, also spoke very briefly and said he had some concerns with the report.  Upon inquiry, he said that he would like to discuss his concerns with the Town's engineers, whereupon he was invited to do so at his earliest convenience.  He also declined to express his concerns at the public hearing.

After the meeting Dustyn Shaffer with Sunrise Engineering talked to Zachary Renstrom about scheduling a meeting to discuss any engineering concerns.  Also, after the meeting, I asked Mr. Wisan what his concerns were regarding the public hearing notice.  I told him that the Town Council had adopted the notice of hearing sixty days ago in a public meeting, had published it in the newspaper, posted it on the web and in the community, inviting public comment.  The Utility Board had also been discussing the report in public meetings.

He said that they (the United Effort Plan Trust) had hired a municipal law attorney who had identified several concerns.  I asked Mr. Wisan if Mr. Renstrom was going to review their public notice concerns when he met with Sunrise Engineering?  Mr. Wisan said that Mr. Renstrom was not going to deal with the public notice concerns, and pointed to a list of concerns in his notebook that he said he would not disclose.

I told Mr. Wisan that if there were valid concerns the Town should know about them so that they can be addressed, and told him that if he said there were concerns and then refused to identify them, it appeared as though he was trying to prevent the Town from developing water or implementing impact fees.  He said that they agreed with the Town developing water and implementing impact fees, but just didn't want a discriminatory situation.  I assured him that the Town did not intend to discriminate and is only trying to go through this process in the right way.

Mr. Wisan then began discussing proposed UEP subdivision concepts and pulled Zachary Renstrom into the discussion regarding utility mapping that was available and plat submittals proposed for the near future.  I informed them that the UEP proposal will need to be presented to the Town Council.  Mr. Wisan said he hoped the subdivision can be accomplished in a manner as

Page 1 of 2

appropriate for the City and acceptable to the Trust without involving attorneys. I agreed with him and reminded him that the Town has hired Rick Engineering to handle the process, engineer to engineer.

I told him that we understood there were existing buildings and existing infrastructure that warranted some allowances. He said he understood that if there was property without infrastructure in place, that there would be more requirements. He said he was attempting to sell lots that were already in a service area.

Mr. Wisan said that they would like to wait to identify their concerns. I told Mr. Wisan that if he waited while the Town goes through the long public hearing process and unaware of a concern aimed to derail the impact fee implementation process, it would be a big waste of time and resources; The Town would like to address his concerns now rather than later.

Mr. Wisan then admitted that the reason why he wanted to wait was to see how the Town reacted to his subdivision requests to see if the Town's attitude was worthy of the Trust working with the Town. I questioned why if he had a concern with the impact fee facilities plan, that he did not want to notify the Town of those concerns. He said he wanted to see if the Town started functioning like a real city, then there would be a lot more assistance and help and it would determine what they do and how they do it.

I assured him that the Town was attempting to work through the issues in the proper way. I told him that if he had a concern with the proposed enactment of impact fees then to let us know so we could address them.

David Darger,
Town Manager

# Exhibit D

**AFFIDAVIT OF TRAINING**

**TRAINING REQUIREMENTS REQUIRED UNDER THE JUDGEMENT AND DECREE
GRANTING RELIEF**

Employee's Full Name: _____

Date hired: _____

Position title:_____

The above-named employee has completed the training indicated below:

| | Training Required | Date Complete |
|---|---|---|
| 1. | Requirements of Injunction | _____ |
| 2. | Constitutional Training | _____ |
| 3. | Fair Housing Training | _____ |

I, the undersigned employee, declare under penalty of perjury, that I have received the training indicated above and that the information provided on this certificate is true and correct.

Employee Signature: _____   Date: _____

# Exhibit E

January 24, 2018

To: Mayor Allred, Mayor Jessop, David Darger, Raymond Barlow

From: Roger Carter, Court Monitor

**Re: Timetable matrix of Injunction requirements**

     In order to assist in the proactive adherence to court mandated time-tables I am providing the following chart for your assistance.

| Compliance Requirement | Time Frame | Reporting |
|---|---|---|
| Modification of Building Department policies and procedures (Section V.C (4)(7))[1] | 30 days prior to adoption | Court Monitor |
| Modification of water service regulations (Section V.C (12))[2] | 30 days prior to adoption | Court Monitor |
| Adoption of new culinary water impact fees (Section V.C (17)) | 35 days from receipt of Update Impact Fee Report | Court Monitor |
| Modification to culinary water impact fees (Section V.C (21)) | 30 days prior to adoption | Court Monitor |
| Posting of Council and Utility Board meetings (Section V.C (23)(b)) | 24 hours | Public |
| Annual training for required employees as outlined in section V.C (24) of the Court Order | Annually in September | Monitor |
| New hire training for required employees as outlined in section V.C (24) of the Court Order | 30 days from hire | Monitor |
| Denials or no-action on municipal land-use decisions, rules or ordinances (Section V.C (131)(b)) | 30 days | Monitor and applicant |
| Modifications to any ordinances, regulations, procedures, policies outlined but not limited to section V.C (31)(c)).[3] | Upon coordination with the Cities | Court Monitor |
| Release of documents as outlined in section V.C (37) of the the Court Order | Upon request | Monitor |

---

[1] All modifications to Building Department policies and procedures are to be submitted to the Court Monitor clearly showing all recommended deleted (strikeout) changes and all recommended proposed changes (redline).

[2] All modifications to water service regulations are to be submitted to the Court Monitor clearly showing all recommended deleted (strikeout) changes and all recommended proposed changes (redline).

[3] All modified ordinances, regulations, procedures, and policies are to be submitted to the Court Monitor clearly showing all recommended deleted (strikeout) changes and all recommended proposed changes (redline).

This table is not be considered comprehensive nor relied upon without consulting the "Judgement and Decree Granting Injunctive Relief". This is provided for convenience purposes only and may be modified from time-to-time

It is the responsibility of the Cities to adhere to these timelines and not wait to be reminded by the Court Monitor. Failure to proactively comply with these requirements can result in notification of non-compliance with the Courts.

Please notify me if you have any questions.