**UNITED STATES OF AMERICA vs. TOWN OF COLORADO CITY, ARIZONA, et al.**

**No. 3:12-cv-8123-HRH (Prescott Division)**

November 1, 2024

To: United States District Court for the District of Arizona

From: Roger Carter, Court Monitor

**Re: November 2024 Monitoring Report for the cities of Colorado City, Arizona, and Hildale, Utah.**

This report is submitted in compliance with § V.C. (39) of the Judgement and Decree Granting Injunctive Relief ("Order" "Court Order"), requiring a written report every six months on injunction compliance by the Defendant Cities ("Cities" "Communities") and the activities of the Court Monitor ("Court Monitor" "Monitor").

This report will cover the period from May 1, 2024, to October 31, 2024, and include a current compliance status on all the Order requirements, identify any obstacles to the work of the Monitor, and provide general observations.

**Court Injunction History**

In May 2024, the honorable Judge H. Russell Holland retired from court oversight of this Injunction, which was transferred to the honorable Judge Susan M. Brnovich of the United States District Court, District of Arizona. As a courtesy to the Court, and in light of this reassignment, the Monitor provides the following section to update Judge Brnovitch on the history, challenges, and progress of this Injunction with the towns of Hilldale, Utah, and Colorado City, Arizona.

**Summary**

This Injunction aims to address entrenched discriminatory practices, promote fair governance, and develop new policies and practices based in fair housing and policing laws. The first three years of this Injunction involved many technical changes in how the two communities were governed. In particular, the first year required substantial changes to the city code, improvements in public transparency, land-use process changes, utility practice updates, and changes in police hiring, training, reporting, and administration of duties. Additionally, training for public officials on fair housing, Constitutional rights, and the terms of the Injunction were implemented. The first three years of this Injunction represented the "attainment" component, requiring the communities to "attain" compliance with specifically identified elements outlined in the original Court Order.

**Injunction Compliance and Implementation**

During the first three years, the towns took steps to comply with the technical issues of the Injunction. This included adopting new processes for conducting business more openly. Changes during this time included the posting of meeting minutes, public processes on subdivision, and revised processes in building permit applications. Policies and utilities, land use, and utility services were restructured and accessible to the public. As mentioned, mandatory training sessions were required each year. These training sessions provided consistent Injunction-specific instruction to ensure that the communities were vigilant in upholding their requirements for the Injunction.

The Marshall office (currently known as the "Police Department") was a particular focal point of the Injunction, given its historic role and sensitivity with the community. Changes

within the department were aimed at ensuring transparency and equal treatment under the law. During this first three-year period, efforts by the Police Consultant, Police Mentor, and Chief Marshal focused on hiring and training, revision of department policies, police reporting and accountability, and overall department stability. The most significant challenge facing the department at this time involved recruitment. This continues to be a challenge today, as low pay and minimal benefits hinder the department's ability to permanently attract and retain officers. One positive event during this time was the Marshall office's ability to move to a permanent and more established headquarters. This was a symbolic step forward.

**Community Dynamics and Response**

The first three years of this Injunction represented a dynamic time in these communities' history. The cultural aspects of the community, along with the dramatic events surrounding the history of the FLDS Church and its leaders, created a highly fractionalized community. The area's demographics substantially shifted between FLDS, ex-FLDS, and non-FLDS members. The tension created by this time of change manifested itself in many inquiries to the Court Monitor regarding personal liberties and rights. Citizens not accustomed to established rules of law, such as land-use codes, subdivision requirements, utility policies, and other governmental decisions, often needed clarification about whether decisions were based on their religious affiliation. The monitor received and investigated several complaints of discrimination during this period. Through the complaint process established in the Injunction, the Monitor provided a safe harbor to hear and investigate complaints, to ensure the community of the protection offered by the Court, and to work with the local governments in addressing and avoiding misunderstandings. The Monitor viewed the filing of these complaints as a positive sign of

growth, as local citizens began to recognize that significant changes were occurring in their community.

Within the two communities, the presence of the United Effort Plan ((UEP) added to the unique complexity of the situation. This organization, under a separate court order, deals with common property ownership and the privatization of those assets. Occasionally, their work could create complications with property ownership, access, utility services, and conflicting perceptions of land rights, which, on occasion, involved the intervention of the Monitor.

This initial period made evident the challenges that would be present in transforming an isolated community unfamiliar with private property rights and open and democratic processes into a more stable, civic environment. While the structural requirements of the Injunction were being met, the long-term sustainability of fair governance required a more profound cultural shift. Efforts by local officials were encouraging as they worked towards more equitable treatment. Still, frequent administrative and staffing turnover has limited the permanent implementation and effectiveness of some of the work of these years. This element, combined with a community that struggled with lingering trust issues, made for an engaged and continuous demand for Court oversight. As earlier mentioned, this "attainment" period established the basic framework required by the Injunction. The more significant challenge still awaited in determining whether the community could "sustain" an accountable, representative governance model.

<b>Reporting Periods 2020-2024</b>

**Summary**

The past five years of court monitoring in Colorado City, Arizona, and Hildale, Utah, have represented the "sustainment" period of the Injunction. This time has been marked by a

maturation period in establishing fair and accountable governance. The goal of the remaining years of the Injunction has been emphasizing deeper integration of representative democratic practices, persistence in fostering public trust, and a sustained focus on institutional transparency and accountability. These local governments have been learning how to be governments through this period.

**Injunction Compliance and Implementation**

This monitoring report will review the required compliance elements of the Injunction, including adopting subdivision regulations, revising building department policies, amending water service regulations, enhancing transparency, and providing regular training. However, beyond these technical issues, the town needed to maintain consistency with these requirements. During this period, there were lapses in compliance, such as posting meeting minutes and agendas, revising water impact fees, timely updating of ordinances and policies, and fair and consistent processing of applications. These missteps highlighted their need for continued diligence in adhering to the fundamental elements of the Injunction, especially in improving transparency standards to bolster public accountability.

The police department, central to the injunctions for policing requirements, continued to transition positively. This is evidenced by the improved qualifications of hired officers, the moving into a new police headquarters, the adoption of a more robust computer-aided dispatch (CAD) system to improve interoperability with surrounding agencies, and a strong department training program. However, recruitment and retention in the police department continued to pose a persistent challenge. Due to the noncompetitive benefits and dual state certification requirements, the police department struggles with recruitment and retention. The inability to maintain tenure in this department creates substantial risk and vulnerability. Recognizing this

vulnerability, Judge Holland continually emphasized the need for the two communities to create a more sustainable pay and benefit package.

**Community Dynamics and Response**

While less pronounced than in earlier years, the divide between FLDS and non-FLDS residents continues to resurface through complaints and perceptions of bias, mainly related to property and utility disputes. Although not always substantiated by evidence of discrimination, these concerns revealed ongoing cultural tensions underpinning local governance challenges. During these five years, the monitor and others have made efforts to enhance public engagement and increase citizen involvement in government processes. The monitor introduced public outreach measures, including open houses, social media updates, and performance dashboards, to increase community understanding of government function and citizens' rights. Specific effort was directed at bringing FLDS and non-FLDS citizens to the table as joint partners and stakeholders in their community. The open houses and stakeholder engagement initiatives were a valuable start to building long-term public involvement in government oversight. By encouraging community dialogue and providing regular updates on government activities, these engagement initiatives encouraged a sense of inclusivity among citizens. Importantly, they addressed the historical reticence around public participation as more residents began to feel their voices were heard and instrumental in shaping their town's governance.

Even public officials would agree these last five years may have been some of the most difficult under the Injunction. The first three years' mandated requirements created an easily understood "compliance checklist" for government officials. The past five years have been more difficult as these governments needed to go beyond the checklists and prove their ability to provide resilient, sustainable, systemic changes within their government processes. While

significant strides have been made, the lingering challenges - ensuring complete transparency, fostering public engagement, and building a stable government structure – continue to be necessary through court oversight.

**Injunction Compliance**

**Policing Act Injunction**

**Compliance with the Policing Act[1]**

In consultation with and under the direction of the Police Consultant, the Colorado City Police Department (identified as CCMO in the Order, and hereafter in this document referred to as CCPD) shall implement and adhere to new hiring policies and procedures, adopt and adhere to new policies and procedures for internal affairs investigations, obtain and properly deploy bod-worn cameras, review all CCMO (CCPD) policies and update as needed, attend all Injunction required trainings, and strengthen the relationship with the Washington County Sheriff's Office and Mohave County Sheriff.

**Status**

The towns of Hildale, Utah, and Colorado City, Arizona, are currently in compliance with the Policing Act orders outlined in the Injunction. The Court-appointed Police Consultant will provide a separate report to the Court outlining those compliance issues and any obstacles that may have arisen during this reporting period. Additionally, The Police Consultant continues to assist the Monitor in auditing police records, dispatch reports, and camera footage.[2] This service has proved invaluable in not only providing strong oversight by the courts but also

---

[1] United States of America v. Town of Colorado City, Arizona, et al. Judgement and Decree Granting Injunctive Relief IV.

[2] United States of America v. Town of Colorado City, Arizona, et al. Order, Court Monitor and Police Consulting Report. May 2, 2022.

assisting the CCPD in improving their own accountability and highlighting areas of continued training and improvement. The Police Consultant provides the following summary of progress.

*The Chief and the police department staff have continued over the last six months working hard to increase the trust and confidence of the community members, as well as the services they provide. Although the department is fully staffed at this time, the hiring and retention of police officers continues to be one of the top concerns because of the lack of competitive retirement and health care benefits provided by CCPD. This creates a lack of interest to start new at the CCPD or transfer to CCPD as a tenured mid-career officer. Not being able to attract tenured/experienced officers to this, still relatively new police department, is critical in its future sustainability. Although very slowly, the process to join the state retirement system is currently being worked on. Although we continue to make positive improvements, we have and will continue to work on the police reports for consistency with coding, follow up/follow through, and supplemental reports. Policy and Procedures are continually looked at and updated. The department is working to finish up the accreditation process in both states, Utah and Arizona. I was able to observe the Internal affairs process being used during this last reporting period, which helps grow the department internally and helps build the relationship with the community. We will continue our efforts to enhance the quality of work and service that the CCPD staff provide to this community. (sic)*

## Fair Housing Act Injunction

## Compliance with Approval of Subdivision Plat[3]

Approval of Subdivision Plat stipulates that the town of Colorado City was to work with UEP Trust to create a final subdivision plat and file it with the State of Arizona.

## Status

The towns of Hildale, Utah, and Colorado City, Arizona, completed this requirement of the Injunction on September 27, 2017. **The Communities are in compliance with this requirement of the Injunction.**

---

[3] United States of America v. Town of Colorado City, Arizona, et al. Judgement and Decree Granting Injunctive Relief V. (2)

**Compliance with the Adoption of Building Department Policies and Procedures[4]**

Approval of Building Department Policies and Procedures stipulates that the communities are to develop objective, uniform, non-discriminatory policies and procedures per stipulations set out in the Injunction to govern the building department and its functions.

**Status**

The towns of Hildale, Utah, and Colorado City, Arizona, completed this requirement of the Injunction on August 16, 2017. **The Communities are in compliance with this requirement of the Injunction.**

**Compliance with Amendments to Water Service Regulations[5]**

Approval of Building Department Policies and Procedures stipulates that the Cities should repeal outdated water ordinances and create new ordinances in accordance with stipulations set out in the Injunction.

**Status**

The towns of Hildale, Utah, and Colorado City, Arizona, completed this requirement of the Injunction on September 12, 2017. **The Communities are in compliance with this requirement of the Injunction.**

**Compliance with Culinary Water Impact Fee[6]**

The Culinary Water Impact Fee stipulates that the communities must have an engineering firm confirm the validity of the "then" culinary water impact fee. This requirement also

---

[4] United States of America v. Town of Colorado City, Arizona, et al. Judgement and Decree Granting Injunctive Relief V. (3)
[5] United States of America v. Town of Colorado City, Arizona, et al. Judgement and Decree Granting Injunctive Relief V. (9)
[6] United States of America v. Town of Colorado City, Arizona, et al. Judgement and Decree Granting Injunctive Relief V. (14)

mandates that any future change to the fee would require approval by the United States and the Court Monitor.

**Status**

On April 15, the Colorado City Council adopted the revised impact fee schedule and rate; on May 10, the Hilldale City Council adopted the revised impact fee schedule and rate. The necessary waiting periods were observed, and the new impact fees were enacted in June and July of this year. **The Communities are in compliance with this requirement of the Injunction.**

**Compliance with Websites and Public Notice[7]**

Websites and public notice stipulate that the communities should post on their website the following information:

A. Contact information for every elected, appointed, and department official

B. Notice of all upcoming meeting agenda(s) for councils, commissions, and utility board. Furthermore, all minutes should be posed once adopted.

C. Web links to applications for building permits, utility connections or transfers, subdivision applications, and public records requests.

D. Web link to all ordinances, regulations, procedures, and policies, including building department.

E. Web link to Marshall Office's policies and procedures.

F. Injunction language and contact information for the Court Monitor.

---

[7] United States of America v. Town of Colorado City, Arizona, et al. Judgment and Decree Granting Injunctive Relief, V. C. (22)

**Status**

      **The Cities are currently in compliance with the Order's requirements for their websites and public notices.** The Monitor encourages the cities to stay vigilant in posting meeting minutes to comply with the Order and satisfy state law requirements.

| Colorado City Website Compliance | | | | |
|---|---|---|---|---|
| Metric | May 1, 2023 | November 1, 2023 | May 1, 2024 | November 1, 2024 |
| Contact information | Incomplete | X | X | X |
| Meetings posted | X | X | X | X |
| Minutes available | Incomplete | X | X | X |
| Applications | X | X | X | X |
| Ordinances/Policies | X | X | X | X |
| Police policies | X | X | X | X |
| Injunction language | X | X | X | X |

| Hildale Website Compliance | | | | |
|---|---|---|---|---|
| Metric | May 1, 2023 | November 1, 2023 | May 1, 2024 | November 1, 2024 |
| Contact information | X | X | X | X |
| Meetings posted | X | X | X | X |
| Minutes available | Incomplete | X | X | X |
| Applications | X | X | X | X |
| Ordinances/Policies | X | X | X | X |
| Police policies | Incomplete | X | X | X |
| Injunction language | X | X | X | X |

**Compliance with Mandatory Education & Training[8]**

Mandatory education and training stipulates that the communities are to provide elected, appointed, and key personnel with annual training on the U.S. Constitution, the Fair Housing Act, and the orders found within this Injunction.

**Status**

In July, the towns of Hildale, Utah, and Colorado City, Arizona, completed the Constitutional training provided by the Washington County, Utah Attorney's Office. In October, the towns completed the Injunction training presented by Jeff Matura and Melissa England, legal counsel for Colorado City. Attendance and historical data from previous trainings are noted in the following table. Fair Housing training is scheduled for December and will be reported in the May 2025 Monitor Report. **The towns currently find themselves in compliance with this requirement.**

| Fair Housing Training | | | |
|---|---|---|---|
| Metric | December 1, 2021 | November 17, 2022 | December 7, 2023 |
| In-person training | 63 | 56 | 65 |
| Positions vacant | 5 | 11 | 0 |
| Follow-up training | 4 | 10 | 8 |
| Total Trained | 68 | 67 | 73 |

---

[8] United States of America v. Town of Colorado City, Arizona, et al. Judgement and Decree Granting Injunctive Relief V. (24)

| Injunction Training | | | |
|---|---|---|---|
| Date | November 17, 2022 | October 2023 | October 2024 |
| In-person training | 56 | 53 | 54 |
| Positions vacant | 11 | 5 | 3 |
| Follow-up training | 10 | 18 | 14 |
| Total Trained | 66 | 71 | 71 |

| Constitutional Training | | | |
|---|---|---|---|
| Metric | July 19, 2022 | July 18, 2023 | July 2024 |
| In-person training | 55 | 51 | 51 |
| Positions vacant | 2 | 5 | 1 |
| Follow-up training | 10 | 22 | 24 |
| Total Trained | 67 | 72 | 75 |

## Compliance with Monitoring Duties[9]

Monitoring duties stipulate the following responsibilities:

A. Conduct regular site visits, interviewing city officials and documents necessary to carry out their assignment.

B. Review the handling of all applications or requests associated with utilities, permits, subdivisions, and other land-use applications.

C. Review all modifications to any ordinance, regulation, procedure, or policy affecting housing, zoning, planning, subdivision, building permits, licenses, rental taxes, and utility services and connections.

---

[9] United States of America v. Town of Colorado City, Arizona, et al. Judgement and Decree Granting Injunctive Relief V. (29)

D. Review all complaints by residents or others associated with any of the above-noted items.

E. Review any changes proposed by the cities to building department policies, water service regulations, or culinary impact fees.

F. Monitor defendant cities' services, operations, and facilities associated with housing, utility services, building permits, subdivisions, land-use and planning provisions, and police services related to any of the above.

G. Monitor councils, commissions, boards, committees, and departments for compliance with the Injunction items.

**Status**

During the previous six months, the Court Monitor performed the following oversight in accordance with the Injunction. The following table identifies the number of activities the Monitor participated in for the previous two years.

| Monitoring Activities | | | | |
|---|---|---|---|---|
| Metric | May 1, 2023 | November 1, 2023 | May 1, 2024 | November 1, 2024 |
| Public official engagements* | 62 | 78 | 62 | 62 |
| Application audits | 10 | 13 | 9 | 11 |
| Ordinance/Policy changes | 5 | 2 | 4 | 3 |
| Complaints | 2 | 3 | 3 | 10 |
| Operational review | 12 | 17 | 13 | 2 |
| Other monitor engagements | 4 | 18 | 4 | 2 |
| Meetings attended | 29 | 25 | 29 | 34 |

*-This figure represents a cumulative total of all other monitoring activities.

A. **Public Official Engagements:** The Court Monitor regularly attends meetings, visits with city officials, reviews documents or conducts business in or with these communities. This data roughly represents the engagements involving audits, ordinance/policy changes, complaints, operational reviews, other monitoring efforts, and meetings attended.

B. **Application Audits:** A random sample of utility and building department audits is conducted regularly. Both audits include on-site visits, but the Court Monitor has administrative access to the city's building permit and inspection program through their program "City Inspect." This allows the Monitor to review applications in real-time status. Any deficiencies identified within the records audits have not been substantive and have been rectified with additional documentation. The Monitor will continue encouraging the towns to implement this software for zoning and land-use applications.

C. **Ordinance/Policy Change:** Three significant ordinance/policy changes/development agreements were reviewed during this reporting period.

   a. Worked with the communities on the culinary water impact ordinance.

   b. Review the proposed water rate study.

   c. Reviewed proposed zoning language and land-use process compliance.

   d. Reviewed other miscellaneous land-use code changes.

D. **Complaints:** Three complaints were received by citizens or staff during this reporting period.

   a. In the previous monitoring report, it was noted that several employees filed a complaint regarding disparate treatment by the Town of Colorado City Human Resource Department. This investigation concluded during this monitoring period. Although the investigation identified several human resource mistakes and

errors, there was no indication of intentional discrimination, nor was there any clear conclusion that treatment was disparately administered among the protected classes of employees. The Monitor determined to continue to monitor the Human Resource department. The Human Resource Director, who was at the center of these complaints, permanently left the city's employment a few months ago. The current Human Resource Director has a much-improved relationship with city personnel. This investigation will be concluded if no other complaints are received at the end of this reporting period.

b. The previous report noted that a citizen had complained about unfair treatment and targeting by the Colorado City Police Department. Additional complaints were received during the reporting period. The Monitor, in consultation with the Police Consultant, reviewed video evidence and statements by the complainant and the involved police officers. There was no evidence of targeting or discriminatory behavior by the officers. The police response was appropriate and in line with the nature of the call for service. The Monitor met with the complainant and shared the findings of his investigation. Although the individual claimed he had evidence of discrimination, none has been presented to date. This complaint investigation has been concluded in light of the unsubstantiated discrimination claim.

c. The owner of the local vape shop notified the monitor that the police department had been harassing employees and customers regarding the age of eligibility for purchase. The owner complained that an office shut down the selling of vape products to individuals under 21 years of age due to changes in Arizona law. The

officer notified the business and customers that the Arizona law had changed, making it illegal to sell vape products to customers under 21. The shop owner disagreed and filed a complaint, claiming that this was part of a larger pattern of harassing enforcement by the police department. Upon investigation, it was determined that the shop owner was correct and that the officer had erred in enforcing the wrong legal age. Throughout the investigation, there was no evidence or pattern that this officer or department had discriminated against the shop, personnel, or customers. The office had errored in his understanding of the law. The Monitor recommended that the shop owner contact the Police Chief and ask that an internal affairs investigation be conducted as to the circumstances of the officer's misinformation. This was recommended to build trust between the community and its police department so that the Monitor and Police Consultant could evaluate the IA process to ensure it is done correctly, fairly, and in compliance with department policy and policing practices. The IA was initiated and recently completed, and discipline and additional training were required of the officer.

d. The previous monitoring report noted that the monitor received complaints from employees and family members from the public works department regarding discrimination by a Colorado City Councilman. The investigation was completed during this monitoring period. Although there were some significant management missteps, there was no indication that the council member's behavior was motivated by discrimination. The Monitor provided written recommendations to

the town on steps that could be taken to avoid misunderstandings and concerns about disparate management treatment.

E. **Operational Review:** This category refers to engagements between the Monitor and town officials or staff, the Department of Justice, the Police Department, the Police Consultant, other governmental agencies, and community organizations. During this past reporting period, the Court Monitor interacted with many, if not all, of these agencies.

F. **Other Monitor Engagements:** This category refers to engagements not identified in previous categories.

G. **Meetings Attended:** These include city council meetings, planning commission meetings, utility board meetings, mandated training, and other meetings outlined within the Injunction.

**Community Snapshot**

This community snapshot section gives the Court a contextual perspective of the community and how the Injunction's mandates affect overall community life and direction. This section will identify both areas of needed effort and community progress.

Colorado City and Hildale have made significant efforts to meet their requirements throughout the Injunction. They have strived to adopt fair governance practices, as they have understood them to be, within the context of their experience. These efforts are to be commended. As the Injunction moves forward, the focus will continue to be on sustaining the requirements of the Injunction, but additionally, on ensuring that the principles and spirit of the Injunction are embedded deeply within the community fabric, ensuring that the principles enforced by the Court's oversight become the communities own principles.

**Organizational Stability**

It has been previously noted in this and other reports of the necessity for the communities to work towards creating an organization that attracts and retains talented professionals. A high amount of turnover, especially among organizational leadership, is disruptive and hinders the positive development of the organization. One of the areas that has been identified as a way to reduce turnover is providing competitive pay and benefits. This area of organizational weakness has been of particular concern regarding the police department. As the Court knows, there is a strong correlation between the tenure and experience level of police officers and their ability to safely, confidently, and legally perform their duties. Generally, as officers grow in knowledge and experience, their ability to improve their policing services increases. Because of the current need for more competitiveness in benefits compared to other agencies, the Colorado City/Hildale Police Department has primarily become a training ground for new recruits, who, once experienced, leave the department for agencies for better benefits.

The Monitors and Court recognize that implementing a competitive pension program is complex. However, this stabilizing element of the organization must continue to be a high priority. Although the Town of Colorado City has been working to address this issue for some time, our current concern is that any additional implementation delays could begin destabilizing the department leadership. The deadline for Department leaders who have accrued benefits from other agencies to keep their years-of-service uninterrupted will require adopting a new benefit program within a short window of time.

The Monitor has received milestones for completing this essential project from the Colorado City Town Manager. Based on those discussions, significant benefits should be in

place by the next Court Monitor report or shortly thereafter. The Monitor will report to the Court at that time.

**Structural Improvements**

The need for Colorado City and Hildale to have strong due process procedures is necessary for their self governance. During the upcoming years of the Injunction, the Monitor will focus on ensuring the codification and good practice of the citizen's rights to due process. These rights, which include government land-use decisions, utility processing and disputes, police department complaints, and other governmental decisions, will be clearly outlined and strengthened in the town codes. Additionally, the Monitor will ensure that councils, boards, and commissions are fully trained on their duty under these appeal processes. Finally, the Monitor will ensure that the citizens understand their rights to seek redress on governmental decisions within the administrative appeals process.

Strengthening and communicating these crucial protocols for appeals and dispute resolution within the communities is critical for future independence. Strong, local appeals processes will empower residents to independently demand and uphold fair and responsive government practices, reduce the government's risk of arbitrary decision-making, and instill the principles of justice and accountability.

**Sustaining Leadership**

It would be rare to find another circumstance quite as unique as the one that exists here with this Injunction and these communities. Beyond the facts and ruling of this case, it is necessary to understand how the factors of history, culture, and the personal experience of each citizen have needed to be considered to accomplish the work of the Injunction. While these local governments were implementing the Injunction requirements, they were simultaneously learning

how to operate a first-generation representative government. Although these towns long existed before the Injunction, they traditionally operated as extensions of the church rather than independent, democratic institutions. In addition to this, private property ownership was, and continues to be, a new concept for residents, as historically, land was controlled by the church through a community trust. These elements and others have forced public officials and city leadership to learn principles of representative government that function more naturally in local governments throughout the country.

Many current government officials directly involved in the Court's oversight are beginning to move on. This shift brings new leaders, all with a variety of perspectives. Some of these leaders have experience in community service and recognize their role in benefitting citizens' lives. Other leaders may still need to fully grasp the Injunctions' transformative purpose. Still, other leaders are eager to operate free from court oversight, having not seen the critical practices that may have been fostered during that time of accountability.

From a community standpoint, citizens' historic role did not include public feedback, debate, or contradiction to community leadership. For generations, citizens were not allowed to question the authority of leadership. Although the demographics of the towns are changing, evidence of citizens' hesitancy in questioning or challenging leadership authority can still be seen in their limited participation in public hearings, feedback, and engagement events.

This steep learning curve for government officials, combined with a level of citizen engagement proportionate to their trust in their government, has made the overarching objectives of the Injunction much slower in development. This is where the Court's wisdom in establishing the timetable of the Injunction has been beneficial. The "leadership bench" in these communities

appears to be more limited than in other similar municipalities, which, left unaddressed, could impact emphasized attention to the critical principles and work from the Injunction period.

Although the Monitor and the Court recognize that the Injunction lacks the time and ability to develop robust and generational leadership, community leadership should look for every opportunity to strengthen citizen involvement and service opportunities. Building a strong, community-based leadership bench is crucial for the long-term sustainability of the towns.

**Conclusion**

The Court Monitor encourages the towns to remain vigilant to the principles and practices established by the Injunction. The elements of fairness, accountability, and transparency developed over the years of the Injunction should serve as a foundation for their future. Sustaining the progress made within these communities will require ongoing commitments from public officials and residents. The accomplishments to date are commendable, but the true measure of the success will be in the community's commitment to continue this path, embracing these values as the cornerstone of their governance.

As always, the Court Monitor looks forward to the continued work with these communities to ensure their bright future. The Monitor thanks the Court and the communities for their continued trust and ongoing cooperation.

This report is provided electronically to:

<u>To plaintiff:</u>

Corey Sanders
United States Department of Justice
Civil Rights Division
950 Pennsylvania Ave, N.W.
Washington, DC 20053

<u>To Colorado City:</u>

Jeffrey C. Matura
Graif Barrett & Matura P.C.
1850 North Central Avenue, Ste. 500
Phoenix, AZ 85004

Town Manager
Colorado City
PO Box 70
Colorado City, AZ 86021

<u>To Hildale City:</u>

Shawn Guzman
320 East Newel Ave
P.O. Box 840490
Hildale, UT 84784

Mayor - Hildale City, Utah
320 East Newel Ave
PO Box 840490
Hildale, UT 84784

DATED at Washington, Utah, this 1st day of November 2024.

_____

Roger Carter, DPA
Court Monitor